Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon Grammel*
**LEHOTSKY KELLER COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Joshua P. Morrow*
**LEHOTSKY KELLER COHN LLP**
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
**LEHOTSKY KELLER COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

* *Pro hac vice* forthcoming.

*Attorneys for Plaintiff NetChoice*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| NETCHOICE,<br><br>          Plaintiff,<br><br>    v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>          Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**COMPLAINT**

**INTRODUCTION**

1.    California is again attempting to unconstitutionally regulate minors' access to protected online speech—impairing adults' access along the way. The restrictions imposed by California Senate Bill 976 ("Act" or "SB976") violate bedrock principles of constitutional law and precedent from across the nation. As the United States Supreme Court has repeatedly held, "minors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). And the government may not impede adults' access to speech in its efforts to regulate what it deems acceptable for minors. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997). These principles apply with equal force online: Governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2399 (2024).

2.    That is why courts across the country have enjoined similar state laws restricting minors' access to online speech. *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024) (enjoining age-assurance, parental-consent, and notifications-limiting law); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ("*CCIA*") (enjoining law requiring filtering and monitoring of certain content-based categories of speech on minors' accounts); *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024) (enjoining age-verification and parental-consent law); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024) (enjoining parental-consent law); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) (enjoining age-verification and parental-consent law).

3.    This Court should similarly enjoin Defendant's enforcement of SB976 against NetChoice members.

4.    The websites regulated by the Act allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all "protected by the First

**COMPLAINT**

Amendment" from government interference. *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017)).[1] They do this primarily through providing "feeds" that are "personalized" to each user. *Moody*, 144 S. Ct. at 2403. "Like . . . editors, cable operators, and parade organizers[,] . . . social-media platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." *Id.* at 2405 (citation omitted). The rights to provide and view these personalized feeds are thus fully protected by the First Amendment. *Id.* at 2393.

5.    The Act would fundamentally limit the expressive activity of NetChoice members by restricting how and when they can disseminate personalized feeds. Furthermore, it would limit the expressive activity of *users* by placing multiple restrictions on minors and adults' ability to access covered websites and, in some cases, blocking access altogether. Accordingly, the Act—in whole and in part—is unlawful for multiple reasons.

6.    The Act's parental-consent provisions violate the First Amendment. The Act requires that covered websites secure parental consent before allowing minor users to (1) access "feed[s]" of content personalized to individual users, § 27001(a); (2) access personalized feeds for more than one hour per day, § 27002(b)(2); and (3) receive notifications during certain times of day, § 27002(a). Each of these provisions restricts minors' ability to access protected speech and websites' ability to engage in protected speech. Accordingly, each violates the First Amendment. The Supreme Court has held that a website's display of curated, personalized feeds is protected by the First Amendment. *Moody*, 144 S. Ct. at 2393. And it has also held that governments may not require minors to secure parental consent before accessing or engaging in protected speech. *Brown*, 564 U.S. at 799; *see Fitch*, 2024 WL 3276409, at *12-13 (enjoining parental-consent requirement to access protected speech); *Yost*, 716 F. Supp. 3d at 577-62 (same); *Griffin*, 2023 WL 5660155, at *17 (same); *see also Reyes*, 2024 WL 4135626, at *13 & n.135 (similar).

_____

[1] This Complaint refers to "internet website[s], online service[s], online application[s], online service[s], [and] mobile application[s]," § 27000.5(7)(b)(1), as "websites." It refers to websites regulated by challenged provisions of the Act as "covered websites." Unless otherwise noted, statutory citations in this Complaint refer to the California Health & Safety Code. When discussing the Act's requirements, this Complaint uses "minor," "adult," and "user" to refer only to California minors, adults, account holders, and users covered by the Act.

7.      The Act's requirements that websites conduct age assurance to "reasonably determine" whether a user is a minor, §§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c), also violate the First Amendment. *Reyes*, 2024 WL 4135626, at *16 n.169 (enjoining age-assurance requirement); *Fitch*, 2024 WL 3276409, at *11-12 (enjoining age-verification requirement); *Griffin*, 2023 WL 5660155, at *17 (same). All individuals, minors and adults alike, must comply with this age-assurance requirement—which would force them to hand over personal information or identification that many are unwilling or unable to provide—as a precondition to accessing and engaging in protected speech. Such requirements chill speech, in violation of the First Amendment. *See, e.g.*, *Ashcroft*, 542 U.S. at 673; *Reno*, 521 U.S. at 882.

8.      Moreover, the Act imposes unconstitutional content-based and speaker-based regulations of speech by purporting to cover "[a]ddictive internet-based service[s]." § 27000.5(b). That coverage definition includes and excludes websites based on their content. For example, websites that display self-generated content or "consumer reviews" are excluded, while websites that foster social interaction are included. § 27000.5(b)(2)(A); *see Reyes*, 2024 WL 4135626, at *9-11 (holding that law's central coverage definition was facially content-based); *Fitch*, 2024 WL 3276409, at *9 (similar); *Yost*, 716 F. Supp. 3d at 558 (similar). "Content-based laws" regulating speech "are presumptively unconstitutional and may be justified only if" they satisfy "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (citations omitted). Similarly, the coverage definition discriminates based on who is speaking—singling out for favorable treatment websites that have made the editorial choice to not display personalized feeds of user-generated or user-shared content "as a significant part of [their] service," § 27000.5(b)(1), while regulating websites that have made the editorial choice to display such feeds. Supreme Court precedent is "deeply skeptical" of laws "distinguishing among different speakers." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) ("*NIFLA*") (cleaned up).

9.      None of the Act's provisions can satisfy the demanding requirements of strict scrutiny, nor any level of heightened scrutiny. They are not appropriately tailored to any substantial or compelling governmental interest.

10.     Finally, the Act should also be enjoined because its central definition of "[a]ddictive internet-based service or application," § 27000.5(b), is unconstitutionally vague, leaving many websites uncertain about whether they must shoulder the Act's burdens.

11.     For these reasons and more, this Court should enjoin Defendant from enforcing the Act against Plaintiff's members and declare the Act unlawful.

## PARTIES & STANDING

12.     Plaintiff NetChoice is a District of Columbia nonprofit trade association for Internet companies. NetChoice members are listed at NetChoice, About Us, https://perma.cc/45JF-PMWK. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while minimizing burdens that could prevent businesses from making the Internet more accessible and useful.

13.     NetChoice has standing to bring its challenges on at least two grounds.

14.     *First*, NetChoice has associational standing to challenge the Act, because: (1) some NetChoice members would have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Reyes*, 2024 WL 4135626, at *7; *CCIA*, 2024 WL 4051786, at *8-9; *Fitch*, 2024 WL 3276409, at *5-6; *Yost*, 716 F. Supp. 3d at 548-50; *Griffin*, 2023 WL 5660155, at *9-10.

