Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon Grammel*
**LEHOTSKY KELLER COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Joshua P. Morrow*
**LEHOTSKY KELLER COHN LLP**
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
**LEHOTSKY KELLER COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com
* *Pro hac vice* forthcoming.

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Attorneys for Plaintiff NetChoice*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NETCHOICE,<br><br>          Plaintiff,<br><br>   v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>          Defendant. | Case No. _____<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: TBD<br>Time: TBD<br>Judge: TBD<br>Courtroom: TBD |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

NOTICE OF MOTION ............................................................................................. 1

RELIEF SOUGHT .................................................................................................. 1

INTRODUCTION .................................................................................................. 1

STATEMENT OF THE ISSUES ............................................................................ 3

BACKGROUND ................................................................................................... 4

A.    NetChoice-member websites disseminate vast amounts of protected speech. .................. 4

B.    Parents have many tools to oversee how their children use the Internet. ......................... 5

C.    California Senate Bill 976 ................................................................................ 6

ARGUMENT ....................................................................................................... 9

I.    NetChoice is likely to succeed on the merits of its claims that the Act's speech regulations violate the First Amendment. ........................................................ 10

A.    The Act's speech regulations trigger strict scrutiny. ..................................................... 11

      1.    The Act's parental-consent requirements for minors to access protected speech violate the First Amendment (§§ 27001(a), 27002(a), (b)(2)). ................................................................................ 12

      2.    The Act's age-assurance requirements for both minors and adults to access protected speech violates the First Amendment (§§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c)). ................................... 15

      3.    The Act's speech regulations apply to only a subset of Internet websites based on content and speaker, which independently triggers strict scrutiny for all the Act's speech regulations. .................................. 16

B.    The Act's speech regulations fail strict scrutiny and any other form of heightened First Amendment scrutiny. ..................................................................................... 19

      1.    The State lacks a sufficient governmental interest in restricting adults and minors' access to protected speech. ............................................... 19

      2.    The Act's speech regulations are not properly tailored. ............................ 20

            i.    The Act's speech regulations are not the least restrictive means to accomplish any interest the State may assert because many tools already exist for parents to oversee their children online. .................................................................. 20

            ii.    The Act's central coverage definition, and thus all speech regulations depending on it, are improperly tailored. .................. 21

            iii.    The parental-consent and age-assurance provisions are independently improperly tailored. ............................................. 22

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

II.    NetChoice is likely to succeed on the merits of its claim that the Act's central coverage definition of "[a]ddictive internet-based service or application" is unconstitutionally vague (§ 27000.5(b))........................................................................................ 24

III.    NetChoice meets all the remaining factors for a preliminary injunction......................... 25

CONCLUSION........................................................................................................................ 25

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Mukasey*,
    534 F.3d 181 (3d Cir. 2008)......................................................................................16

*Ala. Ass'n of Realtors v. HHS*,
    594 U.S. 758 (2021)................................................................................................25

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
    916 F.3d 749 (9th Cir. 2019) ..................................................................................25

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003) .....................................................................................16

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021)...........................................................................................19, 20

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)......................................................................................... *passim*

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020).................................................................................................17

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)......................................................................................... *passim*

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
    563 F.3d 847 (9th Cir. 2009) ..................................................................................25

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*,
    271 F.3d 1141 (9th Cir. 2001) ................................................................................24

*Citizens United v. FEC*,
    558 U.S. 310 (2010).................................................................................................17

*Cmty. House, Inc. v. City of Boise*,
    490 F.3d 1041 (9th Cir. 2007) ................................................................................25

*Comput. & Commc'n Indus. Ass'n v. Paxton*,
    2024 WL 4051786 (W.D. Tex. Aug. 30, 2024)............................................. *passim*

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ..................................................................................25

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
    565 U.S. 606 (2012).................................................................................................25

iii

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) .................................................................................10, 19, 20

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ..............................................................................................24

*FEC v. Cruz*,
    596 U.S. 289 (2022) ..............................................................................................11

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ..............................................................................................10

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ..............................................................................................10

*Meinecke v. City of Seattle*,
    99 F.4th 514 (9th Cir. 2024) ...........................................................................11, 25

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ..............................................................................................18

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) .................................................................................. *passim*

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ..............................................................................19

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) .........................................................................................17, 18

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ........................................................................10, 21

*NetChoice, LLC v. Fitch*,
    2024 WL 3276409 (S.D. Miss. July 1, 2024) ................................................ *passim*

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) .............................................. *passim*

*NetChoice, LLC v. Reyes*,
    2024 WL 4135626 (D. Utah Sept. 10, 2024) ................................................. *passim*

*NetChoice, LLC v. Yost*,
    716 F. Supp. 3d 539 (S.D. Ohio 2024) .......................................................... *passim*

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................................25

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) .................................................................................2, 11, 12, 19

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)..................................................................11, 16, 17, 18

*Reno v. ACLU*,
    521 U.S. 844 (1997)...........................................................................2, 3, 15, 23

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020).................................................................................25

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*,
    702 F. Supp. 3d 809 (N.D. Cal. 2023) ...................................................13

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)...........................................................................14, 16, 22

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994)...........................................................................17, 18

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000)...........................................................................20, 21

*United States v. Williams*,
    553 U.S. 285 (2008).................................................................................24

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982).................................................................................24

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)...........................................................................10, 23

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ........................................................7, 10, 19

**Statutes**

Cal. Bus. & Prof. Code § 22675 .................................................................6, 17

Cal. Health & Safety Code § 27000.5.............................................. *passim*

Cal. Health & Safety Code § 27001.................................................. *passim*

Cal. Health & Safety Code § 27002.................................................. *passim*

Cal. Health & Safety Code § 27005.............................................................9, 18

Cal. Health & Safety Code § 27006.................................................. *passim*

Cal. Senate Bill 976 (2024) § 1...................................................................19

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**NOTICE OF MOTION**

Plaintiff NetChoice will submit an amended notice of motion setting forth the date and time for hearing, once set by the Court.

**RELIEF SOUGHT**

Plaintiff respectfully requests a preliminary injunction prohibiting Defendant from enforcing California Senate Bill 976 (2024) ("Act" or "SB976") against NetChoice's regulated members until this matter may be resolved on the merits. Plaintiff requests that the Court enter such injunction **before January 1, 2025**, the Act's effective date. NetChoice members and their users face immediate and irreparable harm without an injunction. The Act will unconstitutionally impede adults and minors' access to vast amounts of constitutionally protected speech. The First Amendment prohibits the Act's requirements that covered websites—explicitly defined in content-based and speaker-based terms—to secure parental consent before allowing minor users to access personalized feeds, to view such feeds for more than one hour per day, and to receive notifications at certain times of day. The First Amendment also prohibits the requirement to conduct age assurance of all covered websites' users—minors and adults.[1] The Act also violates the First and Fourteenth Amendments because its central coverage definition distinguishing among different kinds of "[a]ddictive internet-based service[s]" is unconstitutionally vague. § 27000(b)(1).

