**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NETCHOICE,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>　　　　　Defendant. | Case No. _____<br><br>**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION** |

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

I, Bartlett Cleland, declare as follows:

1. I am the General Counsel and Director of Strategy Initiatives of Plaintiff NetChoice. As such, I draft and deliver legislative testimony, regulatory comments, and position papers in support of NetChoice's objectives, as well as represent NetChoice in public forums, at industry events, and in meetings with government officials and agencies. I work with team members to execute NetChoice's lobbying efforts at the federal and state levels, educating lawmakers and regulators on technology issues in service of NetChoice's mission. I also assist in developing NetChoice's policy agenda, working closely with the CEO, Board of Directors, and members to identify legislative and regulatory priorities. My role at NetChoice and my previous experience—which includes being a known thought leader, writer, and speaker on all issues of innovation, communications, and technology, having spent twenty-six years in the technology and innovation public policy space—has also made me familiar with other websites, applications, and digital services more broadly.[1]

2. I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

### About NetChoice.

3. NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas. NetChoice has over two

---

[1] This Declaration will refer to all digital services covered by the Act as "covered websites," unless necessary to distinguish among different kinds of digital services. Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

[2] NetChoice, Home, https://perma.cc/QU4H-5KPQ.

1

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet.

4. For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services, including: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluid Truck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Netflix, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pindrop, Pinterest, PrizePicks, Snap Inc., StubHub, Swimply, Travel Tech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo!. *See* NetChoice, About Us, https://perma.cc/45JF-PMWK.

**NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.**

5. NetChoice members' websites publish, disseminate, display, compile, create, curate, and distribute a wide range of valuable and protected expression—including through feeds personalized for each user. They disseminate content (text, audio, graphics, and video) that facilitates their users' ability to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills. Users employ the websites to communicate in a wide variety of ways—socially (to connect with friends from school and church, form groups, or find communities of those with likeminded interests), demonstratively (to showcase their creative, artistic, or athletic talents), informatively (to keep up with the news or current events), politically (to participate in public discussion or raise awareness about social causes), educationally (to get help with math problems, learn about financial literacy, or listen to college course lectures), professionally (to network, find job opportunities, and share their resumes), and myriad other ways.

6. NetChoice member websites offer their users the ability to participate in different communities. On Facebook, users can create communities with other like-minded users for many purposes, including by taking part in religious services. On Instagram, users can share vacation

pictures and short informative videos. On Nextdoor, users can connect with their neighbors, including by sharing local news and requesting to borrow tools. On Pinterest, users can discover ideas for recipes, style, home decor, motivation, and more. On YouTube, users can watch documentaries. And on X, users can engage with their elected representatives and the political, cultural, and social topics of the day.

7. These covered websites organize combinations of both user-generated (third-party) content and speech they author. Each website makes unique decisions about how to organize, display, moderate, and disseminate content.

8. **Personalized feeds.** Because it is impossible for users to view all of the content available on the websites, websites must decide how to organize each user's home page. Many member websites provide a "feed," "for you," "following," or "landing" page. This is a central hub that allows a user to see the content, activity, and other expression created and shared by family, friends, selected contributors, connections, and other content creators. Personalization is a hallmark of members' feeds and ensures that people are presented with the most useful and relevant content. Without the ability to curate and present content to people, it would be impossible for websites to prioritize minor safety and display only age-appropriate content to minors—counterproductively making it more likely that minors encounter inappropriate content on members' websites.

9. **Notifications.** Many covered websites also provide users the option to receive notifications. Notifications allow covered websites to facilitate communication and interaction among users by informing users about new messages, comments, content from connections, and recommendations, among other things. NetChoice member websites that use notifications allow users to control those notifications. *See, e.g.*, Facebook, Choose What You Get Notifications for on Facebook, https://perma.cc/KA7L-AQW4; Instagram, Notification Settings, https://perma.cc/A2WU-DECL; Nextdoor, How to Change Your Mobile Notifications, https://perma.cc/KA5S-J2FJ; Pinterest, Edit Notification Settings, https://perma.cc/FVX9-N282; YouTube Help, Manage YouTube Notifications, https://perma.cc/JT2G-TLWL; X, About Notifications on Mobile Devices, https://perma.cc/N5N7-V7YU. And users can also adjust

3

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

notification settings on their devices. *See, e.g.*, Apple, Use Notifications on Your iPhone or iPad, https://perma.cc/YB2V-PACA; Samsung, Control App Notifications on Your Galaxy Phone or Tablet, https://perma.cc/QK3D-KJMQ; Google, Control Notifications on Your Pixel Phone, https://perma.cc/W5HT-UPSR.

