ROB BONTA
Attorney General of California
LARA HADDAD, State Bar No. 319630
Supervising Deputy Attorney General
JENNIFER E. ROSENBERG, State Bar No. 275496
SHIWON CHOE, State Bar No. 320041
CHRISTOPHER J. KISSEL, State Bar No. 333937
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6388
  E-mail:  Christopher.Kissel@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his official
capacity as Attorney General of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **NETCHOICE, LLC,**<br><br>                                   Plaintiff,<br><br>        **v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California,**<br><br>                                   Defendant. | No. 5:24-cv-07885-EJD<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:          December 17, 2023<br>Time:          9:00 a.m.<br>Courtroom:   4 (Fifth Floor)<br>Judge:         The Honorable Edward J. Davila<br>Trial Date:    None set.<br>Action Filed: November 12, 2024 |

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................................................... 1

Statement of Issues to be Decided ..................................................................................... 2

Background ......................................................................................................................... 2

    I.     Features Designed to Keep Users Online Cause Children Harm ........................... 2

    II.    The Protecting Our Kids From Social Media Addiction Act ................................. 3

Legal Standard ................................................................................................................... 5

Argument ........................................................................................................................... 6

    I.     Plaintiff's Challenge to the Age-Assurance Requirements Is Unripe ................... 6

    II.    Plaintiff Fails to Show that Limiting Minors' Exposure to Addictive Feeds
          and Off-Hour Notifications Burdens Its Protected Speech .................................... 7

        A.    Standards Applicable to As Applied and Facial Challenges ..................... 7

        B.    *Moody v. NetChoice* Did Not Create Per Se First Amendment
            Protections for Content Feeds—It Emphasized That Analyzing
            Their Expressiveness Is Fact Intensive ....................................................... 8

        C.    Plaintiff Fails to Satisfy Its Burden Under Moody ................................... 10

        D.    Instead of Submitting Evidence to Satisfy its Burden, Plaintiff
            Misconstrues the Act and Misapplies the Caselaw ................................... 12

    III.   Even if the Act Were Subject to First Amendment Scrutiny, Intermediate
          Scrutiny Applies ................................................................................................. 13

    IV.   In Any Event, The Act Satisfies Both Intermediate Scrutiny and Strict
          Scrutiny ............................................................................................................. 16

        A.    The Act Furthers a Compelling Government Interest Unrelated to
            the Suppression of Free Expression: Protecting the Health of
            Children..................................................................................................... 16

        B.    The Restrictions the Act Imposes Are Narrowly Tailored to Serve
            the Compelling Interest of Protecting the Health of Minors .................... 18

    V.    The Act is Not Unconstitutionally Vague ........................................................... 23

    VI.   All Other Injunction Factors Weigh Against Plaintiff ......................................... 24

Conclusion ....................................................................................................................... 25

i

1

## TABLE OF AUTHORITIES

2

**Page**

3  CASES

4  *Anheuser-Busch, Inc. v. Schmoke*
5     101 F.3d 325 (4th Cir. 1996) ................................................................................... 17

6  *Arce v. Douglas*
      793 F.3d 968 (9th Cir. 2015) ................................................................................... 23

7
   *Ashcroft v. ACLU*
8     542 U.S. 656 (2004) ........................................................................................... 7, 22

9  *Brown v. Entertainment Merchants Association*
10    564 U.S. 786 (2011) ........................................................................................ 15, 17

11 *Cal. Teachers Ass'n v. State Bd. of Educ.*
      271 F.3d 1141 (9th Cir. 2001) ................................................................................. 24

12
   *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*
13    596 U.S. 61 (2022) ................................................................................................ 14

14 *City of Renton v. Playtime Theaters, Inc.*
15    475 U.S. 41 (1986) ................................................................................................ 14

16 *Clark v. Cmty. for Creative Non-Violence*
      468 U.S. 288 (1984) .............................................................................................. 19

17
   *Comput. & Commc'ns Indus. Ass'n v. Paxton*
18    No. CV 24-849-RP, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ..................................... 13

19 *Developmental Servs. Network v. Douglas*
20    666 F.3d 540 (9th Cir. 2011) ................................................................................. 25

21 *Erznoznik v. City of Jacksonville*
      422 U.S. 205 (1975) .............................................................................................. 17

22
   *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*
23    98 F.4th 1180 (9th Cir. 2024) ................................................................................... 5

24 *Frisby v. Schultz*
      487 U.S. 474 (1988) .............................................................................................. 18

25
   *Goldie's Bookstore, Inc. v. Super. Ct.*
26    739 F.2d 466 (9th Cir. 1984) ................................................................................. 25

27 *Gomez v. Campbell-Ewald Co.*
28    768 F.3d 871 (9th Cir. 2014) ................................................................................. 19

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

4

*Hill v. Colorado*
530 U.S. 703 (2000) ................................................................................ *passim*

5

6

*HomeAway.com, Inc. v. City of Santa Monica*
918 F.3d 676 (9th Cir. 2019) ................................................................... 6, 10

7

*In re Nat'l Sec. Letter*
33 F.4th 1058 (9th Cir. 2022) ............................................................. 16, 19, 23

8

9

*J.D.B. v. North Carolina*
564 U.S. 261 (2011) ..................................................................................... 17

10

*Lorillard Tobacco Co. v. Reilly*
533 U.S. 525 (2001) ..................................................................................... 17

11

12

*Maryland v. King*
567 U.S. 1301 (2012) ................................................................................... 25

13

14

*Moody v. NetChoice, LLC*
144 S. Ct. 2383 (2024) ....................................................................... *passim*

15

*Morse v. Frederick*
551 U.S. 393 (2007) ............................................................................... 17, 22

16

17

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*
585 U.S. 755 (2018) ..................................................................................... 14

18

19

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*
538 U.S. 803 (2003) ....................................................................................... 6

20

*NetChoice, LLC v. Bonta*
113 F.4th 1101 (9th Cir. 2024) ............................................................. 8, 11, 12

21

22

*NetChoice, LLC v. Fitch*
No. CV 24-170-HSO (BWR), 2024 WL 3276409 (S.D. Miss. July 1, 2024) ............. 7, 13, 23

23

24

*NetChoice, LLC v. Griffin*
No. CV 23-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ..................... 7, 13, 15, 23

25

*NetChoice, LLC v. Reyes*
No. CV 23-00911-RJS (CMR), 2024 WL 4135626 (D. Utah Sept. 10, 2024)
.................................................................................................... 7, 13, 15, 20

26

27

*NetChoice, LLC v. Yost*
716 F.Supp.3d 539 (S.D. Ohio 2024) ..................................................... 13, 15

28

Type Footer Info Here 2 («Matter Primary Court Case #»)

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Nken v. Holder*
    556 U.S. 418 (2009) .................................................................................. 25

4

5

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
    676 F.3d 829 (9th Cir. 2012) .................................................................. 6, 7

6

*OPAWL – Bldg. AAPI Feminist Leadership v. Yost*
    118 F.4th 770 (6th Cir. 2024) ................................................................... 21

7

8

*Porter v. Martinez*
    68 F.4th 429 (9th Cir. 2023) ....................................................... 14, 16, 19, 23

9

10

*Reno v. ACLU*
    521 U.S. 844 (1997) ............................................................................... 7, 22

11

*Roulette v. City of Seattle*
    97 F.3d 300 (9th Cir. 1996) ........................................................................ 7

12

13

*Sable Commc'ns of Cal., Inc. v. FCC*
    492 U.S. 115 (1989) ............................................................................. 16, 25

14

15

*Santa Barbara Sch. Dist. v. Super. Ct.*
    13 Cal.3d 315 (1975) ................................................................................ 25

16

17

*Thomas v. Anchorage Equal Rts. Comm'n*
    220 F.3d 1134 (9th Cir. 2000) ..................................................... 6, 8, 10, 12

18

*United States v. Christie*
    825 F.3d 1048 (9th Cir. 2016) .................................................................... 16

19

20

*United States v. Swisher*
    811 F.3d 299 (9th Cir. 2016) ....................................................................... 6

