Steven P. Lehotsky*
Scott A. Keller**
Jeremy Evan Maltz**
Shannon Grammel**
**LEHOTSKY KELLER COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Joshua P. Morrow*
**LEHOTSKY KELLER COHN LLP**
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
**LEHOTSKY KELLER COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com
* *Pro hac vice* pending.
** Admitted *pro hac vice*.

*Attorneys for Plaintiff NetChoice*

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETCHOICE,<br><br>              Plaintiff,<br><br>      v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>              Defendant. | Case No. 5:24-cv-07885-EJD<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: December 17, 2024<br>Time: 9:00am<br>Judge: Hon. Edward J. Davila<br>Courtroom: San Jose, Courtroom 4, 5th Floor |

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.     NetChoice is likely to succeed on the merits of its challenges to the Act. ......................... 1

       A.     NetChoice's challenge to the Act's age-assurance requirements is ripe. .............. 1

       B.     NetChoice is likely to succeed on the merits of its First Amendment challenges. .. 3

              1.     The Act's provisions regulate speech—not non-expressive activity—
                     by burdening the dissemination and consumption of speech on
                     covered websites and by compelling speech. ............................................. 3

              2.     The Act's content-based and speaker-based speech regulations trigger
                     strict scrutiny. .......................................................................................... 7

              3.     The Act's speech regulations fail strict scrutiny. .................................... 10

              4.     NetChoice's facial First Amendment challenge is proper under
                     *Moody*. .................................................................................................. 13

       C.     NetChoice is likely to succeed on the merits of its claim that the Act is
              impermissibly vague. ......................................................................................... 14

II.    The remaining factors support granting NetChoice a preliminary injunction. ................ 14

CONCLUSION ................................................................................................................. 15

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF AUTHORITIES**

**Cases**

*Ackerley Commc'ns of Ma., Inc. v. City of Somerville,*
    878 F.2d 513 (1st Cir. 1989) ................................................................9

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008) ................................................................2

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ..........................................................................13

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ......................................................................4, 12

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
    591 U.S. 610 (2020) ........................................................................7, 9

*Berger v. City of Seattle,*
    569 F.3d 1029 (9th Cir. 2009) ............................................................9

*Brown v. Ent. Merchs. Ass'n,*
    2010 WL 2787546 (U.S. July 12, 2010) ........................................7, 11

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ................................................................. *passim*

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    596 U.S. 61 (2022) ..............................................................................7

*City of L.A. v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) ............................................................................8

*Cohen v. California,*
    403 U.S. 15 (1971) ..............................................................................9

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
    2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ................................11

*FEC v. Cruz,*
    596 U.S. 289 (2022) ............................................................................3

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................................9

*Haw. Newspaper Agency v. Bronster,*
    103 F.3d 742 (9th Cir. 1996) ..........................................................1, 2

*Hill v. Colorado,*
    530 U.S. 703 (2000) ............................................................................9

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

*Moody v. NetChoice, LLC*,
   144 S. Ct. 2383 (2024) ................................................................. *passim*

*Nat'l Ass'n of Mfrs. v. SEC*,
   800 F.3d 518 (D.C. Cir. 2015) .............................................................. 4

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) ............................................................................ 8

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) ...................................................... 4, 15

*NetChoice, LLC v. Griffin*,
   2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............................ 2, 6, 13

*NetChoice, LLC v. Reyes*,
   2024 WL 4135626 (D. Utah Sept. 10, 2024) ............................ 5, 10, 13

*NetChoice, LLC v. Yost*,
   716 F. Supp. 3d 539 (S.D. Ohio 2024) .............................................. 7

*New York v. United States*,
   505 U.S. 144 (1992) ............................................................................ 2

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
   460 U.S. 37 (1983) ............................................................................. 9

*Reno v. ACLU*,
   521 U.S. 844 (1997) ....................................................................... 4, 8

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*,
   702 F. Supp. 3d 809 (N.D. Cal. 2023) ............................................... 4

*United States v. Playboy Ent. Grp.*,
   529 U.S. 803 (2000) .......................................................................... 12

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ........................................................................... 3

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) .......................................................................... 14

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ........................................................................... 3

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ........................................................................... 9

iii

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008).............................................................................................................12

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ...................................................................................4, 13

**Statutes**

Cal. Bus. & Prof. Code § 17500 .............................................................................................12

Cal. Bus. & Prof. Code § 22675 ...............................................................................................7

Cal. Civ. Code §§ 1798.100-.199 ...........................................................................................13

Cal. Health & Safety Code § 27000.5.............................................................................5, 7, 9, 14

Cal. Health & Safety Code § 27001............................................................................................1, 3

Cal. Health & Safety Code § 27002............................................................................................1, 3

