Steven P. Lehotsky*
Scott A. Keller**
Jeremy Evan Maltz**
Shannon Grammel**
**LEHOTSKY KELLER COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Joshua P. Morrow*
**LEHOTSKY KELLER COHN LLP**
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
**LEHOTSKY KELLER COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

* *Pro hac vice* pending.
** Admitted *pro hac vice*.

*Attorneys for Plaintiff NetChoice*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NETCHOICE,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. 5:24-cv-07885-EJD<br><br>**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING ASSOCIATIONAL STANDING**<br><br>Date: December 17, 2024<br>Time: 9:00am<br>Judge: Hon. Edward J. Davila<br>Courtroom: San Jose, Courtroom 4, 5th Floor |

**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING ASSOCIATIONAL STANDING**

Plaintiff NetChoice has associational standing to bring as-applied First Amendment claims on behalf of its members with websites regulated by California Senate Bill 976 ("Act"). NetChoice's request for "declaratory and injunctive relief" does not "require[] individualized proof" and is "thus properly resolved in a group context." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). At core, whether the government can regulate access to undisputedly protected speech on NetChoice's covered member websites is not a question that requires the participation of NetChoice members as parties. The Western District of Texas—in an analogous case involving NetChoice raising both as-applied and facial challenges—concluded as much. *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *9 (W.D. Tex. Aug. 30, 2024) ("*CCIA*"). Otherwise, there is no question that NetChoice meets the other two jurisdictional elements for associational standing: NetChoice's members would have had standing to sue in their own right and seeking relief for its members is "germane" to NetChoice's purpose. *Hunt*, 432 U.S. at 343. That is why each of the five courts in the country to have considered the issue has concluded that NetChoice has associational standing to seek redress for its members' First Amendment injuries. *See NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *7 (D. Utah Sept. 10, 2024); *CCIA*, 2024 WL 4051786, at *8-9; *NetChoice, LLC v. Fitch*, 2024 WL 3276409, at *5-6 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 548-51 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *9 (W.D. Ark. Aug. 31, 2023). This case provides no reason to depart from that unanimous consensus. Accordingly, this Court can and should hold that the Act is both facially unconstitutional and unconstitutional as applied to NetChoice's covered members.

## ARGUMENT

NetChoice meets all three requirements for associational standing: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. "Although the first two requirements are constitutional in nature, the third is prudential." *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (citation omitted).

**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING ASSOCIATIONAL STANDING**

Importantly, the arguments raised in NetChoice's as-applied challenge do not vary depending on the specific circumstances of how this law is applied to different covered members. Rather, NetChoice's claims involve application of a categorically *unconstitutional* law to NetChoice's covered members for which the analysis is clear and uniform. In other words, the as-applied challenge here goes only to the scope of relief, which is limited to just NetChoice's covered members. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (claim had "characteristics" of as-applied challenge where it did "not seek to strike the [law] in all its applications, but only to the extent it covers referendum petitions").

The analysis in this supplemental brief will start with the third prong of associational standing concerning the participation of individual members, which is the prong at issue in the case cited in this Court's order requesting supplemental briefing. *See* ECF 25 (citing *Ass'n of Christian Schs. Int'l v. Stearns*, 362 Fed. App'x 640, 644 (9th Cir. 2010)).

**I. NetChoice's as-applied challenges do not require the participation as parties of individual members regulated by the Act, so NetChoice satisfies the third, prudential prong of the associational-challenge analysis.**

**A.** This Court can resolve NetChoice's as-applied claims without "the participation of individual members" as parties. *Hunt*, 432 U.S. at 343. "[N]either [1] the claim asserted nor [2] the relief requested requires" members' participation as parties in this lawsuit. *Id.*

*First*, "the *claim[s] asserted*" do not "require[] the participation of individual members in the lawsuit." *Id.* (emphasis added). The Western District of Texas concluded as much in an analogous as-applied challenge brought by NetChoice. *CCIA*, 2024 WL 4051786, at *9.

NetChoice's First Amendment claims raise legal arguments for which the relatively few relevant facts are common to all regulated NetChoice members. Specifically, the Act imposes a variety of unconstitutional restrictions and burdens on undisputedly protected speech under binding Supreme Court precedent: (1) it requires age assurance for all users and parental consent for minors to view the kinds of "personalized" feeds of protected, expressive content that the Supreme Court has held are entitled to First Amendment protection, *see Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2403 (2024); (2) it imposes the same restrictions on access (age assurance and parental consent) to receive notifications—that is, messages with protected speech—at particular times of

**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING ASSOCIATIONAL STANDING**

day; (3) it imposes a variety of default limitations on the speech minors can engage in on their accounts; and (4) it compels speech. *See* ECF 2 at 10-16. Moreover, the Act targets websites for regulation using a content-based and speaker-based coverage definition. *Id.* at 16-19.

