Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon Grammel*
**LEHOTSKY KELLER COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Joshua P. Morrow*
**LEHOTSKY KELLER COHN LLP**
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
**LEHOTSKY KELLER COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

* Admitted *pro hac vice*.

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Attorneys for Plaintiff NetChoice*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NETCHOICE,<br><br>           Plaintiff,<br><br>   v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>           Defendant. | Case No. 5:24-cv-07885-EJD<br><br>**PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL**<br><br>Date: TBD<br>Time: TBD<br>Judge: Hon. Edward J. Davila<br>Courtroom: TBD |

**PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL**

**NOTICE OF MOTION**

Plaintiff NetChoice will submit an amended notice of motion setting forth the date and time for hearing, if one is set by the Court.

**RELIEF SOUGHT**

Plaintiff NetChoice has appealed this Court's order denying in part Plaintiff's Motion for Preliminary Injunction. ECF 39. NetChoice moves this Court for an injunction pending appeal to prohibit Defendant from enforcing the following provisions in California Senate Bill 976 (2024) ("Act" or "SB976") against NetChoice's covered members: Cal. Health & Safety Code §§ 27001, 27002(b)(2)-(5). This will prevent irreparable harm to NetChoice's members, including the loss of its members' First Amendment freedoms recognized by the Supreme Court in *Moody v. NetChoice*, 603 U.S. 707 (2024). And this injunction will maintain the status quo ante while the full appellate process plays out.

This Court's order conflicts with binding Supreme Court precedent. The Supreme Court just recognized that websites regulated by the Act disseminate protected expression to their users through their "personalized" and "individualized" feeds. *Id.* at 734. And the Supreme Court has long held that minors have a First Amendment "right to speak or be spoken to" in accessing protected speech. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). The Court's order also conflicts with the holdings of at least five other district courts across the country that held similar laws violated the First Amendment. *E.g.*, *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ("*CCIA*"); *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023). Therefore, for the reasons explained below and in Plaintiff's previous briefing in support of its motion for a preliminary injunction,[1] this Court should enjoin Defendant's enforcement of §§ 27001, 27002(b)(2)-(5) against NetChoice's covered members pending appeal of this Court's order.

---

[1] Given the posture of this case and the fact that the Court rejected Plaintiff's arguments in its motion for a preliminary injunction, NetChoice restates those arguments in brief here, incorporates the arguments raised in prior briefing by reference, *see* ECF 2, 29, and focuses mainly on the Court's order.

1

**PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL**

Plaintiff intends to move for an injunction pending appeal in the United States Court of Appeals for the Ninth Circuit if this Court does not rule before close of business on January 2, 2025. As Plaintiff's uncontested declarations demonstrate, the Act would require burdensome and large-scale changes to Plaintiff's members' services. *See* Cleland Decl. ¶¶ 28-32, 35; Veitch Decl. ¶¶ 41, 48-49, 52; Paolucci Decl. ¶¶ 13, 19, 23-27. And those changes would restrict their users' access to protected speech.

Counsel for Plaintiff conferred with Defendant about whether Defendant would agree to stay enforcement of the un-enjoined provisions of SB976 against NetChoice's members while NetChoice sought injunctive relief pending appeal. Defendant would not agree to any stay of enforcement of the non-enjoined provisions for any period of time. So without an injunction pending appeal, NetChoice's covered members are at imminent risk of enforcement and irreparable harm. The Court should therefore grant this motion for an injunction pending appeal to maintain the status quo ante, giving the Ninth Circuit the opportunity to consider these important constitutional questions during a full appellate process.

## ARGUMENT

Plaintiff meets all four factors governing the issuance of an injunction pending appeal: (1) likelihood of success on the merits of the appeal; (2) the likelihood of irreparable harm absent an injunction; (3) the harm to opposing parties; and (4) the public interest. *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016).