15.     Based on the Act's definitions, § 27000.5(b), the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Google, which owns and operates YouTube; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; and (5) X. Although the Act does not regulate all of Plaintiff's members, this Complaint refers to members with services that the Act regulates as "members."

16.     *Second*, NetChoice has standing to assert the First Amendment rights of members' current and prospective users. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *CCIA*, 2024 WL 4051786, at *9; *Fitch*, 2024 WL 3276409, at *7; *Yost*, 716 F. Supp. 3d at 550-51; *Griffin*, 2023 WL 5660155, at *11-12.

**COMPLAINT**

17.     Defendant Rob Bonta is the California Attorney General. Defendant is a California resident and is sued in his official capacity. The Act gives the California Attorney General authority to enforce it. § 27006(a). Defendant has publicly pursued enforcement against some NetChoice members under other laws, advancing claims related to minors' online welfare. *See, e.g.*, *California v. Meta Platforms, Inc.*, No. 4:23-cv-05448 (N.D. Cal. Oct. 24, 2023).

## JURISDICTION & VENUE

18.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

19.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) & (2) because Defendant performs his duties and thus resides in this District, and because the injuries giving rise to this action have been and will continue to be suffered by NetChoice and its members in Santa Clara County, California.

20.     Assignment to the San Jose Division is proper under Local Civil Rule 3-2(c) & (e) because the injuries giving rise to this action have been and will continue to be suffered by NetChoice and its members in Santa Clara County, California.

## BACKGROUND

21.     **NetChoice members' covered websites disseminate and facilitate speech protected by the First Amendment.** "Social media" websites—such as Plaintiffs' members' covered services—"engage[] in expression" through their "display" and "compiling and curating" of protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 144 S. Ct. at 2393, 2401, 2406. They do so by providing "feeds" that are often "personalized" to each user. *Id.* at 2403. These websites "allow[] users"—both minors and adults—"to gain access to information[,] communicate with one another," and "engage in a wide array of protected First Amendment activity." *Packingham*, 582 U.S. at 105, 107.

22.     Minors and adults use NetChoice members' websites to engage in speech that is entitled to First Amendment protection from governmental interference. On these websites, minors can "take positions on and engage with others in pursuit of the type of 'political, social, economic,

**COMPLAINT**

educational, religious, and cultural' activities" protected by the First Amendment. *Fitch*, 2024 WL 3276409, at *10 (citation omitted); *see Yost*, 716 F. Supp. 3d at 557; *Griffin*, 2023 WL 5660155, at *5-6. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for the causes they care about, showcase their art or athletic talent, and hear from their local government officials. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows users to explore recipes, home decor, and more. On X (formerly Twitter), "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

23.    **Display of user-generated content on covered websites.** Although each NetChoice member is unique, they all aim to facilitate social interaction among users through the dissemination of protected speech on their services.

24.    In general, covered websites organize combinations of both user-generated (third-party) content and speech they author. Each website makes unique decisions about how to organize, display, moderate, and disseminate content.

25.    Covered websites have many means to facilitate users' ability to express themselves—and those means have their own independent expressive qualities.

26.    *Personalized feeds.* Many member websites provide a "feed," "for you," "following," or "landing" page. This is a central hub that is "personalized" and allows a user to see the content, activity, and other expression created and shared by family, friends, selected contributors, connections, and other third-party content creators. *Moody*, 144 S. Ct. at 2403; *see id.* ("Facebook delivers a personalized collection of [users'] stories" and "YouTube" provides "an individualized list of video recommendations"). The "present[ation]" of these feeds constitutes "expressive activity." *Id.* at 2400.

27.    Because it is impossible to display every piece of content, and because it is therefore impossible to foster a social environment without prioritizing the people and ideas a user is interested in, covered websites display speech through "stream[s] of other users' posts," *id.* at 2403, that are, to a greater or lesser extent, personalized as defined by the Act, § 27000.5(b). Moreover, personalization is how many covered websites provide minors with age-appropriate experiences (*e.g.*, by filtering out inappropriate or potentially harmful content).

28.    Without this personalization, minors may see less high-quality and developmentally appropriate content, and instead would see more content they may not have any interest in or that is not age-appropriate. *See, e.g.*, *Moody*, 144 S. Ct. at 2403 ("Of the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list, only the tiniest fraction do. The selection and ranking is most often based on a user's expressed interests and past activities. But it may also be based on more general features of the communication or its creator. Facebook's Community Standards and YouTube's Community Guidelines detail the messages and videos that the platforms disfavor.").

29.    *Notifications.* Many covered websites also provide users the option to receive notifications.

30.    Notifications allow covered websites to facilitate communication and interaction among users by informing users about new messages, comments, content from connections, and recommendations, among other things. They also enable covered websites to communicate with users about other issues like problems with their accounts, fraud or spam alerts, and emergencies.

31.    Apple News, Disney+, ESPN, Libby, The New York Times, and the Wall Street Journal, in addition to many other applications, send users notifications. *See* Apple, Turn Notifications and Emails On or Off in Apple News, https://perma.cc/D446-ET89; Disney+, Push Notifications on Disney+, https://perma.cc/V47H-KSBU; ESPN, How Do I Sign Up for Alerts?, https://perma.cc/GA3Z-AZ2A; Libby Help, Managing Notifications, https://perma.cc/4WLC-FNJL; The New York Times Help Center, iOS News App, https://perma.cc/5MG8-8Q46; The Wall Street Journal Help Center, Newsletters & Alerts, https://perma.cc/XL6M-RPYD. But those websites and applications are not covered by the Act.

7

**COMPLAINT**

32.     Member websites that use notifications allow users to control those notifications. *See, e.g.*, Facebook, Choose What You Get Notifications for on Facebook, https://perma.cc/KA7L-AQW4; Instagram, Notification Settings, https://perma.cc/A2WU-DECL; Nextdoor, How to Change Your Mobile Notifications, https://perma.cc/KA5S-J2FJ; Pinterest, Edit Notification Settings, https://perma.cc/FVX9-N282; X, About Notifications on Mobile Devices, https://perma.cc/N5N7-V7YU; YouTube Help, Manage YouTube Notifications, https://perma.cc/8D7F-JP63.

33.     In addition to customizing notifications on the websites themselves, users can adjust notification settings for each application on their devices, including permitting them only during certain times of day or turning them off entirely. *See, e.g.*, Apple, Use Notifications on Your iPhone or iPad, https://perma.cc/YB2V-PACA; Samsung, Control App Notifications on Your Galaxy Phone or Tablet, https://perma.cc/QK3D-KJMQ; Google, Control Notifications on Your Pixel Phone, https://perma.cc/W5HT-UPSR.