**INTRODUCTION**

California is again attempting to unconstitutionally restrict minors' access to protected online speech—while impairing adults' access too. California Senate Bill 976 uses content-based and speaker-based coverage provisions to target disfavored covered websites. The Act restricts users' access to, and engagement with, protected speech on those websites. It does so by requiring parental consent for minor users, §§ 27001(a), 27002(a), (b)(2); and age assurance for *all* users (minors and adults), §§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c), before permitting those users to access and engage in protected speech displayed to them in particular ways and at times they

---

[1] This Motion refers to "internet website[s], online service[s], online application[s], online service[s], [and] mobile application[s]," § 27000.5(7)(b)(1), as "websites." It refers to websites regulated by challenged provisions of the Act as "covered websites." Unless otherwise noted, statutory citations in this Motion refer to the California Health & Safety Code.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

choose. This violates the First Amendment under established precedent. And the Act restricts the websites' ability to present protected speech, which also violates the First Amendment. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393, 2400-01 (2024). This Court should follow the courts across the country that have unanimously barred enforcement of similar laws and enjoin the Act before its January 1, 2025, effective date. *E.g.*, *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ("*CCIA*"); *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).

"Minors are entitled to a significant measure of First Amendment protection," and the government's power to protect children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (citation omitted). Furthermore, governmental efforts to regulate speech appropriate for minors cannot infringe or burden adult speech rights. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997).

These principles apply with equal force online: governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Moody*, 144 S. Ct. at 2399 (citation omitted). On the Internet, all Americans can "gain access to information and communicate with one another on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). That speech often takes place on NetChoice members' websites. These websites disseminate a "staggering amount" of protected speech. *Moody*, 144 S. Ct. at 2395. They do this primarily through displaying "feeds" that are "personalized" to each user. *Id.* at 2403. These personalized feeds are fully protected by the First Amendment. *Id.* at 2393.

The Act unconstitutionally stifles this protected speech. The Act's parental-consent requirements (§§ 27001(a), 27002(a), (b)(2)) restrict access to protected speech, defying the Supreme Court's recognition that governments lack the "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S.at 795 n.3 (emphasis omitted); *see Fitch*, 2024 WL 3276409, at *12-13 (enjoining similar parental-consent requirement for

2

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

social media websites); *Yost*, 716 F. Supp. 3d at 557-60 (same); *Griffin*, 2023 WL 5660155, at *17 (same); *see also Reyes*, 2024 WL 4135626, at *13 & n.135 (similar). And the Act's age-assurance requirement (§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c)) unconstitutionally restricts access to protected speech for both minors and adults. *See, e.g.*, *Ashcroft*, 542 U.S. at 667 (invalidating age-verification requirement); *Reno*, 521 U.S. at 882 (same); *Reyes*, 2024 WL 4135626, at *16 n.169 (same); *Fitch*, 2024 WL 3276409, at *11-12 (similar); *Griffin*, 2023 WL 5660155, at *17 (similar).

Compounding the First Amendment violations, the Act imposes its speech regulations only on select websites by using a content-based, speaker-based, and vague coverage definition of "[a]ddictive internet-based service or application." § 27000.5(b). That triggers strict scrutiny for all of the Act's speech regulations. The Act's coverage also creates illogical results. YouTube must comply with the Act, but streaming services—which use algorithms to present personalized rec-ommendations of movies and shows—are exempted. § 27000.5(b)(1). Pinterest is regulated, but it would not be if it restricted users' discussions to "consumer reviews of products" online. § 27000.5(b)(2)(A). X is restricted in when it can send notifications to a minor about breaking news about a natural disaster, but ESPN can send the same minor unlimited notifications at any time of day. The State's decision to pick favored and less favored websites based on the content of their speech and the identity of the speaker means that the Act's regulations are underinclusive and not appropriately tailored. In any event the State lacks a sufficient governmental interest to justify the Act's direct attack on online speech.

This Court should enter a preliminary injunction before January 1, 2025.

## STATEMENT OF THE ISSUES

1.  Is NetChoice likely to succeed on the merits of its claims that the Act's speech regula-tions violate the First Amendment?

2.  Is NetChoice likely to succeed on the merits of its claims that the Act's speech regula-tions are vague in violation of the First and Fourteenth Amendments?

3.  Will NetChoice members and their users be irreparably harmed without an injunction of the Act's speech regulations?

4.  Do the balance of the hardships and public interest favor enjoining Defendant's en-forcement of the Act's speech regulations against NetChoice members?

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

1

2

**BACKGROUND**

3

**A. NetChoice-member websites disseminate vast amounts of protected speech.**

4

NetChoice is a leading Internet trade association. Based on the Act's coverage definition,

5

the Act regulates some websites operated by the following NetChoice members: (1) Google

6

(YouTube); (2) Meta (Facebook and Instagram); (3) Nextdoor; (4) Pinterest; and (5) X. *See* Cle-

7

land Decl. ¶ 26. This Motion refers to members with services the Act regulates as "members."

8

Although each NetChoice member is unique, they all aim to facilitate social interaction

9

among users through the dissemination of protected speech. *E.g.*, Veitch Decl. ¶¶ 8-9. This case

10

concerns two of the ways that NetChoice members do so. *First*, these websites "engage[] in ex-

11

pression" by "display[ing]," "compil[ing,] and curat[ing]" protected "third-party speech" (text,

12

audio, images, and video) "created by others." *Moody*, 144 S. Ct. at 2393, 2400-01; *see* Cleland

13

Decl. ¶¶ 5-7; Davis Decl. ¶¶ 10-12; Veitch Decl. ¶ 21. Such websites "allow users to upload con-

14

tent . . . to share with others," and those "viewing the content can" "react to it, comment on it, or

15

share it themselves." *Moody*, 144 S. Ct. at 2394-95. Because it is impossible for any user to find

16

or view even a meaningful portion of the billions of pieces of content on the websites, these web-

17

sites display speech through "stream[s] of other users' posts" that are "personalized" to each user.

18

*Id.* at 2403. It would be impossible to foster a unique community without elevating the people and

19

ideas a user is interested in. So, many NetChoice members display a personalized page for each

20

user, which various websites may call a "feed," "for you," "following," or "landing" page. Cleland

21

Decl. ¶¶ 8, 33; *Moody*, 144 S. Ct. at 2395. Such personalized pages allow users to see content

22

created and shared by family, friends, and others in a way that ensures users are presented with the

23

most useful, relevant, and high-quality content—rather than be lost in the all-but endless stream of

24

material posted online. *E.g.*, Veitch Decl. ¶ 21. Moreover, by personalizing these feeds, websites

25

can prioritize the safety of, and display age-appropriate content to, minors. *E.g.*, *id.* ¶ 43. In other

26

words, personalized feeds display to users more content they want to see and less, if any, content

27

they do not want to see or that may not be appropriate for them. Davis Decl. ¶ 12.