10. The use of notifications is widespread and not limited to covered websites. Nearly every application left uncovered by the Act also sends notifications to its users. Examples include Apple News, Disney+, ESPN, The New York Times, and The Wall Street Journal. *See* Apple, Turn Notifications and Emails On or Off in Apple News, https://perma.cc/D446-ET89; Disney+, Push Notifications on Disney+, https://perma.cc/V47H-KSBU; ESPN, How Do I Sign Up for Alerts?, https://perma.cc/GA3Z-AZ2A; Libby Help, Managing Notifications, https://perma.cc/9DD2-CPRM; The New York Times Help Center, iOS News App, https://perma.cc/5MG8-8Q46; The Wall Street Journal Help Center, Newsletters & Alerts, https://perma.cc/XL6M-RPYD.

**Parents have many tools to oversee and control their minor children online, and NetChoice members go to great lengths to protect minors.**

11. With existing and widely available tools, parents and guardians have many choices to oversee and control their minor children's use of the Internet. These tools both overlap and complement each other.

12. Of course, parents can also control whether their minor children have access to Internet-connected devices in the first place.

13. **Network-level restrictions.** Many cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access, to block certain apps, sites, and contacts from their children's phones and tablets, and to restrict screen time on devices. *See, e.g.*, Verizon, Verizon Family, https://perma.cc/QMJ7-MG4C; AT&T, AT&T Secure Family, https://perma.cc/CP4K-W4BV; T-Mobile, Family Controls and Privacy, https://perma.cc/9P3X-RQB4;. Similarly, many wireless routers publicize their parental control settings that parents can use to block specific online services, allow only the specific online services that a parent specifies, limit the time that their children spend on the Internet, set individualized content filters, and

4

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

monitor the online services that their children visit. *See, e.g.*, Molly Price & Ry Crist, *Take a Moment to Set Up Parental Controls on Your Router*, CNET (Sept. 24, 2024), https://perma.cc/UW2U-P4FX; Netgear, Netgear Smart Parental Controls, https://perma.cc/F22D-VH27; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/TYM8-RAUD.

14. **Device-level restrictions.** Many Internet-connected devices contain ways parents can restrict their use by minor children. Specifically, many of the manufacturers of the most widely used mobile phones and tablets publicize the ways parents can limit screen time across their devices and provide parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings. *See, e.g.*, Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/8TYS-ZJL4; Google, Family Link, Help Keep Your Family Safer Online, https://perma.cc/7G83-FK48; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/25SA-MGXP; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/2RD6-SH5X. Likewise, third-party applications allow parents to monitor their minor children's activity, set limits on screen time, and filter content—as publicized in mainstream publications. *See, e.g.,* Alyson Behr, *The Best Parental Control Apps in 2024, Tested By Our Editors*, CNN underscored (Mar. 11, 2024), https://perma.cc/ACV9-43KB.

15. **Browser-level restrictions.** Internet browsers also allow parents to control what online services their minor children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/2BTF-Z6HZ. For example, some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, Helping You Set Digital Ground Rules with Family Link, https://perma.cc/R4Y9-UCNS; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/6ZFY-ZSHK. Similarly, third-party software and browser extensions are also widely available to reinforce these tools on browsers. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PCMag (Dec. 15, 2023), https://perma.cc/GEJ4-YPZS. In addition, as the FTC has observed, browsers also provide users with "some control over the information

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

websites collect." FTC, How Websites and Apps Collect and Use Your Information, https://perma.cc/9XV5-YHV7.

16. **App-level restrictions.** On top of all these resources, NetChoice members have developed their own tools that allow parents to set further restrictions on their minor children's use of the services. Below are some examples.