21

22

*Valle del Sol, Inc. v. Whiting*
    709 F.3d 808 (9th Cir. 2013) ............................................................... 11, 23

23

*Vivid Entm't, LLC v. Fielding*
    774 F.3d 566 (9th Cir. 2014) ...................................................................... 25

24

25

*Ward v. Rock Against Racism*
    491 U.S. 781 (1989) .................................................................................. 19

26

*Wash. State Grange v. Wash. State Republican Party*
    552 U.S. 442 (2008) ....................................................................... 10, 11, 12

27

28

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

*Williams-Yulee v. Fla. Bar*

4
    575 U.S. 433 (2015) ................................................................. 18, 21

5

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ............................................................................. 5

6

*X Corp. v. Bonta*

7
    116 F.4th 888 (9th Cir. 2024) ......................................................... 23

8

*Zauderer v. Off. of Disciplinary Couns.*
    471 U.S. 626 (1985) ........................................................................ 23

9

10

**STATUTES**

11

California Business & Professions Code
    § 19921 ............................................................................................. 1

12

California Health & Safety Code

13
    § 27000.5 ................................................................................. *passim*

14
    § 27001 ................................................................................. 4, 5, 6, 7
    § 27002 ................................................................................. 4, 5, 6, 7

15
    § 27003 ............................................................................................. 5
    § 104559.5 ......................................................................................... 1

16

United States Code

17
    15 U.S.C. § 6502 ............................................................................. 22

18

19

20

21

22

23

24

25

26

27

28

Type Footer Info Here 2 («Matter Primary Court Case #»)

**INTRODUCTION**

The California Legislature passed the Protecting Our Kids From Social Media Addiction Act ("the Act") with one goal in mind: to protect the mental and physical health of children. The Act is inspired by a growing body of research showing that children are manipulated and harmed by the mechanisms that some internet companies employ to keep their users online as much as possible. Specifically, the Act bars online platforms from displaying addictive feeds of user-generated or user-shared content that are personalized based on the minor's data; prohibits platforms that offer such feeds as a significant part of their service from sending notifications to minors late at night and during school hours; and creates a suite of tools to allow parents to adjust those protections and others as necessary.

In keeping with core free speech principles—and unlike social media restrictions recently passed in other states—the Act targets harmful online mechanisms, not content or types of content, or specific websites or online platforms. In that sense, the Act is more akin to California laws that regulate, for instance, the ability of vendors to sell flavored tobacco products, Cal. Health & Safety Code § 104559.5, or casino operators to admit individuals under 21 years old, Cal. Bus. & Prof. Code § 19921, in that it regulates conduct, not speech.

Plaintiff is unlikely to succeed on the merits of its claims for several reasons. As a threshold matter, one of Plaintiff's key challenges to the Act is not ripe for judicial determination. Moreover, and contrary to one of Plaintiff's core arguments here, the Supreme Court has never held that restrictions on content feeds or similar mechanisms are always subjected to First Amendment scrutiny. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2404 n.5 (2024). Instead, the plaintiff bears the burden of showing how a challenged law burdens its expressive speech—a burden Plaintiff fails to satisfy here. The Act therefore does not implicate the First Amendment.

Even assuming the Act is subject to First Amendment scrutiny, intermediate scrutiny applies because the Act regulates digital mechanisms, not topics, ideas, or messages. Yet regardless of the applicable level of scrutiny, the Act is constitutional because it pursues a compelling interest—the health of children—while focusing narrowly on the mechanisms that cause children harm. Finally, review of the Act's plain terms demonstrates that the Act is not

1  unconstitutionally vague.

2      The First Amendment does not prevent States from using content-agnostic means to

3  regulate harmful conduct—especially when that conduct has, at most, an incidental relationship to

4  expression. The Court should deny Plaintiff's motion for a preliminary injunction.

5              **STATEMENT OF ISSUES TO BE DECIDED**

6      (1) Has Plaintiff shown it is likely to succeed on the merits?

7      (2) Has Plaintiff shown it is likely to suffer irreparable harm without relief?

8      (3) Does the balance of the equities favor an injunction?

9      (4) Does the public interest favor a preliminary injunction?

10                      **BACKGROUND**

11  **I.    FEATURES DESIGNED TO KEEP USERS ONLINE CAUSE CHILDREN HARM**

12      Almost half of American adolescents report being online "almost constantly." Feder Decl.

13  ¶ 18; Radesky Decl. ¶ 36. An estimated 19 percent of teens use the internet to a degree that it

14  interferes with schoolwork, socializing, physical activity, or sleep. Radesky Decl. ¶ 33. Indeed,

15  many children and teens feel that they spend more time online than they would like. Radesky

16  Decl. ¶ 54. In a nationally representative sample of girls aged 11-to-15, for example, over a third

17  described their own use of social media as an addiction. Radesky Decl. ¶ 34.

18      At the same time, internet companies have developed features that are designed specifically

19  to maximize the amount of time users spend on their platforms. Egelman Decl. ¶¶ 34, 37. Among

20  other things, companies have adopted personalized content feeds that monitor their users' actions,

21  locations, and attributes, then use algorithms to serve up media based on what the algorithm

22  "thinks" the users want to see. Egelman Decl. ¶¶ 18, 23; Radesky Decl. ¶ 60. Other features, like

23  notifications that nudge users back online, auto-playing audio and video, and reward-like

24  interactions, are similarly designed to keep users coming back and to make them stick around

25  longer. Egelman Decl. ¶ 37.

26      Research suggests these mechanisms are effective. Radesky Decl. ¶¶ 61, 64, 67. Children

27  and teens are already vulnerable to psychological manipulation; their executive functions are less

28  developed, and they have less impulse control and ability to think critically about digital media.

                                2

Radesky Decl. ¶¶ 50, 54; Egelman Decl. ¶ 49. Too many engagement-promoting features cause teens frustration and affect their sense of control and autonomy. Radesky Decl. ¶ 56. Indeed, nearly three-quarters of teens believe tech companies are manipulating them to spend more time on their products. Radesky Decl. ¶ 54. And it apparently works—one study estimated that close to a third of the amount of time users spend on social media is the result of habit or lack of self-control rather than a genuine desire to engage. Feder Decl. ¶ 45.

The mechanisms cause children real harm. The more excess time children and teens spend online, the more they experience poor sleep, sedentary behaviors, and other health and behavioral issues. Radesky Decl. ¶ 55. Another study, conducted by one of the State's experts, supports the claim that, roughly speaking, teens who spend more time on social media experience progressively worse mental health outcomes, including anxiety and depression. Feder Decl. ¶¶ 20, 30, 36, 37. Other studies conducted around the same time, including one involving children, indicated that reductions in social media use or overall screen time improved, for example, instances of depression and negative self-image. Feder Decl. ¶¶ 38–47.

There are ways to mitigate the harm caused by these mechanisms. Randomized experiments have indicated that replacing personalized feeds on certain platforms with reverse-chronological feeds caused users to spend significantly less time on them. Feder Decl. ¶ 59. Another randomized trial indicated that "batching" of notifications, so they are sent only at certain times of day, improved users' self-reported attentiveness, productivity, mood, and sense of control over their use of their devices. Feder Decl. ¶ 60.

## II.    THE PROTECTING OUR KIDS FROM SOCIAL MEDIA ADDICTION ACT

Motivated to address harms caused to children by addictive engagement mechanisms, the California Legislature passed the Protecting Our Kids From Social Media Addiction Act, Senate Bill No. 976 (Reg. Sess. 2023-2024) (SB 976). The Legislature found that "the algorithmic delivery of content and other design features . . . pose a significant risk of harm to the mental health and well-being of children and adolescents." SB 976 § 1. It noted that "the risk of poor mental health outcomes doubles for children and adolescents who use social media at least three hours a day." *Id.* It also noted that heavy use of social media "leads to less healthy sleep patterns

and sleep quality, which can in turn exacerbate both physical and mental health problems." *Id.* And it discussed a United States Surgeon General's report concluding that children and adolescents who use social media at least three hours a day have double the risk of poor mental health outcomes compared to their peers. *Id.*

The Act contains three central provisions designed to combat those harms without intruding on the speech rights of companies or the rights of children to access content. First, the Act limits any "internet website, online service, online application, or mobile application," with exceptions, from providing an "addictive feed" to a minor unless a parent or guardian consents. Cal. Health & Safety Code §§ 27000.5(b), 27001(a)(1)[1]. An "addictive feed" is a feed consisting of media generated or shared by other users, in which that media is "recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5(a). But an addictive feed is *not* one, for example, consisting of media provided in response to a user's active search request, § 27000.5(a)(2), nor is it a feed of media from authors, creators, or posters whose content the user has expressly requested and that is not recommended, selected, or prioritized based on other information associated with the user or the user's device, § 27000.5(a)(4).