Cal. Health & Safety Code § 27006............................................................................................1, 3

Cal. Health & Safety Code § 270005..........................................................................................4, 15

Cal. Senate Bill 976 (2024) § 1...............................................................................................10

**Other Authorities**

Pet. Br., *Brown v. Ent. Merchs. Ass'n*,
    2010 WL 2787546 (U.S. July 12, 2010) ...............................................................................7, 11

Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory
    (2023), https://perma.cc/YQ76-J687 ....................................................................................10

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

California Senate Bill 976 ("Act") uses a content-based and speaker-based coverage definition to restrict access to speech protected from government interference on disfavored websites through parental-consent and age-assurance requirements. In so doing, it affects a wide range of speech activities, with harms to both NetChoice's covered member websites *as well as their respective users*. Defendant's opposition does not once address the Act's effects on users' rights. Instead, Defendant focuses largely on minimizing the scope of the Act's effects on speech. And his central argument relies on the erroneous assertion that the Supreme Court's holding in *Moody*—protecting "organizing," "presenting," and "display" of "third-party speech" through "personalized" feeds—somehow may not apply to this Act's restrictions on personalized feeds. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393, 2402 (2024). That argument misreads *Moody* (which analyzed many of the same website feeds that are regulated by the Act here) and a wealth of other First Amendment precedent. Defendant also largely fails to address the Act's other speech restrictions.

Defendant has not demonstrated that the Act's speech restrictions satisfy the First Amendment's demanding standards. Accordingly, the Act here is much like the state laws that courts across the country have preliminarily enjoined. And, without an injunction before the end of the year, NetChoice members and their users will be irreparably harmed. This Court therefore should preliminarily enjoin enforcement of the Act before its January 1, 2025, effective date.

## ARGUMENT

**I.    NetChoice is likely to succeed on the merits of its challenges to the Act.**

**A.    NetChoice's challenge to the Act's age-assurance requirements is ripe.**

NetChoice's challenge to the Act's age-assurance requirements is ripe. Mot. 15-16 (discussing §§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c)). There is no dispute that some

NetChoice members are subject to the Act's age-assurance regulations. And NetChoice raises "[l]egal questions that require little factual development." *Haw. Newspaper Agency v. Bronster*, 103 F.3d 742, 746 (9th Cir. 1996) (citation omitted). These legal questions constitute a present controversy because covered NetChoice members must develop their means of compliance, which

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

is a "costly, *time-consuming*, and resource-intensive" process. Cleland Decl. ¶ 29 (emphasis added). Indeed, compliance is so difficult that NetChoice member Dreamwidth contends it would not be possible at all. Paolucci Decl. ¶¶ 14-18. And there is little doubt that the Defendant "Attorney General will seek to enforce the requirements of" the Act against NetChoice's members. *Bronster*, 103 F.3d 742 at 747. He has already pursued actions based on similar legal theories against NetChoice members. *See* ECF 1 ¶ 17.

Defendant's main argument is that a challenge to the age-assurance requirements is not ripe because those provisions are not effective until January 1, 2027. Opp. 6-7. Defendant ignores that NetChoice is challenging multiple provisions in the Act, and, even as to the age-assurance requirement, the Supreme Court has concluded that lawsuits challenging laws that will not take effect for even four years can be ripe. *New York v. United States*, 505 U.S. 144, 175 (1992). That is especially true where (as here) compliance is a time-intensive process, *id.*, as the uncontested record evidence here supports, *see* Cleland Decl. ¶ 29; Paolucci Decl. ¶¶ 14-18. And Defendant does not explain why the Court cannot address this provision now, rather than in a duplicative lawsuit to be filed a year from now. The age-assurance requirements are now law, and members will need to take steps to come into compliance with them before the Act takes effect if they are not enjoined.

Nor does it matter that the government may later promulgate *regulations* detailing technical means for websites to engage in age assurance. The non-technical substance of the age-assurance requirements already violates the First Amendment: *Any* barrier or requirement for users to trade their anonymity for access to protected speech will chill their speech in violation of the First Amendment. *E.g.*, *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *17 (W.D. Ark. Aug. 31, 2023) (citing *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008). No technical particularities described in implementing regulations could cure that violation. Nor do the technical requirements matter to the NetChoice members that have stated they lack resources to engage in *any* form of age assurance. Paolucci Decl. ¶¶ 14-18.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**B.    NetChoice is likely to succeed on the merits of its First Amendment challenges.**

      **1.    The Act's provisions regulate speech—not non-expressive activity—by burdening the dissemination and consumption of speech on covered websites and by compelling speech.**

"Whether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011). Each of these steps in the speech process is protected by the First Amendment. And this Act regulates all of them. Defendant incorrectly contends that presenting personalized feeds of protected speech may not be protected "expressive" activity. *Cf.* Opp. 9. This argument is incorrect. In any case, Defendant does not address the Act's other speech restrictions. Defendant's other arguments are similarly unavailing.