Resolving these claims requires this Court only to construe the Act's requirements and judge them against binding First Amendment precedent. It can do so without the participation of individual members as parties because the Act "imposes relatively uniform requirements on all Plaintiffs' covered members." *CCIA*, 2024 WL 4051786, at *9. Indeed, Defendant has attempted to justify the Act by arguing the Act "aim[s] solely at curbing the harmful effects of certain online mechanisms." ECF 18 at 18. Put another way, Defendant contends that the Act applies to discrete actors and activities. That makes the constitutional analysis straightforward. For instance, the Act's improper "tailoring" "does not vary between covered" websites. *CCIA*, 2024 WL 4051786, at *9.

More generally, the claims at issue here should require little factual development. In fact, the Supreme Court has held that First Amendment claims should "entail minimal if any discovery"—let alone individualized examinations into similarly situated services—"to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation." *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 469 (2007) (controlling plurality op. of Roberts, C.J.).

Some examples are illustrative. In *Brown v. Entertainment Merchants Ass'n*, the Supreme Court held that the First Amendment prohibited a California law requiring minors to secure parental consent before buying or renting "violent video games." 564 U.S. 786, 789, 805 (2011). That case was brought by organizations "representing the video-game and software industries." *Id.* at 789. Associational standing was not even questioned in the case. Nor would it have been if the organizations argued that law was unconstitutional only "as applied" to their members, *e.g.*, specific video game stores or particular video game developers. Nothing about adjudicating the law's unconstitutional parental-consent requirement "require[d] the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. That was true even though there were undoubtedly some differences among the plaintiffs' members, including: differing business practices of video game stores and developers, diverse technical aspects of different video games (*e.g.*, graphics, subject matter, gameplay), and potentially myriad other *irrelevant* distinctions.

**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING ASSOCIATIONAL STANDING**

Similarly, a publishers' trade association would be able to bring "as-applied" First Amendment claims challenging a law requiring parental consent and age assurance to purchase books or newspapers. *Cf. Virginia v. Am. Booksellers, Inc.*, 484 U.S. 383, 388 n.3 (1988). The court would not need "individualized proof" of the publishers' editorial practices, bookbinding techniques, or distribution supply chains to adjudicate such a First Amendment claim.

*Second*, "because [NetChoice] seeks declaratory and prospective relief rather than money damages, its members need not participate directly in the litigation." *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987). "[C]ourts regularly allow membership organizations and trade associations to bring suit on behalf of their members when they seek to enjoin enforcement of a statute or regulation, rather than damages." *CCIA*, 2024 WL 4051786, at *9; *see Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought"). Here, all NetChoice requests is declaratory and injunctive relief. *See* ECF 1 pp.31-32 (Complaint prayer for relief).

As a result, courts often permit organizations to raise "as-applied" constitutional challenges on behalf of their members. *See, e.g.*, *Coal. for Indep. Tech. Rsch. v. Abbott*, 706 F. Supp. 3d 673, 686 (W.D. Tex. 2023) ("Plaintiff has brought a challenge to Texas's TikTok ban [for all public employees] *as applied to public university faculty*, who are both academics and public employees." (emphasis added)); *Cal. Rifle & Pistol Ass'n, Inc. v. City of Glendale*, 644 F. Supp. 3d 610, 615 (C.D. Cal. 2022) (permitting organization's as-applied Second Amendment claim on behalf of members); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1134 (N.D. Ala. 2020) (permitting as-applied challenges on behalf of organization members to voting regulations); *Pietsch v. Ward Cnty.*, 446 F. Supp. 3d 513, 530 (D.N.D. 2020), *aff'd*, 991 F.3d 907 (8th Cir. 2021) (permitting organization to bring as-applied procedural due process claim on behalf of members); *N.H. Motor Transp. Ass'n v. Rowe*, 324 F. Supp. 2d 231, 235 (D. Me. 2004) (permitting as-applied preemption claim on behalf of organization's members); *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 250 (S.D.N.Y. 1997) ("association-wide facts sufficient to prove an element of the plaintiffs' claim could be shown").

**B.** Here, NetChoice's legal arguments do not vary based on the specific factual characteristics of certain websites. That makes this case unlike the fact-dependent claim in *Ass'n of Christian Schools*, cited in this Court's order requesting supplemental briefing. ECF 25. That case involved as-applied First Amendment claims about the University of California's "review and approval of high school courses in order to qualify applicants for" admission. *Ass'n of Christian Schs. Int'l*, 362 Fed. App'x at 643. The Ninth Circuit concluded that whether any one course was unconstitutionally rejected "require[d] 'individualized proof'" about the courses that were rejected. *Id.* at 644 (citation omitted). In other words, whether the government violated the First Amendment depended on the specific facts about particular courses and the schools that offered them.

There are no similarly relevant distinctions among NetChoice members here that would alter the underlying constitutional merits analysis. Nor are there any relevant differences among the *users* of different websites, whose access to these websites will be uniformly burdened by the Act. *See Am. Booksellers*, 484 U.S. at 388 n.3.