**I. Plaintiff Is Likely To Succeed On the Merits.**

NetChoice is likely to succeed on the merits. This Court correctly enjoined some provisions of SB976. *See* §§ 27002(a), 27002(b)(1), § 27005. But it erred and misinterpreted Supreme Court precedent in denying a preliminary injunction as to the other challenged SB976 provisions. Indeed, NetChoice needed only make "a *colorable* claim that its First Amendment rights have been infringed, or are threatened with infringement" to meet the "likelihood-of-success standard in [this] First Amendment case[]." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (citation omitted) (emphasis added). NetChoice's arguments against SB976 certainly surpassed that low bar in light of the binding Supreme Court precedent in *Moody*.

2

**PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL**

**A**. As explained more fully in Plaintiff's preliminary injunction briefing, the Act restricts NetChoice members' rights to disseminate protected speech—and users' access to, and engagement with, protected speech. *See* ECF 2 at 10-23; ECF 29 at 1-14. The Act's parental consent requirements to access protected speech, §§ 27001(a), 27002(b)(2), are unconstitutional. *See Brown*, 564 U.S. at 794 (rejecting parental-consent requirement); ECF 2 at 12-15; ECF 29 at 9, 11. Similarly, the Act's default settings restrict speech and are subject to strict scrutiny. *See FEC v. Cruz*, 596 U.S. 289, 305 (2022) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); ECF 2 at 11-19; ECF 29 at 3, 11. Compounding the constitutional defects, the Act restricts protected speech through a content-based and speaker-based coverage definition of state-disfavored websites, which also triggers strict scrutiny. ECF 2 at 16-19; ECF 29 at 7-10. These challenged provisions are not the least restrictive means to achieve the State's interest, they are both over and underinclusive, and they fail any form of First Amendment scrutiny. ECF 2 at 19-23; ECF 29 at 11-13. Likewise, the Act's central coverage provision is unconstitutional vague. ECF 2 at 24; ECF 29 at 14.

**B**. The Court's contrary decision refusing to enjoin all of the Act's speech restrictions was based in large part on an erroneous interpretation of the Supreme Court's decision in *Moody*. *See* ECF 39 at 14-23. *Moody* holds that websites like those regulated by this Act necessarily engage in First Amendment protected expression by presenting personalized, curated compilations of speech created by others.

This Court's holding conflicts with multiple passages from *Moody* showing that personalized feeds of social media websites—including specifically the main feeds of "Facebook" and "YouTube"—are protected First Amendment expression by the covered websites. *Moody*, 603 U.S. at 734-35, 739-40. This Court concluded that NetChoice "failed to meet its burden of demonstrating . . . that most or all personalized feeds covered by SB 976 are expressive and therefore implicate the First Amendment." ECF 39 at 15. But *Moody* already decided that key point. Websites like those covered by SB976, and expressly referenced by *Moody*, receive First Amendment protection because their "personalized" and "individualized" feeds constitute protected expression—including when they use "algorithms" to implement their editorial policies, even if "most

3

**PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL**

often" websites choose to display speech based on a "user's expressed interests":

> And whenever a user signs on, Facebook delivers a *personalized* collection of those stories. Similarly for YouTube. . . . And any person opening the website or mobile app receives an *individualized* list of video recommendations. The key to the scheme is prioritization of content, achieved through the use of *algorithms*. Of the billions of posts or videos (plus advertisements) that could wind up on a user's *customized* feed or recommendations list, only the tiniest fraction do. The selection and ranking is *most often based on a user's expressed interests and past activities*. But it may also be based on more general features of the communication or its creator. Facebook's Community Standards and YouTube's Community Guidelines detail the messages and videos that the platforms disfavor. The platforms write *algorithms* to implement those standards—for example, to prefer content deemed particularly trustworthy or to suppress content viewed as deceptive (like videos promoting "conspiracy theor[ies]").