34.     **Existing options for parental control and oversight.** Parents, guardians, and other caregivers (collectively, "parents") have many existing choices to control their children's online experiences. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Reyes*, 2024 WL 4135626, at *13 n.138; *Fitch*, 2024 WL 3276409, at *12; *Griffin*, 2023 WL 5660155, at *6-8.

35.     Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the Internet.

36.     Cellular and broadband Internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/QMJ7-MG4C; AT&T, AT&T Secure Family, https://perma.cc/CP4K-W4BV; T-Mobile, Family Controls and Privacy, https://perma.cc/9P3X-RQB4.

37.     Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/2BTF-Z6HZ. For example, some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center,

**COMPLAINT**

https://perma.cc/R4Y9-UCNS; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/6ZFY-ZSHK. Parents can also use widely available third-party software and browser extensions to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PCMag (Dec. 15, 2023), https://perma.cc/GEJ4-YPZS.

38.    Wireless routers often have settings allowing parents to block particular websites, filter content, monitor Internet usage, and control time spent on the Internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/F22D-VH27; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/TYM8-RAUD.

39.    Device manufacturers allow parents to limit the time their children may spend on the device, curtail the applications that can be used, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/8TYS-ZJL4; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/7G83-FK48; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/25SA-MGXP; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/2RD6-SH5X.

40.    Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps In 2024, Tested By Our Editors*, CNN underscored (Mar. 11, 2024), https://perma.cc/ACV9-43KB.

41.    In addition, NetChoice members provide parents with tools and options to help monitor their minor children's activities.

a.    Facebook offers supervision tools that parents and guardians can use to help support their teens. When supervision is set up on Facebook, "a parent can see how much time their teen has spent on the Facebook app each day for the last week and their average daily time spent for the week; set scheduled breaks for their teen; see their teen's Facebook friends; see some of their teen's privacy settings and content preferences; [and] see the people and Pages their teen has blocked." Meta, Supervision on Facebook, https://perma.cc/6UX2-UG74 (alternations to capitalization and punctuation).

b.    Instagram currently offers supervision features for teens under 18 that allow parents and guardians to set time limits; set reminders to close the app; see the average amount of time

1   their teen has spent on Instagram; and see which accounts their teen is following, which accounts

2   are following their teen, which accounts their teen is currently blocking, and their teen's account

3   privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help Center, About Super-

4   vision on Instagram, https://perma.cc/46M4-LHCB. Instagram recently announced that minors un-

5   der 18 will automatically be placed into "Instagram Teen Accounts," which default to the strictest

6   privacy settings and have limitations on who can contact minors, the content minors can see, and

7   the time of day minors can receive notifications. *See, e.g.*, Instagram, Introducing Instagram Teen

8   Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024),

9   https://perma.cc/NM66-8FR3. Minors under 16 will need a parent's permission to change any of

10  these Instagram Teen Accounts settings to less strict settings. *Id.* Via Teen Accounts, parents will

11  have added supervision features, including ways to get insights into who their minors are chatting

12  with and seeing topics their minor is looking at. *Id.*

13        c.      YouTube offers similar features, such as, *e.g.*, a "supervised experience" for teens,

14  allowing parents (1) to receive email notifications when a teen uploads a video or starts a

15  livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and

16  subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, My Family,

17  https://perma.cc/8SFQ-LXXZ.

18        42.     All NetChoice members prohibit minors under 13 from accessing their main ser-

19  vices, although some offer separate experiences for users under 13 geared toward that age group.

20  For example, YouTube offers two services (YouTube Kids and a separate "Supervised Experience"

21  on YouTube) for minors younger than 13 with parental consent. *See* YouTube for Families Help,

22  Important Info for Parents About YouTube Kids, https://perma.cc/5934-HWNQ; YouTube Help,

23  What Is a Supervised Experience on YouTube, https://perma.cc/ML4N-F64F. These services allow

24  parents to select content settings, set screen-time limits, and otherwise oversee their children's use

25  of the services.

26        43.     **Covered websites' dedication to positive user experiences and user secu-**

27  **rity.** NetChoice members expend vast resources to improve their services and curate the content

28  on their websites to best ensure that it is appropriate for users, especially with respect to minors.

**COMPLAINT**

1   They restrict the publication of content they consider potentially harmful, like violent and sexual

2   content, bullying, harassment, and content that encourages body shaming or eating disorders. *See,*

3   *e.g.*, *Moody*, 144 S. Ct. at 2404 ("hate speech, violent or graphic content, child safety"). Con-

4   versely, many covered websites promote positive and age-appropriate content, such as content that

5   encourages a healthy self-image.

**CALIFORNIA SENATE BILL 976**

7        44.   This year, the California Legislature enacted Senate Bill 976, which places multiple

8   content-based and speaker-based speech restrictions—including parental-consent and age-assur-

9   ance requirements—on certain websites and their users. The Act takes effect January 1, 2025.

10       45.   **Content-based and speaker-based central coverage definition of "[a]ddictive**

11  **internet-based service or application" (§ 27000.5(b)).** The Act's speech regulations apply to

12  only a subset of Internet websites. The Act's coverage depends on a content-based and speaker-

13  based set of definitions and exclusions. The Act regulates only so-called "[a]ddictive internet-

14  based service[s] or application[s]." § 27000.5(b)(1). In so doing, the Act selects websites for reg-

15  ulation by discriminating based on content and speaker. Specifically, it targets websites based on

16  their constitutionally protected "feeds" that are "personalized" for each user. *Moody*, 144 S. Ct. at

17  2403. These covered "actors" and "activities," *id.* at 2398, include the members and services iden-

18  tified above in ¶ 15.

19       46.   The Act defines an "[a]ddictive internet-based service or application" as "an inter-

20  net website . . . including, but not limited to, a 'social media platform' as defined in Section 22675

21  of the Business and Professions Code, that offers users or provides users with an addictive feed as

22  a significant part of the service provided by that internet website." § 27000.5(b)(1).

23       47.   The Business and Professions Code defines "social media platform" as "a public or

24  semipublic internet-based service or application that has users in California and that meets both of

25  the following criteria":

26       (1)(A) A substantial function of the service or application is to connect users in order to
         allow users to interact socially with each other within the service or application. (B) A
27       service or application that provides email or direct messaging services shall not be consid-
         ered to meet this criterion on the basis of that function alone.

28

11

**COMPLAINT**

(2) The service or application allows users to do all of the following: (A) Construct a public or semipublic profile for purposes of signing into and using the service or application. (B) Populate a list of other users with whom an individual shares a social connection within the system. (C) Create or post content viewable by other users, including, but not limited to, on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users.