28

*Second*, many members allow users to receive notifications. These notifications inform

users about recommended content, announcements, activities of their connections, or suspicious

4

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

account logins—among other things. Cleland Decl. ¶ 9; Veitch Decl. ¶ 45. Some notifications are designed specifically for safety updates, such as Facebook's "marked safe" notifications during disasters or other emergencies like wildfires and earthquakes. *E.g.*, Davis Decl. ¶¶ 20-21. Thus, notifications are an important tool websites use to communicate with their users and to enable those users to communicate with other users. Cleland Decl. ¶ 34. Members allow users to change what notifications they receive. *Id.* ¶ 9; Veitch Decl. ¶ 45. And device manufacturers also allow users to control what notifications they see on their devices; to permit them only during certain times of day; or to turn them off entirely. Cleland Decl. ¶ 9. Notifications are ubiquitous among nearly all services, including those exempted from the Act, like Apple News, Disney+, ESPN, Libby, The Wall Street Journal, and The New York Times, as well as messaging and other shopping applications. *Id.* ¶ 10.

**B. Parents have many tools to oversee how their children use the Internet.**

Parents can and do control their children's online experiences. *Id.* ¶ 11 To start, parents control what *devices* minors can access—and when. *Id.* ¶ 12. Not all devices are Internet-enabled. And devices come with many parental-control options, including the ability to lock or limit specific apps and features, restrict the device settings to limit content and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* ¶ 14.

Parents also control the *networks* minors use. Wireless routers allow parents to manage which network a minor connects to and to set up rules defining which Internet websites minors can use (and at what times). *Id.* ¶ 13. Many Internet service providers offer similar controls. *Id.*

Parents also control *software*. Web browsers offer parental controls. *Id.* ¶ 15. And third-party parental control software is available for many devices. *Id.* ¶ 14. In addition, many members have developed their own suite of parental controls and other protections for minors. *E.g.*, *id.* ¶¶ 16-22; Davis Decl. ¶¶ 30-37; Veitch Decl. ¶¶ 12-28; *see* Paolucci Decl. ¶ 10. These controls supplement the resources that members spend crafting and enforcing "content moderation" policies that aim to prevent harmful or objectionable speech from reaching users. *E.g.*, Cleland Decl. ¶ 23; Davis Decl. ¶¶ 38-51; Veitch Decl. ¶¶ 29-37. These members' efforts have been successful. Cleland Decl. ¶ 23.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## C. California Senate Bill 976

The Act takes effect on January 1, 2025.

**1. Covered actors and activities (§ 27000.5(b)).** The Act's speech regulations apply to only a subset of Internet "actors" and "activities." *Moody*, 144 S. Ct. at 2398. The Act selects websites for regulation by discriminating based on content and speaker.

The Act regulates only what it calls "[a]ddictive internet-based service[s] or application[s]" providing "addictive feed[s]." § 27000.5(b)(1).[2] The Act defines "[a]ddictive internet-based service or application" as "an internet website . . . including, but not limited to, a 'social media platform' as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service." *Id.* The Act defines an "[a]ddictive feed" as "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are … recommended, selected, or prioritized for display to a user based … on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5(a). So it is the very engagement in what the Supreme Court has recognized as protected First Amendment activity that subjects websites to regulation: displaying "feeds" of "personalized" and "curated compilation[s]" of user-generated "third-party speech." *Moody*, 144 S. Ct. at 2399-2400, 2403.

The Act both includes and excludes websites using content-based and speaker-based definitions. The Act *includes* websites based on whether one of their substantial functions "is to connect users in order to allow users to interact socially with each other within the service or application." Cal. Bus. & Prof. Code § 22675(1)(A). And the Act *excludes* feeds if "any of [seven] conditions are met." § 27000.5(a).[3] The Act also excludes "[a]n internet website . . . for which interactions between users are limited to commercial transactions or to consumer reviews of products,

---

[2] NetChoice does not agree with the Act's pejorative label of "[a]ddictive internet-based service" or "[a]ddictive feed" to refer to websites that have personalized feeds for users.

[3] Those seven "conditions" include the following:

    (1) The information is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others.

    (2) The information consists of search terms that are not persistently associated with the user or user's device.

---

6

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

sellers, services, events, or places, or any combination thereof." § 27000.5(b)(2).

In sum, the Act targets "social media" feeds, so this Court "need not speculate" about any "hypothetical or imaginary cases." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (cleaned up). The Act's "[a]ddictive internet-based service" and "[a]ddictive feed" definitions, § 27000.5(a), (b)(1), cover the "individualized" and "personalized" "social media" feeds that *Moody* held are entitled to First Amendment protection, 144 S. Ct. at 2398, 2403, and that courts around the country have found minors have a right to access, unencumbered by the government, *see supra* p.2. And the Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply. The Act's exclusion of services where interactions between users are limited to "commercial transactions or to consumer reviews," § 27000.5(b)(2)(A), excludes "ride-sharing service[s]," "payment service[s]," and "online marketplace[s]," *Moody*, 144 S. Ct. at 2398. And the Act's exclusion for "direct, private communications," § 27000.5(a)(5), excludes "direct messaging" and "email," *Moody*, 144 S. Ct. at 2398.

**2. The Act's speech regulations.**

**Parental consent to view personalized feeds (§ 27001(a)).** The Act provides that "[i]t shall be unlawful for the operator of" a covered website "to provide an addictive feed to" a minor "user unless … [t]he operator has obtained verifiable parental consent to provide an addictive feed to the user who is a minor." § 27001(a).

---

(3) The information consists of user-selected privacy or accessibility settings, technical information concerning the user's device, or device communications or signals concerning whether the user is a minor.

(4) The user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media, or the blocking, prioritization, or deprioritization of such media, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device, except as otherwise permitted by this chapter and, in the case of audio or video content, is not automatically played.

(5) The media consists of direct, private communications between users.

(6) The media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played.

(7) The recommendation, selection, or prioritization of the media is necessary to comply with this chapter or any regulations promulgated pursuant to this chapter.

§ 27000.5(a).

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

1

2       **Parental consent to view personalized feeds for more than one hour per day**

3  **(§ 27002(b)(2)).** Even if covered websites obtain parental consent to provide a personalized feed

4  to minor users, the Act requires covered websites to implement a "default" setting limiting minor

5  users' access to "one hour per day *unless modified by the verified parent*." § 27002(b)(2) (emphasis

6  added). Although the Act's other default requirements on minors' accounts (discussed below) may

7  potentially be overridden by minors or their parents, this provision can be overridden only by

8  parents. Thus, this provision requires parental consent before minor users can access personalized

9  feeds for more than one hour per day.

10      **Parental consent to receive notifications at particular times (§ 27002(a)).** The Act

11 makes it "unlawful for" a covered website, "between the hours of 12 a.m. and 6 a.m., in the user's

12 local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from

13 September through May in the user's local time zone, to send notifications to a user . . . unless the

14 operator has obtained verifiable parental consent to send those notifications." § 27002(a).

15      **Age assurance (§§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c)).** The Act requires covered

16 websites to assure themselves of all users' ages. From January 1, 2025, to December 31, 2026,

17 covered websites must secure parental consent from users that covered websites have "actual

18 knowledge" are minors. §§ 27001(a)(1)(A), 27002(a)(1). Starting January 1, 2027, however, cov-

19 ered websites must use "age assurance" for all their users to determine which users are minors—

20 that is, they will need to treat as minors those users that their age-assurance processes "reasonably

21 determine" are minors. §§ 27001(a)(1)(B), 27002(a)(2), 27006(b).