17. *Meta (Facebook and Instagram).* Meta has supervision tools that parents and guardians can use to help support their teens. When supervision is set up on Facebook, a parent can see how much time their teen has spent on the Facebook app each day for the last week, and their average daily time spent for the week; set scheduled breaks for their teen; see their teen's Facebook friends; see some of their teen's privacy settings and content preferences; and see the people and Pages their teen has blocked. *See, e.g.*, Meta, Supervision on Facebook, https://perma.cc/6UX2-UG74. Instagram currently offers Supervision features for teens under 18 that allow parents and guardians to set time limits; set reminders to close the app; see the average amount of time their teen has spent on Instagram; see which accounts their teen is following and which accounts are following their teen, which accounts their teen is currently blocking, and their teen's account privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help Center, About Supervision on Instagram, https://perma.cc/46M4-LHCB. Instagram recently announced that minors under 18 will automatically be placed into "Instagram Teen Accounts" which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. Minors under 16 will need a parent's permission to change any of these Instagram Teen Accounts settings to less strict settings. Via Teen Accounts, parents will have added supervision features, including ways to get insights into with whom their minor children are chatting and seeing topics their minor is looking at. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents, https://perma.cc/NM66-8FR3.

18. *Pinterest.* Pinterest provides parents of minors "under 18" the ability to "set[] up a 4-digit passcode" that "lock[s] certain settings related to account management, privacy and data,

and social permissions on [a] teen's Pinterest account." Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/X6KF-AHV9.

19. *Google (YouTube).* YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, My Family, https://perma.cc/8SFQ-LXXZ.

20. In addition to these tools to aid parents, NetChoice members pursue measures like the following to help promote minors' safety on their services.

21. *Limiting access by age.* All NetChoice members prohibit minors younger than 13 from accessing their main services. Some members, however, offer separate experiences for users under 13 geared for that specific age group with their own protections. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. *See* YouTube for Families Help, Import Info for Parents About YouTube Kids, https://perma.cc/5934-HWNQ; YouTube Help, What Is a Supervised Experience on YouTube, https://perma.cc/LZ82-4JH5. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

22. *Minor-specific policies.* Some NetChoice members have policies or practices specifically for minors' accounts on their main services. YouTube, for instance, publicizes that it "place[s] an age-restriction on" certain content that "may be . . . not appropriate for viewers under 18." YouTube Help, Age-Restricted Content, https://perma.cc/HC2B-VVTN. Pinterest sets accounts for users younger than 16 to private. Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/X6KF-AHV9. Meta has the policies described above at ¶ 17.

23. *Content moderation.* Any minor-specific policies and parental tools exist alongside the websites' generally applicable "content-moderation" policies. NetChoice members limit publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities. Consequently, NetChoice members publish and enforce bespoke content-moderation policies that address the publication of such prohibited content. Based on

NetChoice's research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://perma.cc/CHN8-FBXH.

**The Act's effect on NetChoice members and the Internet.**

24.   I understand that California Senate Bill 976 ("the Act") was signed into law on September 20, 2024, and that the Act takes effect January 1, 2025.

25.   The Act regulates "[a]ddictive internet-based service[s] or application[s]." Cal. Health & Safety Code § 27000.5(b). An "[a]ddictive internet-based service or application" is a "an internet website . . . including, but not limited to, a 'social media platform' as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website." *Id.* § 27000.5(b)(1). An "[a]ddictive feed" is—with some exceptions—"an internet website . . . or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." *Id.* § 27000.5(a).

26.   According to these definitions, the Act appears to cover at least the following NetChoice members' services: (1) Google, which owns and operates YouTube; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; and (5) X.

27.   Many of the Act's requirements and definitions are vague and difficult for NetChoice members (and other websites) to gauge. For example, it is not clear what constitutes an "addictive feed." *Id.* § 27000.5(a). Dreamwidth does not have the same kind of personalized feeds as some of our other members, yet it is not clear whether Dreamwidth's display of content to users is permissible based on what the user has "expressly and unambiguously requested," or impermissible based on "information . . . persistently associated with the user or user's device, and . . . concern[ing] the user's previous interactions with media generated or shared by others." § 27000.5(a)(1), (4).

8

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

28. **Parental consent and age assurance for personalized feeds and notifications (Cal. Health & Safety Code §§ 27001, 27002, 27006).** The Act requires that covered websites "obtain[] verifiable parental consent" before allowing a minor user to access a personalized feed, allowing a minor user to access a personalized feed for more than one hour per day, or sending a minor user notifications during certain times of the day. *Id.* §§ 27001(a)(2), 27002(a), (b)(2). The Act also requires that covered websites conduct age assurance of all users—including both adults and minors. *Id.* §§ 27001(a)(1), 27002(a), 27006. These requirements will impede minors and adults' access to valuable and protected speech. They will also prove costly and difficult for NetChoice members to implement. Accordingly, each of these requirements burdens access to protected speech. These requirements also pose at least four major hurdles for covered websites.