Second, the Act limits platforms with addictive feeds from nudging children online when they should be sleeping or attending school. Specifically, platforms cannot send notifications to a minor's device "between the hours of 12 a.m. and 6 a.m. . . . and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May[.]" § 27002(a).

Third, the Act creates a suite of tools allowing parents and guardians to tailor their children's access as they deem appropriate. Parents may, for example, allow platforms to send notifications but may limit them to specific hours; may allow addictive feeds for only a specified length of time; may limit their child's ability to view the number of likes or other forms of feedback on pieces of media within an addictive feed; and may set their child's account to private

---

[1] All statutory citations are to the California Health and Safety Code, unless otherwise noted.

4

1  mode, limiting engagement only to users with whom the child has chosen to engage. §

2  27002(b)(1)–(5).

3     Because the Act's priority is to protect children, its requirements are enabled by default. *Id.*

4  But parents and guardians may consent to bypass those requirements entirely. §§ 27001(a)(2),

5  27002. Additionally, to facilitate the requirements, the Act contains age-assurance provisions

6  requiring platforms to reasonably determine whether their users are minors. §§ 27001(a)(1)(B),

7  27002(a)(2). But those age-assurance requirements do not go into effect until January 1, 2027. *Id.*

8  Until then, a platform violates the Act by engaging in conduct the Act prohibits only if the

9  platform has "actual knowledge that [a] user is a minor." §§ 27001(a)(1)(A), 27002(a)(1).

10     The Act is also clear about what it does *not* do. It expressly does not limit the ability of

11  users, including minors, to communicate directly with one another on any online platform.

12  § 27000.5(a)(5). It expressly does not diminish privacy protections for children: it contains a

13  provision that prohibits platforms from retaining information furnished in the age-assurance

14  process and clarifies that parents may receive no special access or control over their children's

15  accounts. §§ 27001(b), 27003(a). And it expressly does not limit what content any users,

16  including minors, can search for, access, and view. § 27000.5(a).

17     The bottom line is this: The Act prevents companies from using harmful digital

18  mechanisms to keep children online—it does *not* prevent them, or any other user, from accessing

19  content. And by reducing children's exposure to harmful, addictive engagement mechanisms, the

20  Act protects children from the negative mental and physical outcomes caused by excessive time

21  spent online while preserving their First Amendment rights.

22                                **LEGAL STANDARD**

23     "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v.*

24  *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The moving party must establish that (1) it is

25  likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the

26  balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. "[T]he

27  Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-*

28  *Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024).

5

1

**ARGUMENT**

2      A two-step analysis governs First Amendment challenges to duly enacted statutes. The first

3  step concerns whether the plaintiff has shown the statute burdens its speech in a way that requires

4  First Amendment scrutiny at all. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685

5  (9th Cir. 2019). If, and only if, such scrutiny is warranted, the next step concerns "whether the

6  enactment is content-based or content-neutral," the answer to which determines what level of

7  scrutiny applies. *United States v. Swisher*, 811 F.3d 299, 311 (9th Cir. 2016) (en banc).

8  I.    **PLAINTIFF'S CHALLENGE TO THE AGE-ASSURANCE REQUIREMENTS IS UNRIPE**

9      As a preliminary matter, Plaintiff's challenge to the Act's age-assurance provisions is

10  unripe. Prudential ripeness requires the Court "to first consider the fitness of the issues for

11  judicial review, followed by the hardship to the parties of withholding court consideration."

12  *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 837 (9th Cir. 2012).

13      Fitness for review relates to whether "further factual development would significantly

14  advance [the Court's] ability to deal with the legal issues presented." *Nat'l Park Hosp. Ass'n v.

15  Dep't of Interior*, 538 U.S. 803, 812 (2003) (internal quotation omitted). Plaintiff contends that

16  provisions requiring it to reasonably determine whether each user is a minor create a severe

17  burden demanding this Court's immediate intervention. Mot. at 15. But while the Act does

18  require companies to "reasonably determine[]" whether each user is a minor, *see* §§

19  27001(a)(1)(B), 27002(a)(2), that requirement is not effective until 2027. Indeed, the Act itself

20  does not specify *how* age assurance must be conducted. What type of age assurance will be

21  required, and whether, for instance, it will include a documentation requirement, as Plaintiff

22  speculates, is uncertain at this point. And courts do not decide cases based on speculative or

23  hypothetical allegations of harm. *See Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134,

24  1140, 1142 (9th Cir. 2000) (en banc).

25      That is true despite Plaintiff's citation of section 27001(b), which restricts companies'

26  ability to use "[i]nformation collected for the purpose of determining a user's age." That

27  provision is not a documentation requirement but a privacy protection clause. It forbids operators

28  who do collect documentation from using it for a purpose other than complying with the law.

Because the Act does not require Plaintiff to take any immediate age verification action, the cases Plaintiff cites are inapposite. *See Ashcroft v. ACLU*, 542 U.S. 656, 662 (2004) (users required to provide credit card, debit account, or other proof of identification to access "material that is harmful to minors"); *Reno v. ACLU*, 521 U.S. 844, 882 (1997) (similar); *NetChoice, LLC v. Reyes*, No. CV 23-00911-RJS (CMR), 2024 WL 4135626, at *3 (D. Utah Sept. 10, 2024) (companies required to "implement an age assurance system" and review process requiring submission of documentary evidence), *appeal docketed*, No. 24-4100 (10th Cir. Oct. 11, 2024); *NetChoice, LLC v. Fitch*, No. CV 24-170-HSO (BWR), 2024 WL 3276409, at *2 (S.D. Miss. July 1, 2024) (immediately requiring "all users, adults and minors alike, to verify their age before they may open an account"), *appeal docketed*, No. 24-60341 (5th Cir. July 5, 2024); *NetChoice, LLC v. Griffin*, No. CV 23-05105, 2023 WL 5660155, at *1 (W.D. Ark. Aug. 31, 2023) ("Arkansans must submit age-verifying documentation before accessing a social media platform.").

For the same reasons, Plaintiff fails to show it will suffer any hardship if the Court withholds consideration of its challenge to the age-assurance requirements in sections 27001(a)(1)(B) and 27002(a)(2). *See Oklevueha*, 676 F.3d at 837. The requirements are not in effect until 2027, and their specifics are still to be determined. The Court need not rule on those provisions at this time.

## II. PLAINTIFF FAILS TO SHOW THAT LIMITING MINORS' EXPOSURE TO ADDICTIVE FEEDS AND OFF-HOUR NOTIFICATIONS BURDENS ITS PROTECTED SPEECH

### A. Standards Applicable to As Applied and Facial Challenges

As a preliminary matter, Plaintiff fails to meet its burden to show, at this stage, that the Act's provisions implicate the First Amendment in any way. Plaintiff frames its case as both a facial challenge and an as-applied challenge as it relates to five of its members: (1) Google, which owns YouTube; (2) Meta, which owns Facebook and Instagram; (3) Nextdoor; (4) Pinterest; and (5) X. Mot. at 4, 9. "[A] facial freedom of speech attack must fail unless, at minimum, the challenged statute 'is directed narrowly and specifically at expression or conduct commonly associated with expression.'" *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760 (1988)). Facial challenges under

1   the First Amendment are "hard to win," requiring a plaintiff to show that a challenged statute's

2   "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 144 S. Ct.

3   at 2397. That, in turn, requires the plaintiff to show that a substantial majority of the statute's

4   applications are both (1) subject to First Amendment scrutiny and (2) likely to fail such scrutiny.