**a.** The Act plainly regulates speech multiple times over, affecting both NetChoice covered members' rights and their respective users' rights. So the Act plainly affects "expressive" activity. Opp. 9.

The Act restricts the dissemination and consumption of speech by imposing age-verification and parental-consent requirements to view personalized feeds or to receive notifications at particular times of day. §§ 27001(a), 27002(a), (b)(2), 27006(b)-(c). It likewise regulates speech by imposing defaults on the speech available on minors' accounts, *e.g.*, by disabling by default certain feedback mechanisms or limiting the visibility of minors' accounts. § 27002(b)(1), (3)-(5). All of these provisions restrict protected speech. And wherever the government "restricts" *access* to protected speech, it bears the burden of demonstrating that its restrictions satisfy the First Amendment's demanding standards. *FEC v. Cruz*, 596 U.S. 289, 305 (2022). Defendant's discussion of the First Amendment interests at stake in the case gives short shrift to the many ways that the Act violates established First Amendment doctrine.

*Users* have a First Amendment right to *receive* protected speech on online services—and to communicate with others on them—unimpeded by government interference. *See Brown*, 564 U.S. at 792 n.1. NetChoice expressly raised the rights of its members' users, which Defendant has not contested. *See* Mot. 10 (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988)). "[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S.

3

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

748, 756 (1976). Defendant completely ignores the Act's effect on users' rights. Such rights are not limited to engaging in speech; they extend to access to speech as well. That is why minors have a First Amendment right to access protected speech without government-mandated parental consent. *Brown*, 564 U.S. at 795 n.3. And both adults and minors may access protected speech without first engaging in age assurance. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997).

*Covered websites* additionally have the right to display protected speech, including through the use of personalized feeds and notifications. *E.g.*, *Moody*, 144 S. Ct. at 2393, 2400-01; *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 837 (N.D. Cal. 2023) ("[T]he timing and clustering of notifications . . . is entitled to First Amendment protection."). As is true of traditional publishers, States cannot "prevent[] [a website] from compiling the third-party speech it wants in the way it wants, and thus from offering the expressive product that most reflects its own views and priorities." *Moody*, 144 S. Ct. at 2394. "[L]aws curtailing their editorial choices must meet the First Amendment's requirements." *Id.* at 2393.

Websites also have a First Amendment right against compelled speech. That is especially true of the Act's mandate (§ 270005) that covered websites "publicly condemn" themselves and adopt the labeling of their services and feeds as "addictive." *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015). This provision does not compel mere commercial speech. Forcing a website to adopt a pejorative label is not commercial speech. *Id.* Neither does disclosing how many minors and their parents have chosen particular means of speech dissemination "propose a commercial transaction." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)); *see X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (same). So the commercial-speech doctrine, or some other lesser form of First Amendment scrutiny, does not apply here.

**b.** Defendant's central argument is that covered websites disseminating speech through *personalized feeds* is not necessarily protected by the First Amendment under *Moody*. *See* Opp. 8-10. This argument does not address the Act's other speech regulations at all. Even as to personalized feeds, it misreads *Moody*.

4

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1    *Moody* held that "social media" websites "engage[] in expression" through their "organiz-

2    ing," "presenting," and "display" of protected "third-party speech." 144 S. Ct. at 2393, 2402. In

3    particular, the Court held that the First Amendment protects "compiling and curating" protected

4    speech in "personalized" "feeds." *Id.* at 2393, 2401, 2403. "[D]ecision[s]" about "which third-

5    party content . . . [to] display, or how the display will be ordered and organized," are "expressive

6    choices" that "receive First Amendment protection." *Id.* at 2394, 2406. The "feeds" that the Court

7    considered—Facebook's News Feed and YouTube's homepage—are two of the NetChoice mem-

8    ber feeds that the Act seeks to regulate here. *Id.* at 2403. That is why, after *Moody*, the District of

9    Utah concluded that the "speech social media companies engage in when they make decisions

10   about how to construct and operate their platforms . . . is protected" by the First Amendment.

11   *NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *8 (D. Utah Sept. 10, 2024).