That NetChoice has associational standing to bring these as-applied First Amendment claims is wholly consistent with *Moody*. *Moody*'s vindication of "social media" websites' First Amendment rights does not also stand for the proposition that there will *always* be material differences among NetChoice members. Defendant may attempt to argue otherwise, but the Western District of Texas in *CCIA* recently considered and rejected this argument. "*Moody* is not a case about standing" and "did not alter the standing analysis for associations." *CCIA*, 2024 WL 4051786, at *8; *id.* ("*Moody*'s majority opinion does not mention standing or the requirement of individual participation."). Regardless, this case is unlike *Moody* because NetChoice's claims "do[] not seriously turn on . . . members' particular activities." *Id.* at *9. Although Defendant has argued that *Moody* requires evaluation of each covered member's "algorithms," ECF 18 at 10-12, that argument misreads *Moody* for the reasons NetChoice has explained, *see* ECF 29 at 4-6. Nothing about the precise technical means by which covered members personalize content in feeds is relevant to whether the government can require age assurance or parental consent to access those feeds. Under *Moody*, engaging in curation or "personalization" of third-party content is what triggers First Amendment protection. *See id.* at 4. And *Moody* certainly does not suggest that the Act's

other unlawful regulations of speech are constitutional. *Id.*

Plus, even when a challenge conceivably "require[s] individualized or detailed inquiries into members' activities, [] that does not automatically necessitate those members' participation." *CCIA*, 2024 WL 4051786, at *8. The "parties' briefing and," if necessary, "discovery will likely provide sufficient information to make individualized inquiries where needed." *Id.* at *8-9.

**C.** In any event, this prong of the associational-standing analysis is not jurisdictional, but rather "prudential." *Or. Advoc. Ctr.*, 322 F.3d at 1109 (citation omitted). This prong of the associational-standing test "focuses importantly on matters of administrative convenience and efficiency and is assessed by examining both the relief requested and the claims asserted." *CCIA*, 2024 WL 4051786, at *8 (cleaned up).

And "with the exact same Plaintiffs as in *Moody*, there is no prudential reason why Plaintiff['s] members must participate in this suit" as parties. *Id.* at *9. And there certainly is no reason to deny NetChoice's pending Motion for Preliminary Injunction (ECF 2) on this basis. Multiple members have participated as declarants in the briefing on that motion.

**II.  NetChoice meets the two jurisdictional requirements for associational standing, because its covered members would have standing to challenge the Act and challenging the Act is germane to NetChoice's organizational purpose.**

NetChoice meets the two jurisdictional requirements for associational standing. ECF 2 at 10.

*First*, "there is little question" that the "members would have standing to sue in their own right." *CCIA*, 2024 WL 4051786, at *8. Those members include "social media companies and digital service providers who are regulated by" the law; "[a]s objects of the regulation, those members would have standing to sue." *Id.*; *see* ECF 1 ¶ 15; 2-2 ¶ 26; 2-3 ¶ 5; 2-4 ¶ 56.

*Second*, NetChoice sues "to protect an interest germane to [its] organizational purposes": the Act "interfere[s] with [NetChoice's] mission[] to promote online commerce, speech, and accessibility for internet services" by impeding users' access to online speech. *CCIA*, 2024 WL 4051786, at *8; *see* ECF 1 ¶¶ 12, 24; 2-2 ¶¶ 3-4, 37-38.

## CONCLUSION

NetChoice requests a preliminary injunction before the Act takes effect on January 1, 2025.

6
**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING ASSOCIATIONAL STANDING**

DATED: December 11, 2024

|   |   |
|---|---|
| Steven P. Lehotsky* | */s/ Bradley A. Benbrook* |
| Scott A. Keller** | Bradley A. Benbrook (SBN 177786) |
| Jeremy Evan Maltz** | Stephen M. Duvernay (SBN 250957) |
| Shannon Grammel** | **BENBROOK LAW GROUP, PC** |
| **LEHOTSKY KELLER COHN LLP** | 701 University Avenue, Suite 106 |
| 200 Massachusetts Avenue, NW, Suite 700 | Sacramento, CA 955 |
| Washington, DC 20001 | Telephone: (916) 447-4900 |
| (512) 693-8350 | brad@benbrooklawgroup.cm |
| steve@lkcfirm.com | steve@benbrooklawgroup.com |
| scott@lkcfirm.com | |
| jeremy@lkcfirm.com | |
| shannon@lkcfirm.com | |

Joshua P. Morrow*
**LEHOTSKY KELLER COHN LLP**
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
**LEHOTSKY KELLER COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

* *Pro hac vice* pending.
**Admitted *pro hac vice*.

*Attorneys for Plaintiff NetChoice*

7
**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING ASSOCIATIONAL STANDING**