*Moody*, 603 U.S. at 734-35 (emphases added). This language from *Moody* makes clear that when websites—like NetChoice's covered members—use "personalized" feeds to "[d]ecid[e] on the third-party speech that will be included in" a feed and "organiz[e] and present[] the including items" in that feed to users in a particular way, that "is expressive activity of [their] own." *Id.* at 731. So governments "restricting use of personalized feeds . . . alter[s] the overall speech environment" on covered websites, which changes the "message" those websites convey to users and that users receive from websites. ECF 39 at 19. Under *Moody*, personalized feeds thus constitute covered websites' own expression, and that expression is disseminated to and accessed by websites' users. The First Amendment protects all of this. Therefore, this Court's holding is directly contrary to both the Supreme Court's decision in *Moody*, 603 U.S. at 734-35, 739-40; as well as Ninth Circuit precedent following *Moody*, *see Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024) ("When the platforms use their Standards and Guidelines to decide which third-party content [their] feeds will display, or how the display will be ordered and organized, they are making expressive choices. And because that is true, they receive First Amendment protection." (quoting *Moody*, 603 U.S. at 740)).

The Supreme Court in *Moody* also held that its prior editorial-discretion precedents, like the newspaper case, *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), applied to social media websites, *Moody*, 603 U.S. at 738. The Supreme Court explained that the "wealth of choices about whether—*and if so, how*—to convey posts" gives a "feed a particular expressive quality." *Id.* (emphasis added). And this holds true both "[f]or a paper, and for a platform too." *Id.*

This Court's attempt to distinguish those cases like *Tornillo*, *Hurley*, and *PG&E* was thus squarely rejected by *Moody*. *Id.* at 738-40.

Likewise, this Court's reliance (ECF 39 at 16-17) on *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980), and *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006), is wholly misplaced under *Moody*. *Moody* explicitly recognized that "the key fact in those cases . . . was that the host of the third-party speech was not itself engaged in expression," but the exact "opposite" was true for services such as "Facebook's News Feed and YouTube's homepage." *Moody*, 603 U.S. at 740.

This Court erred in reading far too much into *Moody* reserving judgment on the First Amendment implications regarding "feeds whose algorithms respond *solely* to how users act online" and largely limited its analysis of personalized feeds to that issue. ECF 39 at 18 (emphasis added). To start, *Moody* made clear that the "personalized" feeds utilizing "algorithms" on "Facebook" and "YouTube" are protected expression. *Moody*, 603 at 734 ("And whenever a user signs on, Facebook delivers a *personalized* collection of those stories. Similarly for YouTube. . . . And any person opening the website or mobile app receives an *individualized* list of video recommendations. The key to the scheme is prioritization of content, achieved through the use of algorithms." (emphases added)). This Court thus fundamentally erred in refusing to enjoin the challenged provisions—at a bare minimum—to the main feeds of Facebook and YouTube. This error likewise infected the Court's refusal to enjoin the challenged provisions as applied to personalized feeds disseminated by other NetChoice members that similarly use community guidelines reflecting human-created editorial policies.[2] This Court assumed that the facial challenge was no different from the as-applied challenge. ECF 39 at 31-32. But the as-applied challenge necessarily implicates this record evidence about NetChoice's members. The uncontested record evidence shows that covered NetChoice members do *not* display content to users based "solely" on "how users act online."

---

[2] The Court was right to recognize that "an algorithm designed to convey a message can be expressive," but that is true whether the algorithm's creator designed it to "recommend[] interesting posts" or to "maximize engagement." ECF 39 at 20. Relatedly, the district court ignored *Moody* by asserting that "mixed" feeds, ECF 39 at 21—*i.e.*, that both implement editorial policies while also displaying speech based on user interest and activities—may not be protected by the First Amendment. *Moody*, 603 U.S. at 734-35.

*Moody*, 603 U.S. at 736 n.5. As explained in Plaintiff's reply in support of its motion for a preliminary injunction, ECF 29 at 5, that is not how content-moderation algorithms work. The uncontested record evidence shows that covered NetChoice members display content in feeds according to their own editorial policies developed by humans, which include efforts to "prioritize minor safety and display only age-appropriate content." Cleland Decl. ¶ 8; *id.* ¶ 23 (detailing content-moderation efforts); *e.g.*, Davis Decl. ¶¶ 12, 34-35; Veitch Decl. ¶¶ 21, 24-30.