Cal. Bus. & Prof. Code § 22675(e).

48.     The Act defines "[a]ddictive feed" as "an internet website . . . or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device," unless seven specific "conditions are met, alone or in combination with one another":

(1) The information is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others.

(2) The information consists of search terms that are not persistently associated with the user or user's device.

(3) The information consists of user-selected privacy or accessibility settings, technical information concerning the user's device, or device communications or signals concerning whether the user is a minor.

(4) The user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media, or the blocking, prioritization, or deprioritization of such media, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device, except as otherwise permitted by this chapter and, in the case of audio or video content, is not automatically played.

(5) The media consists of direct, private communications between users.

(6) The media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played.

(7) The recommendation, selection, or prioritization of the media is necessary to comply with this chapter or any regulations promulgated pursuant to this chapter.

§ 27000.5(a)(1)-(7).

**COMPLAINT**

49.    *Moody* recognized that full First Amendment protection applies to websites that work in exactly this way—providing "curated compilation[s]" of personalized feeds of user-created speech, allowing "users to upload content . . . to share with others," and allowing those "viewing the content . . . [to] react to it, comment on it, or share it themselves." 144 S. Ct. at 2393-95.

50.    The Act also contains content-based and speaker-based exceptions from its coverage definition. The Act provides that " '[a]ddictive internet-based service or application' does not apply to either of the following":

> (A) An internet website . . . for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof.

> (B) An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.

§ 27000.5(b)(2).

51.    Accordingly, the Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply when assessing the First Amendment implications of distinct laws that may also regulate non-social media services. 144 S. Ct. at 2398. The Act's exclusion of services where interactions between users are limited to "commercial transactions or to consumer reviews," § 27000.5(b)(2)(A), excludes "ride-sharing service[s] like Uber," "payment service[s] like Venmo," and "online marketplace[s] like Etsy," *Moody*, 144 S. Ct. at 2398. And the Act's exclusion for "direct, private communications between users," § 27000.5(a)(5), excludes "direct messaging" and "email" services, *Moody*, 144 S. Ct. at 2398.

52.    Nothing in the Act defines key coverage terms, such as "significant part of the service," "primary purpose," "multiple pieces," "information," or "persistently associated." § 27000.5(a)(1)-(2), (b)(1)-(2).

53.    **Parental consent (§§ 27001(a), 27002(a), 27002(b)(2)).** The Act contains multiple provisions requiring covered websites to restrict minor users' access to those websites—or particular functions—unless the websites obtain "verifiable parental consent" to allow such access. §§ 27001(a), 27002(a), 27002(b)(2). How covered websites determine whether a user is a minor will change before and after January 1, 2027, as explained below. § 27002(a)(2).

54.     *Parental consent to view personalized feeds (§ 27001(a)).* The Act provides that "[i]t shall be unlawful for the operator of" a covered website "to provide an addictive feed"—that is, a personalized feed—to a minor "user unless . . . [t]he operator has obtained verifiable parental consent." § 27001(a).[2] This provision requires covered websites to secure parental consent to provide minor users with a personalized feed.

55.     *Parental consent to view personalized feeds for more than one hour per day (§ 27002(b)(2)).* The Act requires covered websites to implement a "default" setting limiting minor users' access to "one hour per day *unless modified by the verified parent*." § 27002(b)(2) (emphasis added); *id.* ("The operator of" a covered website "shall provide a mechanism through which the verified parent of a user who is a minor may . . . [l]imit their child's access to any addictive feed from the addictive internet-based service or application to a length of time per day specified by the verified parent"). Although the Act's other default requirements on minors' accounts (discussed below) may potentially be overridden by minors or their parents, this provision can only be overridden by parents. Thus, this provision requires parental consent before minor users can access personalized feeds for more than one hour per day.

56.     *Parental consent to receive notifications at particular times (§ 27002(a)).* The Act makes it "unlawful for the operator of" a covered website, "between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user . . . unless the operator has obtained verifiable parental consent to send those notifications." § 27002(a). This provision requires parental consent before minors can receive notifications at particular times of day.

57.     Despite offering "verifiable parental consent" as a means of avoiding these prohibitions, the Act never defines or explains how such consent must be "verified" or "verifiable" to qualify.

---

[2] The Act defines "Operator" as "a person who operates or provides an internet website, an online service, an online application, or a mobile application." § 27000.5(e). The Act defines "Minor" as "an individual under 18 years of age who is located in the State of California." § 27000.5(d). And the Act defines "Parent" as "a parent or guardian." § 27000.5(f).

**COMPLAINT**

58.    The Act provides that "[i]nformation collected for the purpose of determining a user's age or verifying parental consent pursuant to this chapter shall not be used for any purpose other than compliance with" the Act or another law and that the "information collected shall be deleted immediately after it is used to determine a user's age or to verify parental consent, except as necessary to comply with state or federal law." § 270001(b). Although this provision contemplates that "information" is required to verify parental consent, it does not define that term nor state the extent to which a covered website may use such information to verify parental consent.

59.    The Act does not account for the difficulty in verifying a parent-child relationship. *Griffin*, 2023 WL 5660155, at *4 ("[T]he biggest challenge . . . with parental consent is actually establishing . . . the parental relationship."); *see Fitch*, 2024 WL 3276409, at *13. These difficulties are compounded when, for example, families are nontraditional, families have differences in surname or address, parents disagree about consent, minors are unsafe at home, parents do not have or are unwilling to electronically submit documentation, or parental rights have been terminated.

60.    As a result, covered websites facing liability are likely to "err on the side of caution and require detailed proof of the parental relationship." *Griffin*, 2023 WL 5660155, at *15. Thus, "parents and guardians who otherwise would have freely given consent . . . will be dissuaded by the red tape" and the loss of their own anonymity. *Id.* Those obstacles will drive them to "refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech"— here, personalized feeds and notifications. *Id.*

61.    **Age assurance (§§ 27001(a)(1)(B), 27002(a)(2), 27006).** The Act requires covered websites to perform "age assurance," beginning January 1, 2027. § 27006(b).

62.    From January 1, 2025, to December 31, 2026, covered websites must secure parental consent from users that covered websites have "actual knowledge" are minors. §§ 27001(a)(1)(A), 27002(a)(1). In other words, the Act seems to allow covered websites to rely on users' self-reported ages until the end of 2026.

63.    Beginning January 1, 2027, however, covered websites must affirmatively engage in age assurance to determine which users are minors—that is, they will need to treat as minors

**COMPLAINT**

those users that their age-assurance processes "reasonably determine" are minors. §§ 27001(a)(1)(B), 27002(a)(2).