22      The Act provides that "[i]nformation collected for the purpose of determining a user's age

23 or verifying parental consent pursuant to this chapter shall not be used for any purpose other than

24 compliance with" the Act or another law, and that the "information collected shall be deleted im-

25 mediately after it is used to determine a user's age or to verify parental consent, except as necessary

26 to comply with state or federal law." § 270001(b). Although this provision contemplates that "in-

27 formation" is required to perform age assurance and verify parental consent, it does not define that

28 term nor state how a covered website can use such information to perform age assurance or verify

parental consent.

**Default limitations on minors' accounts (§ 27002(b)(1), (3)-(5)).** The Act requires covered websites to establish certain default settings for minor users' accounts and provide parents with the ability to implement or change those settings. Specifically, covered websites must "provide . . . mechanism[s]" for parents to (1) "[p]revent their child from accessing or receiving notifications . . . between specific hours chosen by the parent" (limiting access between 12 a.m. and 6 a.m. by default); (2) "[l]imit their child's ability to view the number of likes or other forms of feedback" on a personalized feed; (3) require the default feed provided to the child on the website not "recommend[], select[], or prioritize[]" media "based on information provided by the user, or otherwise associated with the user or the users' device, other than the user's age or status as a minor"; and (4) set "their child's account to private mode," where only users connected to the child "may view or respond to content posted by the child." § 27002(b)(1), (3)-(5). All such mechanisms must be set to "on" by default, limiting speech the speech available to minors. *Id.* The Act thus burdens covered websites' protected speech, and minors' access to protected speech.

**Disclosures (§ 27005).** The Act requires covered websites to "publicly disclose, on an annual basis, the number of minor users of its addictive internet-based service." § 27005. Covered websites must also annually disclose "the number [of minor users] for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the [above defaults] are or are not enabled." *Id.* These disclosure requirements are speech regulations, compelling covered websites to speak and burdening their protected speech. Moreover, the disclosure provision requires covered websites to report statistics to the government under the rubric of a pejorative "addictive" label that they disagree with. *E.g.*, Cleland Decl. ¶ 36.

**3. Enforcement (§ 27006(a)).** The Act "may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General." § 27006(a).

## ARGUMENT

NetChoice is entitled to a preliminary injunction because (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024).

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

NetChoice has associational standing to assert its members' rights and obtain relief remedying members' First Amendment and financial injuries. *E.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).[4] NetChoice also has standing to assert the First Amendment rights of its members' users—current and prospective. *E.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).[5] That includes the rights of minors. It is long settled that "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975).

NetChoice raises both a facial challenge to the Act's speech regulations and a challenge to the Act's speech regulations as applied to the regulated NetChoice members and services listed above. *See supra* p.4. For Plaintiff's facial First Amendment claims, the Act should "be struck down in its entirety" because its "unconstitutional applications substantially outweigh its constitutional ones . . . judged in relation to the statute's plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted). This inquiry "first" asks what "actors" and "activities" are regulated by the Act. *Id.* at 2398. It "next" compares the Act's unconstitutional applications with any constitutional applications, asking whether the former "substantially outweigh" the latter. *Id.* at 2397-98.

That inquiry here is straightforward "from the face of the law" because all aspects of the Act's speech regulations, "in every application . . . raise the same First Amendment issues." *X Corp.*, 116 F.4th at 899; *see Reyes*, 2024 WL 4135626, at *9 n.92. At a minimum, the Act is invalid as applied to members' regulated services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).

## I.    NetChoice is likely to succeed on the merits of its claims that the Act's speech regulations violate the First Amendment.

Under Ninth Circuit precedent, "the moving party" in First Amendment cases need only carry the "initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th

---

[4] Courts addressing First Amendment claims asserted by NetChoice have repeatedly reached the same conclusion. *See Reyes*, 2024 WL 4135626, at *7; *CCIA*, 2024 WL 4051786, at *8-9; *Fitch*, 2024 WL 3276409, at *5-6; *Yost*, 716 F. Supp. 3d at 548-50; *Griffin*, 2023 WL 5660155, at *9-10.

[5] *See CCIA*, 2024 WL 4051786, at *9; *Fitch*, 2024 WL 3276409, at *7; *Yost*, 716 F. Supp. 3d at 550-51; *Griffin*, 2023 WL 5660155, at *11-12.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

1

2    Cir. 2024) (citation omitted). The burden then "shifts to the government to justify the restriction

3    on speech." *Id.* (citation omitted).

4          NetChoice easily establishes a colorable First Amendment claim. And the government can-

5    not meet its burden to justify the Act because its parental-consent, age-assurance, default-limita-

6    tion, and disclosure provisions all trigger and fail First Amendment strict scrutiny.

7          **A.  The Act's speech regulations trigger strict scrutiny.**

8          Each of the Act's speech regulations triggers First Amendment strict scrutiny. "When the

9    Government restricts speech, the Government bears the burden of proving the constitutionality of

10   its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). Laws restricting access to

11   protected speech or regulating speech based on content are subject to "strict scrutiny." *Reed v.*

12   *Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

13         The "basic principles of freedom of speech and the press . . . do not vary when a new and

14   different medium for communication appears." *Brown*, 564 U.S. at 790 (cleaned up). Thus, "the

15   First Amendment . . . does not go on leave when social media are involved." *Moody*, 144 S. Ct. at

16   2394. Covered websites "engage[] in expression" through their "display" and "compiling and

17   curating" of protected "third-party speech" in "personalized" "feeds." *Id.* at 2393, 2401, 2403. The

18   "speech social media companies engage in when they make decisions about how to construct and

19   operate their platforms . . . is protected" by the First Amendment. *Reyes*, 2024 WL 4135626, at

20   *8; *see Moody*, 144 S. Ct. at 2406 (websites' decisions about "which third-party content . . . [to]

21   display, or how the display will be ordered and organized," are "expressive choices" that "receive

22   First Amendment protection"). Yet the Act directly regulates that speech activity and puts signif-

23   icant restrictions on access to the expressive compilations of speech that covered websites offer.

24   "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legit-

25   imate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108 (holding that even con-

26   tent-neutral restriction on access to social media websites failed heightened First Amendment scru-

27   tiny).

28

11

1

2

**1. The Act's parental-consent requirements for minors to access protected speech violate the First Amendment (§§ 27001(a), 27002(a), (b)(2)).**

3

The Act violates the First Amendment by requiring minors to secure parental consent be-

4

fore accessing personalized feeds, § 270001(a), accessing personalized feeds for more than one

5

hour per day, § 27002(a), and receiving notifications during specific times, § 27002(b)(2). *See*

6

*Yost*, 716 F. Supp. 3d at 558 ("[L]aws that require parental consent for children to access consti-

7

tutionally protected, non-obscene content, are subject to strict scrutiny."). This would affect minor

8

users' ability to see their preferred content and receive notifications about protected speech, in-

9

cluding sharing "vacation photos" on Facebook and Instagram; looking for work in the neighbor-

10

hood on Nextdoor; learning how to solve math problems or master chemistry on YouTube; "peti-

11

tion[ing] their elected representatives" on X; and otherwise creating or receiving protected speech

12

on covered websites. *Packingham*, 582 U.S. at 104-05; *see* Davis Decl. ¶¶ 13-19, 22-24.