29. *First*, most websites do not have compliance mechanisms in place to process parental consent or to conduct age assurance. Designing and maintaining comprehensive systems to comply with the Act will be extremely costly, time-consuming, and resource-intensive. The burdens increase with the level of certainty with which companies must verify ages and process parental consent.

30. *Second*, as part of implementing mechanisms to comply with the Act, covered websites will be required to obtain sensitive personal identifying information about minors and their parents or guardians. This will significantly amplify the risks of data security breaches, necessitating even more investment in heightened cybersecurity measures. The fact that the Act provides that "[t]he information collected shall be deleted immediately after it is used to determine a user's age or to verify parental consent" does not alleviate these risks. *Id.* § 27001(b). Rather, it confirms that obtaining and storing such personal identifying information is at least temporarily required to verify parental consent and conduct age assurance.

31. *Third*, verifying a genuine parent-child relationship will require covered websites to identify both the minor and the parent (or guardian), just as conducting age assurance will require covered websites to identify the account holder. It is impossible to do any of this without infringing the privacy rights of both minors and parents (or guardians). And it will create friction impeding users' willingness and ability to use the services. Covered websites also face many

9

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

difficulties in securing parental consent. For example, the law does not account for situations in which a person's status as a parent (or guardian) is opaque or disputed, families are nontraditional (like foster families), families have different surnames or addresses, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated.

32. *Fourth*, new processes at sign up or sign in inevitably affect account holder growth, as cumbersome registration processes can dissuade people from signing up or continuing to use a service. Any decline in account holder sign-ups or current accounts means that fewer people avail themselves of the valuable speech available on the websites. It likewise will have a ripple effect on companies' advertising revenues, brand partnerships, and overall vitality.

33. Many NetChoice members' websites cannot function well—if at all—without making decisions about how to present content, groups, and posts on account holders' accounts through personalized feeds. By banning personalization, the Act will also prohibit websites from offering their users choices among these various types of suggestion and organization (as some covered websites currently do).

34. Furthermore, the Act's restrictions on sending notifications to minor users during certain times of day without parental consent fails to take into account the different schedules of minor users and the time-sensitive nature that the protected speech notifications entail. The requirement fails to account for minors with different school or work schedules. It also may cause minors to lose out on valuable and time-sensitive notifications concerning issues they're following for school, college recruitment, or part-time jobs, to name a few. The content on websites also is not static, so content may appear and disappear during the Act's curfew window, meaning that minors would never get to see it.

35. **Default limitations on minors' accounts (§ 27002(b)(1), (3)-(5)).** The Act also requires covered websites to establish certain "default" settings for minor users' accounts and provide parents with "mechanisms" to implement or change those settings. *Id.* § 27002(b)(1), (3)-(5). These provisions would require all members to adopt additional capabilities, which would prove particularly difficult for smaller services or websites.

36. **Disclosures (§ 27005).** The Act requires covered websites to annually disclose "the number of minor users of its addictive internet-based service or application," the "number [of minor users] for whom the operator has received verifiable parental consent to provide an addictive feed," and "the number of minor users as to whom the [parental] controls set forth in Section 27002 are or are not enabled." *Id.* § 27005. This, too, would require all members to adopt additional capabilities for tracking, recording, and reporting these statistics. And it requires members to adopt implicitly the Act's pejorative "addictive" label.

37. NetChoice members would be irreparably harmed if they were required to comply with the Act's burdensome requirements. For one thing, the Act's extremely broad and vague proscriptions make perfect compliance impossible for most websites. Any website that even attempts to comply with the Act will incur substantial, unrecoverable costs in reconfiguring their service. All websites face significant uncertainty about their compliance with the Act given the Act's many ambiguities. NetChoice members' users (both minors and adults, current and prospective) will also suffer irreparable harms, as the Act will place burdens on their access to protected and valuable speech.

*   *   *

38. If the Act takes effect on January 1, 2025, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies and their minor and adult users.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on November 8, 2024, in Washington DC.

Bartlett Cleland

11

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**