5   *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1123 (9th Cir. 2024). Similarly, as-applied challenges

6   require a plaintiff to present a "concrete factual scenario that demonstrates how the laws, as

7   applied, infringe [its] constitutional rights." *Thomas*, 220 F.3d at 1141. In either case, therefore,

8   Plaintiff must demonstrate how restrictions on the ability of its members to make addictive feeds

9   available to children, and to send children notifications during off hours and at school, actually

10  affect speech protected by the First Amendment. It has not met its burden here.

### B.    Moody v. NetChoice Did Not Create Per Se First Amendment Protections for Content Feeds—It Emphasized That Analyzing Their Expressiveness Is Fact Intensive

13      Plaintiff claims that any State action limiting minors' access to algorithm-driven content

14  feeds automatically implicates First Amendment scrutiny. But that contention relies on a

15  misunderstanding of *Moody v. NetChoice*. Properly understood, *Moody* underscores both the

16  nature of the burden that Plaintiff bears and the reasons Plaintiff has failed to meet its burden.

17      Plaintiff argues that the Act's addictive feed provisions invite First Amendment scrutiny

18  because they "cover the 'individualized' and 'personalized' 'social media' feeds that *Moody* held

19  are entitled to First Amendment protection." Mot. at 7. But *Moody* emphatically did not create a

20  per se rule that any laws relating to algorithmic content feeds automatically implicate the First

21  Amendment. *Moody*'s core holding was that lower courts that had considered First Amendment

22  challenges to laws governing online platforms had failed to properly apply the standard for facial

23  challenges. *Moody*, 144 S. Ct. at 2397–98.

24      But before the Court remanded the case back to those courts, it explained that it was

25  necessary to give them some guidance, in particular to the Fifth Circuit. *See id.* at 2399. The Fifth

26  Circuit had concluded that a Texas law that prohibited platforms from demoting or removing

27  content or users from content feeds based on viewpoint had not touched any First Amendment

28  protected speech interest. *Id.* at 2396–97. In response, the Supreme Court clarified that a law that

8

orders a party to provide a forum for someone else's views implicates the First Amendment, "though only if[] the regulated party is engaged in its own expressive activity." *Id.* at 2399–400. The editorial discretion to exclude content from a compilation or "repertoire," the Court explained, had been deemed protected activity in a long line of cases. *Id.* at 2400–01.

At the same time, however, the Court made clear it was *not* creating an overarching rule that online content feeds always receive First Amendment protection—particularly when the expressive nature of such feeds is not clear. All nine Justices agreed on that point. Justice Kagan wrote for five Justices that "[w]e . . . do not deal here with feeds whose algorithms respond solely to how users act online." *Id.* at 2404 n.5. Justice Barrett, who joined Justice Kagan, added separately that "if a platform's algorithm just presents automatically to each user whatever the algorithm thinks the user will like . . . [t]he First Amendment implications . . . might be different," and that "the analysis is bound to be fact intensive, and it will surely vary from function to function and platform to platform." *Id.* at 2409, 2411 (Barrett, J., concurring). And Justice Jackson wrote that it is not "enough to say that a given activity (say, content moderation) for a particular service (the News Feed, for example) seems roughly analogous to a more familiar example from our precedent"; instead, "courts must make sure they carefully parse not only what entities are regulated, but how the regulated activities *actually function* before deciding if the activity in question constitutes expression and therefore comes within the First Amendment's ambit." *Id.* at 2411–12 (Jackson, J., concurring in part). Finally, Justice Alito, for the three remaining Justices, wrote that "the First Amendment protects only those compilations that are 'inherently expressive' in their own right, meaning that they select and present speech created by other persons in order 'to spread [the compiler's] own message.'" *Id.* at 2430 (Alito, J., concurring in the judgment) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006)). He added that the burden is on platforms to establish how their feeds work and whether they are expressive such that they warrant First Amendment scrutiny. *Id.* at 2430–37. In short, the Supreme Court unanimously declined to adopt the rule Plaintiff attributes to it, emphasizing instead that it is a fact-intensive, case-by-case endeavor to determine whether a component of an online platform is sufficiently expressive to warrant First Amendment

9

1    protection. *See also HomeAway.com*, 918 F.3d at 685.

2          Indeed, *Moody*'s core holding was that courts evaluating facial challenges must inquire into

3    the full scope and character of the challenged statutes' impact on expression. *Moody*, 144 S. Ct. at

4    2398–99. Yet Plaintiff invites this Court to make the same mistake that the lower courts made in

5    *Moody*, asking the Court to conclude—on little or no evidence—that Plaintiff's members' speech

6    rights are impacted because the Act restricts minors' access to some of their features. The Court

7    should decline that invitation. To evaluate Plaintiff's likelihood of success on its facial challenge,

8    according to *Moody*, the Court must evaluate whether Plaintiff has provided a factual record

9    establishing (1) how the challenged provisions will tangibly impact its members and (2) how that

10   impact will affect the members' expressive activity. Similarly, to evaluate Plaintiff's as-applied

11   challenge, the Court must determine whether Plaintiff has presented concrete facts showing the

12   Act likely infringes on specific members' First Amendment rights. *Thomas*, 220 F.3d at 1141.

13         **C.      Plaintiff Fails to Satisfy Its Burden Under Moody**

14         Plaintiff has not made the showings *Moody* requires. First, in discussing how the Act's

15   provisions might limit the accessibility of certain content, it offers only hypotheticals. Mot. at 12.

16   Plaintiffs may not carry their burden in a facial challenge with speculation "about 'hypothetical'

17   or 'imaginary' cases," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–

18   50 (2008), and an as-applied challenge requires concrete facts, *Thomas*, 220 F.3d at 1141.

19         Nor is there any showing of just how, or to what extent, the Act impacts the expressive

20   activity of Plaintiff's members. As to the Act's provisions regulating addictive feeds, Plaintiff

21   relies on *Moody*. But *Moody* only underscores that it is a plaintiff's burden to demonstrate that

22   conduct it posits is protected actually "has the inevitable effect of 'singling out those engaged in

23   expressive activity.'" *HomeAway.com*, 918 F.3d at 685 (quoting *Int'l Franchise Ass'n v. City of*

24   *Seattle*, 803 F.3d 389, 408 (9th Cir. 2015)). And while the Texas statute analyzed in *Moody*

25   clearly did impact editorial discretion by requiring platforms "to accommodate messages [they]

26   would prefer to exclude," *Moody*, 144 S. Ct. at 2401, that is not the case here. Plaintiff has not

27   demonstrated that expression is even implicated or that any given content feed is a product of

28   editorial discretion. Nor has Plaintiff shown that algorithms are informed by human decision-

10

1    making in a way that necessarily implicates expression, as opposed to "just present[ing]

2    automatically to each user whatever the algorithm thinks the user will like[.]" *Id.* at 2409 (Barrett,

3    J., concurring). Indeed, Plaintiff provides no facts or details whatsoever. How do Plaintiffs'

4    members' feeds actually operate? Do all the feeds of all of Plaintiff's members operate the same

5    way? All nine Justices indicated in *Moody* that these are critical questions, *see supra* at 9, and

6    Plaintiff does not answer them.

7         Moreover, even if the Court were to find that there is some degree of expressive activity in

8    any content feed, Plaintiff has not demonstrated the degree of First Amendment protection its

9    members' feeds should receive in *this* case. It may be that some content in a feed is expressive,

10   but feeds often also consist of, for example, advertising, *see* Egelman Decl. ¶ 19, which would be

11   subject to lesser constitutional protection—or in the case of fraudulent spam, none at all. *See*

12   *Valle del Sol, Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013). Plaintiff's failure to illuminate

13   those details is fatal to its as-applied and facial challenges.