12   True, the Supreme Court said that *Moody* did "not deal [] with feeds whose algorithms

13   respond *solely* to how users act online." 144 S. Ct. at 2404 n.5 (emphasis added). Even assuming

14   for the sake of argument that different First Amendment principles might apply to laws that regu-

15   late feeds that operate "solely" based on "how users act online," the Act is not such a law. *Id.*

16   Instead, the Act's definition of "addictive feed" extends to any algorithm "based, in whole or in

17   part, on information provided by the user, or otherwise associated with the user or the user's de-

18   vice." § 27000.5(a). Moreover, covered NetChoice members do not display content to users based

19   "solely" on "how users act online." *Moody*, 144 S. Ct. at 2404 n.5. That is not how content-mod-

20   eration algorithms work. To the contrary, uncontested record evidence shows that covered

21   NetChoice members display content in feeds according to their own editorial policies developed

22   by humans, which include efforts to "prioritize minor safety and display only age-appropriate con-

23   tent." Cleland Decl. ¶ 8; *id.* ¶ 23 (detailing content-moderation efforts); *e.g.*, Davis Decl. ¶¶ 12,

24   34-35; Veitch Decl. ¶¶ 21, 24-30. Other covered members' personalized feeds remain protected

25   by the First Amendment, just as the Court held regarding the Facebook and YouTube main pages

26   in *Moody*. 144 S. Ct. at 2403.

27   Defendant's rationale pays no heed to this right. All manner of movies, music, books, and

28   other writing are created and produced because people want it. Under Defendant's theory, the

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

government could ban "vast quantities of constitutionally protected speech" for both minors and adults simply because they choose to receive it in a personalized form. *Griffin*, 2023 WL 5660155, at *17. The First Amendment and *Moody* allow no such thing.

**c.** Defendant erroneously argues that *Brown*'s holding that governments lack "the power to prevent children from hearing or saying anything *without their parents' prior consent*," 564 U.S. at 795 n.3, is somehow limited only to content-based speech regulations, Opp. 15. But minors have a "*constitutional right* to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 795 n.3 (emphasis added). That protection applies equally to content-based and content-neutral requirements. Otherwise, it would "vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to'" minors. *Id.* at 802 (citation omitted). California's law in *Brown* would still have violated the First Amendment if it banned *all* video games without parental consent, not just the "violent" ones. *Id.* Regardless, the Act is both content-based and speaker-based, as discussed below.

**d.** Defendant refers to covered websites' dissemination of protected speech as "digital mechanisms" or "digital content-delivery features" to contend they should receive lesser First Amendment protection. Opp. 5, 14. This argument fares no better. It is akin to saying that the government can regulate video games or "Saturday morning cartoons" under the guise of regulating the "mechanisms" of displaying graphics. *Brown*, 564 U.S. at 795 at 790. As the Supreme Court has repeatedly recognized, "the basic principles of freedom of speech and the press . . . do not vary when a new and different medium for communication appears." *Id.* (cleaned up); *accord Moody*, 144 S. Ct. at 2403 (same). Speech does not lose its First Amendment protections when it evolves from text to audiovisual, from classic to contemporary, or from analog to digital. Here, that means that the "First Amendment . . . does not go on leave when social media are involved." *Moody*, 144 S. Ct. at 2394.

Defendant's attempt to analogize the Act's restrictions on online speech to regulations of tobacco and gambling, *e.g.*, Opp. 1, 17, are inapposite and "weak," *Griffin*, 2023 WL 5660155, at *16, because tobacco and gambling do not involve free speech rights. Minors have a First Amendment right to engage in speech; they lack a constitutional right to engage in the nonexpressive

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

conduct of smoking and gambling. At any rate, this argument has been rejected already by the Supreme Court: California in *Brown* unsuccessfully argued that restrictions on minors' access to protected speech are akin to restrictions for using tobacco and gambling. *See* Pet. Br. at 22-23, *Brown v. Ent. Merchs. Ass'n*, 2010 WL 2787546 (U.S. July 12, 2010) ("Cal. *Brown* Br.") ("purchase tobacco"; "play bingo for money").

> ### 2.    The Act's content-based and speaker-based speech regulations trigger strict scrutiny.

**a.** The Act triggers strict scrutiny because its central coverage definition regulates speech based on content and speaker. Mot. 16-19.

The Act discriminates based on the "topic discussed"—*i.e.*, content—so it need not also discriminate based on "the idea or message expressed," as Defendant argues. Opp.13-14 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022)). The Act's most obvious content-based distinctions are clear on the face of the law, and are unaddressed by Defendant. The Act excludes websites that present or facilitate "*consumer reviews* of products, sellers, services, events, or places." § 27000.5(b)(2)(A) (emphasis added). In other words, if the "topic discussed," *Reagan*, 596 U.S. at 69, on a website is "consumer reviews," § 27000.5(b)(2)(A), the websites can use whatever feeds they choose. Other websites, however, must comply with the Act's onerous restrictions on speech—harming those websites and their users. This "exception[] to the Act for product review websites" is "easy to categorize as content based." *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 557 (S.D. Ohio 2024); *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619-20 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny). The Act's coverage also turns in part on whether websites "allow users to *interact socially* with each other." Cal. Bus. & Prof. Code § 22675(e)(1)(A). Such requirements are also content-based, as multiple courts have recognized. *See* Mot. 17 (collecting cases). By singling out social interaction, the Act excludes other forms of communication.