Regardless, the Court erred in holding that "[w]hen it comes to feeds that recommend posts based solely on prior user activity, there is no apparent message being conveyed." ECF 39 at 19. Displaying speech based on user preference is an editorial "choice[] about what third-party speech to display and how to display it," so it should be fully protected by the First Amendment. *Moody*, 603 U.S. at 716. After all, "it is hardly unusual for publications to print matter that will please their subscribers," and this does not vitiate free-speech rights. *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc).

The Court's erroneous interpretation of *Moody* and holding with respect to the expression of personalized feeds also affects its incorrect holding regarding the Act's restrictions on *users*' access to protected speech. ECF 39 at 22. For the reasons explained above, the Court erred by concluding that because "personalized feeds are not necessarily a form of social media platforms' speech, so restricting personalized feeds does not restrict access to those platforms' speech." *Id.* Likewise, the Court erred in concluding that users' rights are not infringed because "all posts are still, in fact, available to all users under SB 976." *Id.* That statement misapprehends the full burden of the Act. Users have a First Amendment right to access compilations of speech that websites present in a manner according to their preferences. The Act infringes that.

**C.** At a minimum, this Court should have enjoined the personalized feed provisions as applied to NetChoice's members. The analysis for the as-applied challenge is different—it only requires a court to analyze the Act's effect on NetChoice's covered members.

The Court erred in holding that NetChoice lacked associational standing to bring its as-applied claims. ECF 39 at 32. Contrary to this Court's holding, this challenge does not require the participation of individual members. *Id.* At the very minimum, *Moody* requires that an injunction

6

**PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL**

be granted to Facebook and YouTube's main feeds. *See Moody*, 603 U.S. at 734.

Moreover, as to NetChoice's other covered members, the challenges to the Act's personalized feed provisions do not "require deep factual inquiries into how a particular social media feed works." ECF 39 at 32. As explained above, the uncontested record evidence—submitted contemporaneously with Plaintiff's preliminary-injunction motion—shows that these other covered websites are in the materially identical position under *Moody* as Facebook and YouTube's main feeds. As explained in Plaintiff's supplemental brief, this case can be decided "without the participation of individual" members as parties because the Act 'imposes relatively uniform requirements on all Plaintiff's covered members.'" ECF 33 at 3 (quoting *CCIA*, 2024 WL 4051786, at *3).

**D.** NetChoice is also likely to succeed on the merits of its argument that the Act's default settings violate the First Amendment. The Court correctly enjoined the default setting for notifications, § 27002(b)(1), but it erred in declining to enjoin the remaining default settings. The default settings restricting personalized feeds, § 27002(b)(2), (4), should be enjoined for the reasons explained above. As this Court recognized, those provisions "are effectively duplicative of SB 976's personalized feed . . . provisions." ECF 39 at 28. Because the personalized feed provisions fail under *Moody*, the duplicative default settings must be enjoined as well.

Likewise the default setting limiting a "child's ability to view the number of likes or other forms of feedback to pieces of media within an addictive feed," § 27002(b)(3), should be enjoined because it too restricts First Amendment expression. The Court stated that it "sees little apparent expressive value in displaying a count of the number of total likes and reactions." ECF 39 at 28. But this runs headlong into *Moody*: this default setting on the number of likes or other feedback violates covered websites' First Amendment rights to display how many people like or otherwise react to their posts. *See supra* pp.3-4. And the number of likes or other reactions—such as dislikes, sad reactions—has clear expressive value, showing users how others have responded. Thus, far from "virtually no speech being blocked," ECF 39 at 29, a key aspect of expression is unavailable by default for minor users' accounts. And the fact that the underlying reactions are still available does not make the restriction properly tailored. To the contrary, that shows it is underinclusive as

to preventing minors from seeing likes and reactions and overinclusive as to blocking all counting of reactions (whether positive or negative reactions).