64. Engaging in age assurance will require covered websites to evaluate the ages of *all* users—not just minors.

65. Age assurance will deter people—both minors and adults—from accessing protected speech. *See, e.g.*, *Reyes*, 2024 WL 4135626, at *16 n.169 (noting the effect that "age-assurance" requirement will have on access to speech). The Supreme Court has held that governments cannot require people to provide personal information or documentation—such as "identif[ication]" or "credit card information"—to access protected speech. *Ashcroft*, 542 U.S. at 667; *see Reno*, 521 U.S. at 882. Yet under the Act, covered websites must place all content on personalized feeds behind an age-assurance system, § 27001(a)(1)(B), and must restrict sending notifications on any number of subjects based on the results of age-assurance, § 27002(a)(2).

66. **Default limitations on minors' accounts (§ 27002(b)(1), (3)-(5)).** The Act requires covered websites to establish certain default settings for minor users' accounts and provide parents with the ability to implement or change those settings. The Act provides that "[t]he operator of an addictive internet-based service or application shall provide a mechanism through which the verified parent of a user who is a minor may do any of the following":

> (1) Prevent their child from accessing or receiving notifications from the addictive internet-based service or application between specific hours chosen by the parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited between the hours of 12 a.m. and 6 a.m., in the user's local time zone.
>
> . . .
>
> (3) Limit their child's ability to view the number of likes or other forms of feedback to pieces of media within an addictive feed. This setting shall be set by the operator as on by default.
>
> (4) Require that the default feed provided to the child when entering the internet-based service or application be one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor.
>
> (5) Set their child's account to private mode, in a manner in which only users to whom the child is connected on the addictive internet-based service or application may view

or respond to content posted by the child. This setting shall be set by the operator as
on by default.

§ 27002(b)(1), (3)-(5).

67.    The Act's default limitations on minors' accounts burden covered websites' pro-
tected speech and minors' access to protected speech. They do so by requiring covered websites to
implement specific "default[s]" on speech available to users, which are regulations of speech. *Id.*
The fact that parents and users can override those defaults does not alter that the State has imposed
limitations on speech.

68.    **Disclosures (§ 27005).** The Act requires covered websites to "publicly disclose, on
an annual basis, the number of minor users of its addictive internet-based service or application."
§ 27005. Covered websites must also disclose "the number [of minor users] for whom the operator
has received verifiable parental consent to provide an addictive feed, and the number of minor
users as to whom the [above parental tools] are or are not enabled." *Id.* These disclosure require-
ments are speech regulations, compelling covered websites to speak and burdening covered web-
sites' protected speech. Moreover, the disclosure provision requires covered websites to report
statistics to the government under the rubric of a pejorative "addictive" label that they disagree
with.

69.    **Enforcement (§ 27006(a)).** The Act "may only be enforced in a civil action
brought in the name of the people of the State of California by the Attorney General." § 27006(a).

<h2 style="text-align:center">CLAIMS</h2>

70.    For each challenged provision, Plaintiff raises both (1) a facial challenge; and (2) a
challenge as applied to the members and services identified in ¶ 15.

71.    For all First Amendment claims, the facial challenge standard asks whether "a sub-
stantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's
plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted). At a minimum, the Act is
invalid to the extent it regulates "social media" websites, including as applied to Plaintiffs' mem-
bers' regulated services identified in ¶ 15. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010)
(analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

**COMPLAINT**

72. The First Amendment facial challenge here is straightforward "from the face of the law" because all aspects of the Act's speech-restricting provisions, "in every application to a covered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)); *CCIA*, 2024 WL 4051786, at *15 (facial challenge proper because state law "raises the same First Amendment issues in every application to a covered business" (quoting *NetChoice v. Bonta*, 113 F.4th at 1116 (affirming preliminary injunction of law requiring websites to issue reports opining on potential harms to minors) (internal quotation marks omitted)); *Reyes*, 2024 WL 4135626, at *9 n.92 (noting that First Amendment facial challenge "questions are easily answered" where "[t]here is no dispute about who and what the Act regulates" or "how the First Amendment applies to *different* websites or regulatory requirements" (citation omitted)).

73. Similarly, for Plaintiff's First and Fourteenth Amendment vagueness claim, the court must "determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982); *see Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). Plaintiff "need not demonstrate that [the Act] is impermissibly vague in all of its applications to succeed on [its] challenge." *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 n.7 (9th Cir. 2001). That is because, "[i]n the First Amendment context, facial vagueness challenges are appropriate if the statute clearly implicates free speech rights," and where such rights are implicated, "courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *Id.* at 1149-50. Here, a facial vagueness challenge is proper because the statute clearly implicates the First Amendment rights of NetChoice members and their users and "there is no reason to believe one social media company is better suited than another to understand [the Act's] vague terms." *CCIA*, 2024 WL 4051786, at *9.

74. Each First and Fourteenth Amendment challenge raises the rights of both NetChoice members and those who use or could prospectively use NetChoice members' websites.

**COMPLAINT**

**Count I**

**42 U.S.C. § 1983**

**Violation of the First Amendment, as Incorporated by the Fourteenth Amendment**

**(All Speech Regulations Depending on the Central Coverage Definition – § 27000.5(b))**

75.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

76.     The Act's parental-consent, age-assurance, default-limitations, and disclosure pro-visions all violate the First Amendment, because they are speech regulations depending on the Act's central coverage definition that is content-based and speaker-based.

77.     As incorporated against the States by the Fourteenth Amendment, the First Amend-ment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. The First Amendment protects "publish[ing]," *Reno*, 521 U.S. at 852-53; "disseminat[ing]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023); and "creating, distributing, [and] consuming" protected speech, *Brown*, 564 U.S. at 792 n.1. And those rights apply to "social-media platforms." *Moody*, 144 S. Ct. at 2394. The "speech social media companies engage in when they make decisions about how to construct and operate their platforms . . . is protected speech" under the First Amendment. *Reyes*, 2024 WL 4135626, at *8. This includes the "present[ation]" of social media companies' "feeds," including "personalized" feeds. *Moody*, 144 S. Ct. at 2400, 2403, 2406.

78.     "When the Government restricts speech, the Government bears the burden of prov-ing the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

79.     The State cannot demonstrate that the Act's restrictions and burdens on speech sat-isfy any form of heightened First Amendment scrutiny. The "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (citation omitted). The State cannot articulate a sufficient governmental in-terest supporting the Act, and—even if it could—the Act is not properly tailored to satisfy any form of First Amendment scrutiny.

**COMPLAINT**

80.    **The Act's speech regulations trigger strict scrutiny.** The Act's speech regulations trigger strict scrutiny because the Act's definition of "[a]ddictive internet-based service[s] or application[s]," § 27000.5(b), is content-based and speaker-based.

81.    The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). Government cannot use "subtler forms of discrimination that achieve identical results based on function or purpose." *Id.* at 74. "Content-based laws . . . are presumptively unconstitutional." *Reed*, 576 U.S. at 163.

82.    The Act's coverage definition imposes speech regulations based on content. For example, the Act *includes* websites based on whether one of their substantial functions "is to connect users in order to allow users to interact socially with each other within the service or application." Cal. Bus. & Prof. Code § 22675(1)(A). Likewise, the Act *excludes* websites that facilitate "commercial transactions" and "consumer reviews of products, sellers, services, events, or places." § 27000.5(b)(2)(A). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see also Reyes*, 2024 WL 4135626, at *10; *Fitch*, 2024 WL 3276409, at *9; *Yost*, 716 F. Supp. 3d at 557-58.

83.    As the Southern District of Ohio said when concluding that similar exceptions rendered a law's speech restrictions content-based, the "exception[] to the Act for product review websites" is "easy to categorize as content based." *Yost*, 716 F. Supp. 3d at 557.

84.    In addition, the Act singles out websites that display "media generated or shared by users," but not websites that display self-created content in significant part. § 27000.5(a). The Act thus singles out the websites that have made the editorial choice to create an environment that fosters social interaction between users. Multiple district courts have held that regulations singling out websites that allow users to "interact socially" for particular speech-related burdens are content-based and subject to strict scrutiny. *E.g.*, *Fitch*, 2024 WL 3276409, at *8-9.

85. The Act's central coverage definition also imposes speech regulations based on speaker. It discriminates based on who is disseminating speech—regulating covered websites but not others focused on, for example, "commercial transactions" or "consumer reviews." § 27000.5(b)(2)(A). "[L]aws that single out [a subset of speakers], or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (cleaned up). Supreme Court precedent is "deeply skeptical" of laws "distinguishing among different speakers." *NIFLA*, 585 U.S. at 777-78 (cleaned up).

86. The Act's central coverage definition is also speaker-based because it distinguishes between different websites and feeds based on *who* created the content displayed on the website or feed. The Act burdens websites that display personalized feeds of "media generated or shared *by users*." § 27000.5(a) (emphasis added). But it does not burden websites that display content generated *by the website*, even if that content is identical and it is likewise displayed in a personalized feed. Furthermore, the Act exempts feeds that are "a preexisting sequence from the *same author, creator, poster, or source*." § 27000.5(a)(6). But it does not exempt feeds that sequence media from *different authors, creators, posters, or sources*.

87. The Act's central coverage definition is further speaker-based because it burdens websites that disseminate "media generated or shared by users" using personalized feeds, § 27000.5(a), but not other websites that use other forms of disseminating content—including content that is generated by users.

88. Because the Act's central coverage definition is both content-based and speaker-based, so too is each provision of the Act restricting speech that relies on this definition. *See Reyes*, 2024 WL 4135626, at *8 (finding "persuasive" the argument that "the entire Act facially violates the First Amendment because the Act's operative [speech-restricting] provisions each rely on the Central Coverage Definition") (citation omitted)).

89. The Act's parental-consent requirements, §§ 27001(a), 27002(a), (b)(2), regulate and burden speech by requiring minors to obtain parental consent to access protected speech.

**COMPLAINT**

90.    The Act's age-assurance requirement, § 27006(b)-(c), regulates and burdens speech by requiring adults and minors to provide personal information to access protected speech.

91.    The Act's default limitations on minors' accounts, § 27002(b)(1), (3)-(5), regulate speech by imposing legal duties on covered websites for disseminating speech of a certain type of content.

92.    The Act's disclosure requirement, § 27005, also regulates speech by compelling speech. Moreover, it requires covered websites to implicitly adopt the State's pejorative labeling of their services and feeds as "addictive." "[R]equiring a company to publicly condemn itself . . . makes the requirement more constitutionally offensive." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015); *see X Corp.*, 116 F.4th at 901 ("opining" about "controversial" topics is "not commercial speech").

93.    Therefore, because each of these provisions of the Act is a "[g]overnment regulation of speech," *Reed*, 576 U.S. at 163, and relies on the Act's content-based and speaker-based central coverage definition, each provision triggers strict scrutiny.

94.    **All of the Act's speech regulations fail strict scrutiny.** Under strict scrutiny, the State must demonstrate that the Act is "the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (citation omitted). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799. Further, under the First Amendment, Defendant has the burden to "specifically identify" how the Act addresses an "actual problem in need of solving." *Id.* (citation omitted); *Reyes*, 2024 WL 4135626, at *12 (same) (citations omitted). Moreover, Defendant must demonstrate that there is a problem in need of *governmental* solution, as compared to private, family solutions, and that any such governmental solution is one that has the least possible restrictive effect on speech.

95.    The State cannot meet its burden here because the Act does not serve any compelling government interest. *See, e.g.*, *Reyes*, 2024 WL 4135626, at *12.

**COMPLAINT**

96.    Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (cleaned up).

97.    Moreover, parents have a wealth of means to oversee their minor children online. Those choices provide families more flexibility than the State's one-size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls as less restrictive means over governmental interventions that would impose state-created barriers to accessing lawful speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

98.    The State has not "specifically identif[ied]" how the Act's scope responds to "an actual problem in need of solving" by government mandate. *Brown*, 564 U.S. at 799 (cleaned up). Nor has it demonstrated why the Legislature ignored the viable alternatives available to parents. *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 2024 WL 4135626, at *13. The State could have supported "preexisting protections to help parents" and "provid[ed] parents additional information or mechanisms needed to engage in active supervision over children's internet access." *Fitch*, 2024 WL 3276409, at *11-12.

99.    The Act is also not properly or narrowly tailored to any sufficient interest. It "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Reyes*, 2024 WL 4135626, at *16 n.170 (quoting *Yost*, 716 F. Supp. 3d at 560); *see Fitch*, 2024 WL 3276409, at *14 (similar).

100.    The Act is overinclusive because it regulates all manner of protected speech, including political and religious speech that lies at the very heart of the First Amendment.

101.    Nor does the Act purport to identify or limit itself to websites that are particularly harmful to minors or even particularly likely to be accessed by minors. And for the websites it regulates, the Act restricts minors' access to all personalized feeds and all notifications during certain times without parental consent, which restricts access to core protected speech. In doing so, it disadvantages minors in California compared to minors in other states who do not face the same barriers to accessing core protected speech.

**COMPLAINT**

102.    The Act's one-size-fits-all approach of treating all minors at every developmental stage alike—from websites' youngest users to seventeen-year-olds—is also vastly overbroad. *See Reno*, 521 U.S. at 866; *Am. Booksellers Ass'n*, 484 U.S. at 396.

103.    The Act is also underinclusive because it allows websites to rely on users' self-declared ages until January 1, 2027. Defendant has asserted elsewhere that such reliance is insufficient to further the State's goals. *See, e.g.*, ECF 1, Complaint ¶ 767, *California v. Meta Platforms, Inc. et al.*, No. 23-CV-05448 (N.D. Cal. Oct. 24, 2023).

104.    At core, the Act seems like an attempt to prevent minors from spending too much time on disfavored websites. But the State lacks a legitimate interest in preventing minors' access to protected speech and websites where they can engage in a broad range of protected First Amendment activity. That is especially true where the Act does not regulate *other* situations in which minors may spend a lot of time engaging in protected speech, such as playing video games, reading graphic novels, or watching television or streaming services. Although the State could not legitimately regulate those other media, California's decision to regulate only disfavored websites is a constitutional flaw the Act cannot overcome.

105.    The Act's central coverage definition is integral to each of the Act's operative speech regulations. It cannot be severed. Without this central definition, no other provision in the Act could operate. Thus, all of the Act's speech regulations are invalid.

106.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**Count II**

**42 U.S.C. § 1983**

**Void for Vagueness under the First and Fourteenth Amendments**

**(All Speech Regulations Depending on the Central Coverage Definition – § 27000.5(b))**

107.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

**COMPLAINT**

108.    The Act's central coverage definition of "[a]ddictive internet-based service[s] or application[s]," § 27000.5(b), is unconstitutionally vague and violates principles of free speech and due process.

109.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). And a law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment. *Fox*, 567 U.S. at 253-54.

110.    The Act's central coverage definition fails to provide necessary notice. The Act's definition of "addictive feed"—which is central to the Act's coverage—is unconstitutionally vague. Websites lack guidance about what kinds of feeds will subject them to the Act's require-ments. For example, the Act creates potentially conflicting tests for what websites are covered by the Act. A website that shows a reverse-chronological feed of content users follow may be excluded from the Act's coverage because the "user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media." § 27000.5(a)(4). But such feeds may instead be "based, in whole or in part, on other information associated with the user or the user's device." *Id.* In light of the uncertainty about what feeds are permissible without age verifi-cation and parental consent, websites' use of feeds to facilitate social interaction will be chilled.

111.    In addition, the Act does not define the vague terms "significant part" and "primary purpose." § 27000.5(b). That means that websites do not know what it means to have a personal-ized feed "as a significant part" or their service, § 27000.5(b)(1), or what it means to "operate[] a feed for the primary purpose of cloud storage," § 27000.5(b)(2)(B). The use of terms like "signif-icant" and "primary" without definition renders the Act unconstitutionally vague. *See, e.g.*, *Fitch*, 2024 WL3276409, at *15 (holding that the terms "primarily" and "incidental to" in central cover-age definition were "overly indefinite, leaving it open for potential arbitrary and discriminatory enforcement").

112.    Many websites, including NetChoice members such as Dreamwidth, will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2023 WL 5660155, at *13. The Act thus "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements. Such ambiguity renders a law unconstitutional." *Id.*; *Fox*, 567 U.S. at 253.

113.    Because of this vagueness, the Act's central coverage definition violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

114.    The Act's central coverage definition is integral to each of the Act's operative speech regulations. It cannot be severed. Without this central definition, no other provision in the Act could operate. Thus, all of the Act's speech regulations are invalid.

115.    Unless declared invalid and enjoined, the Act's speech regulations will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment and due process rights and will irreparably harm Plaintiff, its members, and Internet users.

**Count III**

**42 U.S.C. § 1983**

**Violation of the First Amendment, as Incorporated by the Fourteenth Amendment**

**(Parental Consent – §§ 27001-02)**

116.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

117.    The Act's parental-consent requirements, §§ 27001-02, are unconstitutional and cannot satisfy any form of First Amendment scrutiny.

118.    Minors have a First Amendment "right to speak or be spoken to," and "the state" lacks the "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3 (emphasis omitted). And websites have the right to publish and disseminate protected speech to minors absent governmental restraint. Although States have power to protect minors, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794.

26

**COMPLAINT**

119.    The Act requires covered websites and minor users to secure parental consent before allowing minor users to access a personalized feed. § 270001(a). It further requires covered websites and minor users to secure parental consent before allowing minor users to access a personalized feed for more than one hour per day. § 27002(a). And it requires covered websites and minor users to secure parental consent before allowing minor users to receive notifications during specific times. § 27002(b)(2).

120.    The Supreme Court has held that laws requiring parental consent for minors to access and engage in protected speech of their choosing are unconstitutional. *Brown*, 564 U.S. at 795 & n.3, 804-05. These First Amendment protections apply with equal force to the covered websites here, which the Supreme Court has repeatedly recognized disseminate and facilitate a broad range of protected speech. *See Moody*, 144 S. Ct. at 2393, 2399, 2401; *Packingham*, 582 U.S. at 105. The Act's parental-consent requirements would impose a substantial hurdle between minors and the "vast quantities of constitutionally protected speech" facilitated by social media companies. *Griffin*, 2023 WL 5660155, at *17. That, in part, is why courts have held that parental-consent requirements for minors to access speech on "social media" websites violate the First Amendment. *See Fitch*, 2024 WL 3276409, at *13; *Yost*, 716 F. Supp. 3d at 561-62; *Griffin*, 2023 WL 5660155, at *18.

121.    Furthermore, the Act would impede covered websites' ability to facilitate social interaction among their users, by disseminating protected speech through personalized feeds and notifications. The Supreme Court has squarely held that dissemination of "personalized" feeds is protected from governmental interference. *Moody*, 144 S. Ct. at 2393, 2403, 2405 ("feeds" that are "personalized" to each user are protected by the First Amendment). If "minors are entitled to a significant measure of First Amendment protection," *Brown*, 564 U.S. at 794, minors must be able to choose, free from government interference, to access protected speech in the same "personalized" form that *Moody* held is protected by the First Amendment.

122.    The parental-consent requirements trigger strict scrutiny because they rely on the Act's central coverage definition, which is content-based and speaker-based.

123. The parental-consent requirements also independently trigger strict scrutiny. *Yost*, 716 F. Supp. 3d at 559-60.

124. The parental-consent requirements fail strict scrutiny, or any form of heightened scrutiny, for the reasons explained above.

125. The State cannot demonstrate what purported problem the parental-consent provisions respond to, how the provisions are necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

126. The parental-consent requirements are also not properly tailored.

127. For example, the Act is underinclusive because it still allows minors to be exposed to the alleged risks or harms the State claims the Act was created to address so long as they have a single parent's consent. *Brown*, 564 U.S. at 802.

128. Moreover, the Act's restrictions on sending notifications without parental consent are over- and under-inclusive. The restrictions apply to *all* notifications. This means that a teenager could not get a "marked safe" Facebook notification from a family member after midnight during a wildfire or earthquake. It also means that a teenager could not get a notification *from a parent* during the prohibited hours. The restrictions also purportedly restrict notifications during school hours, but the prohibited time period is arbitrary and fails to capture vacations, schools on different tracks, homeschooling, and many other date and time differences.

129. Finally, the Act's failure to define what constitutes "verifiable parental consent" creates substantial uncertainty about how websites are supposed to comply with the Act's parental-consent provisions. §§ 27001(a)(2), 27002(a). "If a parent wants to give her child permission to create an account, but the parent and the child have different last names, it is not clear what, if anything, the social media company or third-party servicer must do to prove a parental relationship exists. And if a child is the product of divorced parents who disagree about parental permission, proof of express consent will be that much trickier to establish—especially without guidance from the State." *Griffin*, 2023 WL 5660155, at *14.

**COMPLAINT**

130.    Unless declared invalid and enjoined, the Act's parental-consent requirements, §§ 27001-02, will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

### Count IV

### 42 U.S.C. § 1983

### Violation of the First Amendment, as Incorporated by the Fourteenth Amendment

### (Age Assurance – §§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c))

131.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

132.    The Act's age-assurance requirements, § 27006(b)-(c); *see* §§ 27001(a)(1)(B), 27002(a)(2), are unconstitutional and cannot satisfy any form of First Amendment scrutiny.

133.    Governments cannot require people to provide identification or personal information to access protected speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 874.

134.    These principles apply equally to minors, as age-assurance to access websites "obviously burdens minors' First Amendment Rights." *Griffin*, 2023 WL 5660155, at *17 (discussing *Brown*, 564 U.S. at 794-95).

135.    "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourages users from accessing the regulated sites.'" *Id.* (quoting *Reno*, 521 U.S. at 856) (alterations adopted); *see Fitch*, 2024 WL 3276409, at *12 (holding that age-verification requirement "burdens adults' First Amendment rights, and that alone makes it overinclusive"). So too for minors. Those who are not deterred must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Griffin*, 2023 WL 5660155, at *17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3rd Cir. 2008) ("relinquish their anonymity to access protected speech").

136.    The age-assurance requirements trigger strict scrutiny because they rely on the Act's central coverage definition, which is content-based and speaker-based.

137.    The age-assurance requirements also independently trigger strict scrutiny.

**COMPLAINT**

138.    The parental-consent requirements fail strict scrutiny, or any form of heightened scrutiny, for the reasons explained above.

139.    The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

140.    The age-assurance requirements are also not properly tailored. For example, the Act is underinclusive because it requires age assurance before adults and minors can access content in certain ways on certain disfavored websites while allowing adults and minors to access the same content on other websites (and sometimes even the same website) without such assurance.

141.    Unless declared invalid and enjoined, the Act's age-assurance provisions, § 27006(b)-(c); *see* §§ 27001(a)(1)(B), 27002(a)(2), will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

### Count V

### Equitable Relief

142.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

143.    The entire Act, §§ 27000-07, and individually challenged provisions of the Act violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

144.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

### Count VI

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### Declaratory Relief

145.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

**COMPLAINT**

146.    The Act violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its covered members, and Internet users of enforceable rights. The Act is unlawful and unenforceable because the entire Act relies on an unconstitutional central coverage definition of "[a]ddictive internet-based service[s] or application[s]." § 27000.5(b).

147.    Sections 27000.5(b), 27001, 27002, 27005, and 27006(b)-(c) of the Act are unlawful and unenforceable, together and separately, because they violate the First Amendment of the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

148.    Sections 27000.5(b), 27001, 27002, 27005, and 27006(b)-(c) of the Act are unlawful and unenforceable because they are unconstitutionally vague in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

149.    The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

150.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

151.    This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

152.    This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

Plaintiff requests an order and judgment:

    a.  declaring that California Senate Bill 976 is unlawful;

    b.  declaring that California Senate Bill 976 violates the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment;

**COMPLAINT**

c.    declaring that California Senate Bill 976 is void for vagueness under the First Amend-
ment and the Due Process Clause of the Fourteenth Amendment to the Constitution;

d.    declaring that Cal. Health & Safety Code §§ 27000.5(b), 27001, 27002, 27005, and
27006(b)-(c) violate the First Amendment to the Constitution, as incorporated by the
Fourteenth Amendment;

e.    declaring that Cal. Health & Safety Code §§ 27000.5(b), 27001, 27002, 27005, and
27006(b)-(c) are void for vagueness in violation the First Amendment and Due Process
Clause of the Fourteenth Amendment to the Constitution;

f.    enjoining Defendant and his agents, employees, and all persons acting under their di-
rection or control from taking any action to enforce the Act or the challenged portions
of the Act against Plaintiff or its members;

g.    entering judgment in favor of Plaintiff;

h.    awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, includ-
ing attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983
claims against state officials; and

i.    awarding Plaintiff all other such relief as the Court deems proper and just.

**COMPLAINT**

1    DATED: November 12, 2024

2                                          */s/ Bradley A. Benbrook*
3    Steven P. Lehotsky*                   Bradley A. Benbrook (SBN 177786)
     Scott A. Keller*                      Stephen M. Duvernay (SBN 250957)
4    Jeremy Evan Maltz*                    **BENBROOK LAW GROUP, PC**
     Shannon Grammel*                      701 University Avenue, Suite 106
5    **LEHOTSKY KELLER COHN LLP**          Sacramento, CA 95825
     200 Massachusetts Avenue, NW, Suite 700   Telephone: (916) 447-4900
6    Washington, DC 20001                  brad@benbrooklawgroup.com
     (512) 693-8350                        steve@benbrooklawgroup.com
7    steve@lkcfirm.com
     scott@lkcfirm.com
8    jeremy@lkcfirm.com
     shannon@lkcfirm.com
9
10   Joshua P. Morrow*
11   **LEHOTSKY KELLER COHN LLP**
     408 W. 11th Street, 5th Floor
12   Austin, TX 78701
     (512) 693-8350
13   josh@lkcfirm.com

14   Jared B. Magnuson*
15   **LEHOTSKY KELLER COHN LLP**
     3280 Peachtree Road NE
16   Atlanta, GA 30305
     (512) 693-8350
17   jared@lkcfirm.com

18   * *Pro hac vice* forthcoming.

19                   *Attorneys for Plaintiff NetChoice*

20

21

22

23

24

25

26

27

28

**COMPLAINT**