13

Minors have a First Amendment "right to speak or be spoken to," and "the state" lacks the

14

"power to prevent children from hearing or saying anything without their parents' prior consent."

15

*Brown*, 564 U.S. at 795 n.3 (emphasis omitted). *Brown* invalidated a law prohibiting the sale or

16

rental of "violent video games" to minors while allowing minors to play such games with parental

17

consent. *Id.* at 802. The Supreme Court noted that any other result would allow governments to

18

require parental consent for, say, "political rall[ies]" or "religious" services. *Id.* at 795 n.3. The

19

Court rejected that proposition. *Id.* Furthermore, the "absence of any historical warrant or compel-

20

ling justification for such [a] restriction[] . . . renders [it] invalid." *Id.* The country lacks a

21

"longstanding tradition . . . of specially restricting children's access to" protected speech. *Id.* at

22

795. And governments may not rely on the "unprecedented and mistaken" strategy of "creat[ing]

23

new categories of unprotected speech" specifically for minors. *Id.* at 792, 794. Without "historical

24

warrant," the Act's requirement for parental-consent is "invalid" under any standard of heightened

25

First Amendment scrutiny. *Id.* at 795 n.3.

26

Following *Brown*, courts have repeatedly rejected parental-consent requirements for mi-

27

nors to access and engage in protected speech online, specifically on "social media" websites op-

28

erated by NetChoice members. *Yost* rejected Ohio's parental-consent requirement to access social

12

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

media websites. *See* 716 F. Supp. 3d at 557-60. *Griffin* rejected Arkansas's parental-consent requirement to access "social media platforms." 2023 WL 5660155, at *17. *Fitch* rejected Mississippi's parental-consent requirement to access a "broad range of covered [social media] websites." 2024 WL 3276409, at *12-13. And *Reyes* rejected Utah's parental-consent requirement for minors to speak to certain audiences on "social media service[s]." 2024 WL 4135626, at *13 & n.135.

This Act's parental-consent requirements should be rejected for the same reasons. They would impose a substantial barrier between minors and the "vast quantities of constitutionally protected speech" on social media services. *Griffin*, 2023 WL 5660155, at *17. The Act restricts minors' access to protected speech by requiring them to obtain parental consent to access "personalized feeds" at all or to access personalized feeds for more than one hour per day. *See Moody*, 144 S. Ct. at 2393, 2403, 2405 (holding that "feeds" that are "personalized" to each user are protected by the First Amendment). Minors cannot access feeds personalized for their interests based on information provided by or associated with the user, unless their parents approve. Moreover, given the Act's definition of "[a]ddictive feed," some covered websites may not be able to comply with the Act without limiting their services to a generic, chronological webpage, eliminating the social interaction and personalized features available on these websites. The Act thus improperly "impose[s] governmental authority" over how minors can access protected speech and when, "subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3 (emphasis omitted).

Moreover, the Act impedes websites' ability to engage in precisely the dissemination of "personalized" speech that *Moody* just held is protected by the First Amendment from governmental interference. 144 S. Ct. at 2393, 2403, 2405. Indeed, the Act makes the very curatorial activity that *Moody* held expressive the trigger for the restrictions foreclosing minors' access to speech without parental consent. Minors are free to log on unsupervised to see a torrent of undifferentiated content, but the moment a website exercises its editorial judgments to present third-party speech in a way that is orderly, useful, and tailored, the Act kicks in and requires parental consent.

The same is true of the Act's parental-consent requirement to receive notifications during certain times of day. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 837 (N.D. Cal. 2023) ("[T]he timing and clustering of notifications . . . is entitled

13

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

to First Amendment protection."). Covered websites use notifications to inform users about other users' content and to communicate with users. *E.g.*, Davis Decl. ¶ 60. Users, including minors, rely on notifications at all times of the day—from high school athletes receiving important updates before their 5:30 a.m. workouts or a teenager getting late night "marked safe" notifications from a family member on the other side of the world during a natural disaster. Thus, notifications contain everything from protected "[f]acts" to opinion about useful content—all of which are protected speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). The Act prohibits covered websites from using notifications to communicate factual information to minors unless their parents consent—a type of regulation the First Amendment does not allow. *Brown,* 546 U.S. at 795 n.3 (rejecting idea "that the state has the power to prevent children from hearing or saying anything without their parents' prior consent" (emphasis omitted)).

Compounding the constitutional infirmities, the Act does not define "verifiable parental consent," §§ 27001(a)(2), 27002(a), and does not account for the difficulty in verifying a parent-child relationship. There will be cases in which a lack of parental *consent* does not reflect a lack of parental *approval*. When enjoining a similar parental-consent requirement, *Griffin* credited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." 2023 WL 5660155, at *4; *see also Fitch*, 2024 WL 3276409, at *13 (similar). "If a parent wants to give her child permission to create an account, but the parent and the child have different last names, it is not clear what, if anything, the social media company or third-party servicer must do to prove a parental relationship exists. And if a child is the product of divorced parents who disagree about parental permission, proof of express consent will be that much trickier to establish—especially without guidance from the State." *Griffin*, 2023 WL 5660155, at *14; *see* Veitch Decl. ¶ 42; Paolucci Decl. ¶¶ 20-22. "Disputes about . . . the person claiming to be [a] parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common." Paolucci Decl. ¶ 22. Covered websites are likely to "err on the side of caution and require detailed proof of the parental relationship." *Griffin*, 2023 WL 5660155, at *15. Thus, "parents and guardians who otherwise would have freely given consent . . . will be dissuaded by the red tape" and the loss of their own anonymity. *Id.* Those obstacles will drive them

14

1
2    to "refuse consent—which will unnecessarily burden minors' access to constitutionally protected

3    speech"—here, personalized feeds and notifications. *Id.*

4            **2.    The Act's age-assurance requirements for both minors and adults to**
               **access    protected    speech    violates    the    First    Amendment**
5              **(§§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c)).**

6        The Act also violates the First Amendment by requiring covered websites to engage in "age

7    assurance" before being allowed to engage in protected and valuable speech. This will require

8    covered websites to "collect[ ]" personal "information" or documentation to continue offering their

9    services. § 27001(b). As a result, all users—minors *and adults* alike—will face "significant bur-

10   dens on . . . access to constitutionally protected speech," which will "discourage users from ac-

11   cessing the regulated sites," *Griffin*, 2023 WL 5660155, at *17 (cleaned up).

12       In particular, under the Act's age-assurance requirement, covered websites would need to

13   "collect[ ]" sufficient personal "information," before allowing both minors and adults to access or

14   engage in core protected speech. § 27001(b). That core protected speech would include the exam-

15   ples cited on page 12, in addition to many more: engaging in advocacy, exploring their hobbies,

16   and staying connected with family.

17       The First Amendment prohibits this burden to access protected speech. The Act unlawfully

18   bars access to speech entirely for those unwilling or unable to provide the requisite documentation.

19   *See, e.g.*, *Reno*, 521 U.S. at 856; Davis Decl. ¶ 59; Paolucci Decl. ¶¶ 14-18; Veitch ¶ 50. The Su-

20   preme Court has held that governments cannot require people to provide personal information or

21   documentation—such as "identif[ication]" or "credit card information"—to access protected

22   speech. *Ashcroft*, 542 U.S. at 667; *see Reno*, 521 U.S. at 882. Yet under the Act, covered websites

23   must place *all* content on personalized feeds behind an age-assurance system, § 27001(a)(1)(B),

24   and must restrict sending notifications on any number of subjects based on the results of age-

25   assurance, § 27002(a)(2). That is much broader than the age-verification law held unconstitutional

26   in *Ashcroft*, which regulated "sexually explicit materials on the Internet." 542 U.S. at 659. The

27   Act's age-assurance provision is therefore unconstitutional. *See id.* at 667-68 (voluntary "[b]lock-

28   ing and filtering software is an alternative that is less restrictive than [age-verification]").

         Recent cases have rejected similar age-assurance requirements for social-media websites.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

*Reyes* concluded "the Act's age assurance provision, which applies to all users, [will] broadly burden[] adult users' ability to 'access a broad range of protected speech on a broad range of covered websites.'" 2024 WL 4135626, at *16 n.169 (quoting *Fitch*, 2024 WL 3276409, at *12). Likewise, *Griffin* concluded that "[i]t is likely that many adults" and minors "who otherwise would be interested in becoming account holders . . . will be deterred—and their speech chilled—as a result of the age-verification requirements." 2023 WL 5660155, at *17. Those who are willing to comply with these requirements must "forgo the anonymity otherwise available on the internet" as the price of admission. *Id.* (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) ("relinquish their anonymity to access protected speech"). *Fitch* applied the same principles in enjoining Mississippi's age-verification requirement. 2024 WL 3276409, at *11-12. Here too, the Act's age-assurance requirement would impose an impermissible hurdle for all users to access and exchange protected speech.

### 3. The Act's speech regulations apply to only a subset of Internet websites based on content and speaker, which independently triggers strict scrutiny for all the Act's speech regulations.

The Act's speech regulations also trigger strict scrutiny because the Act's coverage definition of "[a]ddictive internet-based service" is content-based and speaker-based. § 27000.5(b).

*Content-based distinctions.* The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government" satisfies "strict scrutiny." *Reed*, 576 U.S. at 163-64.

The Act's central coverage definitions are facially content-based, rendering all the Act's operative speech regulations content-based and subject to strict scrutiny. *Sorrell*, 564 U.S. at 566 ("[C]ontent-based burdens must satisfy the same rigorous scrutiny as [] content-based bans." (citation omitted)). The Act selects covered websites for regulation based on the "subject matter" disseminated and thus their "content." *Reed*, 576 U.S. at 163. The Act both *includes* websites based on whether one of their substantial functions "is to connect users in order to allow users to interact

16

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

socially with each other," Cal. Bus. & Prof. Code § 22675(1)(A), and *excludes* websites that display "pieces of media generated or shared by [other] users," but not websites that display self-generated content in significant part, § 27000.5(a). The Act thus singles out the websites that have made editorial choices to foster social interaction between users. Courts have held that regulations singling out websites that allow users to "interact socially" for particular speech-related burdens are content-based and subject to strict scrutiny. *See Yost*, 716 F. Supp. 3d at 557; *Fitch*, 2024 WL 3276409, at *9. Moreover, the Act excludes websites that facilitate "commercial transactions" and "consumer reviews of products, sellers, services, events, or places." § 27000.5(b)(2)(A). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see Reyes*, 2024 WL 4135626, at *10; *Fitch*, 2024 WL 3276409, at *9.

As *Yost* said when concluding that similar exceptions rendered a law's speech restrictions content-based, the "exception[] to the Act for product review websites" is "easy to categorize as content based." 716 F. Supp. 3d at 557. Under the Act, websites that focus on state-preferred topics—such as "consumer reviews," § 27000.5(b)(2)(A)—may serve minors without regulation. And users can access those websites without state-imposed hurdles. But covered websites are subjected to onerous regulations based on the content on their services. So are their users. Although a 17-year-old may freely respond to "consumer reviews" of her dog-sitting business on Yelp, § 27000.5(b)(2)(A), she cannot promote that same business to her neighbors on Nextdoor without parental consent. The Act's burdens are quintessentially content-based, so they are "presumptively unconstitutional." *Reed*, 576 U.S. at 163-64.

*Speaker-based.* The Supreme Court is also "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) ("*NIFLA*") (cleaned up). Laws that "distinguish[] among different speakers" are "all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Speaker-based laws "present serious First Amendment concerns" when they "discriminate . . . among different speakers within a single medium" or "f[a]ll upon only a small number" of speakers. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994). "[L]aws that

17

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

single out" certain subsets of speakers "are always subject to at least some degree of heightened First Amendment scrutiny." *Id.* at 640-41 (citation omitted).

Here, the Act "covers a curiously narrow subset of speakers." *NIFLA*, 585 U.S. at 777. It discriminates based on *who* is disseminating speech—regulating covered websites but not others focused on "consumer reviews." § 27000.5(b)(2)(A); *see Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting law that "target[ed] a small group of newspapers"). The Act also favors "provider-generated content over user-generated content." *CCIA*, 2024 WL 4051786, at *10. The Act burdens websites that provide personalized feeds of "media generated or shared *by users*." § 27000.5(a) (emphasis added). But it does not burden websites that provide content generated *by the website*, even if that content is likewise displayed in a personalized feed. Thus, while minors can freely access algorithmically curated feeds of shows selected by streaming services, they cannot access personalized feeds of clips from those same shows on YouTube without facing age-assurance and parental-consent restrictions.[6]

Because the Act's central coverage definition is both content-based and speaker-based, so too is each provision of the Act regulating speech that relies on this definition. *See Reyes*, 2024 WL 4135626, at *8 ("the entire Act facially violates the First Amendment because the Act's operative [speech-restricting] provisions each rely on the Central Coverage Definition"). The Act's parental-consent requirements, §§ 27001(a), 27002(a), (b)(2), rely on this definition to select which websites minors must obtain parental consent to access. The Act's age-assurance requirements, §§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c), rely on this definition to select which websites users must provide personal information to access. The Act's default-limitations, § 27002(b)(1), (3)-(5), are "[g]overnment regulation[s] of speech." *Reed*, 576 U.S. at 163. So too is the Act's disclosure requirement, § 27005, which triggers strict scrutiny for another reason: It requires covered websites to implicitly adopt the State's pejorative labeling of their services and

---

[6] Furthermore, the Act arbitrarily exempts feeds that are "a preexisting sequence from the *same author, creator, poster, or source*." § 27000.5(a)(6) (emphasis added). But it does not exempt feeds that sequence media from *different authors, creators, posters, or sources*. This is like a law that permits newspapers to publish the same institutional authors but forbids letters to the editor. *See Yost*, 716 F. Supp. 3d at 552. And the Act burdens websites that disseminate "media generated or shared by users" using personalized feeds, § 27000.5(a), but not other websites that use other forms of disseminating content—including content that is generated by users. These provisions, too, are content-based and speaker-based restrictions that trigger strict scrutiny.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

feeds as "addictive." *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) ("[R]equiring a company to publicly condemn itself . . . makes the requirement more constitutionally offensive."); *see X Corp.*, 116 F.4th at 901 ("opining" about "controversial" topics is "not commercial speech"). Because these provisions regulate core First Amendment activity based on content and speaker, each triggers strict scrutiny, and none can satisfy it.

**B. The Act's speech regulations fail strict scrutiny and any other form of heightened First Amendment scrutiny.**

Under strict scrutiny, Defendant must demonstrate for each provision that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (citation omitted). Neither the Act nor any of its individual provisions can satisfy this standard. Nor can it satisfy any form of heightened scrutiny, as it is not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted).

**1. The State lacks a sufficient governmental interest in restricting adults and minors' access to protected speech.**

The State must "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up). "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will a government's mere "predictive judgment[s]" about harm. *Id.* at 799; *see Reyes*, 2024 WL 4135626, at *12. Moreover, the problem identified must need a *governmental* solution, as compared to a *private* one.

The Supreme Court has already rejected many interests Defendant may assert. At bottom, the State lacks a sufficient governmental interest in regulating access to protected speech.

*Preventing harms.* Although the "State possesses legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citation omitted). And the government may not "protect the young from ideas or images that a legislative body thinks unsuitable." *Erznoznik*, 422 U.S. at 213.

Although the Act's legislative findings discuss general concerns about the "well-being of children and adolescents" from use of social media, § 1(b), they fail to recognize the wealth of means parents have to control their minor children's online activity. *See supra* pp.5-6; *see also*

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

*Reyes*, 2024 WL 4135626, at \*13 & n. 138. NetChoice members also engage in content moderation and provide their own website- and app-level tools to parents. *See supra* pp.5-6. Those are precisely the kinds of private tools that the Supreme Court has repeatedly endorsed as less restrictive means over governmental interventions imposing barriers to accessing lawful speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000). Whatever "modest gap in concerned parents' control" (if any) those private tools leave open, filling it "can hardly be a compelling state interest" as the "government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Brown*, 564 U.S. at 803 & n.9.

*Parental authority.* The Supreme Court has rejected a governmental interest "in aid of parental authority" to restrict minors' access to protected speech. *Id.* at 802. *Brown* "note[d]" the Court's "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* Accepting that argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212-13); *see, e.g.*, *Yost*, 716 F. Supp. 3d at 560.

### 2. The Act's speech regulations are not properly tailored.

Even if the Act served a sufficient governmental interest, its speech regulations are not the "least restrictive means" of pursuing any such interest. *AFP*, 594 U.S. at 607 (citation omitted). Rather, the Act is both "seriously underinclusive" and "seriously overinclusive." *Brown*, 564 U.S. at 805. The "overbreadth in achieving one goal is not cured by the underbreadth in achieving the other." *Id.* Because the Act's "requirements are overbroad, overly restrictive, and underinclusive, they are properly enjoined on their face." *CCIA*, 2024 WL 4051786, at \*16.

#### i. The Act's speech regulations are not the least restrictive means to accomplish any interest the State may assert because many tools already exist for parents to oversee their children online.

The Act's speech regulations are not the "least restrictive" way to accomplish any goals that the State might assert. *AFP*, 594 U.S. at 607 (citation omitted).

Parents already have many options to oversee their children online. *Supra* pp.5-6. California could easily provide "parents the information needed to engage in active supervision" over

20

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

children's Internet access by using those options. *Playboy*, 529 U.S. at 826; *see, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 2024 WL 4135626, at *14; *Fitch*, 2024 WL 3276409, at *11; *Yost*, 716 F. Supp. 3d at 560. That would require only publicizing the diverse supervisory technologies that are already widely available. For example, the State could "encourage the use of filters" that private companies already make available "by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up). Parents could also control notification settings on websites or devices. *See supra* p.5. The State here ignored these less restrictive options. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 815.

Furthermore, members' existing self-regulation is extensive, encompassing content moderation, parental controls, and other tools. *See supra* pp.5-6. Specifically, many services allow users, including minors, to alter the feeds they see and what kinds of notifications they receive—and when. *E.g.*, Cleland Decl. ¶ 9. Devices also allow users to choose what notifications they receive. *Id.* The Supreme Court has held that "voluntary" self-regulatory efforts are less restrictive means to government intervention. *Brown*, 564 U.S. at 803 (video game industry's self-regulation).

### ii.    The Act's central coverage definition, and thus all speech regulations depending on it, are improperly tailored.

Several tailoring flaws pervade all of the Act's speech regulations.

The Act's central coverage definition is vastly overinclusive. It targets websites that disseminate a broad range of protected speech. *See, e.g.*, *Reyes*, 2024 WL 4135626, at *16. The Act does not purport to identify or limit itself to websites that are particularly harmful to minors or even particularly likely to be accessed by minors. *Cf.* Paolucci Decl. ¶ 9. And for the websites it regulates, the Act restricts users' access to *all* personalized feeds and all notifications during certain times without parental consent, which restricts access to core protected speech. That leaves minors in California worse off relative to their peers in other States.

The Act's coverage is also "seriously underinclusive." *Brown*, 564 U.S. at 805. The Act's central coverage definition and its content-based and speaker-based exclusions create pervasive

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

gaps in the regulatory regime the State is attempting to create. *Sorrell*, 564 U.S. at 573 (governmental regulation requires "coherent policy") (citation omitted); *see, e.g.*, *Reyes*, 2024 WL 4135626, at \*15 ("[T]he Act preserves minors' access to the addictive features Defendants express particular concern with on all internet platforms other than social media services."); *CCIA*, 2024 WL 4051786, at \*16. If the State is attempting to provide parents greater control over their minor children's online activity or prevent minors' exposure to purported harmful content, it makes no sense to limit coverage to websites that do not qualify for one of several ill-defined statutory exceptions, such as "commercial transactions" or "consumer reviews." § 27000.5(b)(2)(A); *see Griffin*, 2023 WL 5660155, at \*18. To the extent the State is attempting to regulate particular personalization features or communications it deems harmful to minors, there too the approach is underinclusive. For example, the Act restricts minor users from accessing personalized feeds of music on YouTube, but allows free access to virtually identical feeds on Spotify. § 27000.5(b)(1). The Act restricts minor users from receiving notifications at certain times of day from covered websites, but minors can receive any number of (identical) notifications from sports, direct messaging, gaming, and other websites at any time of day or night. § 27002(a). "'Essentially all applications' . . . send users push notifications." *Reyes*, 2024 WL 4135626, at \*15 n.157 (quoting and crediting NetChoice declaration). Yet the Act only targets a subset of disfavored websites.

> ### iii. The parental-consent and age-assurance provisions are independently improperly tailored.

The parental-consent and age-assurance provisions have additional, unique tailoring flaws.

*Parental consent (§§ 27001(a), 27002(a), (b)(2)).* The parental-consent requirements are not properly tailored. To begin, the Act does "do[es] not enforce *parental* authority"; it "impose[s] *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3; *see Fitch*, 2024 WL 3276409, at \*11; *Yost*, 716 F. Supp. 3d at 559-60; *Griffin*, 2023 WL 5660155, at \*18. The Act's requirements are also underinclusive. If covered websites' personalized feeds and notifications are genuinely "dangerous," it does "not make sense to" allow minors to access them "so long as one parent . . . says it's OK." *Griffin*, 2023 WL 5660155, at \*18 (cleaned up); *see Fitch*, 2024 WL 3276409, at \*13; *Yost*, 716 F. Supp. 3d at 559-60. That is especially true of notifications,

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

which are ubiquitous among online services—yet the Act only regulates certain websites. *Reyes*, 2024 WL 4135626, at *15 n.157. Muzzling speech dissemination to minors on certain covered websites when minors are otherwise free to access the same or substantially similar speech else-where "is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802.

Moreover, the Act's restrictions on when covered websites can send notifications are over- and under-inclusive. Between 12:00 a.m. and 6:00 a.m., minors could not receive important safety notifications from a family member overseas or important updates about before-school sports workouts. Likewise, the date range—that purportedly is designed to mirror school hours—is over-inclusive as it fails to take into account many situations where minors are not in school. That includes vacations, holidays, schools that start later or earlier in the year, homeschoolers, and more.

Furthermore, the Act fails to "take into account juveniles' differing ages and levels of ma-turity." *Am. Booksellers*, 484 U.S. at 396. The Act's one-size-fits-all approach requires express parental consent for all minors across a wide range of developmental stages—from 13-year-olds to 17-year-olds. *Id.*; *see Reno*, 521 U.S. at 865-66.

*Age assurance (§§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c))*. The age-assurance require-ments effectuate the Act's other age-based restrictions. Because those other provisions are uncon-stitutional, age assurance serves no governmental interest. *See, e.g.*, *Griffin*, 2023 WL 5660155, at *21 ("Age-gating social media platforms for adults and minors does not appear to be an effective approach when, in reality, it is the content on particular platforms that is driving the State's true concerns."). Perhaps indicating that age-assurance is not critical to the State's goals, the Act allows covered websites to rely on users' self-declared ages until January 1, 2027. *See supra* p.8.

Furthermore, the age-assurance requirement is overinclusive as to any governmental inter-est limited to minors. Even *adults* must undergo age assurance to access protected speech on cov-ered websites. *See Reyes*, 2024 WL 4135626, at *16 n.169 (age-assurance requirement "appears overinclusive" as it "broadly burdens adult users'" access to protected speech); *Fitch*, 2024 WL 3276409, at *12 ("This burdens adults' First Amendment rights, and that alone makes it overin-clusive."). Impeding adults' access to protected speech in an effort to regulate minors' access to speech renders the Act insufficiently tailored. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**II.     NetChoice is likely to succeed on the merits of its claim that the Act's central coverage definition of "[a]ddictive internet-based service or application" is unconstitutionally vague (§ 27000.5(b)).**

The Act's speech regulations also should be enjoined because the Act's central coverage definition for "[a]ddictive internet-based service[s]" is unconstitutionally vague. § 27000.5(b). The Constitution requires "fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Laws cannot be "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). A vague law implicating First Amendment freedoms is facially unconstitutional if it "reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982). This First Amendment vagueness standard is "more stringent" than the ordinary vagueness standard. *Id.* at 499; *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 n.7 (9th Cir. 2001) (similar).

The Act's central coverage definition is unconstitutionally vague. Most importantly, websites—including NetChoice member Dreamwidth—lack guidance about what feeds constitute "addictive feed[s]" requiring age verification and parental consent. § 27000.5(b); *see* Cleland Decl. ¶ 27; Paolucci Decl. ¶ 12. For example, the Act creates potentially conflicting tests. A website that shows a reverse-chronological feed of content users follow may be excluded from the Act's coverage because the "user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media." § 27000.5(a)(4). But such feeds may instead be "based . . . on other information associated with the user or the user's device." *Id.*

In addition, the Act does not define the vague terms "significant part" and "primary purpose." § 27000.5(b). That means that websites do not know what it means to have a personalized feed "as a significant part" of their service, § 27000.5(b)(1), or what it means to "operate[] a feed for the primary purpose of cloud storage," § 27000.5(b)(2)(B). These vague terms leave "companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements." *Griffin*, 2023 WL 5660155, at *13. This "ambiguity renders a law unconstitutional." *Id.*; *see, e.g.*, *Fitch*, 2024 WL3276409, at *15 (holding that the terms "primarily" and "incidental to" in central coverage definition were "overly indefinite, leaving it open for potential arbitrary and discriminatory enforcement").

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    NetChoice meets all the remaining factors for a preliminary injunction.

"[T]he likelihood of success on the merits . . . is the most important factor in the preliminary injunction analysis[,]" and "it is all the more critical 'when a plaintiff alleges a constitutional violation and injury.'" *Meinecke*, 99 F.4th at 521 (citation omitted). NetChoice meets the remaining factors as well.

The Act will cause Plaintiff and its members irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). NetChoice's "colorable First Amendment claim," shows its members "likely will suffer irreparable harm." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019).

Furthermore, the Act requires covered websites to shoulder steep compliance costs "with no guarantee of eventual recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Each website must create parental-consent and age-assurance technological systems and devise new default settings for certain accounts—at great expense. Cleland Decl. ¶¶ 28-32, 35; Veitch Decl. ¶¶ 41, 48-49, 52. One member has stated that that the Act's compliance burdens are "excess of our available budget." Paolucci Decl. ¶ 27; *see id.* ¶¶ 13, 19, 23-26. Sovereign immunity would prevent later recovery of those expenses from the government. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012).

The final two factors—"harm to the opposing party and . . . the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The fact that [Plaintiff] ha[s] raised serious First Amendment questions compels a finding that … the balance of hardships tips sharply in [Plaintiff's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (cleaned up). And the Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation omitted).

### CONCLUSION

NetChoice requests a preliminary injunction before the Act takes effect on January 1, 2025.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

DATED: Nov. 12, 2024

*/s/ Bradley A. Benbrook*
Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon Grammel*
**LEHOTSKY KELLER COHN LLP**
200 Massachusetts Avenue, NW,
  Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Joshua P. Morrow*
**LEHOTSKY KELLER COHN LLP**
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
**LEHOTSKY KELLER COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

* *Pro hac vice* forthcoming.

*Attorneys for Plaintiff NetChoice*

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**