14        The same analysis holds true for Plaintiff's challenge to the Act's limits on notifications

15   sent at certain times. It points to no facts or binding authority that would allow the Court to

16   conclude, categorically, that time-based limits on notifications are per se restrictions on

17   expression or content. A notification displaying an advertisement would not be viewed the same

18   way as a notification displaying a message from another user, and a notification containing

19   fraudulent spam would receive no First Amendment protection at all. *See Valle del Sol*, 709 F.3d

20   at 818, 820–21. In short, the level of scrutiny that should be accorded to notifications is fact

21   intensive and likely to vary from platform to platform. But Plaintiff asks the Court to view it all as

22   "content"—relying on hypotheticals, not facts, *see* Mot. at 5—to subject the Act's reasonable

23   limits on off-hour notifications to the strictest level of First Amendment scrutiny.

24        In any event, Plaintiff's failure to provide details about how its members operate makes

25   those determinations impossible. And when constitutional questions surrounding application of a

26   statute "might be cloudy," courts should refrain from reaching them. *Wash. State Grange*, 552

27   U.S. at 450; *see also Bonta*, 113 F.4th at 1123 (explaining Court could not resolve likelihood of

28   success on the merits where it was "unclear whether" particular aspect of online platform "itself

11

constitutes protected speech and whether a ban [on that aspect] should always trigger First

Amendment scrutiny"). That is especially so when "[t]he State has had no opportunity to

implement [the Act], and its courts have had no occasion to construe the law in the context of

actual disputes . . . or to accord the law a limiting construction to avoid constitutional questions."

*Wash. State Grange*, 552 U.S. at 450. Without the "full range" of the Act's applications to

Plaintiff's members, there is "no basis to conclude that NetChoice [i]s likely to succeed in its

facial challenge," *Bonta*, 113 F.4th at 1123, nor has Plaintiff presented the "concrete factual

scenario" necessary to succeed in its as-applied challenge, *Thomas*, 220 F.3d at 1141.

### D.   Instead of Submitting Evidence to Satisfy its Burden, Plaintiff Misconstrues the Act and Misapplies the Caselaw

As explained above, the Act creates discrete and limited restrictions on the ability of online

platforms to use certain harmful mechanisms on children. Plaintiff mischaracterizes those

restrictions in several ways. First, Plaintiff claims "[i]t would be impossible to foster a unique

community without elevating the people and ideas a user is interested in." Mot. at 4. But the Act

allows users to search for media and media creators and to subscribe to users that they are

interested in, whether they be family and friends or media creators, and allows companies to

prioritize media for the user from other users—as long as companies do so in response to requests

by the user and not based on data mined from the user's actions and device and programmed into

their mysterious algorithms. *See* §§ 27000.5(a)(2), (4).

Plaintiff also claims its members provide "personalized pages" ensure that the content

presented to users is the most useful, relevant, and high-quality—describing, for example, how a

young user likely would want to see high-quality videos to prepare for the SAT, not just the

newest or most "liked." Mot. at 4. But the Act does not prohibit a company from providing such

content. Under the Act, a company can continue to exercise its editorial judgment about what

videos it considers high quality and to provide high-quality videos to users who search for them.

*See* §§ 27000.5(a)(1), (2).

Plaintiff similarly claims that the Act would prevent minors from, for example, sharing

vacation photos on Facebook and Instagram or looking for work on Nextdoor "and otherwise

creating or receiving protected speech on covered websites." Mot. at 12. But Plaintiff does not

support that claim. The declaration it cites does not say that an addictive feed is necessary to do

those activities. To the contrary, the declaration asserts that Facebook and Instagram *can* provide

simple reverse-chronological feeds instead of feeds based on persistently retained user

information, and it does not say that doing so would break its sites or prevent users from creating

or receiving *any* speech. Davis Decl. ¶ 34.

Cases in district courts in other circuits where Plaintiff prevailed, and upon which Plaintiff

relies heavily, are distinguishable. Plaintiff neglects to mention that those cases were decided

within the last sixteen months, and three of the five are currently on appeal. In *NetChoice v. Reyes*

(on appeal), the District of Utah expressly did not reach whether the plaintiff met its burden of

showing a First Amendment impact on its speech because the defendant apparently conceded the

point. *See* 2024 WL 4135626, at *8. And the laws at issue in other jurisdictions targeted content

on their face and/or contained much more sweeping bans on entire social media platforms. *See*

*Fitch*, 2024 WL 3276409, at *2 (on appeal); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, No.

CV 24-849-RP, 2024 WL 4051786, at *1–2 (W.D. Tex. Aug. 30, 2024), *appeal docketed*, No. 24-

50721 (5th Cir. Sept. 13, 2024); *NetChoice, LLC v. Yost*, 716 F.Supp.3d 539, 546–47 (S.D. Ohio

2024); *Griffin*, 2023 WL 5660155, at *1. Two of those cases, *Yost* and *Griffin*, were decided

before the Supreme Court issued its decision in *Moody*. Finally, even assuming those cases were

not distinguishable on those bases, they are, at bottom, recently decided district court cases in a

new First Amendment arena; their conclusions are subject to development and change.

In sum, because Plaintiff failed to meet its burden to show that the Act implicates the First

Amendment, or to show the specific nature of its members' purported speech interests, it has not

demonstrated that the Act or the specific requirements Plaintiff challenges are unconstitutional.

For that reason alone, Plaintiff has failed to show that it is likely to succeed on the merits.

### III.    EVEN IF THE ACT WERE SUBJECT TO FIRST AMENDMENT SCRUTINY, INTERMEDIATE SCRUTINY APPLIES

Even if the Court were to conclude that the Act implicates First Amendment concerns, it is

not subject to heightened scrutiny because it is not content-based and is, instead, content-neutral.

13

1    A law is content-based when it "applies to particular speech because of the topic discussed or the

2    idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61,

3    69 (2022). A law that has some effect on speech but does not regulate based on topic, idea, or

4    message is content-neutral and is subject, at most, to intermediate scrutiny. *Porter v. Martinez*, 68

5    F.4th 429, 439 (9th Cir. 2023). The Act is content-neutral because neither its requirements nor its

6    "purpose or justification" are based on any "topic discussed" or "idea or message expressed." *City

7    of Austin*, 596 U.S. at 73–74. Its purpose—"to ensure that social media platforms obtain parental

8    consent before exposing children and adolescents to harmful and addictive social media *features*,"

9    SB 976 § 1(g) (emphasis added)—is "agnostic as to content." *City of Austin*, 596 U.S. at 69.

10    Plaintiff does not point to any viewpoint or opinion the State seeks to suppress. It asserts

11    that the government may not "protect the young from ideas or images that a legislative body

12    thinks unsuitable," Mot. at 19, but it does not identify any ideas or images that the Legislature

13    deemed unsuitable or that the Act bars. Plaintiff simply concludes *ipse dixit* that its members'

14    feeds are protected speech and argues that the Act places limits on that speech. That does not

15    show that the Act's motives or effects are content-based. As discussed above, regulations of

16    addictive feeds or other digital content-delivery features are not per se regulations of protected

17    speech. *See supra* at 8–10. At the very least, Plaintiff must submit evidence that the Act burdens

18    its expressive conduct. *See Moody*, 144 S. Ct. at 2433–37 (Alito, J., concurring in the judgment).

19    Moreover, contrary to Plaintiff's assertion, it makes little difference whether a law is

20    "speaker based" if that law does not target messages or ideas. Mot. at 17–18. Indeed, any law

21    restricting conduct must distinguish between those who engage in that conduct and those who do

22    not. As Plaintiff's own authorities explain, it is only when a State has regulated some speakers but

23    "left unburdened those speakers whose messages are in accord with its own views" that the law is

24    viewed with suspicion. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 778 (2018).

25    For example, in *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41 (1986), the Supreme Court

26    examined a law that prohibited adult theaters from locating in certain parts of the city. *Id.* at 43–

27    44. The law singled out certain speakers (adult theaters), and did so based on their speech (adult

28    movies). *See id.* at 47. But the city's interest was not "the *content* of the films" but "the *secondary*

14

1   effects of such theaters on the surrounding community." *Id.* at 47 (emphasis in original). Because

2   the city's intent was not to suppress free expression, its speaker-based restrictions were

3   permissible. *Id.* at 48.

4       So too here. The Act's intent is not to suppress free expression but to mitigate the effects of

5   addictive feeds and other mechanisms on children. *See* SB 976 § 1. The Act targets websites with

6   addictive feeds—a feature that shopping and cloud storage websites lack. For one thing, such

7   sites typically do not feature user-generated or user-shared content, one of the defining elements

8   of such feeds. *See* § 27000.5(a).

9       Plaintiff's central case—*Brown v. Entertainment Merchants Association*, 564 U.S. 786

10  (2011)—is therefore inapposite. Plaintiff uses *Brown* to advance several arguments, including, for

11  instance, that the Act's parental verification requirements erect an impermissible barrier between

12  minors and protected speech. *See, e.g.*, Mot. at 2, 11–14, 19, 22. But *Brown* concerned a self-

13  consciously content-based restriction on violent video games—specifically, those that "appeal[ed]

14  to a deviant or morbid interest" and were "patently offensive to prevailing standards in the

15  community as to what is suitable for minors." *Brown*, 564 U.S. at 789. The Court's disapproval of

16  that law, including its parental consent provisions, centered on the fact that it was an effort to

17  limit children's access to "unsuitable" ideas and images. *Id.* at 795. That law is nothing like the

18  Act here, which imposes no limit on the content that children may access. Indeed, the Act

19  provides children with *more* freedom to find and access the content they want to see, rather than

20  having their choices dictated by algorithms that monitor their data. If the Act limited access to

21  ideas or messages, for either children or adults, then *Brown* might apply. But it does not.

22      Plaintiff's remaining cases concerning parental consent and social media laws are similarly

23  distinguishable. *See* Mot. at 12–13. Those courts concluded that the challenged statutes were

24  content-based because they "facially distinguishe[d] between 'social' speech and other forms of

25  speech," *Reyes*, 2024 WL 4135626, at *11; *see Yost*, 716 F. Supp. 3d at 557; *Finch*, 2024 WL

26  3275409, at *9, or concerned laws that targeted specific platforms in ways that appeared

27  pretextual, *Griffin*, 2023 WL 5660155, at *16 ("tend[ing] to agree" that law was content-based

28

15

1   because it targeted specific websites but declining to "reach that conclusion definitively at this

2   early stage").

3        Because the Act is content-neutral, it is subject, at most, to intermediate scrutiny.

4   **IV.   IN ANY EVENT, THE ACT SATISFIES BOTH INTERMEDIATE SCRUTINY AND STRICT
        SCRUTINY**

5        To satisfy intermediate scrutiny, a statute must further an important or substantial

6   governmental interest, the interest must be unrelated to the suppression of free expression, and the

7   restriction on speech must be "no greater than is essential" to further that interest. *Porter*, 68 F.4th

8   at 439. However, the restriction "need not be the least restrictive or least intrusive means" of

9   furthering the State's interest, so long as the statute does not burden substantially more speech

10  than is necessary. *Id.* Alternatively, if a law is content-based, it is subject to strict scrutiny and

11  "may be justified only if the government proves that [it is] narrowly tailored to serve compelling

12  state interests." *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1070 (9th Cir. 2022). "A restriction is not

13  narrowly tailored if less restrictive alternatives would be at least as effective in achieving the

14  legitimate purpose that the statute was enacted to serve." *Id.* at 1073 (internal quotation omitted).

15  "Nevertheless, strict scrutiny requires only that a content-based restriction 'be narrowly tailored,

16  not that it be "perfectly tailored."'" *Id.* (citation omitted). "Accordingly, a reviewing court should

17  'decline to wade into the swamp' of calibrating the individual mechanisms of a restriction." *Id.*

18  (brackets omitted). Here, although at most only intermediate scrutiny applies, the Act satisfies

19  both intermediate and strict scrutiny.

20
21        **A.   The Act Furthers a Compelling Government Interest Unrelated to the
                Suppression of Free Expression: Protecting the Health of Children**

22       The Act furthers an interest that is both compelling and substantial: protecting the physical

23  and mental health of children. The Supreme Court "ha[s] recognized that there is a compelling

24  interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of

25  Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989); *accord United States v. Christie*, 825 F.3d 1048,

26  1057 (9th Cir. 2016). "This interest extends to shielding minors from the influence of" certain

27  speech that is typically subject to First Amendment protection. *Sable*, 492 U.S. at 126.

28       Further, protecting minors from manipulative or addiction-like mechanisms is a compelling

16

state interest. As the Supreme Court has recognized, children "generally are less mature and

responsible than adults"; they "often lack the experience, perspective, and judgment to recognize

and avoid choices that could be detrimental to them," and "are more vulnerable or susceptible to

outside pressures[.]" *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) (ellipses and internal

quotation omitted) (citing cases). As such, the law properly "assum[es] that children

characteristically lack the capacity to exercise mature judgment and possess only an incomplete

ability to understand the world around them." *Id.* at 273. In the First Amendment context, the

Supreme Court has said that "[a] State may permissibly determine that, at least in some precisely

delineated areas, a child—like someone in a captive audience—is not possessed of that full

capacity for individual choice which is the presupposition of First Amendment guarantees."

*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 n.11 (1975). Indeed, the Court has

"repeated[ly] recogni[zed] that children deserve special solicitude in the First Amendment

balance because they lack the ability to assess and analyze fully the information presented

through commercial media." *Anheuser-Busch, Inc. v. Schmoke*, 101 F.3d 325, 329–30 (4th Cir.

1996) (collecting cases).

For example, the Supreme Court has held in a First Amendment case that deterring tobacco

or drug use by high-schoolers is a compelling interest because, *inter alia*, "[s]chool years are the

time when the physical, psychological, and addictive effects of drugs are most severe." *Morse v.

Frederick*, 551 U.S. 393, 407 (2007); *see Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 564

(2001). Excessive social media use presents similar dangers. *See Moody*, 144 S. Ct. at 2423

(Alito, J.) (citing research suggesting "social media are having a devastating effect on many

young people"); Radesky Decl. ¶ 50 (children's psychological vulnerability to manipulative

digital features); Feder Decl. ¶ 45 (discussing research showing social media is habit forming).

Plaintiff cites *Brown* to assert that the State must "specifically identify an actual problem in

need of solving" and claims that "[a]mbiguous proof will not suffice." Mot. at 19. But *Brown*

involved a permanent (not preliminary) injunction, entered after full discovery and summary

judgment. *See Brown*, 564 U.S. at 790. The Supreme Court has not instituted a rule at the

preliminary-injunction stage that any particular quanta of proof are per se insufficient to establish

17

a compelling interest. In fact, in other cases, the Court has upheld government interests as compelling, including under a strict-scrutiny standard, without conducting searching scientific analysis. *See*, *e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 439, 444 (2015). Nevertheless, the Legislature here has identified an actual problem in need of solving, which the Act's title, findings, and history address, *supra* at 3–4, and which Plaintiff ignores. Moreover, the State has supported those findings with evidence, *supra* at 2–3. The State has therefore met its burden.

> **B.    The Restrictions the Act Imposes Are Narrowly Tailored to Serve the Compelling Interest of Protecting the Health of Minors**

Because the Act imposes restrictions no greater than what is essential to effect the government's interest, it satisfies intermediate scrutiny. And because the Act's provisions are narrowly tailored, they satisfy strict scrutiny. The Act's provisions are aimed solely at curbing the harmful effects of certain online mechanisms and resemble classic time, place, and manner restrictions that the Supreme Court and the Ninth Circuit have repeatedly endorsed.

The State's motive in creating and enforcing the Act is to protect the physical and mental health of minors, which includes limiting their access to feeds that use data collected from and about the child user to curate a targeted feed of content used to keep the child online. The Act's definition of "addictive feeds" places limits in connection with such feeds while avoiding restrictions beyond those necessary to further the State's interest. The Act does not prevent minors from signing up for any site, viewing any content or category of content, searching for any specific media, or subscribing to any creators they choose to follow. *See* §§ 27000.5(a)(2), (4). It only restricts companies from pushing feeds of media to minors they did *not* request, a restriction not greater than essential—indeed, narrowly tailored—to the State's interest in curbing the feeds' negative effects. As the Supreme Court has held, even a total ban on certain communications can be narrowly tailored "if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

In *Hill v. Colorado*, 530 U.S. 703, 707 (2000), the Supreme Court examined a statute prohibiting any speaker within 100 feet of the entrance to a healthcare facility from approaching within eight feet of another person, without that person's consent, for the purposes of protesting,

counseling, or distributing literature. The statute did not restrict the contents of any message—and was therefore content-neutral—but it did restrict the ability of speakers to provide unsolicited advice to people entering or leaving the facility. *Id.* at 708. Colorado's interest was in protecting individuals' unimpeded access to healthcare facilities generally, but the legislative history made clear that the primary motivation was to address protests around abortion clinics. *Id.* at 715–16. The Court held that the statute, a blanket prohibition on speakers approaching individuals without their affirmative consent, was narrowly tailored to the government's interest because it restricted only unsolicited approaches and allowed alternative paths of communication. *Id.* at 726–27.

Similarly, the Act's restriction on addictive feeds only applies to feeds of content that the user did not affirmatively request. That restriction is narrowly tailored to the State's interest in protecting the physical and mental health of children. It is also, like restrictions on robocalls that the Ninth Circuit has held constitutional, justified by the State's interest in protecting privacy in the home and at school—including, as the Ninth Circuit held, via cell phones. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876 (9th Cir. 2014); *see also Hill*, 530 U.S. at 728 ("States and municipalities plainly have a substantial interest in controlling the activity around certain public and private places," including "schools . . . and private homes.").

The same holds true for off-hour notifications. The Act's restrictions on such notifications are classic time, place, or manner rules, narrowly tailored to the State's interest in limiting platforms with addictive feeds from luring minors away from sleep or schoolwork. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293–95 (1984). Platforms may still send minors notifications; they just cannot send them at specific sensitive times. *See Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). That the restrictions might not mirror when minors are sleeping or in school in corner cases (e.g., vacations), Mot. at 23, does not render it problematic. Under intermediate scrutiny, a law "need not be the least restrictive or least intrusive means," *Porter*, 68 F.4th at 439; under strict scrutiny, it must be "narrowly tailored" but not "perfectly tailored." *Nat'l Sec. Letter*, 33 F.4th at 1073 (quoting *Williams-Yulee*, 575 U.S. at 454). In short, time, place, or manner restrictions can be sufficiently tailored without covering every fringe case.

Plaintiff claims that the Act is overinclusive because it is not limited to websites that are

1    "particularly harmful to minors" or that are "particularly likely to be accessed by minors." Mot. at

2    21. That is wrong. First, the argument presupposes that the Act is subject to strict scrutiny, which

3    it is not. But even so, the Act's objective is not to broadly target "harmful" websites, or indeed

4    websites in general, and the Act's provisions do not have that effect. Whether a website's content

5    may be "particularly harmful" or whether its user base is predominantly under 18 is irrelevant to

6    the Act's purpose. A website that uses an addictive feed to keep a minor user on the site longer is

7    harmful to minors irrespective of its content or whether other users happen to be adults.

8        Plaintiff also cites *Reyes* to claim that the Act is overinclusive because it covers websites

9    that "disseminate a broad range of protected speech." Mot. at 21. But *Reyes* does not support

10   Plaintiff's argument. The law in *Reyes* targeted "social media companies," requiring them to

11   disable certain features that prolong user engagement, such as autoplay, continuous-scroll, and

12   push notifications. *Reyes*, 2024 WL 4135626, at *3–4. The law was not limited to social media

13   companies that actually used those features; it expressly covered all social media companies. *See*

14   *id.* at *3–4. The *Reyes* court found the law overinclusive because it was not limited to "social

15   media platforms that use the addictive features fundamental to Defendants' well-being and

16   privacy concerns." *Id.* at *16. But the Act here is limited in just this way, regulating only websites

17   and platforms that use the features core to the State's well-being concerns. The Act thus achieves

18   the narrow tailoring that the *Reyes* court found lacking.

19       Plaintiff next claims that the Act is not the least restrictive means to achieve the State's

20   interest because parents can monitor their children's internet access through internal filters and

21   notification settings. Mot. at 20–21. But even if the least-restrictive-means test applied here, the

22   Act's measures perform vital functions that existing features, including those Plaintiff discusses,

23   do not. First, to the extent that there are features that perform the same function as the Act's

24   measures, they do not equally accomplish the State's goal of furthering child health because they

25   are not enabled by default. Moreover, Plaintiffs' own evidence indicates that some of its members

26   do not provide an option for users to disable addictive feeds. Plaintiff claims that "many services

27   allow users, including minors, to alter the feeds they see," Mot. at 21, but the declaration it cites

28   merely suggests that many of Plaintiff's sites cannot or will not stop using the feeds that are

20

1    subject to the Act and do not have options for users to turn them off. Cleland Decl. ¶¶ 9, 33.

2        Plaintiff next claims the Act is *under*inclusive because it allows parents to opt their children

3    into features regulated by the Act. Plaintiff argues that if addictive feeds and off-hour

4    notifications are dangerous, it does not make sense to allow minors to access them even if a

5    parent approves. Mot. at 22–23. But as the Supreme Court held in a strict scrutiny case, it is

6    "counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech."

7    *Williams-Yulee*, 575 U.S. at 448 (emphasis in original). The concept of underinclusiveness is used

8    to assess "whether the government is in fact pursuing the interest it invokes," *id.* (citing *Brown*,

9    564 U.S. at 802), or whether "a law does not actually advance a compelling interest," *id.* at 449.

10   "[T]he First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Id.* The Court

11   "ha[s] accordingly upheld laws—even under strict scrutiny—that conceivably could have

12   restricted even greater amounts of speech in service of their stated interests." *Id.*

13       *Williams-Yulee* illustrates that point. The state law at issue barred judicial candidates from

14   soliciting campaign funds directly but did not prohibit them from establishing campaign

15   committees to raise funds. *Id.* at 439. The Supreme Court rejected a challenge based on

16   underinclusiveness because restricting one form of speech but not the other does not violate the

17   First Amendment. *Id.* at 448–52. The Court explained, "[w]e will not punish [a state] for leaving

18   open more, rather than fewer, avenues of expression, especially when there is no indication that

19   the selective restriction of speech reflects a pretextual motive." *Id.* at 552.

20       The same rule applies here. The fact that the Act places restrictions on addictive feeds and

21   notifications, while allowing for parental opt-ins, does not suggest a pretextual motive. It reflects

22   the State's effort to limit the Act's scope so it does not go beyond what is necessary to effectuate

23   its purpose. It would be absurd to require the State to both narrowly tailor its laws to limit effects

24   on speech *and* show that it has regulated the *maximum* amount of speech, and it is not what the

25   First Amendment requires. *See Hill*, 530 U.S. at 715–16, 734–35; *OPAWL – Bldg. AAPI Feminist

26   Leadership v. Yost*, 118 F.4th 770, 783 (6th Cir. 2024) ("Overinclusive if you do, underinclusive

27   if you don't. The First Amendment doesn't create that dilemma.").

28       Nor is the Act underinclusive because it exempts some websites that do not provide

21

addictive feeds. *See* Mot. at 22. The State's interest is in limiting children's exposure to addictive feeds. That the Act excludes websites that do not have such feeds shows it is narrowly tailored.

Plaintiff claims that the Act is not narrowly tailored because it does not account for differing levels of maturity between 13-year-olds and 17-year-olds. Mot. at 23. But the State's interest in safeguarding the mental and physical health of minors applies as much to 13-year-olds as it does 17-year-olds. *See*, *e.g.*, Feder Decl. ¶¶ 20, 30 (study composed of teens ages 14–17 indicated increased depression and anxiety resulting from excessive social media use); *cf. Morse*, 551 U.S. at 407 (state's interest in curbing drug use extended to 12th graders). The Act would not be properly tailored to achieve the State's interest if it did not cover all minors in California.

Plaintiff also argues that the Act's age-assurance and parental-verification requirements are impermissible barriers between minors and protected speech. *See* Mot. at 12–16. Even assuming Plaintiff's age-assurance challenge were justiciable, *but see supra* at 6–7, the argument presupposes that its members' content feeds and notifications are protected speech. As explained above, Plaintiff has not met its burden of demonstrating they can be accorded First Amendment protection. Moreover, the Act does not restrict minors' access to content and allows platforms to show the same content to them through different means. *See Hill*, 530 U.S. at 721–22. For those reasons, Plaintiff's cited authorities are inapplicable. *See, e.g.*, *Ashcroft*, 542 U.S. at 658 (addressing "content-based restriction designed to protect minors from viewing harmful materials"); *Reno*, 521 U.S. at 859 (statute targeted "indecent" and "patently offensive" content).

Even assuming the age-assurance and parental-notification requirements were to restrict access to protected speech, they are not so onerous as Plaintiff claims. *See* Mot. at 14. First, Plaintiff offers little in the way of facts to show that the requirements are burdensome. Indeed, one declarant appears to misapprehend the Act's requirements altogether. *See* Paolucci Decl. ¶ 20 (warning of parties who "falsely claim the user is under the age of 13 and does not have parental consent to hold an account," even though the Act does not require parental consent to hold an account). In fact, federal law already requires verifiable parental consent before companies such as Plaintiff's members may collect the personal information of children under the age of 13, 15 U.S.C. § 6502(b)(1)(A)(ii), and there is existing Federal Trade Commission guidance on how to

22

1    obtain that consent, Egelman Decl. ¶ 54. Many devices and services already offer parental

2    controls. Egelman Decl. ¶ 53. And age assurance is already required in other countries where

3    Plaintiff's members operate. Egelman Decl. ¶ 55.

4         And those requirements, as set forth in the Act, are much less restrictive here than in

5    Plaintiff's cases, which concern laws requiring parental consent before a minor can even access

6    certain platforms. *Griffin*, 2023 WL 5660155, at *1; *Fitch*, 2024 WL 3276409, at *2. In any

7    event, neither intermediate nor strict scrutiny require the means adopted to achieve the State's

8    objective to be perfect. *Porter*, 68 F.4th at 439; *Nat'l Sec. Letter*, 33 F.4th at 1070. Here, the State

9    simply adopted the means that its objectives require. Age assurance is necessary to assure

10   platforms that a user is of age; parental verification is necessary to verify that a person consenting

11   to a child's use of certain features is the child's parent.

12        Finally, in passing, Plaintiff challenges the Act's requirement in section 27005 that

13   operators annually disclose the number of minors who use their platforms, the number of those

14   "for whom the operator has received verifiable parental consent to provide an addictive feed," and

15   the number for whom the Act's default protections have been disabled. But required disclosures

16   of "purely factual and uncontroversial" information about a business's commercial transactions is

17   subject only to "a lesser form of scrutiny akin to a rational basis test." *X Corp. v. Bonta*, 116 F.4th

18   888, 900 (9th Cir. 2024); *see also Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626 (1985).

19   The disclosure requirement satisfies that standard because the required information is purely

20   factual and will allow the State to monitor the Act's success. The Act requires Plaintiff to report

21   facts—it does not require it to provide opinions about its features or to describe them as addictive.

22   **V.    THE ACT IS NOT UNCONSTITUTIONALLY VAGUE**

23        A statute is impermissibly vague if it "fails to provide a reasonable opportunity to know

24   what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory

25   enforcement." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015). This standard "does not

26   require 'impossible standards of clarity.'" *Id.* A statute must simply "give a 'person of ordinary

27   intelligence a reasonable opportunity to know what is prohibited.'" *Valle del Sol*, 732 F.3d at

28   1019. "The touchstone . . . is not whether *some* amount of legitimate speech will be chilled; it is

23

1    whether a *substantial* amount of legitimate speech will be chilled." *Cal. Teachers Ass'n v. State*

2    *Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) (emphasis in original). Though there may be

3    debatable cases at the margin, or hypotheticals that could be invented, a statute is not vague if it is

4    "clear what the [statute] as a whole prohibits." *Hill*, 530 U.S. at 733.

5        Plaintiff argues that the Act is vague because certain websites, including its member

6    Dreamwidth, are uncertain whether the Act applies to them. Mot. at 24. But the declarations

7    supporting that argument undermine its credibility. Dreamwidth states that it does not provide an

8    addictive feed the way Plaintiff's other members like YouTube and Meta do. *See* Paolucci Decl.

9    ¶ 6. Instead, it states that it provides only a reverse-chronological feed of posts from people a user

10    has chosen to follow. *Id.* ¶ 12. Dreamwidth claims it does not know if this constitutes an addictive

11    feed, because its feed is based on a user "request[ing] . . . media by the author, creator, or poster

12    of the media" under section 27000.5(a)(4), but the user's list of subscriptions is also "persistently

13    associated" with the user, in contravention of § 27000.5(a)(1). *Id.*; *see also* Cleland Decl. ¶ 27.

14    But there is no vagueness in the actual text of the Act. The plain terms of sections 27000.5(a)(1)

15    and 27000.5(a)(4) are disjunctive. *See* § 27000.5 (feed is not an "addictive feed" if "*any* of the

16    following conditions are met, alone or in combination with one another") (emphasis added). If

17    Dreamwidth's feed satisfies section 27000.5(a)(4)—which the State does not concede—it is

18    subject to the Act regardless of whether it separately satisfies section 27000.5(a)(1).

19        Plaintiff also argues that the Act is impermissibly vague because it does not define the

20    terms "significant part" or "primary purpose." Mot. at 24. Plaintiff cites no cases from the Ninth

21    Circuit holding that such terms are impermissibly vague. To the contrary, a Ninth Circuit decision

22    that Plaintiff cites discusses how numerous other statutes have withstood First Amendment

23    challenges using terms that were arguably more vague or ambiguous. *See Cal. Teachers Ass'n*,

24    271 F.3d at 1153–54 (citing cases). Plaintiff does not present evidence that an ordinary person

25    lacks a reasonable opportunity to know what is prohibited. *See* Mot. at 24. Indeed, Plaintiff itself

26    has identified at least five of its members covered by the Act. Mot. at 4.

27    **VI.    ALL OTHER INJUNCTION FACTORS WEIGH AGAINST PLAINTIFF**

28        "[I]f a plaintiff fails to show that he has some chance on the merits, that ends the matter."

*Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011). That said, Plaintiff has not established that the three remaining injunction factors weigh in its favor, either.

Plaintiff has not shown that its members will face irreparable harm if the Act goes into effect. Its allegations of financial harm are speculative. One declaration says, for example, that age assurance will "prove costly and difficult to implement," Cleland Decl. ¶ 28—even though the Act does not mandate an age assurance standard beyond "actual knowledge" until 2027. "Speculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984).

The balance of equities and the public interest also militate against an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (factors merge when government is party). Enjoining the Act would prevent the State from pursuing the public interest in protecting children's health. *See Sable*, 492 U.S. at 126. Further, an injunction would inflict irreparable harm on California by preventing enforcement of a statute enacted by the people's representatives. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). To the extent that the Court concludes any of the Act's provisions cannot be enforced, it should sever those provisions rather than enjoining enforcement of the entire Act, pursuant to the Act's severability clause in section 27007. *Santa Barbara Sch. Dist. v. Super. Ct.*, 13 Cal.3d 315, 331 (1975) (severability clause creates presumption of severability); *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014) (federal courts apply California law when analyzing severability). In any case, the balance of the equities weighs against granting the motion.

## CONCLUSION

The Court should deny Plaintiff's motion for a preliminary injunction.

1    Dated: December 3, 2024                    Respectfully submitted,

2                                               ROB BONTA
                                                Attorney General of California
3                                               LARA HADDAD
                                                Supervising Deputy Attorney General
4                                               JENNIFER E. ROSENBERG
                                                SHIWON CHOE
5                                               Deputy Attorneys General

6

7                                               */s/ Christopher J. Kissel*
                                                CHRISTOPHER J. KISSEL
8                                               Deputy Attorney General
                                                *Attorneys for Defendant Rob Bonta, in his*
9                                               *official capacity as California Attorney*
                                                *General*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Plaintiff's Motion for a Preliminary Injunction (5:24-cv-07885-EJD)