Beyond the content-based distinctions on the face of the law, at least one of the Act's stated "purpose[s] or justification[s]" is based on the "topic discussed" on the websites. *Reagan*, 596 U.S. at 69, 73-74. Defendant's declarant Dr. Radesky admits that reducing access to covered websites is an attempt to reduce access to content-based categories of speech, such as "violent, scary, or

7

sexualized images." *See* Radesky Decl. ¶¶ 61.b-e, 91. Although covered websites already engage in content moderation to address such speech, Mot. 4, the government itself cannot target protected speech for regulation without satisfying strict scrutiny.

In addition, the Act is speaker-based because it distinguishes among different kinds of online services. *See* Mot. 17-18. In short, the Act's decisions to exclude websites featuring "consumer" reviewers or content created by the websites themselves means that the Act "distinguish[es] among different speakers, allowing speech by some but not others." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (cleaned up).

**b.** Defendant contends it is irrelevant whether the Act is speaker-based because the Act purportedly regulates the "secondary effects" of covered websites. Opp. 14-15 (citation and emphasis omitted). But this secondary-effects doctrine is rarely applied and has covered only physical "zoning ordinance[s]" applied to "adult bookstores" purveying material *unprotected for minors*. *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (controlling op. of Kennedy, J.). The Supreme Court in *Reno* held that restrictions on access to online speech are not analogous to zoning ordinances regulating physical property. 521 U.S. at 867-68. It has been the law for more than a generation that States cannot "cyberzon[e]" the Internet by imposing "restriction[s] on speech." *Id.* In addition, States "may not regulate the secondary effects of speech by suppressing the speech itself . . . by reference to secondary effects." *Alameda*, 535 U.S. at 445 (Kennedy, J.). Yet the Act does just that and does not limit itself to unprotected speech for minors.

**c.** The Act's regulation of notifications also triggers strict scrutiny, and Defendant is wrong to argue that it is a permissible "time, place, or manner restriction[]." Opp. 19.

Editorial choices about how to present speech are not the "manner" of speech that governments may regulate under this doctrine. *E.g.*, *Moody*, 144 S. Ct. at 2400-02 (collecting authorities protecting the right to editorial discretion). Otherwise, governments would be allowed to regulate how online newspapers, cable news, streaming services, and other private entities publish speech. Defendant cites no authority for anything close to such sweeping governmental authority, nor could he after *Moody*. Rather, the "manner" of speech that government can regulate is largely limited to things like (1) amplification of sound to prevent public disruption; and (2) distance from

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

places that might be disturbed, such as schools. *Ward v. Rock Against Racism*, 491 U.S. 781, 784 (1989) (amplification); *Grayned v. City of Rockford*, 408 U.S. 104, 105 (1972) (law preventing demonstrations within 100 feet of schools). That is why time, place, and manner restrictions traditionally apply to speech over which listeners have no control in public places and commons—and public forums especially. *E.g.*, *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009) ("traditional public fora"; "public parks").

Furthermore, the Act's restrictions are not proper time, place, and manner regulations because they are not "content[ ] neutral." *Id.* If a law exempts websites featuring "consumer reviews," § 27000.5(b)(2)(A), from complying with restrictions on the time, place, or manner of speech, that law must satisfy strict scrutiny. Time, place, and manner restrictions also cannot be speaker-based. *See, e.g.*, *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 55 (1983); *Ackerley Commc'ns of Ma., Inc. v. City of Somerville*, 878 F.2d 513, 520 (1st Cir. 1989).

Fundamentally, the justifications underlying time, place, and manner restrictions are inapposite here, where minor users (and parents) *can control* their individual online experiences. The covered websites are publications of speech to individual and willing users. Specifically, users can: (1) sign up for and turn off the services; (2) decide what messages they want to see, and when; and (3) use the services without disrupting their neighbors, let alone the public. Unrebutted record evidence demonstrates that users can control whether the services use personalized feeds or send them notifications. *E.g.*, Mot. 4-5; Cleland Decl. ¶ 9; Veitch Decl. ¶ 45. Put another way, users of the covered websites are not "unwitting listeners or viewers." *Cohen v. California*, 403 U.S. 15, 21 (1971). And even if they were, users may "simply [] avert[] their eyes." *Id.* That makes this case completely unlike the outlier situations addressing state regulations of "unwelcome" and "confrontational" "speech." *Hill v. Colorado*, 530 U.S. 703, 717 (2000).

The Act is also unlike regulations of robocalls. *Cf.* Opp. 19. The Supreme Court has explained that government can flatly ban robocalls. *Barr*, 591 U.S. at 633 (controlling plurality op.) ("A generally applicable robocall restriction would be permissible under the First Amendment."). There is no such support for the proposition that government can ban certain forms of expression on "social media" websites. That is especially true given users' ability to control whether, when,

9

and how they receive notifications—as explained above. That is why courts have uniformly held that notifications and personalized feeds are protected. *See supra* p.4. Under Defendant's theory, however, the government could ban people from sending or receiving emails at particular times of day. This Court should reject that assertion of governmental authority.

### 3. The Act's speech regulations fail strict scrutiny.

**a.** Defendant fails to show a sufficient governmental interest in restricting adults and minors' access to protected speech. Defendant claims that the Act's speech restrictions "protect[] the physical and psychological well-being of minors." Opp. 16; *id.* at 18. But Defendant fails to show a "causal link," as the First Amendment demands. *Brown*, 564 U.S. at 799-800.

Even the materials in Defendant's one-sided submission reflect as much. For instance, the Surgeon General's Advisory highlights multiple potential "benefits of social media use among children and adolescents." Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 6 (2023), https://perma.cc/YQ76-J687 ("Advisory") (capitalization altered), *cited at* Opp. 4; Feder Decl. ¶ 33; Radesky Decl. ¶¶ 11, 28; Act § 1(c) (legislative findings); *see Reyes*, 2024 WL 4135626, at *12 (noting Surgeon General's Advisory's "nuanced view" of social media). Dr. Feder's declaration admits: "study findings on social media use are not consistent, and some find no association between social media use and mental health problems." Feder Decl. ¶ 34; *id.* ¶ 36 ("not all studies produce consistent findings"). Dr. Radesky underscores that—in addition to these inconsistent findings—the potential "harms to minors **vary** in their **prevalence** and the **magnitude of effect** that they have on a child or teen's mental health." Radesky Decl. ¶ 32 (emphasis in original).

In addition, "[n]early all of the research" cited by Defendant "is based on correlation, not evidence of causation." *Brown*, 564 U.S. at 800 (citation omitted); *see Reyes*, 2024 WL 4135626, at *13 (noting same problem in similar evidence). The Surgeon General's Advisory notes: "[m]ore research is needed to fully understand the impact of social media," and "[m]ost prior research to date has been correlational." *See* Advisory at 4, 11; Feder Decl. ¶ 52 ("this is an active area of research"). Dr. Feder's own conclusions are supported by only speculative assertions and evidence of correlation. Feder Decl. ¶¶ 12, 14, 19, 28, 30, 34, 36, 37, 50, 51, 57, 58, 63, 66 ("tend to";

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

"plausible explanations"; "positive correlation"; "likely to experience"; "higher odds"; "small but statistically significant correlation"; "is associated with"; "results are also consistent with other plausible alternative hypotheses"; "it is reasonable to conclude"; "it is plausible"; "suggests"; "can increase"). Further afield, Defendant's declarants cite the purported effects of other technology left unregulated by the Act, like smartphones. *E.g.*, *id.* ¶¶ 35, 56, 60; Radesky Decl. ¶¶ 39, 68 (smartphones); *id.* ¶¶ 63-64 (infinite scroll and autoplay). At bottom, Dr. Feder concludes only that the Act "*could* improve children's mental health." Feder Decl. ¶ 16 (emphasis added); *id.* ¶ 51 ("the size of these benefits is generally moderate"); *id.* ¶ 62 ("could result"). And he admits the multiple "limitations" in his conclusions, including that "none of the studies [he reviewed] is a perfect analog for the Act under consideration." *Id.* ¶ 49; *see id.* ¶¶ 57 ("my own research does not examine these" personalized feeds and notifications); 60 ("I could not find any published studies on push notifications sent by social media platforms specifically"). This inconclusive evidence is not enough to justify the Act's restrictions on access to protected speech. *Brown*, 564 U.S. at 799.

This is not the first time that California has raised a similar interest in regulating the purportedly harmful effects of new technology. Briefing in *Brown* also raised concerns about minors' developmental capacity, but such concerns did not overcome minors' First Amendment rights. *Compare* Cal. *Brown* Br. at 8, 2010 WL 2787546, *with* Opp. 16-17; Radesky Decl. ¶¶ 50-53.

**b.** Defendant fails to show the Act is narrowly tailored. Because its "requirements are overbroad, overly restrictive, and underinclusive, they are properly enjoined on their face." *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *16 (W.D. Tex. Aug. 30, 2024). Simply because the Act is purportedly narrower than other States' laws does not make the Act narrowly tailored. *Cf.* Opp. 8, 23.

As an initial matter, Defendant does not dispute that parents have many means to oversee their minor children online or that covered websites provide parental tools and engage in content moderation. To the contrary, one of Defendant's own declarants acknowledges that covered websites allow users some control over their feeds. Egelman Decl. ¶ 51. Nor does Defendant dispute the effectiveness of existing private alternatives. Instead, Defendant says those means are insufficient because they "are not enabled by default" and that "some of [NetChoice's]m members do

11

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

not provide an option for users to disable addictive feeds." Opp. 20. But "if a less restrictive means is available . . . , the Government must use it." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 815 (2000). Those less-restrictive alternatives need not be "perfect," *Ashcroft*, 542 U.S. at 668-69; nor does "the government . . . have a compelling interest in each marginal percentage point by which its goals are advanced," *Brown*, 564 U.S. at 803 n.9; *see Playboy*, 529 U.S. at 824 ("it is no response" that a less restrictive alternative "may not go perfectly every time").

Regardless, the Act's coverage is also "seriously underinclusive" to address the State's purported concerns. *Brown*, 564 U.S. at 805; *see* Mot. 21-23. Defendant does not respond to many of the Act's tailoring flaws, except to argue that "the First Amendment imposes no freestanding underinclusiveness limitation." Opp. 21 (cleaned up). But here, the Act's various exceptions for all manner of Internet websites, feeds, and notification demonstrates that the Act is "wildly under-inclusive when judged against its asserted justification, which . . . is alone enough to defeat it." *Brown*, 564 U.S. at 802.

For example, Defendant suggests that feeds and notifications may contain "advertise-ment[s]" or "fraudulent spam." Opp. 11. But media is replete with advertisements, from television, to newspapers, to video games—not to mention many other websites left unregulated by the Act. The potential presence of advertisements in feeds is not enough to restrict minors' and adults' access to speech: The State could not require age assurance or parental consent before people read newspapers, even on the theory that newspapers contain more "advertisements" relative to books. Nor is the Act properly tailored to address advertisements. For one, California has existing laws regulating advertising. *E.g.*, Cal. Bus. & Prof. Code § 17500. Leaving that aside, the Act sweeps further than necessary on covered websites because it requires age assurance and parental consent to access *all* content on the services. Plus, the Act does not regulate advertisements on nearly enough websites with advertisements or notifications. *See* Mot. 22. In addition, Defendant's spec-ulation that notifications may contain "fraudulent spam," Opp. 11, is the kind of "hypothetical" and "imaginary" consideration cannot defeat this pre-enforcement challenge, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008). Plus, it is contrary to the record evidence about the kinds of protected speech that notifications contain. *See* Mot. 4-5.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Defendant's submissions suggest that the Act addresses minors' data privacy. *E.g.*, Egelman Decl. ¶¶ 16-31, 38-49, 57-67; Radesky Decl. ¶¶ 42-45. But the Act does not directly regulate data privacy. And California already has comprehensive data-privacy regulations that are less restrictive alternatives to the Act's restrictions on speech. *See, e.g.*, Cal. Civ. Code §§ 1798.100-.199

In addition, many of the purported problems Defendant identifies come from Internet use in general, not specific use of "social media." *See* Opp. 2 ("being online"; "use the Internet"; "spend more time online"), 5 ("time spent online"); Radesky Decl. ¶ 39 ("mobile games"). Defendant cites nothing for the proposition that the government has a legitimate governmental interest in minimizing the time that minors engage in protected speech activities. At any rate, the Act does *nothing* to reduce the time minors spend on other websites, such as Hulu, news sites, gaming sites, messaging services, and myriad other online services. The Act thus "leav[e]s out and fail[s] to regulate significant influences bearing on the [State's] interest." *Griffin*, 2023 WL 5660155, at *16 (cleaned up). That is "enough to defeat" the Act. *Brown*, 564 U.S. at 802.

### 4. NetChoice's facial First Amendment challenge is proper under *Moody*.

The Act's speech regulations are both facially unconstitutional under the First Amendment —and unconstitutional as applied to NetChoice's covered members. A law is facially invalid where the "*pertinent facts* . . . are the same across the board" and those "pertinent facts" demonstrate that the law fails heightened First Amendment scrutiny. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021) (emphasis added). That is why other courts—including the Ninth Circuit—have held laws facially unconstitutional when all aspects of a law's speech regulations, "in every application . . . raise the same First Amendment issues." *X Corp.*, 116 F.4th at 899; *see Reyes*, 2024 WL 4135626, at *9 n.92 (similar).

The Act regulates, restricts, and burdens speech—and thus is "directed narrowly and specifically at expression or conduct commonly associated with expression." Opp. 7-8 (quoting *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996)). Next, the parties agree on the range of "actors" regulated by the Act: websites that display "feeds" of "personalized" and "curated compilation[s]" of user-generated "third-party speech." *Moody*, 144 S. Ct. at 2399-2400, 2403. Thus, the concerns raised in *Moody* about whether the law at issue there covered other potential actors

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

and activities (such as ridesharing services) are clearly not present here. *See id.* Similarly, the parties agree that all users must engage in age-assurance before receiving notifications at certain times of day or before viewing personalized feeds. *See* Opp. 4-5. Likewise, the parties agree that minors need to mount the separate hurdle of parental content to access that protected expression. *See id.*

In short, none of the questions about the scope of the law or the First Amendment's applicability to different services or features are present here.

**C.    NetChoice is likely to succeed on the merits of its claim that the Act is impermissibly vague.**

The Act's central coverage definitions are unconstitutionally vague. Mot. 24. The parties agree on the prevailing standard for this vagueness challenge: whether the Act "reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982). But Defendant's arguments that the Act meets this standard only highlight the vagueness inherent to this coverage definition.

NetChoice member Dreamwidth explained that it lacks sufficient guidance about whether its feeds—which are not personalized based on user preferences—nevertheless submit Dreamwidth to regulation under the Act's conflicting tests for regulated feeds. Cleland Decl. ¶ 27; Paolucci Decl. ¶ 12. In response, Defendant does not "concede" that Dreamwidth is covered or confirm that it is not covered. Opp. 24. Instead, Defendant merely states that the Act's tests "are disjunctive." *Id.* That does nothing to clarify the overlap (if any) between regulated feeds "based . . . on other information associated with the user or the user's device" and unregulated feeds based on "specific media or media by the author, creator, or poster of the media . . . [the] user expressly and unambiguously requested" § 27000.5(a)(4). If Defendant, tasked with enforcing the Act, cannot clarify this area of confusion as to one NetChoice member, there are many more websites across the Internet that will lack sufficient guidance.

**II.    The remaining factors support granting NetChoice a preliminary injunction.**

If not enjoined, the Act will irreparably harm NetChoice's members. Mot. 25. First, NetChoice's covered members and their users face irreparable First Amendment harms. *See id.*

---

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Second, NetChoice's covered members will incur unrecoverable compliance costs for which sovereign immunity would likely bar recovery. *See id.* Defendant does not contest the record evidence that compliance costs may be impossible for some NetChoice members. *Id.*

The Court should enjoin each of the Act's speech restrictions challenged in this lawsuit. To begin, if it enjoins enforcement based on the Act's central coverage definition, then the other provisions of the Act are not severable. In any event, the Act's requirements are interdependent. Each provision "must stand on [its] own, unaided by the invalid provisions. . . nor inextricably connected to them by policy considerations. They must be capable of separate enforcement." *Bonta*, 113 F.4th at 1125 (citation omitted). All provisions rely on age assurance and parental consent to effectuate the Act's age-based restrictions and the parental-oversight options. Moreover, if the Act's limitations on users' access to feeds and notifications is enjoined, the compelled disclosures—which "explicitly refer to" the Act's limitations, *id.*—serve no purpose, § 270005. This Court should also not "sever" the Act's obvious content-based coverage exceptions, as that would only broaden the First Amendment harms by restricting more speech.

## CONCLUSION

NetChoice respectfully requests a preliminary injunction against enforcement of the Act against its covered members before the Act takes effect on January 1, 2025.

15

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

DATED: December 9, 2024

1

2    Steven P. Lehotsky*

3    Scott A. Keller**
    Jeremy Evan Maltz**

4    Shannon Grammel**
    **LEHOTSKY KELLER COHN LLP**

5    200 Massachusetts Avenue, NW,
      Suite 700

6    Washington, DC 20001
    (512) 693-8350

7    steve@lkcfirm.com
    scott@lkcfirm.com

8    jeremy@lkcfirm.com
    shannon@lkcfirm.com

9

10   Joshua P. Morrow*
    **LEHOTSKY KELLER COHN LLP**

11   408 W. 11th Street, 5th Floor
    Austin, TX 78701

12   (512) 693-8350
    josh@lkcfirm.com

13

14   Jared B. Magnuson*
    **LEHOTSKY KELLER COHN LLP**

15   3280 Peachtree Road NE
    Atlanta, GA 30305

16   (512) 693-8350
    jared@lkcfirm.com

17

18   * *Pro hac vice* pending.
    ** Admitted *pro hac vice*.

19

20

_/s/ Bradley A. Benbrook_
Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 955
Telephone: (916) 447-4900
brad@benbrooklawgroup.cm
steve@benbrooklawgroup.com

*Attorneys for Plaintiff NetChoice*

21

22

23

24

25

26

27

28

16