The "private mode" default setting, § 27002(b)(5), should be enjoined because it restricts with whom a minor user can speak. As this Court noted, this provision "obviously regulates speech because it limits the ability of users to speak with minors on social media platforms." ECF 39 at 29. The Court nevertheless found this provision of the Act to be constitutional. But it cannot survive any level of heightened First Amendment scrutiny because it is not properly tailored. It is overinclusive as it applies to all covered websites and minor users, regardless of why they are using a particular service. For example, a high school athlete would be hindered from speaking with recruiters on X and a 17-year-old running a pet sitting business could face hurdles to interact with clients on Nextdoor. It is also underinclusive as it does not prevent strangers from requesting to connect with minor users.

**E.** Finally, the Court erred in concluding that the Act's coverage provision is not vague. ECF 39 at 33. The Court did not grapple with the record evidence about the difficulties websites face about what constitute "addictive feed[s]" requiring age verification and parental consent. § 27000.5(b); *see* Cleland Decl. ¶ 27; Paolucci Decl. ¶ 12. This difficulty is precisely why other district courts held similar terms unconstitutionally vague. *See Griffin*, 2023 WL 5660155, at *13, *Fitch*, 2024 WL3276409, at *15; ECF 2 at 24.

\*   \*   \*

For these reasons, NetChoice is likely to succeed on the merits that the Act's restrictions of personalized feeds violate the First Amendment. And even if the Court disagrees with Plaintiff on the merits, the language from *Moody* cited above certainly demonstrates that Plaintiff meets the low bar of "of making a *colorable* claim that [their] First Amendment rights have been infringed, or are threatened with infringement." *Meinecke*, 99 F.4th at 521 (citation omitted) (emphasis added). In light of that standard at this stage of the proceedings and the holding of *Moody*, an injunction pending appeal is "appropriate" here "even if the Court believed its analysis in denying preliminary injunctive relief is correct." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 2016 WL 9184999, at *2 (N.D. Cal. June 7, 2016).

**II. Plaintiff's members face irreparable injury without an injunction.**

As explained in Plaintiff's preliminary-injunction motion, NetChoice's members and their users will all suffer irreparable harm if the Act's challenged provisions are not enjoined. *See* ECF 2 at 25. The Act's "nonrecoverable" compliance costs impose irreparable injury. *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (citation omitted). Plaintiff and its members have detailed the changes to covered websites' operations that compliance with the Act will require. *See* Cleland Decl. ¶¶ 28-32, 35; Veitch Decl. ¶¶ 41, 48-49, 52. For some websites, SB976's costs may be insurmountable. Paolucci Decl. ¶ 27; *see id.* ¶¶ 13, 19, 23-26. Plus, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted); ECF 39 at 28 (holding that NetChoice would "suffer irreparable harm from First Amendment violations").

**III. The balance of equities and public interest support an injunction pending appeal.**

The balance of equities and public interest favor NetChoice. The same equitable considerations the Court found with respect to the notification restrictions apply to the other provisions of the Act. *See* ECF 39 at 28 ("There is a strong public interest in protecting free speech."). Injunctions protecting First Amendment rights are in the public interest. The Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation omitted). And the "fact that [Plaintiff] ha[s] raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [Plaintiff's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (cleaned up).

At bottom, an injunction pending appeal would "preserve[] the status quo prior to the recent legislative action" while the Ninth Circuit considers these important First Amendment questions. *Feldman*, 843 F.3d at 369.

**CONCLUSION**

Accordingly, Plaintiff respectfully requests this Court enjoin Defendant's enforcement of Sections 27001 and 27002(b)(2)-(5) pending appeal of this Court's order granting in part and denying in part Plaintiff's Motion for Preliminary Injunction.

DATED: January 1, 2025

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Joshua P. Morrow*
**LEHOTSKY KELLER COHN LLP**
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
**LEHOTSKY KELLER COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

* Admitted *pro hac vice*.

*s/ Scott A. Keller*
Scott A. Keller*
Steven P. Lehotsky*
Jeremy Evan Maltz*
Shannon Grammel*
**LEHOTSKY KELLER COHN LLP**
200 Massachusetts Avenue, NW,
   Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com
steve@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

*Attorneys for Plaintiff NetChoice*

---

10
**PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL**