UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


NETCHOICE,

          PLAINTIFF,               CASE NO.  CV-24-07885 EJD

   VS.                         SAN JOSE, CALIFORNIA

ROB BONTA, IN HIS OFFICIAL      DECEMBER 17, 2024
CAPACITY AS ATTORNEY GENERAL OF
CALIFORNIA,                   PAGES 1 - 133

         DEFENDANT.



TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE


A-P-P-E-A-R-A-N-C-E-S


FOR THE PLAINTIFF:   LEHOTSKY KELLER COHN LLP
                     BY:  STEVEN P. LEHOTSKY
                     200 MASSACHUSETTS AVENUE NW
                     WASHINGTON, DC 20001

                     BENBROOK LAW GROUP, PC
                     BY:  BRADLEY A. BENBROOK
                     701 UNIVERSITY AVENUE, SUITE 106
                     SACRAMENTO, CALIFORNIA 95825


          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074


      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

A-P-P-E-A-R-A-N-C-E-S  (CONT'D):


FOR THE DEFENDANT:               CALIFORNIA ATTORNEY GENERAL'S
                                 OFFICE
                                 BY:  SHIWON CHOE
                                 455 GOLDEN GATE AVENUE,
                                 SUITE 11000
                                 SAN FRANCISCO, CALIFORNIA 94102

                                 ATTORNEY GENERAL'S OFFICE
                                 BY:  CHRISTOPHER KISSEL
                                 300 S. SPRING STREET, SUITE 1702
                                 LOS ANGELES, CALIFORNIA 90013

SAN JOSE, CALIFORNIA                    DECEMBER 17, 2024

P R O C E E D I N G S

(COURT CONVENED AT 9:05 A.M.)

THE COURT:  LET'S TURN TO OUR MORNING MATTER.

THIS IS 24-7885, NETCHOICE VERSUS BONTA.

LET ME FIRST CAPTURE THE APPEARANCE OF THE PARTIES.  WHO APPEARS FOR THE PLAINTIFF?

MR. LEHOTSKY:  GOOD MORNING, YOUR HONOR.

STEVEN LEHOTSKY ON BEHALF OF THE PLAINTIFF NETCHOICE.

THE COURT:  THANK YOU.  GOOD MORNING.

MR. BENBROOK:  BRAD BENBROOK ALSO FOR THE PLAINTIFF.

THE COURT:  THANK YOU.  GOOD MORNING.

AND FOR THE DEFENDANT?

MR. KISSEL:  GOOD MORNING, YOUR HONOR.

CHRISTOPHER KISSEL FOR THE ATTORNEY GENERAL.

THE COURT:  THANK YOU.  GOOD MORNING.

MR. CHOE:  GOOD MORNING, YOUR HONOR.

SHIWON CHOE FOR THE ATTORNEY GENERAL.

THE COURT:  THANK YOU.  GOOD MORNING.

AND WE'RE HERE THIS MORNING TO DISCUSS THE MOTION FOR PRELIMINARY INJUNCTION THAT WAS FILED BY PLAINTIFF IN THIS MATTER.

I'VE REVIEWED THE PLEADINGS.  THANK YOU VERY MUCH. THEY'VE BEEN VERY HELPFUL.

I DO HAVE QUESTIONS.  I'M SURE YOU HAVE ANSWERS FOR THE

QUESTIONS AND SUGGESTIONS.

WHAT I WANTED TO DO FIRST OF ALL WAS TO GIVE YOU AN AGENDA OF HOW AT LEAST MY NOTES REFLECT SOME TOPICS THAT I THINK WOULD BE HELPFUL, AND THERE ARE SEVEN ITEMS HERE.  AND I THOUGHT THAT WE COULD ENGAGE THE DISCUSSION, IF YOU DON'T MIND, BY MY AGENDA.  THAT WOULD BE HELPFUL.

I'D LIKE TO FIRST TALK ABOUT THE AGE VERIFICATION.  AND THIS IS IN ORDER.  AGE VERIFICATION, THE ADDICTIVE FEEDS, NOTIFICATION LIMITS, CONTENT NEUTRALITY, AND THEN TALK A LITTLE BIT ABOUT THE SCRUTINY THAT WOULD APPLY, INTERMEDIATE SCRUTINY, GOVERNMENT INTERESTS, THOSE THINGS.  CONCURRENT WITH THAT WE WOULD TALK ABOUT TAILORING, AND THEN I WOULD LIKE TO TALK ABOUT DEFAULT SETTINGS, ANY COMPELLED DISCLOSURES, AND THEN VOID FOR VAGUENESS.

AND JUST IN THE SPIRIT OF FULL DISCLOSURE, I'VE CATEGORIZED THESE BY WHAT I THINK ARE THE MOST, AT LEAST FOR ME, MOST INTERESTING AND IMPORTANT ISSUES.  BUT NOT TO SAY THAT YOU MIGHT HAVE YOUR CASE COMPLETELY CENTERED ON THE VOIDNESS ISSUE, BUT THIS IS THE ORDER THAT I THOUGHT WOULD BE HELPFUL TO DISCUSS THINGS.

SO WHAT I THOUGHT I WOULD DO ALSO IS TO ALLOW YOU TO MAKE A BRIEF OPENING STATEMENT IF YOU WOULD LIKE, ABOUT YOUR POSITIONS, EACH SIDE, AND THEN WE'LL GO THROUGH THESE ISSUES. I'D LIKE TO GO THROUGH THEM IN PROBABLY A COUNT POINT, COUNTERPOINT, AND I THINK BE THAT WOULD BE MORE EFFECTIVE FOR

US FOR OUR DISCUSSION AND RATHER THAN HAVING ONE SIDE PRESENT THEIR WHOLE ARGUMENT AND PROCEED.

SO I HOPE THAT DOESN'T DISRUPT YOUR PREPARATION, BUT THAT'S HOW I WOULD LIKE TO PROCEED.

I ALSO UNDERSTAND THAT THERE'S LIKELY TO BE SOME OVERLAP IN THESE ISSUES AS WE DISCUSS THEM, AND I'M HAPPY TO HEAR FROM YOU ON THAT AS WELL.

OKAY.  I'M ASSUMING THAT YOU AGREE TO THAT AGENDA.

SO ANY OPENING COMMENTS THAT THE PLAINTIFFS WOULD LIKE TO MAKE?  YOU CAN COME TO THE LECTERN.

MR. LEHOTSKY:  YES, YOUR HONOR.  THANK YOU.

GOOD MORNING, YOUR HONOR.

I'D BE HAPPY TO ADDRESS THOSE SEVEN ISSUES IN ORDER.  I'D LIKE TO START OUT WITH WHAT I THINK ARE A COUPLE OF KEY POINTS THAT I HOPE YOU WILL KEEP IN MIND THROUGHOUT THIS MORNING'S DISCUSSION.

THE COURT:  SURE.

MR. LEHOTSKY:  WE BELIEVE THAT THIS IS AN OBVIOUSLY UNCONSTITUTIONAL LAW.  IT IS OBVIOUSLY ALSO DIFFERENT FROM THE OTHER SIX LAWS THAT HAVE ALREADY BEEN ENJOINED BY OTHER DISTRICT COURTS AROUND THE COUNTRY IN DIFFERENT STATES, BUT IT SHARES THE SAME FUNDAMENTAL FEATURES OF THOSE OTHER LAWS, WHICH IS THAT IT RESTRICTS ACCESS TO SPEECH OF MINORS, AND IT PROHIBITS OUR COVERED MEMBER WEBSITES FROM SPEAKING TO BOTH MINORS AND ADULTS ALIKE.

IT IS UNQUESTIONABLY A RESTRICTION ON OUR SPEECH AND ON THE RIGHTS OF THOSE USERS, MINOR AND ADULT, TO CONSUME SPEECH.

I THINK THERE ARE THREE CRITICAL POINTS ABOUT THIS LAW. THE FIRST IS THAT IT IS CONTENT BASED.  AND THE GOVERNMENT HAS NO ANSWER TO THE POINT THAT THERE ARE EXPRESS CARVE-OUTS FOR CERTAIN TYPES OF CONDUCT, CERTAIN TYPES OF CONTENT, YOU KNOW, CONSUMER REVIEWS OF PRODUCTS AND SERVICES, AND ALSO THAT THE CORE DEFINITION OF A SOCIAL MEDIA PLATFORM IS ITSELF CONTENT BASED, A VERY BROAD CONTENT CATEGORY TO BE SURE BECAUSE IT FOCUSES ON SOCIAL INTERACTION ONLINE.  SO THAT'S THE FIRST POINT.

THE SECOND IS THAT THE STATE DOESN'T ADDRESS THE RIGHTS OF MINORS, THE FIRST AMENDMENT RIGHTS OF MINORS AT ALL.  IT IS WELL ESTABLISHED SUPREME COURT PRECEDENT FOR ALMOST 50 YEARS, AND ESPECIALLY SINCE THE BROWN CASE, THAT MINORS HAVE A SUBSTANTIAL AMOUNT OF FIRST AMENDMENT FREEDOM TO ACCESS PROTECTED SPEECH.

THE WHOLE PURPOSE OF THIS LAW IS TO RESTRICT SPEECH FOR MINORS.  IT'S TO LIMIT THE AMOUNT OF TIME THAT MINORS SPEND ONLINE.  THAT RUNS DIRECTLY CONTRARY TO CASES LIKE BROWN AND OTHER ESTABLISHED SUPREME COURT PRECEDENT.

AND THE THIRD POINT IS, AGAIN, THAT RECENT SUPREME COURT PRECEDENT, IN PARTICULAR THE MOODY DECISION, BUT ALSO OTHER CASES, ESTABLISH THAT OUR MEMBERS HAVE A FIRST AMENDMENT RIGHT TO ENGAGE IN CURATION AND DISSEMINATION OF THIRD PARTY CONTENT

AND TO DISTRIBUTE THAT TO USERS.  AND THAT IS THE HEARTLAND OF THIS LAW IS RESTRICTING OUR MEMBER'S ABILITY TO ENGAGE IN THE KIND OF PERSONALIZATION TO PROVIDE CONTENT BASED ON ALL OF OUR MEMBER'S POLICIES, ALL OF -- EVERYTHING THAT THEY KNOW ABOUT USERS AND WHAT PEOPLE ARE INTERESTED IN AND WHAT TYPE OF CONTENT THEY THINK THEY MIGHT WANT TO CONSUME.  AND THIS LAW DIRECTLY RESTRICTS OUR ABILITY TO PROVIDE THAT SPEECH TO OUR USERS.

NOW, THE ATTORNEY GENERAL STARTS OFF HIS BRIEF ON PAGE 1 BY ARGUING THAT SB976 IS A REGULATION OF CONDUCT OF THESE EUPHEMISMS OF DIGITAL MECHANISMS INSTEAD OF SPEECH, BUT THROUGHOUT HIS OPPOSITION AT A COUPLE OF DIFFERENT POINTS THE ATTORNEY GENERAL I THINK ADMITS THAT THIS REALLY IS A REGULATION OF SPEECH.

FOR INSTANCE, ON PAGE 2 THE ATTORNEY GENERAL SAYS THAT THE PERSONALIZED FEEDS THAT THE ACT REGULATES, QUOTE, "SERVE UP MEDIA," END QUOTE, TO USERS.

THROUGHOUT THE BRIEF HE CONTINUES TO RECOGNIZE THAT WHAT OUR MEMBER WEBSITES SUCH AS YOUTUBE AND FACEBOOK AND INSTAGRAM AND PINTEREST AND X ARE PROVIDING IS MEDIA.

ELSEWHERE HE SAYS THAT, YOU KNOW, THE PERSONALIZED FEEDS THAT OUR MEMBER WEBSITES PROVIDE ARE DESIGNED TO PROLONG USER ENGAGEMENT BY, QUOTE, "AUDIO PLAYING AUDIO AND VIDEO," THAT IS, SPEECH.  THAT IS WHAT WE ARE TALKING ABOUT, WE'RE TALKING ABOUT SPEECH.

I THINK IT'S FAIRLY OBVIOUS THAT IF YOU REQUIRE PARENTAL CONSENT AND AGE ASSURANCE AS A GATEWAY, AS A LIMITING PRINCIPLE BEFORE YOU CAN ENGAGE IN CERTAIN TYPES OF SPEECH OR CAN RECEIVE CERTAIN TYPES OF SPEECH -- AND I TAKE THE STATE'S POINT THAT THEY ARE NOT FORBIDDING ALL ACCESS TO OUR WEBSITES.  BUT THEY ARE GETTING AT THE CORE OF WHAT WE DO AND WHAT MAKES OUR MEMBER'S WEBSITES INTERESTING AND VALUABLE, AND IT MAKES PEOPLE WANT TO GO AND SPEND TIME THERE.  AND THEY ARE DOING IT EXPRESSLY FOR THE PURPOSE OF RESTRICTING SPEECH.

AGAIN, WE THINK THIS IS CLEARLY CONTROLLED BY BROWN, ANOTHER CALIFORNIA STATUTE WHERE MANY OF THE SAME ARGUMENTS WERE APPLIED ABOUT HOW, YOU KNOW, MINORS DON'T HAVE THE ADEQUATE, YOU KNOW, BRAIN DEVELOPMENT, THE MATURITY TO DEAL WITH WHAT THEY SEE IN VIOLENT VIDEO GAMES.  THE SAME ARGUMENTS THAT WERE REJECTED BY THE SUPREME COURT IN BROWN ARE NOW BEING APPLIED HERE.

AS I SAID, IT'S ALSO VERY SQUARELY, THE STATUTE HERE IS ALSO VERY SQUARELY CONTRARY TO THE MOODY DECISION WHERE THE SUPREME COURT SAID THAT STATES CANNOT PREVENT A WEBSITE FROM COMPILING THE THIRD PARTY SPEECH IT WANTS IN THE WAY IT WANTS AND THUS FROM OFFERING THE EXPRESSIVE PRODUCT THAT MOST REFLECTS ITS OWN VIEWS AND PRIORITIES, AND THOSE LAWS THAT -- CURTAILING THEIR EDITORIAL CHOICES MUST MEET THE FIRST AMENDMENT'S REQUIREMENTS.

I THINK WE'RE GOING TO HEAR A LOT TODAY ABOUT ALGORITHMS,

AND AN ALGORITHM IS ESSENTIALLY A FANCY WORD FOR COMPUTER CODE. IT'S COMPUTER CODE THAT IS DESIGNED BY HUMANS WORKING AT OUR MEMBER COMPANIES TO COME UP WITH WEBSITES THAT IMPLEMENT THEIR POLICIES, THE KIND OF UNIQUE COMMUNITIES THAT THEY WANT TO CREATE AND FOSTER.  AND THOSE ALGORITHMS BOTH IMPLEMENT COMMUNITY GUIDELINES SUCH AS PROVIDING APPROPRIATE CONTENT TO MINORS AND IDENTIFYING HIGH QUALITY CONTENT, AND THEN ALSO TRYING TO IDENTIFY THE CONTENT THAT A USER MIGHT LIKE BASED ON WHAT THE WEBSITE KNOWS ABOUT THE USER, WHERE THEY'RE LOCATED, WHAT THEY'VE LIKED BEFORE, WHAT THEIR FRIENDS MIGHT HAVE LIKED, THINGS THAT ARE POPULAR AND SEEM TO MATCH WITH THEIR INTERESTS.

ALL OF THAT IS DESIGNED JUST LIKE ANY BOOK PUBLISHER OR MOVIE STUDIO OR T.V. PRODUCTION STUDIO TO PROVIDE INFORMATION AND CONTENT THAT PEOPLE WILL WANT TO CONSUME.

I THINK IF YOU WERE TO THINK ABOUT THIS LAW, YOU KNOW, IMAGINE THAT THE STATE OF CALIFORNIA SAID BEFORE YOU CAN BUY "CATCHER IN THE RYE," YOU HAVE TO HAVE PARENTAL CONSENT, OR BEFORE YOU CAN SHOW A MOVIE OR BEFORE YOU CAN DISTRIBUTE A MOVIE TO MOVIE THEATRES, YOU HAVE TO DO AGE ASSURANCE OR HAVE THESE DEFAULT LIMITATIONS ABOUT HOW MUCH TIME SOMEBODY CAN SPEND READING IT OR WATCHING IT.  THAT LAW WOULD OBVIOUSLY BE UNCONSTITUTIONAL.

AND THE SUPREME COURT HAS SAID TIME AND TIME AND TIME AGAIN THAT EVEN WHEN THE MODE OF TECHNOLOGY CHANGES, THE FIRST AMENDMENT PRINCIPLES DO NOT CHANGE.  AND I THINK THAT'S

WHY YOU'VE SEEN THESE OTHER SIX DISTRICT COURTS WHO HAVE PRELIMINARILY ENJOINED THESE DIFFERENT LAWS SEEKING TO RESTRICT SOCIAL MEDIA IN ALL OF ITS VARIOUS FORMS AND FORMULATIONS BECAUSE THE FUNDAMENTAL PRINCIPLES OF THE FIRST AMENDMENT ARE CLEAR AND THE APPLICATION OF LAWS LIKE CALIFORNIA'S TO OUR MEMBERS IS ALSO CLEAR AND UNIFORM.  PARENTAL CONSENT, AGE ASSURANCE, LIMITATIONS ON HOW MUCH TIME OUR USERS CAN SPEND WATCHING A VIDEO UNLESS THEY HAVE PARENTAL CONSENT, ALL OF THESE ARE CATEGORICALLY UNCONSTITUTIONAL, AND WE URGE THE COURT TO ISSUE A PRELIMINARY INJUNCTION BEFORE JANUARY 1ST.

THE COURT:  THANK YOU.  AND YOU MENTIONED BROWN, AND WE'LL GET INTO THIS, BUT BROWN I THINK WAS A STRICT SCRUTINY ANALYSIS; IS THAT RIGHT?

MR. LEHOTSKY:  SO WE THINK BROWN CAN BE READ AS CATEGORICALLY SAYING IT'S UNCONSTITUTIONAL WITHOUT ANY NEED TO APPLY ANY FORM OF HEIGHTENED SCRUTINY.

BROWN SAID THERE IS NO HISTORY IN THIS COUNTRY OF GOVERNMENTAL RESTRICTION OF MINOR'S ACCESS TO SPEECH.

PARENTS, OF COURSE, CAN RESTRICT ACCESS TO SPEECH. PRIVATE COMPANIES LIKE THE MOVIE THEATER CAN SAY THIS MOVIE IS RATED R, AND WE'RE NOT GOING TO SCREEN IT.  BUT THAT'S A PRIVATE DECISION.

BUT THERE'S NO HISTORY OR TRADITION IN THE COUNTRY OF GOVERNMENTAL RESTRICTION OF SPEECH FOR MINORS.

IF, THOUGH, YOU DISAGREE WITH ME ON THAT, IF YOU THINK IT

IS A STRICT SCRUTINY ANALYSIS, THEN, YES, I THINK IT IS A STRICT SCRUTINY CASE.  I THINK IT WAS CLEARLY A CONTENT BASED LAW, AND I THINK THIS LAW IS CLEARLY A CONTENT BASED LAW FOR VERY SIMILAR REASONS.

THE COURT:  AND WE'LL TALK ABOUT ALSO -- YOU MENTIONED MOODY, OF COURSE, AND THAT'S I THINK THE MOST RECENT STATEMENT FROM THE SUPREME COURT.

MR. LEHOTSKY:  YES, YOUR HONOR.

THE COURT:  AND OUR ATTENTION WILL BE DRAWN TO FOOTNOTE 5, WON'T IT, AND JUSTICE KAGAN'S COMMENTS, WHICH ARE FURTHER ELABORATED ON BY HER COLLEAGUES AND THEIR CONCURRENCES?  AND THAT'S INTERESTING, TOO, SPEAKING ABOUT, AS YOU MENTIONED, ALGORITHMIC OR HUMAN INTERACTION AND WHAT SHOULD WE DO WITH THAT?  I THINK FOOTNOTE 5 SAYS THEY MAKE NO DECISION ON THAT.

MR. LEHOTSKY:  SO, YES, YOUR HONOR, I DO THINK WE WILL SPEND A LOT OF TIME TALKING ABOUT IT TODAY.

FOOTNOTE 5 IN THE MAJORITY OPINION SAYS THAT THEY ARE RESERVING JUDGMENT ON A LAW THAT REGULATES AN ALGORITHM PURELY TO PROVIDE INFORMATION CONTENT TO PEOPLE WHO WANT IT.

AND I WOULD SAY TWO THINGS.  ONE, THIS IS NOT A LAW THAT REGULATES ALGORITHMS PURELY ON THAT BASIS, AND, TWO, OUR MEMBER WEBSITES ARE NOT AN EXAMPLE OF THAT TYPE OF ALGORITHM.  THERE ARE ALL MANNER OF POLICIES.  YOU KNOW, SAFETY POLICIES, CONTENT MODERATION POLICIES, ALL SORTS OF RESTRICTIONS ABOUT WHAT TYPE OF MATERIAL CAN BE ON THE WEBSITE, CAN BE DELIVERED TO CERTAIN

USERS.

WE DO NOT HAVE AMONG OUR FIVE COVERED MEMBERS THAT WE SAY ARE CLEARLY COVERED BY THIS STATUTE -- DREAMWIDTH, WE THINK THERE'S SOME QUESTION ABOUT WHETHER IT IS OR ISN'T -- BUT OF THE FIVE THAT ARE CLEARLY COVERED, NONE OF THEM IS AN EXAMPLE OF AN ALGORITHM THAT IS PURELY PROVIDING CONTENT ONLY BECAUSE SOMEBODY WANTS IT.

SO WE DON'T THINK FOOTNOTE 5 HAS ANY RELEVANCE.  WE THINK OUR MEMBER'S RIGHTS ARE SOLELY CONTROLLED BY THE MOODY DECISION.

THE COURT:  OKAY.  WE'LL GET INTO WHAT YOUR THOUGHTS ARE.  YOU'VE TOLD ME A LITTLE BIT.  BUT THIS IS, OF COURSE, YOUR OPENING STATEMENT.  BUT WHAT DOES MOODY TEACH?  AND AT THE END, WHAT DOES MOODY REALLY TELL US?

AND I THINK IT FILTERS THROUGH EACH OF OUR TOPICS HERE, BUT I'LL BE CURIOUS TO HEAR YOUR RELIANCE ON MOODY AND WHAT IT REALLY TEACHES TO THIS STATUTE AS WE GO FORWARD.

MR. LEHOTSKY:  YES, YOUR HONOR.  I AM HAPPY TO ADDRESS THAT NOW OR WAIT.

THE COURT:  WELL, LET'S HEAR YOUR COLLEAGUE OPPOSITE'S OPENING, AND THEN WE CAN DEAL WITH THE ISSUES AS THEY COME UP.  THANK YOU.

MR. LEHOTSKY:  THANK YOU.

THE COURT:  THANK YOU.  MR. KISSEL.

MR. KISSEL:  GOOD MORNING, YOUR HONOR.

SIMILARLY, I WOULD LIKE TO START WITH A FEW POINTS THAT I THINK THEMATICALLY RUN THROUGH THE CASE, AND THEN I'D LIKE TO, IF I MAY, RESPOND TO A COUPLE OF THE POINTS THAT WERE MADE BY MY FRIEND.

TO START, THE PROTECTING OUR KIDS FROM SOCIAL MEDIA ADDICTION ACT IS AN ESSENTIAL TOOL TO ADDRESS AN EPIDEMIC OF DANGEROUSLY COMPULSIVE AND EXCESSIVE INTERNET USE BY CHILDREN AND TEENAGERS, AN EPIDEMIC THAT HAS BEEN TIED TO VARIOUS MENTAL AND PHYSICAL HEALTH ISSUES AND LEFT MINORS FEELING A LACK OF CONTROL OVER THEIR OWN ONLINE ACTIVITY.

THE ACT RESPONDS WITH SCALPEL-LIKE PRECISION CREATING TOOLS TO LIMIT MINOR'S ACCESS TO FEATURES DESIGNED TO EXTEND THEIR TIME ONLINE, BUT FULLY PRESERVING THEIR ACCESS TO THE PLATFORMS AND TO ALL OF THE CONTENT ON THE PLATFORMS WHILE PRESERVING COMPANY'S ABILITY TO CURATE THAT CONTENT FOR THEIR USERS.

PLAINTIFF'S FACIAL AND AS-APPLIED CHALLENGES FAIL AT THE THRESHOLD.  FIRST, PLAINTIFF'S FACIAL CHALLENGE FAILS BECAUSE IT HAS IGNORED ITS BURDEN OF SHOWING HOW THE ACT UNCONSTITUTIONALLY BURDENS SPEECH AND SHOWING THAT THOSE BURDENS SUBSTANTIALLY OUTWEIGH CONSTITUTIONAL APPLICATIONS OF THE ACT AS YOUR HONOR MENTIONED.

MOODY IS VERY MUCH PRESENT IN THIS CASE, AND IF THERE IS ANY CLEAR HOLDING IN MOODY, IT'S THAT, THAT A PLAINTIFF HAS THAT BURDEN OF DEMONSTRATING THE SCOPE OF THE STATUTE AND

EXPLAINING HOW THE APPLICATIONS ARE UNCONSTITUTIONAL AND SHOWING THAT THEY SUBSTANTIALLY OUTWEIGH THE CONSTITUTIONAL APPLICATIONS.

INSTEAD, WHAT PLAINTIFF DOES HERE IS THAT IT ASKS THIS COURT TO JUST ASSUME THAT ANY REGULATION OF A FEATURE OF SOME OF ITS MEMBER'S SITES BURDENS PROTECTIVE SPEECH.  THAT'S THE TYPE OF ERROR THAT THE SUPREME COURT IN MOODY SPECIFICALLY WARNED AGAINST.

SECOND, AS TO THE AS-APPLIED CHALLENGE, IT FAILED BECAUSE PLAINTIFF LACKS ASSOCIATIONAL STANDING.  AN AS-APPLIED CHALLENGE LIKE PLAINTIFF, ON BEHALF OF FIVE DIFFERENT COMPANIES, NECESSARILY REQUIRES FIVE AD HOC FACTUAL INQUIRIES, WHICH PRECLUDES ASSOCIATIONAL STANDING.

EVEN ASSUMING THE COURT COULD PROCEED PAST THE THRESHOLD, THE ACT IS NOT CONTENT BASED BECAUSE IT DOES NOT TARGET MESSAGES OR TOPICS, AND IT DOES NOT ALTER THE MARKETPLACE OF IDEAS.

AT MOST, THE ACT AFFECTS THE TIME OR MANNER THAT MINORS CAN ACCESS CERTAIN MATERIAL IN WAYS THAT ARE PRECISELY TAILORED TO ADDRESS HARM AND TO LEAVE AMPLE AVENUES FOR MINORS TO ACCESS THE SAME EXACT SPEECH.

AS TO SOME OF THE POINTS THAT WERE RAISED EARLIER, I THINK IT CAN'T BE UNDERSTATED, FIRST OF ALL, HOW DIFFERENT THIS LAW IS FROM THE OTHER DISTRICT COURT CASES THAT PLAINTIFF DISCUSSES IN ITS BRIEFING.

IF FOR NO OTHER REASON THAN THAT THOSE LAWS EITHER SPECIFICALLY RESTRICTED ACCESS TO ENTIRE SOCIAL MEDIA SITES, MEANING ANY CONTENT ON THOSE SITES WAS FORBIDDEN TO MINOR USERS TO EVEN ACCESS OR THAT THE LAWS SPECIFICALLY TARGETED SPECIFIC KINDS OF WEBSITES, BASICALLY DIVIDED WEBSITES INTO TWO GROUPS AND SAID WE'RE GOING TO REGULATE THESE WEBSITES AND NOT REGULATE THESE WEBSITES.

THE ACT DOES NOT DO THAT.  THE ACT IS VERY SPECIFICALLY HONED IN ON HARMS CREATED BY FEATURES, AND THAT'S WHY WE EMPHASIZE THESE POINTS IN OUR BRIEF IN TERMS OF THE KIND OF HARM SPECIFICALLY RELATED TO EXCESSIVE USE OF THE PLATFORMS THAT HAVE A NEXUS WITH SOME OF THESE, WITH THE SPECIFIC FEATURES THAT ARE ADDRESSED IN THE STATUTE.

THE COURT:  COULD I JUST STOP YOU THERE.  AND MAYBE I SHOULD HAVE ASKED YOU IN THE BEGINNING.  TELL US, JUST FOR THE RECORD, WHAT DOES THE STATUTE DO?  WHAT DOES IT SEEK TO DO AND WHAT DOES IT DO WHEN IT'S IMPLEMENTED, IF IT IS IMPLEMENTED IN JANUARY 1 OF 2025?  WHAT DOES IT DO?

MR. KISSEL:  WELL, IT CREATES A REQUIREMENT THAT ANY SITE THAT HAS WHAT THE ACT DEFINES AS AN ADDICTIVE FEED CANNOT -- I MEAN, PRIMARILY CANNOT MAKE THOSE FEEDS AVAILABLE TO MINORS WITHOUT PARENTAL CONSENT.

OF COURSE, THERE ARE OTHER REQUIREMENTS, TOO.  I THINK THAT SORT OF THE OTHER CENTRAL REQUIREMENT IS THE REQUIREMENT AROUND SENDING NOTIFICATIONS TO MINORS AT NIGHT AND DURING THE

SCHOOL DAY.  I THINK IT'S IMPORTANT TO NOTE WITH THAT PARTICULAR REQUIREMENT THAT THE CONTENT IN THE NOTIFICATIONS IS NOT REGULATED TO THE EXTENT THAT IF, FOR EXAMPLE, A MESSAGE IS INCLUDED IN A NOTIFICATION OR AN ADVERTISEMENT OR WHAT HAVE YOU, THAT THAT CONTENT IS STILL ACCESSIBLE TO THE MINOR.  THE MINOR JUST DOESN'T RECEIVE THE NOTIFICATION ABOUT THAT CONTENT.

AND THEN THERE ARE ADDITIONALLY, YOU KNOW, WHAT WE THINK OF AS FIVE TOOLS THAT PARENTS CAN USE THAT ALSO ADDRESS SPECIFIC FEATURES THAT ARE SORT OF DESIGNED TO MAXIMIZE TIME.

SO, FOR EXAMPLE, A REGULATION OF THE ABILITY TO SEE INTERACTIONS WITH A POST, WHICH IS ONE OF THE SORT OF MAIN DRIVERS OF ENGAGEMENT OR DESIGN TO DO THAT.

I THINK IN TERMS OF WHAT IS THE STATUTE TRYING TO ADDRESS? WE'VE PUT TOGETHER AS MUCH EVIDENCE AS WE COULD IN A VERY SHORT PERIOD OF TIME FROM A FEW EXPERTS DESCRIBING THE HARMS THAT ARE CAUSED BY EXCESSIVE USE, WHICH INCLUDE -- ON THE ONE HAND EFFECTS ON SLEEP FOR MINORS WHICH CAN AFFECT THEIR ABILITY TO SUCCEED AT SCHOOL OR HAVE SOCIAL RELATIONSHIPS.

ONE OF OUR EXPERTS, DR. RADESKY, TALKED ABOUT 19 PERCENT OF TEENAGERS HAVE HAD EXCESSIVE INTERNET USE INTERFERE WITH SORT OF THEIR BASIC DAY-TO-DAY LIVES.

WHILE AT THE SAME TIME THOSE TEENAGERS HAVE SAID THEY FEEL LIKE THEY HAVE A LACK OF CONTROL OVER THEIR ABILITY TO USE THESE SITES OR THEIR ABILITY TO LIMIT THEIR USE OF THESE SITES.

SO PART OF IT, TOO, IS JUST PROVIDING A TOOL TO LIMIT A

USER'S OWN AND A MINOR'S OWN HABITUAL OR SORT OF NOT, YOU KNOW, NOT QUITE INTENTFUL ENGAGEMENT WITH THESE SITES.

I DON'T KNOW IF THAT ADDRESSES THIS --

THE COURT:  NO, NO.  I JUST WANTED YOU AT A HIGH LEVEL TO TELL ME WHAT THE STATUTE -- WHAT THE LEGISLATURE SAID AND INTENDED THAT STATUTE TO DO.

AND JUST ALSO, WE KNOW THAT THE STATUTE IS RECENTLY ENACTED.  WAS IT SEPTEMBER 20TH OF THIS YEAR?

MR. KISSEL:  IT WAS, IT WAS IN SEPTEMBER, CORRECT.

THE COURT:  AND IT'S SCHEDULED TO BE ENACTED, AS YOUR COLLEAGUE SUGGESTED, JANUARY 1ST OF NEXT YEAR.

MR. KISSEL:  YES, YOUR HONOR, IT IS.

ALTHOUGH -- AND, OF COURSE, YOUR HONOR IS FAMILIAR WITH THIS BECAUSE WE'VE TALKED IT QUITE A BIT IN OUR BRIEF, THE AGE-ASSURANCE REQUIREMENTS ARE NOT EFFECTIVE UNTIL 2027.

THE COURT:  '27.

MR. KISSEL:  WHICH IS NOT A SMALL MATTER BECAUSE THE AGE-ASSURANCE REQUIREMENTS ARE REALLY -- YOU KNOW, UNTIL THEN THERE'S AN ACTUAL KNOWLEDGE STANDARD IN TERMS OF DOES THE PLATFORM ALREADY KNOW OR HAVE AN INDICATION THAT THAT PERSON IS A MINOR.

THE COURT:  THE ACTUAL KNOWLEDGE ON THE PROVIDERS.

MR. KISSEL:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  OKAY.  GREAT.  THANK YOU FOR THAT.  I APPRECIATE THAT.

SO YOU CAN CONTINUE WITH YOUR PRESENTATION.  I DIDN'T MEAN TO INTERRUPT YOU.

MR. KISSEL:  OH, NO.  AND I'M SURE I'LL HAVE TIME TO ADDRESS A LOT OF THESE OTHER THINGS.

I THINK A COUPLE OF THINGS THAT JUMPED OUT THAT ARE WORTH RESPONDING TO IS, ONE IS THAT IT'S NOT A CONTENT BASED LAW.  IF THE PRIMARY EXAMPLE THAT THE PLAINTIFF POINTS TO IN TERMS OF AN EXCEPTION FOR -- I THINK THE PLAINTIFF IS REFERRING TO AN EXCEPTION FOR CLOUD BASED WEBSITES AND CONSUMER REVIEWS, WEBSITES THAT HAVE -- FEATURE CONSUMER REVIEWS.

THE DISTINCTION BETWEEN THE SITES THAT ARE REGULATED BY THE ACT AND THOSE SITES IS NOT CONTENT BASED OR A CONTENT MOTIVATED DISTINCTION.

ESSENTIALLY, THE REASON FOR THAT EXCEPTION IS THAT THOSE SITES MAY FIND THEMSELVES FITTING THE DEFINITION OF A SITE THAT IS SIGNIFICANTLY BASED ON AN ADDICTIVE FEED, BUT THOSE ARE NOT THE SITES THAT THE LEGISLATURE THOUGHT WAS CAUSING THE HARM THAT IS THE CENTER OF THE STATUTE, A NON-CONTENT BASED HARM I SHOULD EMPHASIZE.

SO, IN SHORT, IF EBAY, FOR EXAMPLE, HAS AN ADDICTIVE FEED OR COULD BE SEEN AS HAVING AN ADDICTIVE FEED, EBAY IS NOT THE WEBSITE WAKING UP TEENAGERS IN THE MIDDLE OF THE NIGHT TO LET THEM KNOW THAT THE LAMP SHADE THAT THEY WERE BIDDING ON IS GOING ON SALE OR SOMETHING LIKE THAT.  BECAUSE THAT DISTINCTION IN THE STATUTE IS NOT BASED ON CONTENT, THEN THE DISTINCTION

DOES NOT MAKE THE STATUTE CONTENT BASED.

YOU KNOW, WE WILL JUST UNDERSCORE WITH MOODY, WHICH IS SUCH A BIG TOPIC, THAT REALLY THERE'S NO SHOWING THAT THIS LAW HAS A SUBSTANTIAL -- THAT ITS UNCONSTITUTIONAL APPLICATIONS SUBSTANTIALLY OUTWEIGH ITS CONSTITUTIONAL APPLICATIONS PARTIALLY BECAUSE WE DON'T REALLY KNOW HOW MUCH ABOUT HOW THESE CONTENT FEEDS WORK AND THE ALGORITHMS THAT POWER THESE CONTENT FEEDS.

AND THIS IS SOMETHING THAT THE COURT IN MOODY WAS SO CAREFUL THAT REALLY PROMPTED MULTIPLE JUSTICES TO WRITE SEPARATELY TO EMPHASIZE THAT IT MAY BE AN APPROPRIATE COMPARISON TO A CONTENT MODERATION POLICY TO TALK ABOUT EDITORIAL DISCRETION IN TERMS OF THE LAWS THAT WERE AT ISSUE IN THAT CASE WHICH SAID THAT, YOU KNOW, A PLATFORM CAN'T USE ITS CONTENT MODERATION POLICY TO DO THIS OR THAT.

WHETHER THAT LOGIC AND THOSE COMPARISONS APPLY TO THE SPECIFIC FEEDS IN THESE SITES IS VERY MUCH LIKE A FACTUAL CASE-BY-CASE INQUIRY WHETHER WE'RE LOOKING AT IT FROM A FACIAL PERSPECTIVE OR AS AN AS-APPLIED PERSPECTIVE.  AND THE INABILITY OR THE REFUSAL OF PLAINTIFF TO SORT OF ILLUMINATE THOSE QUESTIONS, I MEAN, THAT'S WHAT A FACIAL CHALLENGE IS ALL ABOUT.

AND THEN I SUPPOSE LASTLY, BECAUSE I'LL SAVE US SOME TIME TO RESPOND TO YOUR HONOR'S QUESTIONS, BUT I REALLY THINK IT'S IMPORTANT TO DISTINGUISH BROWN FROM THIS CASE FOR MULTIPLE REASONS.

ONE, IS THAT TO YOUR HONOR'S POINT, IT IS VERY MUCH A STRICT SCRUTINY CASE.

THE COURT:  BROWN WAS.

MR. KISSEL:  BROWN WAS, YES.  NOT THIS CASE, NO.

THE SUPREME COURT IN BROWN IS VERY MUCH -- THE DISCUSSION IS VERY MUCH ABOUT THE TARGETING OF A SPECIFIC KIND OF CONTENT, A SPECIFIC KIND OF TOPIC WHEN THE LEGISLATURE SET OUT TO BAN VIOLENT VIDEO GAMES.

AND THE REASON, FOR EXAMPLE, THAT THE COURT TALKS SO MUCH ABOUT PARENTAL VERIFICATION, FOR EXAMPLE, IS THAT THE COURT WAS CLEARLY SKEPTICAL ABOUT THE JUSTIFICATION FOR THAT LAW THAT REALLY -- YOU KNOW, I THINK THE COURT SAW IT AS A MORALE PANIC TYPE LAW WHERE THERE WASN'T A REAL FIRM JUSTIFICATION FOR A CONTENT BASED DISTINCTION.

SO WHEN IT WAS TALKING ABOUT SOME OF THOSE REQUIREMENTS, IT WAS SAYING, WELL, THESE ARE REALLY JUST PRETEXTUAL, YOU KNOW, REQUIREMENTS BECAUSE IF THE CONTENT WAS REALLY THAT BAD, FOR EXAMPLE, WHY WOULDN'T YOU ALLOW A PARENTAL VETO?

IN A CASE LIKE THIS WHERE THE STATE REALLY HAS SUBSTANTIATED THE HARM, AND NOT JUST IN THIS CASE BUT IN THE LEGISLATIVE FINDINGS THEMSELVES, AND TALKED ABOUT AND DESCRIBED THE HARM AS NOT A CONTENT RELATED HARM, THEN THIS COURT DOESN'T NEED TO HAVE THE SAME -- SHOULD NOT LOOK AT THE REQUIREMENTS OF THE STATUTES WITH THE SAME KIND OF SKEPTICISM THAT I THINK IS REALLY A HUGE PART OF WHAT MOTIVATES THE DISCUSSION IN BROWN.

I COULD HIT MANY MORE POINTS, BUT UNLESS YOUR HONOR WANTS TO ASK ABOUT ANY OF THE THINGS THAT I'VE BROUGHT UP, THEN I'LL MAKE SURE THAT WE HIT THEM IN CONVERSATION.

THE COURT:  YES.  THAT'S WHY I WANTED TO GIVE YOU AN OPPORTUNITY TO EXPRESS YOUR THOUGHTS, AND THEN I THOUGHT WE WOULD GO THROUGH THE, IF WE COULD, GO THROUGH THE TOPICS AS I HAVE IDENTIFIED THEM.

SO THANK YOU VERY MUCH.  I APPRECIATE IT.

MR. KISSEL:  OKAY.

THE COURT:  SO LET'S TURN TO AGE VERIFICATION.  THIS IS A PI.  THE PLAINTIFFS ARE MOVING FOR PI.  AND MY SENSE IS THAT WE'VE TALKED ABOUT THE CHALLENGE HERE, AND IT LOOKS LIKE THIS IS A FACIAL CHALLENGE THEN, MR. LEHOTSKY.  IT SEEMS LIKE THAT.

MR. LEHOTSKY:  YES, YOUR HONOR.  I MEAN, I THINK THERE MIGHT BE A LITTLE BIT OF MISUNDERSTANDING ABOUT SORT OF WHAT THESE TERMINOLOGIES OF FACIAL AND AS-APPLIED.

REALLY, AS-APPLIED, WE'RE JUST TALKING ABOUT THE SCOPE OF RELIEF THAT WE ARE SEEKING.  OUR LEGAL ARGUMENTS ARE CATEGORICAL.  WE DON'T THINK THERE IS ANY CONSTITUTIONAL APPLICATION OF EITHER THE AGE ASSURANCE REQUIREMENTS OR THE PARENTAL CONSENT REQUIREMENTS.

BUT OUR ARGUMENTS THERE DON'T VARY AT ALL DEPENDING UPON WHAT WEBSITE WE'RE TALKING ABOUT, WHAT MEMBER.  WHEN IT COMES TO THE SCOPE OF OUR RELIEF, WE'RE JUST SEEKING RELIEF ON BEHALF

OF OUR COVERED MEMBERS.  SO THERE ARE MEMBERS OF NETCHOICE THAT ARE NOT COVERED BY THE STATUTE, AND THE STATUTE DOESN'T APPLY TO THEM, AND WE'RE NOT SEEKING ANY SORT OF INJUNCTION FOR THEM. AND THERE MAY BE OTHER COMPANIES THAT ARE NOT MEMBERS OF WEBSITES AND AN INJUNCTION WOULDN'T APPLY TO THEM AS WELL.  IT WOULD APPLY JUST TO OUR MEMBERS.

SO I DON'T WANT THERE TO BE TOO MUCH OF A HANG UP ON THE AS-APPLIED NATURE OF OUR ARGUMENTS OR OF THE RELIEF THAT WE'RE SEEKING.  AND I'M HAPPY TO DELVE INTO THAT MORE BECAUSE I KNOW YOUR HONOR ASKED FOR SUPPLEMENTAL BRIEFING WITH RESPECT TO OUR ASSOCIATIONAL STANDARD TO PURSUE AS-APPLIED CLAIMS, BUT I'M ASSUMING THAT WE SHOULD STICK FOR NOW WITH AGE ASSURANCE, BUT I'LL FOLLOW YOUR HONOR'S LEAD.

THE COURT:  YES.  THANK YOU.  LET'S START WITH AGE VERIFICATION, AGE ASSURANCE AS YOU CALL IT.

MR. LEHOTSKY:  SURE.  WELL, I GUESS I WOULD CALL IT AGE VERIFICATION.  I KNOW THE STATE HAS ATTACHED A DIFFERENT LABEL TO IT.  THEY CALL IT AGE ASSURANCE.  OTHER STATES HAVE DONE THE SAME THING.  IT'S STILL THE SAME FUNDAMENTAL PROBLEM, WHICH IS THAT WE WILL BE REQUIRED TO ENGAGE IN AGE ASSURANCE FOR ALL OF OUR USERS.

AND I THINK, AS THE ATTORNEY GENERAL NOTED, YOU KNOW, THERE'S BOTH A JANUARY 1ST COMPONENT, BUT I ALSO THINK, AND WE'VE NOTICED THIS, NOTED THIS IN OUR BRIEFING, THERE ARE REQUIREMENTS THAT TAKE EFFECT STARTING JANUARY 1, 2025 THAT

WILL ESSENTIALLY BE SORT OF A BACKDOOR AGE ASSURANCE.

SO THE ACT DOES REQUIRE COVERED WEBSITES TO ASSURE THEMSELVES OF ALL USER'S AGES.  FROM JANUARY 1, 2025 UNTIL DECEMBER 31, 2026, COVERED WEBSITES MUST SECURE PARENTAL CONSENT FROM USERS WHERE THE COVERED WEBSITES HAVE ACTUAL KNOWLEDGE THAT THE USER IS A MINOR.

THE COURT:  SO THE STATUTE STARTS WITH THAT, DOESN'T IT?

MR. LEHOTSKY:  YES.

THE COURT:  THERE'S ACTUAL KNOWLEDGE.

AND THEN THERE'S THIS OTHER PROVISION THAT SAYS, WELL, WE'RE GOING TO CARRY OVER THIS VERIFICATION ASSURANCE, WHATEVER IT IS, TO 2027.

AND MY SENSE IS, WAS THAT TO ALLOW FOR THE DEVELOPMENT OF FURTHER TOOLS AND ANALYSIS TO SEE IF AGE DETERMINATION CAN BE ACCOMPLISHED IN A MORE FASCICLE MANNER?

MR. LEHOTSKY:  I DON'T KNOW WHAT THE LEGISLATURE'S INTENT MIGHT HAVE BEEN BEHIND THAT PROVISION.  THAT MIGHT BE RIGHT.

I WILL SAY THAT THIS REQUIREMENT, EVEN THOUGH IT MAY NOT TAKE EFFECT UNTIL JANUARY 1ST, 2027, THE STATUTE IS IN EFFECT AS OF JANUARY 1, 2025.  IT IS A LAW ON THE BOOKS IN CALIFORNIA WHERE, FRANKLY, MOST, IF NOT I THINK ALL OF OUR MEMBERS ARE HEADQUARTERED, AND IT IS AN ENORMOUS, YOU KNOW, ISSUE FOR THEM TO DEAL WITH AS WE DETAIL IN OUR DECLARATIONS, YOU KNOW, FROM

MR. CLELAND, FROM MS. VEITCH, FROM MS. PAOLUCCI, AND FROM MS. DAVIS AS WELL.

SO, YOU KNOW, WE SORT OF LAY OUT ALL OF THE FACTS.  THIS WILL COST A LOT OF MONEY, ENGINEERING TIME, ENGINEERING COSTS, COMPLIANCE EFFORTS.  YOU KNOW, THESE ARE COMPANIES THAT TAKE SERIOUSLY THEIR OBLIGATION TO COMPLY WITH STATE LAW, AND THEY'LL START COMPLYING.

THE COURT:  SURE.

MR. LEHOTSKY:  AND THOSE COSTS ARE NOT RECOVERABLE. DUE TO SOVEREIGN IMMUNITY, WE CAN'T EVER GET THAT MONEY BACK ONCE PEOPLE START SPENDING ON IT.

THE COURT:  RIGHT.  WELL, I LOOKED AT THAT AND I THOUGHT, WELL, META IS ONE OF THE MEMBERS, I THINK.  THEY'RE A PUBLIC COMPANY.  I DON'T KNOW WHAT THEIR NET WORTH IS RIGHT NOW.  THE MONEY PART OF IT IS INTERESTING, AND I UNDERSTAND THAT.  WE'LL TALK ABOUT THIS MORE.

BUT ONE OBSERVATION IS WE LOOK TO THE RENO CASE AND ALL OF THOSE THINGS AND RENO IS, WHAT, TWO DECADES OLD NOW, MAYBE MORE?  MY SENSE IS THAT THE INDUSTRY HAS GROWN SIGNIFICANTLY AND INCLUDING META AND SOME OF YOUR OTHER MEMBERS, THEY PROBABLY INTERNALLY HAVE DEVELOPED TOOLS TO MINE THIS INFORMATION.  I USE THAT TERM, AND NOT PEJORATIVELY, BUT TO COLLECT IT FOR THEIR OWN DIFFERENT BASIS.

SO I THINK THE TECHNOLOGY IS ADVANCED SOMEWHAT AS WELL. BUT I DON'T WANT TO GET OFF TOPIC.  WE'RE NOT THERE YET.

MR. LEHOTSKY:  SO MAYBE A FEW POINTS ON THAT.

THE COURT:  SURE.  YES.

MR. LEHOTSKY:  ONE, I DON'T THINK ANY OF THAT IS IN THE RECORD.  AND SO FOR THE PURPOSES OF THE PRELIMINARY INJUNCTION AND SATISFYING OUR STANDARD UNDER THE NINTH CIRCUIT'S PRECEDENT IN MEINECKE THAT WE HAVE A COLORABLE FIRST AMENDMENT CLAIM --

THE COURT:  I GUESS MINE WAS A QUESTION MORE THAN I'M MAKING A FINDING OF THAT.  SO LET ME BE CLEAR ABOUT THAT.

MR. LEHOTSKY:  FAIR ENOUGH, YOUR HONOR.

BUT A SECOND POINT IS, YES, WE HAVE, YOU KNOW, MULTIPLE PUBLIC COMPANY MEMBERS.  WE ALSO HAVE DREAMWIDTH AS A MEMBER.  DREAMWIDTH IS A VERY SMALL OPERATION.  THE DECLARATION FROM MS. PAOLUCCI SAYS IT'S ESSENTIALLY A ONE-WOMAN SHOP.  THEY DON'T HAVE THE RESOURCES TO BE ABLE TO IMPLEMENT THESE TYPES OF SYSTEMS.  AND, YOU KNOW, EVEN IF THE ATTORNEY GENERAL DURING THE OPENING ARGUMENT SORT OF ADMITTED THEY'RE GOING AFTER OUR MEMBER'S WEBSITES -- I MEAN, THERE'S NOT ANY MYSTERY HERE ABOUT WHO THE LEGISLATURE WAS INTENDING TO TARGET WITH THIS ACT AND HOW THEY SORT OF GERRYMANDERED IT TO AVOID EBAY AND OTHER SITES WHO HE SAID SORT OF MIGHT INADVERTENTLY FIND THEMSELVES WITH A PEJORATIVE PREDICTIVE FEED.  AND SO THEY CARVE THEM OUT LIKE THEY'RE GOING AFTER THOSE -- OUR MEMBERS, YOU KNOW, TRYING TO TARGET THEM.

AND I WOULD SUGGEST, YOU KNOW, MAYBE PERHAPS, AS

YOUR HONOR'S INITIAL QUESTION WAS SUGGESTING, MAYBE TRYING TO NUDGE THEM TO START TO IMPLEMENT THESE SYSTEMS AND GETTING IT DONE BY JANUARY 2027.

BUT THE THIRD POINT I WANTED MAKE WAS THE INITIAL PROVISION, 27001(A)(1)(A) FOLLOWED BY THE PROVISION IN LARGE (B), WHICH IS THE 2027 REQUIREMENT, BUT THERE ARE ALSO OTHER PROVISIONS IN THE ACT THAT REQUIRES COVERED WEBSITES TO, QUOTE, "PUBLICLY DISCLOSE ON AN ANNUAL BASIS THE NUMBER OF MINOR USERS OF ITS ADDICTIVE INTERNET BASED SERVICE."

AGAIN, AS I THINK WE HAVE SAID REPEATEDLY IN OUR BRIEFS, WE TOTALLY REJECT THAT PEJORATIVE ADDICTION FRAMING.  WE REJECT THE NOTION THAT SPEECH COULD BE ADDICTIVE LIKE CIGARETTES.

SPEECH IS DIFFERENT.  SPEECH IS PROTECTED BY THE FIRST AMENDMENT.  THE EFFORTS TO SORT OF ANALOGIZE THIS TOBACCO AND GAMBLING, OTHER THINGS THAT I WOULD SAY DON'T HAVE A LOT OF SOCIAL BENEFIT FOR MINORS, MAYBE NOT FOR ADULTS EITHER, BUT IT'S A LOT DIFFERENT WHEN YOU'RE TALKING ABOUT SPEECH, EVEN THE SOLICITOR GENERAL REPORT, ALL OF THE MATERIALS THAT THE GOVERNMENT CITES IDENTIFY THERE ARE A LOT OF BENEFITS FROM OUR WEBSITE, FROM POLITICAL ENGAGEMENT, FROM TEENAGERS, YOU KNOW, ENGAGING IN IDEAS.  ALL OF THESE ARE RESTRICTED BY THIS AGE-ASSURANCE REQUIREMENT.

THE COURT:  SO ARE YOU ARGUING THAT AGE VERIFICATION IS PER SE UNCONSTITUTIONAL?  IS THAT YOUR ARGUMENT?

MR. LEHOTSKY:  YES, YOUR HONOR.

THE COURT:  OKAY.

MR. LEHOTSKY:  THAT IS ONE OF OUR ARGUMENTS.

THE COURT:  OKAY.

MR. LEHOTSKY:  AND THAT IS AN ARGUMENT THAT OTHER DISTRICT COURTS HAVE ADOPTED.  WE ALSO, OF COURSE, HAVE A SECOND ARGUMENT, WHICH IS THAT AGE ASSURANCE HAS A CHILLING EFFECT ON ADULTS.

THE COURT:  THAT WAS THE NEXT QUESTION, ISN'T IT?

MR. LEHOTSKY:  YEAH.

THE COURT:  IS THAT PART OF THAT ANALYSIS ALSO --

MR. LEHOTSKY:  YES, YOUR HONOR.

THE COURT:  -- THE BURDEN ON ADULT ACCESS?

MR. LEHOTSKY:  YES, YOUR HONOR.  AND THAT IS THE ASHCROFT AND RENO CASES, WHICH, AS YOU SAY, THEY'RE A GENERATION OLD, BUT I DON'T THINK THAT THE FUNDAMENTALS HAVE CHANGED.

LET'S -- I WOULD PROBABLY AGREE WITH YOU LIKE THE TECHNOLOGY MIGHT BE BETTER.  THE FUNDAMENTALS OF HUMAN NATURE ARE NOT, AND THE GRIFFIN CASE IN ARKANSAS SORT OF SAID, MADE EXPRESSED FACTUAL FINDINGS, ADULTS WILL BE CHILLED.  THEY WILL NOT WANT TO PROVIDE THEIR INFORMATION IF THEY GET -- YOU KNOW, PROVIDE THIS INFORMATION SO WE CAN BE SURE YOU'RE NOT A MINOR, SOME OF THEM WILL NOT BE ABLE TO DO SO IN THE MOMENT AND SO THEY WON'T ENGAGE WITH OUR WEBSITES.  THAT DEPRIVES US OF OUR FIRST AMENDMENT RIGHTS.

SOME OF THEM WILL SAY I'M NOT GOING TO DO THAT, I DON'T TRUST THESE COMPANIES WITH MY INFORMATION, AND THEY'RE NOT GOING TO DO THAT.  THAT'S IMPOSED ON US BY THE STATE OF CALIFORNIA.

THE COURT:  SURE.

MR. LEHOTSKY:  THAT IS CLEARLY A GOVERNMENTAL RESTRICTION ON OUR ABILITY TO SPEAK.

THE COURT:  AND IT ALSO -- IT SEEMS THIS IS ONE OF THOSE OVERLAP I THINK THAT THEN LOOKS TOWARDS TAILORING, DOESN'T IT?  THAT'S PART OF THAT ANALYSIS IS THE TAILORING AND HOW THAT LOOKS, AND THAT WOULD SEEM TO BE MORE FACT SPECIFIC.

MR. LEHOTSKY:  WELL, I DON'T THINK --

THE COURT:  I'M NOT PUSHING YOU TO TAILORING YET, I'M JUST RAISING THAT AS AN ANCILLARY TOPIC HERE.

MR. LEHOTSKY:  I DON'T THINK THAT VARIES AT ALL THOUGH FOR OUR WEBSITES BECAUSE, AGAIN, I'M TALKING ABOUT THE USERS AND THE REACTION OF THE USERS AND THE PUBLIC AT LARGE, YOU KNOW, TO HOW THEY WILL REACT TO AGE ASSURANCE, WHICH IS THAT IT WILL DETER, IT WILL CHILL THEM.  THAT DOESN'T MATTER EVEN IF THE TECHNOLOGY IS BETTER, IT'S FUNDAMENTALLY AN ASPECT OF HUMAN TRUST.

AND, YOU KNOW, I DON'T WANT TO PROVIDE THAT INFORMATION, I DON'T WANT TO DO THIS, I DON'T HAVE TIME TO DO THIS, YOU KNOW, THAT -- AND AGAIN, SORT OF WE HAVE THIS IN OUR DECLARATIONS. IT'S IN THE RECORD.  I DON'T SEE ANYTHING FROM THE STATE TO

REBUT THAT.

SO ON THAT FACTUAL POINT, I THINK, YOU KNOW, WE'RE CLEARLY CORRECT, AND I THINK THAT'S THE SAME FACTUAL POINT THAT OTHER DISTRICT COURTS IN GRIFFIN AND REYES AND FITCH HAVE ALL AGREED WITH.

WITH RESPECT TO TAILORING, I DO THINK THAT IS ALSO IN PLAY HERE BECAUSE, YOU KNOW, THERE ARE OTHER WEBSITES LIKE EBAY, FOR INSTANCE, OR ESPN WHERE YOU CAN GO TO EBAY OR YOU CAN GO TO ESPN OR HULU OR SOME OTHER WEBSITE AND YOU CAN, YOU KNOW, BUY PRODUCTS WITHOUT HAVING TO DO AGE ASSURANCE.  YOU CAN WATCH, YOU KNOW, NBA HIGHLIGHTS WITHOUT HAVING TO DO AGE ASSURANCE.

BUT IF YOU WANT TO GO TO FACEBOOK MARKETPLACE AND BUY SOMETHING, YOU HAVE TO GET AGE ASSURANCE.

IF YOU WANT TO GO WATCH NBA HIGHLIGHTS ON YOUTUBE, YOUTUBE HAS TO DO AGE ASSURANCE.

I THINK IN TRYING TO AVOID THE ARGUMENT THAT THIS IS A CONTENT BASED AGE-ASSURANCE REQUIREMENT, THE STATE ADMITTED THAT IT IS A SPEAKER BASED AGE-ASSURANCE REQUIREMENT.  IT IS TARGETING OUR MEMBER'S WEBSITES.  SPECIFICALLY, IT'S SINGLING THEM OUT FOR A BURDEN THAT OTHER STATES, WHICH MAY HAVE SIMILARLY ADDICTIVE FEEDS, WHICH MAY HAVE THE SAME TYPE OF NOTIFICATIONS.

IF ESPN IS, YOU KNOW, SENDING NOTIFICATIONS AFTER SOMEBODY WINS A COLLEGE BOWL GAME AT 12:30 AT NIGHT TO SOME MINOR WHO IS INTERESTED IN THAT PARTICULAR TEAM, YOU KNOW, IT POSES THE

EXACT SAME PROBLEMS, BUT IT'S NOT REGULATED.

SO I THINK TAILORING IS A HUGE PROBLEM FOR THE STATE.  IT IS NOT A FACTUAL PROBLEM FOR US.

I DON'T KNOW IF YOUR HONOR HAS OTHER QUESTIONS WITH RESPECT TO THE AGE ASSURANCE PROVISION.

THE COURT:  WELL, THERE IS ONE, REASONABLY DETERMINE.  WHAT DOES THAT MEAN AND HOW DOES THAT COME INTO PLAY?  TELL ME YOUR THOUGHTS ON THAT.

MR. LEHOTSKY:  WELL -- SO I MEAN, MY THOUGHTS ARE IT DOESN'T ESPECIALLY MATTER WHAT THE STATE, YOU KNOW, ENDS UP COMING WITH --

THE COURT:  BECAUSE YOU'VE TOLD ME IT'S PER SE UNCONSTITUTIONAL.

MR. LEHOTSKY:  -- FOR THAT REQUIREMENT.

WELL, I THINK WHATEVER THEY COME UP, YOU KNOW, THIS IS AGE ASSURANCE, AND SO IT'S NOT GOING TO BE ENOUGH JUST TO SAY HOW OLD ARE YOU, RIGHT?  I MEAN, IF WE JUST ASKED THE QUESTION HOW OLD ARE YOU AND SOMEONE WRITES IN, OH, I'M 18.  LIKE, THAT'S NOT ASSURANCE, RIGHT?  THAT'S NOT WHAT THE STATUTE MEANS.  THAT'S, YOU KNOW, NOT WHAT THEY'RE TRYING TO GET AT BECAUSE, AGAIN, THE WHOLE PURPOSE BEHIND THIS LAW -- AND I'M NOT TRYING TO IMPUGN THE MOTIVES OF THE LEGISLATURE OF THE STATE OF CALIFORNIA.  I DO THINK THAT THEY ARE TRYING TO PROTECT CHILDREN AND THEY HAVE, YOU KNOW, THE SORT OF BEST INSTINCTS.

BUT WHAT THEY ARE TRYING TO DO, AS THE STATE ADMITS IN

ITS BRIEF, IS TO GET KIDS TO SPEND LESS TIME ONLINE, ON OUR SITES.  YOU KNOW, THEY ARE TRYING TO DETER KIDS FROM, YOU KNOW, USING THESE WEBSITES.

AND, YOU KNOW, IF I CAN MAYBE CIRCLE BACK TO THE OTHER POINT I WAS MAKING ABOUT THE SORT OF BACKDOOR AGE ASSURANCE, WHICH HAS TO BEGIN NOW, IS WE HAVE TO DO THIS SORT OF PUBLIC DISCLOSURE OF HOW MANY MINORS ARE ON AN ADDICTIVE FEED, THEN WE ALSO HAVE TO DISCLOSE THE NUMBER OF USERS FOR WHOM THE OPERATOR HAS RECEIVED VERIFIABLE PARENTAL CONSENT AND THE NUMBER OF MINOR USERS AS TO WHICH DEFAULTS ARE AND ARE NOT ENABLED.

SO BASICALLY YOU HAVE TO IMPLEMENT ALL OF THIS SCAFFOLDING OF HOW OLD ARE THESE PEOPLE AND WE HAVE TO DO IT IMMEDIATELY IN ORDER TO COMPLY WITH ALL OF THESE PROVISIONS.

SO I THINK THE WHOLE NOTION THAT THIS IS SOMETHING THAT DOESN'T HAVE TO HAPPEN UNTIL 2027 WON'T BE BURDENSOME NOW IS MISLEADING.  IT DOESN'T HELP US.  IT DOESN'T HELP OUR MEMBERS ANY TO HEAR THAT THERE MIGHT BE REGULATIONS COMING AT SOME POINT FROM THE STATE OF CALIFORNIA THAT MIGHT PROVIDE MORE CLARITY SINCE, YOU KNOW, OUR VIEW IS ANY CLARITY IS NOT GOING TO HELP ADDRESS THE FUNDAMENTAL CONSTITUTIONAL DEFECT.

THE COURT:  WE'LL HEAR FROM THE STATE WHY DIDN'T THEY JUST DO IT ALL ON JANUARY 1ST?  AND WHAT WAS THE REASON FOR THE DELAY TO 2027?  WE CAN PROBABLY GUESS WHAT THAT IS OR GUESS WHAT THEY MIGHT SAY TO GIVE YOUR CLIENTS AN OPPORTUNITY TO RAMP UP AND GEAR UP.

MR. LEHOTSKY: I WOULD ASSUME THAT THEY ARE TRYING TO PROVIDE MORE TIME FOR THAT.

OTHER STATES, YOU KNOW, HAVE NOT. SOME OTHER STATES HAVE DEADLINES THAT ARE MORE LIKE IN 2026 THAN 2027. BUT, AGAIN, YOU KNOW, THESE ARE NOT ISSUES THAT CAN BE ADDRESSED OVERNIGHT. THESE ARE VERY COMPLEX WEBSITES. AS I NOTED THE ENGINEERING AND COMPLIANCE TIME AND COSTS.

THE COURT: IT'S NOT IN THE RECORD THAT YOUR CLIENTS HIRE THE BEST AND BRIGHTEST ENGINEERS, I'M SURE, BUT MY SENSE IS THAT THEY DO AND THEY'RE EMINENTLY QUALIFIED TO CHALLENGE ANY PROBLEM THAT COMES.

MR. LEHOTSKY: YEAH. AND THEY COULD BE DOING OTHER THINGS, TOO. THERE'S AN OPPORTUNITY COST TO THAT, RIGHT? THE BEST AND THE BRIGHTEST ENGINEERS COULD BE WORKING ON CANCER.

THE COURT: REMOTELY.

MR. LEHOTSKY: ON WHAT?

THE COURT: REMOTELY.

MR. LEHOTSKY: REMOTELY.

THE COURT: GO AHEAD.

MR. LEHOTSKY: NO --

THE COURT: OKAY. LET ME HEAR FROM YOUR COLLEAGUE OPPOSITE ON THIS TOPIC THEN. THANK YOU VERY MUCH. I APPRECIATE THE HELP.

MR. KISSEL: I DIDN'T KNOW IF YOUR HONOR HAD QUESTIONS YOU WANTED TO START WITH OR IF I SHOULD --

THE COURT:  IF YOU WANT TO RESPOND TO ANYTHING, I'LL CERTAINLY GIVE YOU THAT OPPORTUNITY.

MR. KISSEL:  THANK YOU.  THERE ARE A FEW POINTS THAT I WOULD LIKE TO RESPOND TO.

ONE IS THAT I THINK THE COURT'S ATTENTION TO THE RENO AND ASHCROFT LINE OF CASES IS VERY MUCH THE APPROPRIATE WAY TO THINK ABOUT THE AGE ASSURANCE REQUIREMENTS.

IN PARTICULAR THE MUKASEY VERSUS ACLU, WHICH IS ACTUALLY A THIRD CIRCUIT CASE, BUT IT PROVIDES A GOOD OVERVIEW OF KIND OF THE PROCEDURAL HISTORY.

ONE THING THAT IS REALLY CLEAR IS THAT IF THE COURT WAS SAYING ANYTHING, IT WAS THAT THERE ISN'T A PER SE RULE ABOUT AGE ASSURANCE BECAUSE WHEN THE COURT REMANDED THE CASE TO THE DISTRICT COURT, IT SPECIFICALLY SAID PAY ATTENTION TO THE STATE OF THE TECHNOLOGY.

THE STATUTE WAS PASSED IN 1998.  I THINK IT FINALLY MADE IT BACK TO THE DISTRICT COURT IN SOMETHING LIKE 2004, 2005, AND SO EVEN THE PASSAGE OF SIX OR SEVEN YEARS, THE COURT FOUND VERY MUCH MATERIAL TO THE QUESTION OF WHAT KIND OF BURDEN DOES THE AGE ASSURANCE PLACE, THE AGE ASSURANCE REQUIREMENTS PLACE IN TERMS OF A PERSON'S ACCESS TO SPEECH.

AMONG OTHER THINGS ALSO, THOSE WERE VERY DIFFERENT CASES BECAUSE THE STATUTE AT ISSUE WAS ALSO VERY PLAINLY CONTENT BASED.  I MEAN, IT WAS AN ONLINE PORNOGRAPHY LAW THAT BASICALLY SAID, YOU KNOW, THAT -- YOU KNOW, BASICALLY POINTED TO A

SPECIFIC KIND OF CONTENT.

EVEN IN THAT REALM, TO YOUR HONOR'S POINT ABOUT THE LEVEL OF TAILORING, THE QUESTION WAS HOW MUCH OF AN INTEREST IS IN, A LEGITIMATE INTEREST IN CONTROLLING THIS KIND OF CONTENT ON A STRICT SCRUTINY ANALYSIS THERE, BUT ALSO IS THE BURDEN PROPORTIONAL TO THE HARM THAT IS BEING POINTED TO?

AND SO ALL OF THAT IS TO SAY IT'S VERY MUCH A SORT OF SITUATIONAL OR CIRCUMSTANTIAL QUESTION WHEN YOU'RE TALKING ABOUT AGE ASSURANCE.

AND I THINK THAT'S ALSO IMPORTANT BECAUSE WHEN WE'RE TALKING ABOUT WHAT THE SPECIFIC REQUIREMENT WILL BE IN 2027, IT'S NOT JUST A QUESTION OF CAN WE JUST DELAY EVERYTHING FOR TWO YEARS.  IT IS A QUESTION OF HOW CAN WE MAKE SURE THAT THIS STATUTE IS FEASIBLE, THAT IT OPERATES IN A WAY THAT IS -- THAT DOES WHAT WE WANT IT TO?

SO IT REALLY IS DESIGNED TO GIVE COMPANIES THE CHANCE TO FIND WHATEVER IS THE PROCESS THAT IS GOING TO WORK BEST.

AND PART OF THAT IS A RECOGNITION, AS WE MENTIONED IN OUR BRIEFING, THAT THERE ARE ALREADY, FOR AT LEAST SOME OF THE MEMBERS, THERE ARE REQUIREMENTS FOR AGE ASSURANCE IN OTHER COUNTRIES WHERE THESE COMPANIES OPERATE, THERE'S A FEDERAL STATUTE, COPPA, WHICH REQUIRES SOME FORM OF KNOWLEDGE OF THE AGE OF USERS ON THE PART OF AT LEAST SOME OF THESE COMPANIES.

THE COURT:  SO THIS IS NOT A CASE OF FIRST IMPRESSION TO THESE INDUSTRIES, THESE COMPANIES?  THEY'VE DEALT

WITH SOMETHING LIKE THIS BEFORE?

MR. KISSEL:  THIS IS NOT THE FIRST TIME THAT AT LEAST SOME OF THESE COMPANIES HAVE HAD TO FIGURE OUT IN SOME WAY THE AGE OF THEIR USERS.

THE COURT:  SO WHERE IN THE FIRST AMENDMENT DOES AGE VERIFICATION FIT?  WHERE IS THAT?  HOW DOES THAT WORK?

MR. KISSEL:  WELL, I THINK FOR A LAW LIKE THIS WHERE WE'RE TALKING ABOUT A LAW THAT IS, FIRST OF ALL, COMPLETELY NOT CONTENT BASED, THEN AT MOST WE'RE TALKING ABOUT A SORT OF INTERMEDIATE SCRUTINY ANALYSIS AND THAT'S VERY MUCH, FIRST OF ALL, WHAT SEPARATES THIS CASE FROM A CASE LIKE BROWN, BUT IT ALSO HAS TO DO WITH YOU HAVE ALL OF THESE OTHER QUESTIONS THAT COME UP ON INTERMEDIATE SCRUTINY SUCH AS ARE THERE OTHER AVENUES FOR THE SPEECH TO REACH THE PERSON WHO IS LISTENING OR FOR THE SPEAKER TO REACH THE LISTENER WITH THEIR SPEECH?

SO BECAUSE THAT IS SORT OF THE TAILORING THAT IS AT THE CENTER OF THAT KIND OF INQUIRY, THEN AGE ASSURANCE JUST BECOMES SORT OF ANOTHER QUESTION ABOUT, YOU KNOW, HOW DOES THE -- WHAT IS THE IMPACT OF THE LAW ON SPEECH AND HOW IS THE SPEECH ABLE TO FLOW?

AND IN THAT REGARD, I THINK IT'S -- I WANT TO MAKE SURE THAT I EMPHASIZE THE FACT THAT WHETHER PLAINTIFFS WANT TO SAY THIS IS A FACIAL CHALLENGE OR AN AS-APPLIED CHALLENGE, OR HOWEVER THE COURT WANTS TO THINK ABOUT IT, EITHER WAY, IF A COMPANY, FOR EXAMPLE, IS OPERATING IN A EUROPEAN COMPANY WHERE

AGE ASSURANCE IS ALREADY REQUIRED, IT MAY BE READY TO IMPLEMENT THIS TOMORROW.  I MEAN, I DON'T KNOW.  BUT THOSE KIND OF FACTUAL DISTINCTIONS, THEY BEAR ON THE BURDEN THAT IS PLACED, AND IT REALLY IS, YOU KNOW, AGAIN THE PLAINTIFF'S BURDEN HERE TO DEMONSTRATE THE UNCONSTITUTIONALITY OF THE BURDEN ON SPEECH THROUGHOUT THE ENTIRE SCOPE OF THE STATUTE.

AND THE VERY FACT THAT THE PLAINTIFF IS EMPHASIZING THE DIFFERENCES BETWEEN ITS PLATFORMS I THINK REALLY UNDERSCORES THAT POINT.

THE COURT:  THANK YOU.  HAVEN'T WE SEEN THAT CASES SEEM TO -- WHEN THEY LOOK AT AGE GATING IN REGARDS TO FEATURES OR CONTENT, THEY'VE BEEN FOUND UNCONSTITUTIONAL?

YOUR COLLEAGUE OPPOSITE SUGGESTS THAT, INCLUDING ALL OF THE RECENT -- THEY'VE BEEN VICTORIOUS IN MANY OTHER STATES ON SIMILAR GROUNDS.

MR. KISSEL:  THE CORE POINT IS THAT THIS LAW IS -- I MEAN, THIS IS HOW PLAINTIFF SORT OF STARTED THEIR ARGUMENT HERE.  THIS LAW IS SO DIFFERENT FROM THOSE LAWS.

IT'S ONE THING TO SAY -- I MEAN, I THINK IT STARTS TO LOOK A LOT MORE LIKE BROWN WHEN YOU SAY YOU CAN'T EVEN SEE ANY OF THIS CONTENT, YOU CAN'T EVEN ACCESS THIS CONTENT UNLESS YOU GO THROUGH AN AGE-ASSURANCE PROCESS.  AT LEAST IT'S SIMILAR IN THE SENSE THAT I HAVE NO WAY OF SEEING THE CONTENT OTHERWISE.

THIS LAW IS DIFFERENT BECAUSE ALL OF THE CONTENT IS STILL THERE.  I MEAN, IF ANYTHING, A USER HAS MORE CONTROL OVER THE

CONTENT THAT THEY SEE IF THEY'RE NOT RELYING ON A MACHINE LEARNING ALGORITHM THAT IS JUST SORT OF ANALYZING THEIR USER DATA TO CHOOSE THE MATERIAL THAT THEY SEE.

SO IT BECOMES A COMPLETELY DIFFERENT QUESTION IN TERMS OF ACCESS TO SPEECH, AND I WOULD SAY THAT THAT IS REALLY THE CHIEF DISTINGUISHING FACTOR.

THE COURT:  OKAY.  IS THERE ANYTHING IN THE RECORD THAT TALKS ABOUT CURRENT STATE OF AGE VERIFICATION TECHNOLOGIES OR HOW THAT LOOKS AND WHERE THAT'S GOING?

MR. KISSEL:  THERE MAY BE A LITTLE.  I DON'T WANT TO SPEAK OUT OF TURN, THERE MAY BE A LITTLE IN DR. EGELMAN'S BRIEF BECAUSE HE TOUCHES ON A LOT OF THINGS, BUT WHAT I WOULD UNDERSCORE IS ALL THE COURT REALLY NEEDS TO KNOW IS THAT IT'S -- THAT IF YOU LOOK AT IT THE WAY THE SUPREME COURT SAID IT SHOULD BE LOOKED AT, THE RENO AND ASHCROFT CASES, THAT BASICALLY WHATEVER THE STATE OF AGE ASSURANCE IS NOW, THAT'S A VERY RELEVANT FACTUAL QUESTION.  AND IT WAS PLAINTIFF'S BURDEN TO COME INTO COURT WITH THOSE FACTS AND TO DEMONSTRATE HOW ANY AGE-ASSURANCE BURDEN IS GOING TO DEMONSTRATE ITS MEMBERS, IS GOING TO AFFECT ITS MEMBERS.

AND THE OTHER POINT ON THAT IS THERE'S A REASON WHY WE THINK THIS CHALLENGE IS UNRIPE WITH REGARD TO THE AGE-ASSURANCE REQUIREMENTS BECAUSE IT DEPENDS ON WHAT THE REQUIREMENT IS.

I'M VERY MUCH NOT AN EXPERT, BUT I KNOW, FOR EXAMPLE, THAT THERE'S AN AGE-ASSURANCE MECHANISM THAT CAN TAKE A PICTURE

OF YOU AND ESTIMATE YOUR AGE, AND THAT IS BY THE WAY THE DIFFERENCE AS I UNDERSTAND IT BETWEEN AGE VERIFICATION AND AGE ASSURANCE, IS THAT AGE ASSURANCE IS MORE OF AN ESTIMATION OF A USER'S AGE THAN IT IS SORT OF A STRICT VERIFICATION REQUIREMENT.

BUT, FOR EXAMPLE, I MEAN, THE REASON THAT THE NATURE OF THE TECHNOLOGY IS IMPORTANT IS BECAUSE THE QUESTION IS, IS SPEECH CHILLED?  ARE ADULT USERS LESS LIKELY TO ACCESS THE SERVICES BECAUSE OF THE DIFFICULTY OF THE PROCESS?

THEN I MEAN HYPOTHETICALLY, MAYBE THE PROCESS IS SO EASY THAT YOU DON'T EVEN KNOW IT HAPPENED.  I MEAN, WE DON'T KNOW BECAUSE WE DON'T HAVE THAT IN THE RECORD, AND WE DON'T KNOW WHAT THE REQUIREMENTS ARE GOING TO BE.  SO THAT'S WHY I WOULD UNDERSCORE THAT POINT.

THE COURT:  OKAY.

MR. KISSEL:  I JUST WANT TO -- I MEAN, I THINK YOUR HONOR MENTIONED WE'RE GOING TO TALK ABOUT DISCLOSURES, SO WE CAN SORT A PUT A PIN ON THAT.

I JUST WOULD NOTE THAT REALLY IT'S THE ZAUDERER STANDARD THAT THE NINTH CIRCUIT RECENTLY DISCUSSED AND NETCHOICE VERSUS BONTA, WHICH IS ALSO THE NAME OF THIS CASE.

IN THE MOODY CASE THE SUPREME COURT DISCUSSED IT IN TERMS OF USING A SORT OF -- WHEN THE INFORMATION IS UNCONTROVERSIAL AND FACTUAL AND THERE ISN'T AN UNDUE BURDEN ON SPEECH, THAT THOSE ARE LOOKED AT FROM A RATIONAL BASIS STANDARD.

AND THAT'S ALL THE STATUTE REQUIRES.  IT DOESN'T REQUIRE THE OPERATORS OF THESE SITES TO LABEL THEIR CONTENT IN A PARTICULAR WAY.

UNLESS THE COURT HAS ANY OTHER QUESTIONS?

THE COURT:  NO, I DON'T.

LET ME TURN TO MR. LEHOTSKY.  DO YOU WANT TWO MINUTES ON THIS BEFORE WE LEAVE AGE VERIFICATION?  AND I'LL GIVE THE DEFENSE AN OPPORTUNITY TO RESPOND AS WELL.

MR. LEHOTSKY:  YES, YOUR HONOR.  THANK YOU.  YOU READ MY MIND.

THE COURT:  SURE.

MR. LEHOTSKY:  I THINK FIVE VERY BRIEF POINTS.

ONE, RENO AND ASHCROFT, THEY WERE CASES ABOUT PORNOGRAPHY, WHICH IS UNPROTECTED SPEECH FROM MINORS.

HERE, OF COURSE, WE ARE TALKING ABOUT PROTECTED SPEECH. WE'RE NOT TALKING AT ALL ABOUT ANY MATERIAL THAT IS OBSCENE FOR MINORS.  SO WE HAVE AN EVEN STRONGER CASE FOR WHY THIS IS PROBLEMATIC UNDER THE FIRST AMENDMENT BECAUSE WE'RE TALKING ABOUT CLEARLY PROTECTED SPEECH ON OUR MEMBER'S WEBSITES THAT MINOR USERS CANNOT ACCESS, WHICH VIOLATES THE RIGHTS OF BOTH OUR MEMBERS AS DISSEMINATORS AND MINORS.

SECOND, COPPA, THE CHILDREN'S ONLINE PRIVACY PROTECTION ACT, THAT DOES IMPOSE REQUIREMENTS ON ACCOUNTS OF USERS UNDER 13.  ALL OF OUR MEMBERS, THEY BAN USERS UNDER 13 SO THAT THEY DON'T HAVE TO ADDRESS THAT AGE-ASSURANCE REQUIREMENT, WHICH

PROVES OUR POINT PRECISELY.

THIS IS WHAT WILL HAPPEN IF THIS LAW IS ALLOWED TO TAKE EFFECT.  IT WILL RESULT IN LESS ACCESS FOR SPEECH FOR MINORS.

AGAIN, THE STATE IS COMPLETELY AVOIDING TRYING TO IGNORE THE RIGHTS, THE FIRST AMENDMENT RIGHTS OF MINOR USERS, THOSE 13 TO 17 YEARS OLD WHO WILL LOSE THEIR ACCESS TO CERTAIN OF THESE FEATURES IN RESPONSE TO THE AGE-ASSURANCE REQUIREMENTS.

THIRD, THERE'S SOME SPECULATION ABOUT WHETHER OUR MEMBERS WOULD BE ABLE TO COMPLY EASILY BECAUSE OF REQUIREMENTS IN OTHER COUNTRIES.  THERE IS ZERO EVIDENCE ABOUT THE FEASIBILITY OR THE COST OR ANYTHING LIKE THAT IN THE RECORD.

THE ONLY EVIDENCE IS OUR EVIDENCE, WHICH SAYS IT'S COSTLY, IT'S NOT EASY, IT'S NOT FEASIBLE.

THE FACT THAT THE STATE WANTS TO IMPOSE THIS REQUIREMENT FIRST AND THEN KIND OF FIGURE IT OUT LATER AND SEE IF THEY CAN MAKE IT REASONABLE BY 2027, IT'S ALL THE MORE REASON TO IMPOSE A PRELIMINARY INJUNCTION.  IF SOMEHOW THEY DO MANAGE TO FIGURE IT OUT AND CIRCUMSTANCES CHANGE IN THREE YEARS, I SUPPOSE WE COULD FIGURE OUT, YOU KNOW, WHAT TO DO THEN.

FOURTH, I WOULD SAY AGE ASSURANCE IS A GOVERNMENT MANDATED GATEWAY ON SPEECH, ON ACCESS TO THE PERSONALIZED FEEDS THAT OUR MEMBERS PROVIDE TO MINOR USERS AND AS SUCH IT IS A CATEGORICAL ABRIDGEMENT, A BURDEN ON FIRST AMENDMENT RIGHTS.

AND THIS IS MY FIFTH AND I THINK FINAL POINT, WHICH IS THAT EVEN IF IT WAS EASY TO DO THAT, EVEN IF THERE WERE SORT OF

TURNKEY SOLUTION, SOMETHING THAT OUR MEMBERS COULD IMPLEMENT QUICKLY AND EASILY OR AT LEAST BY 2027, IT WOULD STILL VIOLATE THE FIRST AMENDMENT, EVEN IF IT'S EASY FOR US TO DO IT BECAUSE IT SERVES AS THAT GATEWAY, THAT GOVERNMENT MANDATED CHECK FOR GETTING ACCESS TO SPEECH.  IMAGINE IF YOU IMPOSED AGE ASSURANCE FOR BUYING A BOOK, BUYING A MOVIE, BUYING A VIDEO GAME.  IT'S OBVIOUSLY UNCONSTITUTIONAL.

THANK YOU, YOUR HONOR.

THE COURT:  OKAY.  WELL, LET'S TURN TO ADDICTIVE FEEDS.  AND WHAT SHOULD I KNOW ABOUT THAT?

MR. LEHOTSKY:  WELL, SO I GUESS FIRST, AS I'VE BEEN SAYING REPEATEDLY THIS MORNING, I'D LIKE TO REJECT THE CATEGORIZATION OF IT AS AN ADDICTIVE FEED.

THE COURT:  I UNDERSTAND.

MR. LEHOTSKY:  MR. KISSEL REFERRED TO THE BROWN CASE AS A CASE INVOLVING A MORAL PANIC LAW.

THIS IS A MORAL PANIC LAW.  THIS IS, YOU KNOW, THE PRECISE TYPE OF LAW THAT IS, YOU KNOW, REPEATED THROUGHOUT HISTORY THAT WAS RELATED IN THE BROWN OPINION FROM JUSTICE SCALIA.

YOU KNOW, VIDEO GAMES, TELEVISIONS, ROCK N' ROLL MUSIC, COMIC BOOKS, PENNY DREADFULS, ALL OF THESE THINGS ARE SUPPOSEDLY POISONING THE MINDS OF AMERICA'S YOUTH.

NOW IT IS THESE PERSONALIZED FEEDS, WHICH THE STATE OF CALIFORNIA ATTACHES THE PEJORATIVE LABEL OF ADDICTIVE FEEDS.

I WANT TO START WITH A LITTLE BIT OF BACKGROUND AND THE

SUPREME COURT PRECEDENT FROM NOT JUST MOODY BUT ALSO PACKINGHAM.  SO IN PACKINGHAM, YOU KNOW, THE SUPREME COURT WAS DEALING WITH A LAW THAT WAS RESTRICTING ACCESS BY ADULTS TO THE INTERNET AND THE SUPREME COURT, YOU KNOW, SAID SOME VERY IMPORTANT THINGS ABOUT OUR MEMBERS AND THE ROLE THAT SOCIAL MEDIA PROVIDES SAYING, QUOTE, "ALL AMERICANS CAN," QUOTE, "GAIN ACCESS TO INFORMATION AND COMMUNICATE WITH ONE ANOTHER ON ANY SUBJECT THAT MIGHT COME TO MIND."

AS I NOTED, THERE IS A LOT OF BENEFICIAL, POSITIVE SPEECH THAT IS ON OUR MEMBER'S WEBSITES.  OUR DECLARATIONS GET INTO THIS AT LENGTH.  THE SURGEON GENERAL'S REPORT, WHICH IS PART OF THE FACTUAL RECORD BEHIND THIS LAW, ALSO ACKNOWLEDGES ALL OF THE BENEFITS THAT COME FROM THE PERSONALIZED FEED THAT OUR WEBSITES EACH PROVIDE.

NOW, EACH FEED MIGHT BE A LITTLE BIT DIFFERENT, YOU KNOW, THE FACEBOOK MAIN PAGE IS A LITTLE BIT DIFFERENT FROM THE YOUTUBE PAGE, THE PINTEREST PAGE IS GOING TO BE A LITTLE BIT DIFFERENT FROM THE INSTAGRAM PAGE, BUT THE CORE FEATURES ARE ALL THE SAME OF HAVING POLICIES ABOUT THE TYPE OF CONTENT THAT IS ACCEPTABLE AND THAT IS GOING TO APPEAR ON THE WEBSITE, AND THEN TRYING TO DELIVER THE BEST, HIGHEST QUALITY, MOST INTERESTING CONTENT TO ALL OF THE USERS AND TRYING TO TAILOR THAT.

IT IS SORT OF A, YOU KNOW, UNIQUE INDIVIDUALIZED TAILORED SPEECH PRODUCT THAT OUR MEMBERS PROVIDE, AND THIS IS WHAT THE

STATE TRIES TO REGULATE.  THIS IS SORT OF THE CORE OF THE STATE'S REGULATION.

AGAIN, I TAKE THE POINT THAT THE STATE IS NOT BANNING ALL SOCIAL MEDIA ACCOUNTS OR PROHIBITING ANYBODY FROM MAKING AN ACCOUNT, BUT THEY ARE TRYING TO ROB WHAT THE SUPREME COURT IN MOODY SAID WAS THE CORE OF OUR EDITORIAL DISCRETION OF OUR CURATION FROM OUR PRODUCT.

AGAIN, THIS IS THE DECISION IN MOODY, THAT QUOTE, "DECISIONS ABOUT WHICH THIRD PARTY CONTENT TO DISPLAY, HOW THE DISPLAY WILL BE ORDERED AND ORGANIZED ARE EXPRESSIVE CHOICES AND RECEIVE FIRST AMENDMENT PROTECTION."

THIS IS EXACTLY WHAT OUR MEMBERS ARE DOING WHEN THEY'RE COMING UP WITH THESE PERSONALIZED FEEDS, THEY'RE MAKING CHOICES.

THE COURT:  RIGHT.  PARDON ME FOR INTERRUPTING YOU.

THAT'S EXPRESSIVE, THAT'S -- ALL OF THAT THAT YOUR CLIENTS DO, THAT IS EXPRESSIVE IN YOUR VIEW, AND, THEREFORE, SHOULD BE PROTECTED?

MR. LEHOTSKY:  YES, YOUR HONOR.  YES.

THE COURT:  OKAY.

MR. LEHOTSKY:  YES, THAT IS EXACTLY WHAT MOODY SAID WAS PROTECTED.

NOW, I THINK WE'VE ALREADY TALKED A LITTLE BIT ABOUT FOOTNOTE 5.  I'M NOT SURE IF YOU WANT TO TALK ABOUT THAT ISSUE IN THIS CONTEXT OR IN ONE OF THE OTHER.

THE COURT:  IT COMES UP.  IT RUNS CONCURRENT.  IT'S THEMATIC THROUGH THIS, ISN'T IT, IT JUST SEEMS TO ME TO BE?

AS JUSTICE KAGAN SUGGESTED, THAT SPECIFIC ANALYSIS OF ALGORITHMIC CREATION AND IMPLEMENTATION, ET CETERA, IS PERHAPS A DECISION FOR ANOTHER DAY.

BUT DOES IT TOUCH HERE?  DO WE NEED TO LOOK AT IT HERE?

MR. LEHOTSKY:  I DON'T THINK SO, YOUR HONOR, BECAUSE OF COURSE THE MOODY CASE WAS DEALING WITH FACEBOOK AND YOUTUBE AND THE MAIN FEEDS OF BOTH OF THOSE.  AND SO JUSTICE KAGAN'S OPINION VERY CLEARLY STATES THAT THOSE WEBSITES, THOSE COVERED MEMBERS, THEIR WEBSITES, THEIR SPEECH PRODUCTS, THOSE ARE PROTECTED BY THE FIRST AMENDMENT, AND THERE IS NOT ANY QUESTION ABOUT IT.  THAT IS WHAT THE SUPREME COURT DECIDES IN ITS MAJORITY OPINION.

IT IS THEN RESERVING IN FOOTNOTE 5, YOU KNOW, QUOTE, "NOT DEALING WITH FEEDS WHOSE ALGORITHMS RESPOND SOLELY TO HOW THE USERS ACT ONLINE," END QUOTE.

AGAIN, AS I SAID IN THE OPENING, THAT DOESN'T HAVE ANYTHING TO DO WITH US OR OUR MEMBERS, ANY OF THE FIVE, YOU KNOW, COVERED WEBSITES THAT ARE INVOLVED.  NONE OF OUR WEBSITES HAVE ALGORITHMS THAT RESPOND SOLELY TO HOW USERS ACT ONLINE.

AGAIN, ALL OF OUR MEMBER'S WEBSITES ARE PROVIDING THEIR OWN UNIQUE EDITORIAL JUDGMENT AND DISCRETION.  THEIR POLICIES DIFFER FROM WEBSITE TO WEBSITE, BUT THAT DOES NOT MATTER FOR THE PURPOSE OF THE FIRST AMENDMENT ANALYSIS.

THE COURT:  AS DONE BY HUMAN DECISION, HUMAN ANALYSIS?

MR. LEHOTSKY:  YES, THAT'S RIGHT.  THESE ARE, YOU KNOW, HUMAN BEINGS WHO WRITE CODE, WHO COME UP WITH THE POLICIES.  THEY HAVE, YOU KNOW, TRUST AND SAFETY TEAMS AT EACH OF THESE COMPANIES WHO DECIDE WHAT IS ACCEPTABLE CONTENT, WHAT TYPE OF ONLINE COMMUNITY DO THEY WANT TO FOSTER WITH THE INFORMATION THAT APPEARS ON THEIR WEBSITE.  ALL OF THAT IS DICTATED ULTIMATELY BY HUMANS WORKING AT A COMPANY AND THEN IMPLEMENTED THROUGH COMPUTER CODE, BUT IT'S ALL DRIVEN BY PEOPLE.

THE COURT:  OKAY.  SO IT'S NOT A SITUATION WHEN WE LOOK AT IT SOMEONE CREATES, AN ENGINEER CREATES AN ALGORITHM, AND THEN SHE PRESENTS IT, AND THEN AT SOME POINT, I DON'T KNOW THE TECHNOLOGY, BUT AT SOME POINT THE ALGORITHM IS SELF-LEARNING AND SELF-TEACHING AND THEN IT JUST STARTS DOING EDITING ON ITS OWN.

DOES THAT STILL HAVE A HUMAN TOUCH TO IT?

MR. LEHOTSKY:  SO I THINK YES, BECAUSE OF COURSE THAT CODE THAT WOULD THEN HAVE THAT MACHINE LEARNING, THAT ABILITY TO, YOU KNOW, IMPROVE, INNOVATE, ADJUST IS STILL ULTIMATELY CREATED BY PEOPLE.  IT WAS STILL PEOPLE WHO CREATED THE CODE.

SO I DON'T THINK THERE'S ANY CONSTITUTIONALLY SIGNIFICANT DIFFERENCE, BUT I WOULD ALSO SAY THAT EVEN IF WE THOUGHT WE

WERE DEALING WITH ALGORITHMS THAT WERE SOLELY RESPONDING TO HOW USERS ACT ONLINE AND WHAT KIND OF INFORMATION THEY WANT, THAT WOULD BE PROTECTED BY THE FIRST AMENDMENT.  THERE'S NO REASON WHY IT WOULDN'T BE.

YOU KNOW, IF YOU HAVE A BOOK PUBLISHER WHO SAYS, BOY, I REALLY THINK THAT MY CUSTOMERS WHO BUY THE BOOKS REALLY WANT TO READ BOOKS ABOUT GARDENING, WE SHOULD START A GARDENING SERIES. WE SHOULD HIRE SOME EDITORS WHO KNOW ABOUT GARDENING.  WE SHOULD HIRE SOME AUTHORS WHO KNOW ABOUT GARDENING.  IT'S ALL RESPONDING TO WHAT THE USER WANTS, AND THAT IS EXACTLY WHAT THE FIRST AMENDMENT PROTECTS.

AGAIN, YOU KNOW, TO SORT OF RESTRICT WHAT MOVIE STUDIOS OR TELEVISION STUDIOS OR OTHER CREATORS, DISSEMINATORS OF CONTENT COULD COME UP WITH JUST BECAUSE IT MATCHES UP WITH WHAT PEOPLE LIKE, THAT -- THERE'S NO BASIS IN THE FIRST AMENDMENT FOR DOING THAT.

I THINK WHAT JUSTICE KAGAN WAS SUGGESTING IS THAT, OKAY, I KNOW THAT THERE IS SOME CONCURRING OPINIONS, AND THERE'S AN OPINION FROM JUSTICE ALITO, AND I'M JUST GOING TO DROP A FOOTNOTE TO SAY I'M NOT DEALING WITH THAT.

BUT THERE -- I DON'T THINK THAT THEY HAVE ANY FIRST AMENDMENT PRECEDENT THAT WOULD SUGGEST THAT THE FIRST AMENDMENT ISSUE SHOULD COME OUT ANY OTHER WAY EVEN IF WE WERE DEALING WITH SOMETHING THAT WAS RESPONDING SOLELY TO HOW USERS ACTED ONLINE.

THE COURT: OKAY. IS THAT HOW THE TECHNOLOGY WORKS NOW? DOESN'T IT FOLLOW, TECHNOLOGY WILL TRACK SOMEBODY'S GARDENING INTEREST IN FLYING, INTEREST IN PAINTING, AND THEN PERHAPS PROVIDE LINKS INFORMATION ACCORDING TO THOSE RESPONSES, OR EXCUSE ME, ACCORDING TO THOSE INTERESTS?

MR. LEHOTSKY: YES. THAT IS WHAT THE STATE OF CALIFORNIA INTENDS TO REGULATE IS OUR ABILITY TO, YOU KNOW, REACT TO --

THE COURT: TO MATCH AN INTEREST?

MR. LEHOTSKY: YEAH. IF I SEE, OKAY, THIS PERSON IS FROM BUFFALO, THEY MIGHT BE INTERESTED IN THIS VIDEO OF JOSH ALLEN, YOU KNOW, THROWING A TOUCHDOWN LAST WEEKEND OR MAYBE THEY WANT TO SEE THIS STORY ABOUT NIAGARA FALLS.

SO THERE IS INFORMATION THAT IS, YOU KNOW, COLLECTED, YOU KNOW, ONLINE FROM USERS, AND THAT IS EXACTLY WHAT THE STATE SEEKS TO PROHIBIT US FROM DOING IS FROM, YOU KNOW, TAKING THAT AS AN ASPECT OF OUR CURATION OF, YOU KNOW, DEVELOPING OUR SPEECH PRODUCTS INTO PROHIBITED.

THE COURT: OKAY.

MR. LEHOTSKY: SO THERE'S TWO SIDES OF THE COIN. LIKE, THAT VIOLATES OUR FIRST AMENDMENT RIGHTS, THE FIRST AMENDMENT RIGHTS OF OUR MEMBERS AS DISSEMINATORS BUT ALSO THE FIRST AMENDMENT RIGHTS OF THE PEOPLE WHO, YOU KNOW, ARE THE USERS, YOU KNOW, WHETHER THEY'RE ADULTS.

THE COURT: THEY HAVE A RIGHT TO RECEIVE? DO THEY

HAVE A RIGHT TO RECEIVE, IS THAT WHAT YOU'RE SAYING?

MR. LEHOTSKY:  YES, YES, ABSOLUTELY.

THE COURT:  UNSOLICITED, THEY HAVE A RIGHT TO RECEIVE UNSOLICITED INFORMATION FROM YOUR CLIENTS ABOUT THEIR PERSONAL OTHERWISE EXPRESSED INTEREST?

MR. LEHOTSKY:  YES, ABSOLUTELY.

THE COURT:  OKAY.

MR. LEHOTSKY:  AND SO I'M NOT SURE IF YOUR HONOR HAS PARTICULAR QUESTIONS ABOUT, YOU KNOW, THE PERSONALIZED FEEDS AND THE REGULATION OF THEM.

THE COURT:  WELL, I'M JUST THINKING ABOUT THE FEEDS BEING EXPRESSIVE.  I THINK YOU'VE TOLD ME THAT THEY ARE, AND EVERY FEED IS EXPRESSIVE IN YOUR VIEW.  EVERYTHING THAT IS SENT OUT HAS AN EXPRESSIVE QUALITY TO IT; IS THAT RIGHT?  IS THAT WHAT I UNDERSTAND YOU TO SAY?

MR. LEHOTSKY:  YES, I THINK THAT'S RIGHT.  AND, YOU KNOW --

THE COURT:  AND WHAT IS THE EXPRESSION, HELP ME WITH THAT, BUFFALO?  WHAT IS THE EXPRESSION THAT'S -- WHAT IS THAT? OKAY.  SOMEONE -- AS YOU SAY, USING YOUR HYPOTHETICAL, SOMEONE IS INTERESTED IN NIAGARA FALLS AND THEN THEY GET INFORMATION ABOUT THE BEST HOTELS, OR WHATEVER THAT IS, WHAT IS EXPRESSIVE ABOUT THAT?

MR. LEHOTSKY:  WELL, I SUPPOSE AT A VERY HIGH LEVEL IT IS -- ARE MEMBERS SAYING YOU MIGHT BE INTERESTED IN THIS,

YOU MIGHT ENJOY READING THIS, YOU MIGHT WANT TO STAY AT THIS HOTEL.  IT IS CLEARLY EXPRESSIVE.  I MEAN, AT A LITERAL LEVEL, IT IS SAYING, IT IS SPEAKING I THINK, YOU KNOW, YOU MIGHT BE INTERESTED IN THIS, I THINK YOU MIGHT LIKE THIS VIDEO, I THINK YOU MIGHT LIKE THIS HOTEL, I THINK YOU MIGHT BE INTERESTED IN NIAGARA FALLS.  IT IS ALSO EXPRESSING THAT MESSAGE THAT IS BEHIND IT AND IT IS OUR --

THE COURT:  A COMMERCIAL MESSAGE?

MR. LEHOTSKY:  WHAT IS THAT?

THE COURT:  A COMMERCIAL MESSAGE?

MR. LEHOTSKY:  WELL, IT'S NOT COMMERCIAL SPEECH. YOU KNOW, IF COMMERCIAL SPEECH IS DEFINED AS I'M PROPOSING AN ECONOMIC TRANSACTION.  SO, YOU KNOW, I WOULD LIKE TO SELL YOU SOMETHING, OBVIOUSLY YOUTUBE OR FACEBOOK OR INSTAGRAM, THEY'RE NOT SELLING THE HOTEL.

THE COURT:  WHAT I'M SAYING IS I'M SELLING YOU A NIGHT FREE AT THE NIAGARA FALLS HOTEL IF YOU SIGN UP WITHIN THE NEXT 30 MINUTES.

MR. LEHOTSKY:  WELL, THAT'S NOT -- I GUESS WE'RE TALKING ABOUT WHAT IS OUR PERSONALIZED FEED.

OUR PERSONALIZED FEED IS THERE IS SOMEONE OVER HERE WHO IS TALKING ABOUT THIS HOTEL, AND YOU MIGHT WANT TO READ WHAT THEY HAVE TO SAY ABOUT THIS HOTEL.  THERE'S THIS VIDEO OF JOSH ALLEN, AND YOU MAY WANT TO SEE THIS VIDEO.

THE COURT:  YOU'RE NOT SENDING THE COMMERCIAL?

MR. LEHOTSKY:  IT'S NOT -- THERE ARE ADS ON THESE SITES, AND SO THERE MIGHT BE AN AD FROM, YOU KNOW, TIDE OR NIKE THAT APPEARS ALONGSIDE A VIDEO OR A POST, AND, OF COURSE -- I MEAN, THIS IS THE WAY THAT RADIO, TELEVISION AND MOST OF THE INTERNET MAKES THEIR REVENUE IS BY ADVERTISING.

YOU KNOW, A TELEVISION STATION WANTS PEOPLE TO KEEP WATCHING TELEVISION SO THAT THEY WILL BE ABLE TO GET PEOPLE TO WATCH THEIR ADS, AND THE MORE PEOPLE THAT WATCH THEIR ADS, THE MORE MONEY THEY CAN MAKE.

SAME WITH RADIO STATIONS.  SAME WITH NEWSPAPERS.  THE SAME THING THAT WE HAVE WITH THE NEWSPAPER.  THE MORE PEOPLE THAT ARE INTERESTED IN WHAT WE HAVE IN THE NEWSPAPER, THE MORE WILL BUY IT AND THE MORE ADVERTISERS WILL WANT TO PAY US FOR IT.

BUT THAT DOES NOT MAKE THE STORIES IN THE NEWSPAPER, THE ADS ON T.V. OR THE MUSIC ON THE RADIO OR THE TELEVISION SHOW COMMERCIAL SPEECH.  YOU KNOW, IT IS SPEECH.

THE COURT:  THOSE ARE ALL SEPARATE IN YOUR VIEW, THE ADS ARE ALWAYS SEPARATE.  SO HERE'S HOTELS IN BUFFALO OR AN ARTICLE ABOUT HOTELS IN BUFFALO AND ATTACHED TO THAT INFORMATIONAL PIECE IS HOTEL RATES.  THAT'S FROM THE ADVERTISER, AND YOU'RE SAYING THAT'S SEPARATE THAN WHAT YOUR CLIENT DOES?

MR. LEHOTSKY:  CORRECT.  AND THE STATE IS NOT SEEKING TO REGULATE THAT.

THE COURT:  EXACTLY.

MR. LEHOTSKY:  THERE'S A SEPARATE STATUTE IN CALIFORNIA THAT REGULATES ADVERTISING, YOU KNOW, UNDER THE CONSUMER PROTECTION CODE.

THE COURT:  I WAS CURIOUS ABOUT THIS.  I'M GOING A LITTLE BIT OUTSIDE THE LANE, BUT I'M JUST CURIOUS ABOUT YOUR ANALYSIS OF HOW THOSE TWO WORK AND HOW THE INTERNET WORKS MONETIZING ADS, ET CETERA.  AND SO I APPRECIATE THAT.

MR. LEHOTSKY:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  YOUR CLIENTS PROVIDING, AGAIN WITH NIAGARA FALLS, HERE'S AN ARTICLE YOU MIGHT BE INTERESTED IN AND IT'S EXPRESSIVE?

MR. LEHOTSKY:  YES, YOUR HONOR.

THE COURT:  OKAY.  AND OTHERWISE PROTECTED.  THANK YOU.

YOU CAN CONTINUE IF YOU HAVE ANYTHING ELSE YOU WANT TO TALK ABOUT HERE.

MR. LEHOTSKY:  YOUR HONOR, THERE ARE SOME OTHER POINTS THAT THE STATE HAD MADE ABOUT TIME, PLACE, AND MANNER RESTRICTIONS, YOU KNOW, THE HARMS TO MINOR USERS, ALLEGED HARMS FROM SOCIAL MEDIA.  I'D LIKE TO ADDRESS THOSE AT SOME POINT, BUT I DON'T HAVE TO ADDRESS THEM NOW IN THE CONTEXT OF THIS QUESTION.

THE COURT:  SURE.  I'LL CERTAINLY GIVE YOU THE OPPORTUNITY TO RESPOND TO THOSE.

WHAT ABOUT THE SITUATION WITH THESE MESSAGING, I GUESS

I'LL CALL IT THAT, WHERE THE INTEREST IN BUFFALO HOTELS, NIAGARA FALLS HOTELS, AND SOMETIMES THERE'S A POSITION THAT SOMEONE MIGHT BE ON THE INTERNET AND THEY MIGHT LOOK TO SEE, WELL, I'M INTERESTED IN, WHATEVER IT IS, A POSITION ON ECONOMICS, AND I THINK IT SHOULD BE MORE KEYNESIAN THAN SOMETHING ELSE, AND THEY GET INFORMATION THAT IS THE OPPOSITE VIEW OF THAT.  DOES THAT MATTER?  IS THAT THE SAME THING?

SO IT'S NOT -- I GUESS WHAT I'M TRYING TO SAY IS MAYBE IT'S NOT SO MUCH THAT YOU'RE INTERESTED IN THIS, BUT HERE'S AN ARTICLE THAT IS CONTRARY TO THAT.

DOES THAT CHANGE ANYTHING?

MR. LEHOTSKY:  WELL, I DON'T THINK IT WOULD IN TERMS OF WHETHER IT'S EXPRESSIVE OR WHETHER THE WEBSITE'S DELIVERY OF THAT INFORMATION IS SPEECH OF THE WEBSITE.  IT CLEARLY STILL IS.

I WOULD SAY, THOUGH, THAT IT DOES ADDRESS ONE OF THE ARGUMENTS THAT THE STATE IS MAKING, WHICH IS THEY SAY, WELL, THIS DOESN'T REALLY AFFECT SPEECH BECAUSE USERS CAN STILL GO AND SEARCH FOR SOMETHING DIRECTLY.  LIKE, THEY CAN EXPRESSLY ASK FOR SOMETHING.

SO THEY CAN SAY I WOULD LIKE INFORMATION ABOUT KEYNESIAN ECONOMICS, AND THEY CAN TYPE THAT IN TO SEARCH IN YOUTUBE OR FACEBOOK AND THEY CAN GET SOMETHING BACK.

HOWEVER, IF WE'RE PROHIBITED FROM PROVIDING THOSE TYPES OF PERSONALIZED TAILORED FEEDS, THE SEARCH RESULT QUALITY IS GOING

TO SUFFER.

IF YOU HAVE INFORMATION ABOUT A USER AND, OH, THIS USER IS FROM BUFFALO AND REALLY LIKES THE BUFFALO BILLS AND ALSO IS REALLY INTERESTED IN KEYNESIAN ECONOMICS AND SEE ALL OF THESE POSTS THAT HAVE BEEN LIKED ABOUT ECONOMICS IN DIFFERENT VIDEOS.

YOU KNOW, IF YOU DON'T HAVE THAT INFORMATION, IT'S GOING TO MAKE THE SEARCH RESULT, IT'S GOING TO MAKE IT HARDER FOR THAT INDIVIDUAL TO GO OUT AND SORT OF FIND SOMETHING ON THEIR OWN BECAUSE THEY'RE NOT GOING TO HAVE THAT, YOU KNOW, HIGHER QUALITY, YOU KNOW, RESULTS THAT THE WEBSITE IS PROHIBITED FROM DELIVERING.

THE COURT:  OKAY.

MR. LEHOTSKY:  ABSENT PARENTAL CONSENT OF COURSE.

THE COURT:  SURE.  THANK YOU.

MR. KISSEL.

MR. KISSEL:  THANK YOU, YOUR HONOR.

I WANT TO START BY ADDRESSING OR JUST RESPONDING TO A COUPLE OF THE SPECIFIC POINTS.  ONE IS THAT PLAINTIFF MAKES THIS ARGUMENT HERE AND IN THE REPLY THAT THE STATE IS IGNORING THE RIGHTS OF MINORS, THE RIGHTS OF MINORS TO ACCESS INFORMATION.

THE STATE IS NOT DOING THAT.  I DON'T THINK THAT THE QUESTION IS PARTICULARLY RELEVANT WHEN WE'RE TALKING ABOUT THE NATURE OF THE ACTIVITY THAT IS BEING REGULATED, WHETHER THE RIGHT ARISES FROM THE USER OR THE PERSON WHOSE -- YOU KNOW, THE

OPERATOR OF THE SITES.

IN PARTICULAR, THERE'S A CASE CALLED BOARD OF EDUCATION VERSUS PICO, WHICH I THINK IS FROM 1982, SUPREME COURT CASE, THAT TALKS ABOUT WHEN YOU'RE TALKING ABOUT A SITUATION WHERE A LISTENER'S SPEECH RIGHTS OR A LISTENER'S FIRST AMENDMENT RIGHTS ARE AT ISSUE, THEY REALLY FLOW FROM THE SPEAKER'S FIRST AMENDMENT RIGHTS.  I THINK IT'S A QUESTION OF FRAMING.  I DON'T KNOW THAT IT'S A PARTICULARLY RELEVANT DETERMINATION.

THE OTHER IS A QUESTION ABOUT THE WORD "ADDICTIVE."  I DON'T THINK THAT THE COURT WILL NEED TO MAKE ANY FINDINGS ABOUT THE WORD "ADDICTIVE."  THERE'S PLENTY OF INFORMATION IN THE RECORD THAT WE'VE PROVIDED IN TERMS OF HABIT FORMING USE, WHETHER WE'RE TALKING ABOUT SORT OF THE PRECISION OF SPECIFIC WORDS.  I DON'T KNOW THAT THE MEANING OR THE RELEVANCE OF THAT SPECIFIC WORD IS GOING TO MAKE A DIFFERENCE IN THE OUTCOME. I'LL GO FROM THERE.

IN TERMS OF BROWN, WHICH I'M SURE WE'LL KEEP COMING BACK TO, THE QUESTION OF WHAT IS THE DIFFERENCE BETWEEN COMIC BOOKS AND VIOLENT VIDEO GAMES VERSUS THE KIND OF CONTENT FEEDS THAT ARE REGULATED BY THIS SITE, I MEAN, ON THE ONE HAND THE QUESTION IS ONE OF THOSE ARE SPECIFIC TYPES OF CONTENT OR SPECIFIC TYPES OF EXPRESSION AND THE OTHER IS A DESIGN FEATURE OF THE SITES.  I THINK FROM A SORT OF BIGGER PICTURE, WE DON'T REALLY KNOW WHAT THE SPEECH, THE NATURE OF THE SPEECH SUCH AS IT IS IN THESE CONTENT FEEDS IS OR MIGHT BE.

AND IF THERE'S ANYTHING TO TAKE AWAY FROM MOODY BEYOND THE SORT OF BASIC HOLDING ABOUT THE REQUIREMENTS FOR FACIAL CHALLENGES, IT'S THAT, FOR EXAMPLE, THE SWING VOTE IN THE SECTION OF THE CASE THAT DISCUSSES THE FIFTH CIRCUIT CASE ABOUT CONTENT MODERATION WAS JUSTICE BARRETT WHO WROTE A VERY CLEAR CONCURRENCE EXPLAINING THAT WHEN WE'RE TALKING ABOUT A FUNCTION OF A SITE THAT WAS AUTOMATED WHERE THERE ARE NOT HUMAN BEINGS WHO ARE MAKING DECISIONS ABOUT WHAT SORT OF CONTENT TO SHOW, THEN THE FIRST AMENDMENT CONSIDERATIONS ARE AT LEAST GOING TO BE VERY DIFFERENT.

WHAT THAT HIGHLIGHTS IS SOMETHING THAT ALL OF THE JUSTICES SAY TO A CERTAIN EXTENT, WHICH IS THAT IT'S GOING TO BE A SEARCHING FACTUAL INQUIRY.  IT'S A VERY BIG QUESTION.

THE COURT:  MR. LEHOTSKY SAYS IT IS, IT IS ALL OF THOSE THINGS, BUT IT'S NOT A QUESTION FOR THIS CASE I THINK IS WHAT HE SAID OR SUGGESTS.

MR. KISSEL:  I THINK IT HAS TO BE.  I MEAN, FOR THE COURT TO MAKE A CONSTITUTIONAL DETERMINATION, EVEN IF WE ARE TALKING ABOUT THE DIFFERENCE BETWEEN STRICT SCRUTINY AND INTERMEDIATE SCRUTINY, THERE HAS TO BE AT LEAST AN UNDERSTANDING OF HOW THE FEEDS WORK GENERALLY, BUT I WOULD SAY THERE HAS TO BE AN UNDERSTANDING OF HOW THEY WORK FROM PLATFORM TO PLATFORM.

I MEAN, THERE CERTAINLY HASN'T BEEN ANY SHOWING THAT ALL OF THESE FEEDS WORK THE SAME WAY, AND I WOULD BE SURPRISED IF

THEY DID BECAUSE ALL OF THESE COMPANIES ARE SEPARATE COMPANIES. THAT'S HOW THEY COMPETE. SO ONE FEED, FOR EXAMPLE, MIGHT HAVE SOME SIGNIFICANT HUMAN INVOLVEMENT. ONE MIGHT BE CODE THAT IS SORT OF SET IT AND FORGET IT AND MAKES ALL OF THESE DECISIONS WITHOUT A HUMAN INVOLVEMENT. THAT'S A VERY RELEVANT DETERMINATION.

IT'S ALSO RELEVANT IF WE'RE TALKING ABOUT COMMERCIAL SPEECH VERSUS NON-COMMERCIAL SPEECH, YOU KNOW, TO WHAT EXTENT ARE THERE ADS IN THE FEEDS? MAYBE A FEED IS 100 PERCENT ADS. THIS IS JUST AN EXAMPLE. ADVERTISING IS NOT -- I DON'T THINK IS THE COURT'S POINT HERE.

IT'S REALLY JUST TO SAY THAT WHEN THIS COURT HAS TO MAKE THE DETERMINATION OF HOW TAILORED IS THE LAW, WHAT IS THE NATURE OF THE INTEREST THAT IS AFFECTED, THOSE ARE REALLY CRUCIAL QUESTIONS.

I AM SORRY.

THE COURT: I WAS CURIOUS WHAT IS YOUR THOUGHT ABOUT HOW THE STATUTE AFFECTS THE COMPANY'S ABILITY TO MODERATE CONTENT?

MR. KISSEL: I DON'T THINK IT AFFECTS THE COMPANY'S ABILITY TO MODERATE CONTENT AT ALL. THERE'S NOTHING IN THE STATUTE THAT SPEAKS TO CONTENT MODERATION.

AND AN EXAMPLE OFF THE TOP OF MY HEAD IS IF I WANTED TO -- IF I'M SOMEBODY WHO, FOR EXAMPLE, LIKES STAR TREK ON YOUTUBE OR SOMETHING, AND I WANT TO SEE STAR TREK CONTENT. I DON'T WANT

TO SEE THE BEST STAR TREK CONTENT.  THERE'S NOTHING THAT PROHIBITS THE PLATFORM FROM SHOWING ME THE TEN BEST STAR TREK RELATED OR THE STAR TREK POSTED VIDEOS OR SOMETHING TO THAT EFFECT BECAUSE IT DOESN'T -- BECAUSE THAT FEED DOESN'T RELY ON USER INFORMATION THAT IS MONITORED BY THE PLATFORM.

AND IN THAT CIRCUMSTANCE, YOU KNOW, THERE IS EDITORIAL DISCRETION.  SOME PEOPLE ARE SAYING THESE ARE THE BEST VIDEOS OR THESE ARE THE VIDEOS THAT THIS PERSON WANTS TO SEE.

BUT WHEN WE'RE TALKING ABOUT AUTOMATED DECISIONS THAT ARE CERTAINLY BASED ON USER INFORMATION, THOSE QUESTIONS BECOME A LOT MIRKIER.

I THINK ONE EXAMPLE OF THAT IS WHEN PLAINTIFF TALKS ABOUT, WELL, THE CODE IS CREATED BY HUMAN BEINGS AND SO THEREFORE THIS IS SPEECH.  I MEAN, AS FAR AS I KNOW THERE HAVEN'T BEEN CASES THAT HAVE SAID THAT CODE IS SPEECH.  I THINK THAT WOULD BE A HUGE DETERMINATION.  I DON'T THINK THERE'S A RECORD FOR THAT.

BUT THAT I THINK, IF THIS WERE, FOR EXAMPLE, AN AS-APPLIED CHALLENGE BY A PARTICULAR PLATFORM THAT COULD MAKE THAT ARGUMENT HERE, THAT WOULD BE A HUGE QUESTION.  I DON'T THINK IT'S AVAILABLE TO THE COURT IN THIS CASE.

THE COURT:  RIGHT.  IT SEEMS ANTICIPATORY.  I COULD SEE A SITUATION WHERE AN ENGINEER CREATES THE CODE AND THEN SOMEHOW THAT THROUGH LLM, OR SOMETHING, THE CODE CHANGES AND THE HUMAN TOUCH BECOME DILUTED I SUPPOSE.

MR. KISSEL:  I SUPPOSE.

I MEAN, I'M VERY MUCH WITH -- ALL OF THE CONCURRENCES, AND I THINK IT RUNS THROUGH THE MAYBE OPINION IN MOODY, TOO, WHICH IS THAT THOSE QUESTIONS ARE SO DIFFICULT THAT IT'S HARD TO EVEN THINK OF THE PRECEDENT THAT COULD BE ANALOGIZED TO THOSE KIND OF SITUATIONS.

THAT'S WHY THIS CASE IS SO DIFFERENT FROM MOODY BECAUSE WHEN YOU'RE TALKING ABOUT IN THE FIFTH CIRCUIT PAXTON VERSUS NETCHOICE CASE THAT WAS ON APPEAL THERE, WHEN YOU HAD A LAW THAT WAS VERY MUCH GETTING INVOLVED IN TELLING PLATFORMS YOU CAN, YOU HAVE TO PLATFORM THIS PERSON, YOU CAN'T DE-PLATFORM THIS PERSON, THE LAW IS VERY MUCH GETTING INVOLVED IN WHAT I THINK IS VERY FAIRLY DESCRIBED AS AN EXERCISE OF EDITORIAL DISCRETION, BUT IT ONLY HIGHLIGHTS THE DIFFERENCE BETWEEN THIS CASE AND THAT ONE.

I THINK IN ADDITION TO -- SO I'VE SORT OF BEEN FOCUSSING ON THIS ISSUE OF FACIAL REQUIREMENT AND HOW THERE REALLY ISN'T INFORMATION TO MAKE THESE DETERMINATIONS.

I THINK ASSUMING THAT THERE WAS, THE REASON THAT THIS IS AT MOST AN INTERMEDIATE SCRUTINY CASE AND NOT A STRICT SCRUTINY CASE -- PLEASE, YOUR HONOR, STOP ME FROM GETTING AHEAD OF MYSELF BECAUSE I KNOW YOU WANTED TO CARVE THIS OUT.

BUT I THINK IN PARTICULAR TO RESPOND TO SORT OF ARGUMENTS ABOUT, YOU KNOW, BECAUSE IT REGULATES CONTENT IT HAS TO BE TREATED A CERTAIN WAY, I WOULD POINT THE COURT'S ATTENTION TO FOOTNOTE 10 IN MOODY, WHICH I THINK IS CRUCIAL BECAUSE IT

DISCUSSES, FOR EXAMPLE, THE TURNER BROADCASTING CASE FROM THE '90S.  THERE ARE OTHER CASES THAT WE CITED IN OUR BRIEF WHICH TALK ABOUT EVEN IF A LAW MAKES SOME DISTINCTION AND THE DISTINCTION CAN BE UNDERSTOOD AS -- THERE'S CERTAIN KIND OF CONTENT ON ONE SIDE OF DISTINCTION AND CERTAIN KIND OF CONTENT ON THE ANOTHER, IF THAT DISTINCTION IS NOT A CONTENT BASED DECISION -- IN OTHER WORDS, IF IT'S NOT MOTIVATED BY MESSAGE, OR TOPIC OR IDEA, THEN IT'S A CONTENT NEUTRAL DISTINCTION, THAT'S SOMETHING THAT THE COURT UNDERSCORES IN MOODY.  I THINK IT EVEN SAYS, WHEN THE INTEREST IS UNRELATED TO THE CONTENT OF EXPRESSION, THEN THE DETERMINATION IS TREATED VERY DIFFERENTLY I THINK IS HOW THE COURT PUTS IT.

BUT THE TURNER BROADCASTING CASE -- WE DISCUSSED IN OUR BRIEF THE CITY OF RENTON CASE.  I THINK THE CITY OF RENTON CASE IS ACTUALLY A GOOD EXAMPLE WHERE AN ADULT THEATRE IS TREATED VERY DIFFERENTLY THAN EVERY OTHER KIND OF BUSINESS, EVERY OTHER KIND OF THEATER.  THE DIFFERENCE IS THAT IT'S AN ADULT THEATER. THERE'S SOME KIND OF CONTENT BASED DISTINCTION, BUT THE REASON THAT THOSE THEATRES WERE TREATED DIFFERENTLY WAS NOT BECAUSE OF THE CONTENT, IT WAS BECAUSE OF, FOR EXAMPLE, THE PROPERTY VALUES IN THE SURROUNDING AREAS.

AND THE COURT HAS SAID THOSE ARE INTERMEDIATE SCRUTINY DETERMINATIONS, THOSE ARE SECONDARY EFFECTS THAT ARE BEING ADDRESSED.

AND TO THE EXTENT THAT THIS LAW IS AFFECTING CONTENT, I

MEAN, JUST ASSUMING THAT THAT IS THE CASE OR THAT SHOWING HAS BEEN MADE, THEN THE DISTINCTION THAT IS MADE AGAIN BETWEEN EVERY OTHER WEBSITE AND A CLOUD STORAGE BASED WEBSITE, FOR EXAMPLE, IT'S CONTENT NEUTRAL BECAUSE IT'S ABOUT THE NON-CONTENT RELATED HARM THAT THE STATUTE IS ADDRESSING.

THE COURT:  AND TURNER ALLOWED FOR PUBLIC STATIONS BECAUSE IT WAS IN THE PUBLIC INTEREST TO HAVE PUBLIC STATIONS RATHER THAN COMMERCIAL STATIONS NOTWITHSTANDING.

MR. KISSEL:  RIGHT.  I BELIEVE IT SAID THAT THESE CABLE OPERATORS HAD TO CARRY OR COULD BE REQUIRED TO CARRY LOCAL STATIONS, NOT BECAUSE LOCAL CONTENT WAS PREFERABLE, BUT FOR THIS SECONDARY REASON OF --

THE COURT:  NOT EVERYBODY COULD AFFORD CABLE.

MR. KISSEL:  EXACTLY, YOUR HONOR.

THE COURT:  RIGHT.

MR. KISSEL:  SO I WOULD ANALOGIZE IN AT LEAST THOSE RESPECTS.

I THINK IT'S PARTICULARLY IMPORTANT TO EMPHASIZE THE UNSOLICITED POINT AS WELL THAT YOUR HONOR BROUGHT UP BECAUSE I THINK THAT BRINGS IT WITHIN THE REALM OF CASES LIKE HILL VERSUS COLORADO AND THE ROBLOX CALL CASES.  GOMEZ VERSUS CAMPBELL-EWALD IS THE NINTH CIRCUIT CASE WHICH TALKS ABOUT IF THE INFORMATION IS BEING CONVEYED IN A WAY THAT IS UNSOLICITED AND THERE'S A GOVERNMENT RESTRICTION THAT SAYS THAT YOU CAN CONVEY THIS INFORMATION BUT YOU CAN'T CONVEY IT HERE AT THIS

TIME, BUT YOU CAN CONVEY IT IN ANOTHER WAY, THEN THAT IS THE KIND OF TIME AND MANNER RESTRICTION THAT AT MOST I THINK WOULD FIT WHERE THIS LAW WOULD FIT.

THE COURT:  IT SOUNDS LIKE THAT'S HOW YOU FEEL -- THAT'S WHAT I HEAR YOU SAYING IS THAT'S WHAT THE STATUTE DOES, IT'S A TIME LIMITATION FOR AN AGE GROUP.

MR. KISSEL:  IT VERY MUCH DOES.  AND I THINK THE NOTIFICATIONS IS A GOOD EXAMPLE OF SPECIFICALLY SORT OF TIME AND MANNER RESTRICTION BECAUSE IF THERE'S WHATEVER NOTIFICATION, SOMEBODY POSTED SOMETHING ON FACEBOOK, AND THAT GOES TO A MINOR'S PHONE AT 1:00 O'CLOCK IN THE MORNING.

THE MINOR, FIRST OF ALL, THEY CAN STILL SEE THAT THAT CONTENT WAS POSTED, BUT THEY CAN EVEN -- THERE'S NOTHING IN THE STATUTE THAT SAYS THAT THEY CAN'T RETRIEVE THAT MESSAGE LATER UNDER THIS SORT OF BROAD NOTIFICATIONS PROVISION OF THE STATUTE.

IT'S JUST THAT TIME, THAT SENSITIVE TIME AND THE MANNER AND IN THAT WAY I WOULD ALSO SAY IT'S SIMILAR TO THE -- I'M JUST THROWING CASES OUT THERE -- WARD VERSUS ROCK AGAINST RACISM BECAUSE IT'S ABOUT, YOU KNOW, THERE ARE CERTAIN TIMES WHERE THE EFFECT OF AMPLIFICATION, FOR EXAMPLE, IS GOING TO BE DISRUPTED, BUT THE STATE CAN REGULATE THAT AS LONG AS IT DOESN'T DEPRIVE THE SPEAKERS OF THIS PLATFORM AND, AGAIN, I THINK THAT'S PARTICULARLY RELEVANT WHEN THESE MESSAGES ARE NOT SOLICITED.

I SUPPOSE UNLESS YOUR HONOR HAS ANY OTHER QUESTIONS.

THE COURT:  NO.  THANK YOU.  YOU TOUCHED ON NOTIFICATIONS AS OUR NEXT TOPIC.

BUT TWO MINUTES, MR. LEHOTSKY.  YOU'RE THE MOVING PARTY.  YOU'LL GET THE LAST WORD ON THIS.

MR. LEHOTSKY:  THANK YOU, YOUR HONOR.

MAYBE I WILL WRAP UP ON THE PERSONALIZED FEEDS AND THEN MOVE INTO NOTIFICATIONS.

THE COURT:  SURE.

MR. LEHOTSKY:  SO A COUPLE OF QUICK POINTS WITH RESPECT TO THE PERSONALIZED FEEDS.

THE COURT:  SURE.

MR. LEHOTSKY:  I APPRECIATE MR. KISSEL'S STATEMENT THAT THE COURT DOESN'T NEED TO MAKE ANY FINDINGS ABOUT THE, YOU KNOW, THE ADDICTIVE FEEDS.  HOWEVER, THE STATE OF CALIFORNIA IS STILL REQUIRING US TO SAY WE HAVE ADDICTIVE FEEDS.  THAT'S PART OF OUR COMPELLED SPEECH ARGUMENTS.  I THINK WE'LL TALK MORE ABOUT THAT LATER, BUT EVEN IF THE COURT DOESN'T HAVE TO MAKE ANY FINDINGS, WHICH I DON'T THINK THE COURT SHOULD, THAT'S STILL A SIGNIFICANT ISSUE FOR US OF HAVING TO SORT OF SAY AS IN THE NATIONAL MANUFACTURERS ASSOCIATION -- OR NATIONAL ASSOCIATION OF MANUFACTURERS VERSUS S.E.C. CASE, THERE'S A LOT OF BLOOD ON YOUR HANDS.

SECOND, I THINK A LOT OF WHAT MR. KISSEL WAS DISCUSSING WITH RESPECT TO, YOU KNOW, MACHINE LEARNING AND A LOT OF

SPECULATION ABOUT HOW FEEDS MIGHT OPERATE OR MIGHT NOT, WE DON'T NEED TO SPECULATE.  WE HAVE DECLARATIONS FROM OUR MEMBERS AND FROM MR. CLELAND SAYING PRECISELY HOW OUR MEMBERS FUNCTION AND OPERATE.  WE DON'T NEED TO SPECULATE.  THE RECORD EVIDENCE IS THERE.  I DON'T THINK THERE'S ANY NEED TO GO BEYOND THAT RECORD EVIDENCE.

YOU KNOW, MR. KISSEL REFERRED TO A COUPLE OF DIFFERENT DOCTRINES.  HE REFERRED TO THE SECONDARY EFFECTS DOCTRINE, THE PHYSICAL ZONING CASES.  THE SUPREME COURT HAS BEEN VERY CLEAR IT DOESN'T APPLY TO THE INTERNET.  THERE IS NO CYBER ZONING THE COURT SAID IN RENO IN ALAMEDA.  THE COURT VERY CLEARLY RECOMMENDED THE APPLICATION OF THE SECONDARY EFFECTS DOCTRINE SAYING STATES, QUOTE, "MAY NOT REGULATE THE SECONDARY EFFECTS OF SPEECH BY SUPPRESSING THE SPEECH ITSELF BY REFERENCE TO SECONDARY EFFECTS," END QUOTE.

THAT IS EXACTLY WHAT THE STATE OF CALIFORNIA IS DOING.  THEY ARE NOT REGULATING THE SECONDARY EFFECTS OF SPEECH, THEY ARE LITERALLY REGULATING SPEECH.

MR. KISSEL SAID HE WASN'T SURE ABOUT WHETHER CODE IS PROTECTED.  WE'RE NOT TALKING ABOUT WHETHER THE CODE, THE COMPUTER CODE IS PROTECTED.  WE ARE LITERALLY TALKING ABOUT WHETHER OUR MEMBERS CAN GAUGE IN THE EDITORIAL DISCRETION, THE UNIQUE INDIVIDUALIZED CURATION THAT THE STATE PURPORTS TO REGULATE.

MAYBE TURNING NOW TO NOTIFICATIONS.  WE'RE TALKING ABOUT

ANOTHER WAY IN WHICH THE STATE SEEKS TO RESTRICT OUR SPEECH, WHICH THEY LITERALLY ARE SAYING THAT YOU CANNOT SEND A NOTIFICATION DURING CERTAIN TIMES UNLESS YOU HAVE PARENTAL CONSENT.

THAT CERTAINLY DOES NOT REGULATE CONDUCT.  IT LITERALLY REGULATES SPEECH.  IT HAS TO BE SUBJECT TO HEIGHTENED SCRUTINY. WE THINK IT'S SUBJECT TO STRICT SCRUTINY BECAUSE THIS IS A CONTENT BASED LAW.

MR. KISSEL SAID THAT CALIFORNIA'S LAW IS NOT MOTIVATED BY WHAT THE IDEA OR THE MESSAGE IS.  I THINK THAT -- WE'RE NOT SAYING THAT THIS IS A VIEWPOINT BASED LAW.  HOWEVER, IT CLEARLY IS A CONTENT BASED LAW AND A SPEAKER BASED LAW FOR THE REASONS THAT WE IDENTIFIED IN OUR BRIEFING EARLIER IN THE ARGUMENT. AND THEN I THINK WE'LL TALK ABOUT -- MAYBE THAT'S OUR NEXT TOPIC AFTER WE TALK ABOUT NOTIFICATIONS.

THE COURT:  IT SEEMS TO BE, AND PARDON ME, I DON'T MEAN TO BE TOO SIMPLISTIC, BUT IT SEEMS LIKE IT'S DEFERRED SPEECH, ISN'T IT?  I'LL JUST USE THAT TERM.

YOU CAN SEE IT BUT NOT JUST DURING THIS TIME PERIOD AND THAT -- THERE IS NO SUCH THING AS DEFERRED SPEECH I GUESS.  IF YOU CAN'T SEE IT, IT'S A FIRST AMENDMENT VIOLATION.

MR. LEHOTSKY:  YES.  I DON'T THINK THE GOVERNMENT CAN CREATE A LAW THAT SAYS YOU CAN'T SEND EMAILS BETWEEN 12:00 A.M. AND 8:00 A.M.  IT DOESN'T MATTER IF IT'S CONTENT BASED, AND IT DOESN'T MATTER WHETHER YOU CAN SEND THAT EMAIL

LATER.  IT RESTRICTS US IN ENGAGING IN TIMELY SPEECH, TWO-HOUR USERS.  WE GAVE A COUPLE OF EXAMPLES.  THE SAFETY UPDATE THAT FACEBOOK DOES IN THE DAVIS DECLARATION WHERE YOU MIGHT GET A MESSAGE, YOU KNOW, IT MIGHT BE 12:30 IN THE MORNING IN BOSTON, MASSACHUSETTS, AND IF THERE'S BEEN AN EARTHQUAKE IN, YOU KNOW, THE BAY AREA AND CALIFORNIA, YOU COULD GET A MESSAGE SAYING YOUR LOVED ONE IN CALIFORNIA IS OKAY.

WE ALSO GAVE THE EXAMPLE OF ALERTS THAT MIGHT COME AT 5:30 IN THE MORNING, PRACTICE IS CANCELLED, PRACTICE IS HAPPENING, YOU NEED TO BE HERE AT THIS TIME FOR, YOU KNOW, AN ATHLETE ON A HIGH SCHOOL BASEBALL TEAM OR OTHER HIGH SCHOOL ACTIVITY.

SO THESE ARE -- AGAIN, THIS IS PROTECTED SPEECH AND PART OF THE IMPORTANCE OF THE SPEECH IS THE TIMELY NATURE.

I KNOW MR. KISSEL BROUGHT UP BOTH OF THE EXAMPLES OF TIME, PLACE, MANNER, AND RESTRICTION AND ROBLOX CALLS.  MAYBE STARTING FIRST WITH THE ROBLOX CALL ARGUMENT.  AGAIN, THE GOVERNMENT CAN FLATLY BAN ALL ROBLOX CALLS.  THAT IS THE BARR CASE.  THEY CAN'T SELECTIVELY BAN ROBLOX CALLS, WHICH IS EXACTLY WHAT THE GOVERNMENT IS DOING HERE IS THEY ARE PROHIBITING NOTIFICATIONS FROM SOME SITES BUT NOT FROM OTHERS.  THEY ARE PROHIBITING NOTIFICATIONS, AGAIN, FROM YOUTUBE ABOUT HERE'S AN NBA CLIP THAT YOU MIGHT LIKE, LOOK AT ALL OF THESE THREE POINTERS, AND WE HAVE TO GO AND GET PARENTAL CONSENT IN ORDER TO BE ABLE TO DISTRIBUTE THOSE IN A TIMELY FASHION TO OUR USERS, HOWEVER, ESPN DOESN'T.  SO CLEARLY SPEAKER BASED.

ALSO BECAUSE OF THE CONSUMER AND CONSUMER PRODUCT REVIEW AND SERVICE REVIEW EXCEPTION, IT IS CLEARLY CONTENT BASED IF YOU ARE A WEBSITE LIKE YELP THAT DOES REVIEWS OF RESTAURANTS OR SERVICES OR IF YOU ARE A COMMERCE SITE AND YOU SELL GOODS AND YOU HAVE PRODUCTS OR YOU HAVE PRODUCT REVIEWS, THEN YOU ARE NOT SUBJECT TO ANY OF THESE RESTRICTIONS.

SO IT CLEARLY IS A CONTENT BASED LAW, AND IT CLEARLY IS NOT A UNIFORM BAN ON ROBLOX CALLS.  SO I THINK THE ENTIRE ROBLOX CALL LINE IS OUT OF ORDER.

THE SAME IS TRUE WITH RESPECT TO TIME, PLACE, AND MANNER. YOU CAN'T HAVE A TIME, PLACE, AND MANNER RESTRICTION THAT IS SPEAKER BASED AND THAT IS CONTENT BASED.  SO I THINK THAT IS THE FIRST PROBLEM WITH THEIR TIME, PLACE, AND MANNER ARGUMENT.

THE COURT:  WHAT IS THE CONTENT BASED DISTINCTIONS THAT THIS STATUTE DRAWS, IF ANY, SOCIAL INTERACTION VERSUS NOT SOCIAL INTERACTION, COMMERCIAL, CONSUMER REVIEWS, THOSE TYPES OF THINGS?

DO YOU HAVE A THOUGHT ABOUT THAT?

MR. LEHOTSKY:  YES.  AND I'M SORRY, I DON'T MEAN TO DRAG US TOO MUCH INTO THE NEXT TOPIC, BUT, YES, I THINK THOSE ARE THE TWO PRIMARY ARGUMENTS THAT WE HAVE ABOUT WHY THIS IS A CONTENT BASED LAW.

THE COURT:  RIGHT.

MR. LEHOTSKY:  FIRST, IS BECAUSE IT APPLIES ONLY TO SOCIAL MEDIA PLATFORMS WHERE THE DEFINITION OF SOCIAL MEDIA

PLATFORM IN THE STATUTE IS TALKING ABOUT SOCIAL INTERACTION AS COMPARED TO OTHER TYPES OF INTERACTION.  YOU KNOW, INTERACTION FOR BUSINESS PURPOSES, FOR OTHER PURPOSES.

THE COURTS I BELIEVE IN FITCH IN MISSISSIPPI AND REYES IN UTAH ACKNOWLEDGE THIS IS A VERY BROAD CATEGORY.  I MEAN, HUMAN SOCIAL INTERACTION IS A MASSIVE CATEGORY, BUT IT IS STILL A CATEGORY.  IT IS STILL DRAWING REGULATORY DISTINCTIONS BASED ON WHETHER YOUR WEBSITE IS HELPING PEOPLE INTERACT WITH EACH OTHER.  THAT IS A CONTENT BASED DISTINCTION.

THE COURT:  CONSUMER REVIEWS.

MR. LEHOTSKY:  AND SO THE SECOND REASON WOULD BE CONSUMER REVIEWS ARE CARVED OUT.  YOU KNOW, THERE ARE THESE EXPRESS CARVE-OUTS WHERE MR. KISSEL SAID THERE MIGHT BE SOME PREFERRED OR FAVORED STATUTE OR COMPANIES IN THE EYES OF THE CALIFORNIA LEGISLATURE THAT, WHOOPS, WE INADVERTENTLY DREW EBAY APPARENTLY INTO THIS STATUTE, BUT WE DON'T WANT THEM TO BE SUBJECT TO THIS REGULATION AND SO WE WRITE A CARVE-OUT.

THAT IS EXACTLY THE SITUATION OF BARR, THE SUPREME COURT CASE ABOUT ROBLOX CALLS.  EXCEPT THE PROBLEM IS HERE, YOU KNOW, THE WAY TO CURE THE FIRST AMENDMENT PROBLEM IS NOT BY LUMPING IN EVERYBODY ELSE AND GETTING RID OF THE EXCEPTION.  IT WOULD VIOLATE THE FIRST AMENDMENT TO, YOU KNOW, ESSENTIALLY BRING MORE PEOPLE INTO THIS, YOU KNOW, PROHIBITION.

AND SO THE CORRECT WAY TO DEAL WITH THIS PROBLEM HERE, AS WE'VE NOTED IN OUR BRIEFING, IS THAT SORT OF THE CENTRAL

COVERAGE DEFINITION OF THIS STATUTE INFECTS ALL OF THE PROVISIONS THAT WE ARE CHALLENGING:  PARENTAL CONSENT, AGE ASSURANCE, THE DEFAULT LIMITATIONS, AND THE DISCLOSURE PROVISIONS.

AND SO THOSE ARE THE FOUR PROVISIONS THAT SHOULD BE ENJOINED ON THE BASIS OF THE CENTRAL COVERAGE DEFINITION, WHICH IS LIKE A FUNDAMENTAL FLAW IN THE STATUTE.

THE COURT:  BEFORE WE LEAVE THE CONSUMER REVIEWS, I'M CURIOUS ABOUT YOUR THOUGHTS ABOUT HOW AUSTIN, THE AUSTIN CASE PLAYS INTO THAT.

MR. LEHOTSKY:  I'M SORRY, WHICH CASE?

THE COURT:  THE AUSTIN CASE, THE CITY OF AUSTIN CASE.  THE AUSTIN CASE.

MR. LEHOTSKY:  OH, SO I THINK THE CITY OF AUSTIN CASE SORT OF EXACTLY PROVES OUR ARGUMENT ABOUT THE SCOPE OF THE SOCIAL INTERACTION BECAUSE I THINK AUSTIN IS REALLY MORE APPROPRIATE FOR OUR FIRST ARGUMENT ABOUT THE BROAD CATEGORY OF SOCIAL INTERACTION WEBSITES AS OPPOSED TO THE SECOND ARGUMENT ABOUT THE EXCEPTIONS.

BUT I THINK THE CITY OF AUSTIN CASE PROVES OUR POINT ABOUT, YOU KNOW, THE LEVEL OF -- THE HIGH LEVEL OF GENERALITY THAT COULD BE APPLIED TO THAT CONTENT CATEGORY AND THAT THAT RENDERS THIS A CONTENT BASED REGULATION OF SPEECH, THIS STATUTE.

THE COURT:  OKAY.

MR. LEHOTSKY:  SO BEFORE I LEAVE THE TIME, PLACE, AND MANNER POINT, BECAUSE I THINK IT DOES APPLY TO NOTIFICATIONS, EVEN IF IT WASN'T A CONTENT AND SPEAKER BASED RESTRICTION, THE NATURE OF OUR MEMBER'S NOTIFICATIONS IS COMPLETELY UNLIKE ANYTHING ELSE THAT HAS EVER COME UP IN THE TIME, PLACE, AND MANNER LINE OF PRECEDENCE.

THOSE CASES VERY CLEARLY DEAL WITH AMPLIFICATION OF SOUND IN A PUBLIC FORUM OR SPEECH THAT IS IN PROXIMITY TO PLACES THAT MIGHT BE DISTURBED LIKE THE HOME, SCHOOL, CHURCH.  THOSE ARE PLACES WHERE, YOU KNOW, IF YOU'RE AT HOME, YOU CAN'T REALLY AVOID SOMEBODY BEING OUTSIDE WITH A MEGA PHONE AT 3:00 IN THE MORNING.

THE KEY DIFFERENCE HERE IS THAT ALL OF OUR USERS HAVE SIGNED UP FOR OUR SITES.  THEY CAN TURN OFF NOTIFICATIONS.  YOU KNOW, WE HAVE THIS IN DECLARATIONS FROM CLELAND AND FROM VEITCH THAT USERS CAN TURN OFF THESE NOTIFICATIONS, AND THEY CAN ALSO DO THINGS LIKE SILENCING THEIR PHONE, LEAVING THE PHONE DOWNSTAIRS, YOU KNOW, DON'T BRING IT UP TO THE BEDROOM. PARENTS CAN CONTROL WHETHER THE WIFI WORKS AFTER CERTAIN HOURS AND CAN ALSO SET LIMITS ON NOTIFICATIONS.

SO THERE ARE ALL SORTS OF THINGS THAT A USER WHO IS SIGNING UP FOR ONE OF OUR WEBSITES CAN DO TO AVOID NOTIFICATIONS IF THEY DON'T WANT TO RECEIVE NOTIFICATIONS.

NOW, IF THEY CHOOSE TO RECEIVE NOTIFICATIONS, IT IS BECAUSE THEY WANT THE SPEECH AND THE STATE -- THIS IS AGAIN A

STATE DEPRIVATION OF TIMELY SPEECH SAYING, NO, MINOR, YOU CANNOT HAVE ACCESS TO THIS SPEECH AT THIS TIME.

BROWN VERY CLEARLY SAYS THAT THE GOVERNMENT LACKS THE POWER TO SAY THAT MINORS CAN'T BE, YOU KNOW, EXPOSED TO, YOU KNOW, CERTAIN KINDS OF SPEECH, AND I THINK THAT VERY CLEARLY ALSO APPLIES TO SOMETHING LIKE THIS WHERE YOU'RE TALKING ABOUT TIMELY SPEECH.

AGAIN, WE'VE GOT THOSE FACTUAL EXAMPLES IN OUR DECLARATIONS TO SUPPORT US ON THIS POINT.

SO I REALLY DON'T THINK THE TIME, PLACE, AND MANNER DOCTRINE PROVIDES ANY HELP FOR THE GOVERNMENT IN THIS SETTING.

I DON'T KNOW IF YOUR HONOR HAS FURTHER QUESTIONS ABOUT EITHER ADDICTIVE FEEDS OR NOTIFICATIONS.

THE COURT:  I'M CURIOUS ABOUT THIS.  HAS THE SUPREME COURT EVER HELD THAT SPEAKER BASED DISTINCTIONS ALWAYS FACE STRICT SCRUTINY?

MR. LEHOTSKY:  WELL, I BELIEVE THE ANSWER TO THAT IS YES.  I THOUGHT THAT WAS TRUE IN A NUMBER OF CAMPAIGN FINANCE CASES, NOT JUST CITIZENS UNITED, BUT ALSO OTHER CASES WHERE SPEAKER BASED RESTRICTIONS ARE HIGHLY SUSPECT.

I WOULD SAY EVEN IF IT'S NOT STRICT SCRUTINY, IT WOULD CERTAINLY BE SUBJECT TO HEIGHTENED SCRUTINY, AND I THINK FOR A VARIETY REASONS WE CAN DISCUSS LATER, AGAIN, I DON'T WANT TO --

THE COURT:  YES.

MR. LEHOTSKY:  BUT I DON'T THINK THAT THIS LAW IS

NARROWLY TAILORED.  SO EVEN IF IT WAS INTERMEDIATE SCRUTINY INSTEAD OF STRICT SCRUTINY, IT WOULD STILL FAIL UNDER THAT FRAMEWORK.

THE COURT:  THANK YOU.  TURNER MAY HAVE SAID OTHERWISE, BUT MAYBE WE'LL TALK ABOUT THAT LATER THEN.

MR. LEHOTSKY:  WELL, I REALLY DON'T THINK THAT TURNER IS APPROPRIATE HERE.

I THINK YOU'RE RIGHT THAT TURNER DEALT WITH A UNIQUE PROBLEM OF SCARCITY, SORT OF A PHYSICAL FEATURE OF A BOTTLENECK PROBLEM AND OF ACCESS TO CERTAIN TELEVISION CHANNELS, AND THAT'S JUST -- WE'RE NOT TALKING ABOUT THAT.

THE COURT:  WE'RE NOT THERE.

MR. LEHOTSKY:  THIS IS NOT A TURNER LAW.

I DO AGREE THAT MR. KISSEL SAID, YOU KNOW, THAT THE LAW IN MOODY AND IN PAXTON WAS VERY DIFFERENT THAN THIS ONE.  THAT'S CERTAINLY TRUE.

I MEAN, THE PAXTON AND MOODY LAWS WERE DEALING WITH COMPELLING CERTAIN SPEECH THAT HAD TO BE CARRIED, AND OF COURSE THE SUPREME COURT DIDN'T APPLY TURNER IN THAT SETTING.

HERE, WE'RE TALKING ABOUT RESTRICTIONS ON SPEECH.  BUT MOODY I THINK DOESN'T CHANGE THE ANALYSIS FOR HOW YOU EVALUATE WHETHER A RESTRICTION ON SPEECH VIOLATES THE FIRST AMENDMENT. IT'S THE SAME AS IT ALWAYS IS.

MOODY I DON'T THINK ALSO DOESN'T CHANGE THE STANDARD FOR HOW YOU EVALUATE A FACIAL CHALLENGE.  THAT STANDARD HAS ALWAYS

BEEN THE SAME.  IT'S -- YOU KNOW, WHETHER THERE IS NO SET OF CIRCUMSTANCES UNDER WHICH THE LAW CAN BE CONSTITUTIONAL OR IF THE ACT IS UNCONSTITUTIONAL IN A SUBSTANTIAL NUMBER OF THE ACT'S APPLICATIONS, AND I THINK HERE WE WOULD WIN UNDER SORT OF UNDER EITHER OF THOSE CRITERIA AS APPLIED TO NOTIFICATIONS, AGAIN, BECAUSE OUR ARGUMENT IS CATEGORICAL.

OUR ARGUMENT IS THAT IT DOESN'T REALLY MATTER WHAT THE NOTIFICATIONS THAT ARE BEING PROVIDED ARE.  YOU MIGHT LIKE THIS VIDEO.  YOUR FRIEND JUST LIKED YOUR POST.  YOUR BROTHER IN CALIFORNIA IS OKAY.  YOU KNOW, WHATEVER THAT CONTENT IS, AND I AGREE IT'S NOT BEING RESTRICTED BY THE STATE, DEPENDING ON WHAT THE CONTENT OF THAT NOTIFICATION IS, BUT IT IS STILL BEING GATED BY PARENTAL CONSENT, AND THAT IS PRECISELY WHAT BROWN SAYS YOU CANNOT DO.  THE STATE DOES NOT HAVE THE POWER TO SAY THAT MINORS DON'T GET TO RECEIVE SPEECH UNLESS MOM OR DAD SAYS IT'S OKAY.  THAT IS CLEARLY UNCONSTITUTIONAL UNDER BROWN.

THE COURT:  THANK YOU.

MR. KISSEL.

MR. KISSEL:  THANK YOU, YOUR HONOR.

I'LL JUST SORT OF START BY SAYING THAT I THINK WE HAVE DISCUSSED A LOT OF THE BIGGER PICTURE QUESTIONS WITH THE NOTIFICATIONS.  I SORT OF ARGUE -- OR I DID ARGUE THE LAST TIME I WAS HERE AND APPEARED UP HERE THAT THESE ARE ESSENTIALLY TIME AND MANNER RESTRICTIONS TO THE EXTENT THAT THERE IS A SHOWING THAT THERE IS SPEECH THAT IS INVOLVED.

I WOULD NOT DISPUTE THAT SOME OF THESE CASES ABOUT SECONDARY EFFECTS ARE ABOUT PHYSICAL ZONING, THAT SOME OF THESE CASES ARE -- THEY'RE VERY MUCH ABOUT -- THEY'RE NOT ABOUT THIS SPECIFIC FACTUAL CIRCUMSTANCE.

BUT, AGAIN, I THINK IF MOODY SORT OF UNDERSCORES ANYTHING, AND I WOULD LOOK DIRECTLY AT JUSTICE KAGAN'S MAJORITY OPINION FOR THIS, IT IS THAT WHEN WE'RE IN THIS BRAVE NEW WORLD ABOUT HOW DO WE THINK ABOUT THESE SPEECH MECHANISMS OR THESE MEDIA WEBSITES THAT DO THINGS THAT NO OTHER MEDIA HAS DONE BEFORE, I THINK IT'S IMPORTANT -- I MEAN, I THINK IT'S NECESSARY THAT WE LOOK TO THE PRECEDENT OF THE SUPREME COURT IN THIS SORT OF BINDING FIRST AMENDMENT DOCTRINE TO FIGURE OUT HOW TO TREAT THESE MECHANISMS.

THE COURT:  WELL, MR. KISSEL SAYS HE AGREES WITH YOU, JUST GO TO BROWN.

MR. KISSEL:  RIGHT.  WELL, THERE'S SOME OBVIOUS DISTINCTIONS BETWEEN THIS CASE -- WELL, THERE ARE SOME DISTINCTIONS THAT I'VE HIGHLIGHTED WITH BROWN, AND I CAN TALK A LITTLE BIT MORE ABOUT THAT AS WELL.  THE MAIN ONE BEING I THINK THERE'S THIS QUESTION OF WHY WAS THE COURT IN THAT CASE SO SKEPTICAL OF THE PARENTAL VERIFICATION REQUIREMENT?  AND THIS ALSO GOES TO THE POINT ABOUT WHEN IS A SPEAKER BASED DISTINCTION UNCONSTITUTIONAL?  WHEN DOES IT GIVE AN INDICATION THAT A LAW MAY BE UNCONSTITUTIONAL?

AND REALLY THAT'S WHEN THE GOVERNMENT SAYS THAT THE

STATUTE IS DOING ONE THING.  INEVITABLY WHEN A STATUTE GETS CHALLENGED UNDER THE FIRST AMENDMENT, I THINK IN A LOT OF THESE CASES THE GOVERNMENT WILL SAY, WELL, THERE'S NO SPEECH INTEREST INVOLVED.

AND THE COURT IS SAYING, WELL, YOU REALLY -- YOU'RE RAISING SOME RED FLAGS FOR US BECAUSE A LOT OF THESE OTHER REQUIREMENTS MAKE US THINK THAT THAT INTEREST IS A PRETEXT.

AND WITH THE PARENTAL VERIFICATION REQUIREMENT IN BROWN, THE COURT WAS SAYING, YOU KNOW, IF THIS IS NOT JUST THE MORAL PANIC DE JURE IN THE LATEST OF A LONG LINE OF THINGS THAT HAVE SCARED PARENTS, THEN WHY ARE YOU STILL ALLOWING CHILDREN TO HAVE ACCESS TO THIS CONTENT?

AND WE DON'T HAVE THIS SAME PROBLEM IN THIS LAW BECAUSE THE FINDINGS, THE LEGISLATIVE FINDINGS AND THE LAW ITSELF MAKE IT CLEAR THAT THERE'S NO CONTENT TARGETED IN THE LAW, THAT THE LAW IS ABOUT THESE DESIGN FEATURES, AND THAT THE CONTENT AND THE AVAILABILITY OF THE CONTENT ISN'T TOUCHED.  I MEAN, IT'S VERY DIFFERENT THAN SAYING YOU CAN'T BUY THIS VIDEO GAME UNLESS YOUR PARENT IS WITH YOU AND APPROVES OF IT.

THE COURT:  CAN THE STATUTE REALLY DO THAT?  CAN IT SAY, OH, WE'RE DOING THESE LIMITATIONS AND WE'RE IMPOSING THESE LIMITATIONS, BUT IT'S NOT A LIMITATION ON SPEECH, WE JUST WANT TO BE CLEAR ON THAT?  CAN THEY DO THAT AND THEY GET A PASS ON THAT?

MR. KISSEL:  WELL, NO, NO.  I MEAN, THAT'S NOT WHAT

IS HAPPENING IN THIS LAW.

THE REASON I WOULD SAY THAT THIS IS A DIFFERENT CASE IS BECAUSE IF THE COURT IS LOOKING TO WHAT IS MOTIVATING THE LAW, WHAT IS THE LAW TARGETING, WHAT IS THE REASON FOR THE LAW, THEN THE COURT SHOULD START WITH THE LEGISLATIVE FINDINGS.

I MEAN, THE COURT SHOULD START WITH THE PART OF THE STATUTE WHERE THE LEGISLATURE IS EXPLAINING HERE IS WHAT WE'RE TARGETING.  AND THEN AS SUPPORT OF THOSE LEGISLATIVE FINDINGS, THE COURT JUST NEEDS TO LOOK AT THE REQUIREMENTS FOR THE STATUTE.

THERE IS NOTHING IN THE STATUTE THAT SAYS ESPN IS NOT INCLUDED IN THIS STATUTE.  THERE'S NOTHING IN THE STATUTE THAT SAYS WE'RE ONLY TARGETING SOCIAL MEDIA SITES.  THAT IS A PROFOUND DISTINCTION BETWEEN THIS CASE AND THE REYES AND THE FITCH CASES.  AND THOSE CASES --

THE COURT:  AND WE'RE GOING TO TALK ABOUT GOVERNMENTAL INTERESTS AND TAILORING AND ALL OF THAT NEXT, AND THIS KIND OF FEEDS INTO THAT AND CREATES A PATH TO IT.

MR. KISSEL:  OKAY.

THE COURT:  BUT I DIDN'T WANT TO SHUT YOU DOWN. PLEASE, FINISH YOUR THOUGHTS.

MR. KISSEL:  WELL, THE SORT OF UNDERLYING POINT IS THAT WHEN YOU ARE TALKING ABOUT A LAW WHERE IT SAYS WHAT IT WANTS TO DO, IT DOES WHAT IT WANTS TO DO, AND TO THE EXTENT THAT THERE'S ANY EXCEPTIONS TO WHAT IT WANTS TO DO, THOSE

EXCEPTIONS ARE NOT BASED ON THE CONTENT THAT THOSE SITES CREATE, BUT THEY'RE NEXUS TO THE NON-CONTENT RELATED HARM THAT THE STATUTE SAYS THAT IT IS TRYING TO REGULATE.  YOU DON'T HAVE THESE QUESTIONS OF, WELL, WHAT IS THE STATUTE REALLY TRYING TO DO?  IS THE LEGISLATURE ACTUALLY TRYING TO DO SOMETHING DIFFERENT?

THAT QUESTION WOULD BE A NATURAL ONE TO ASK IF THIS WERE ANOTHER ONE OF THOSE LAWS THAT SAYS THAT THE PLATFORM NEEDS TO MAKE THIS KIND OF CONTENT UNAVAILABLE TO MINORS OR THIS KIND OF THING -- THIS PARTICULAR CONTENT CANNOT BE SEEN BY MINORS. THIS LAW JUST DOESN'T DO ANYTHING LIKE THAT.

AND AS FAR AS -- I WOULD ARGUE THAT THE SPEAKER BASED DOCTRINE, THE QUESTION OF WHEN DOES A COURT LOOK AT SPEAKERS ARE TREATED DIFFERENTLY, I THINK ALL OF THOSE CASES INCLUDING, FOR EXAMPLE, THE NIFLA CASE, WHICH MAY BE THE MOST RECENT CASE THAT THE PARTIES HAVE DISCUSSED, THERE IS DISCUSSION IN THE MAJORITY OPINION IN THAT CASE THAT SAYS THAT IT'S NOT THAT A LAW CAN'T TREAT ONE SPEAKER DIFFERENTLY THAN ANOTHER, IT'S HARD TO SEE HOW ANY LAWS COULD NOT TREAT SOME PARTIES DIFFERENTLY THAN OTHERS.  THE DISTINCTION HAS TO BE THE CONDUCT AND NOT THEIR SPEECH.

WHEN A LAW DOES TREAT SPEAKERS DIFFERENTLY, IT MAY RAISE A RED FLAG FOR A COURT AND A COURT MAY SAY, WELL, WHY ARE ABORTION CLINICS SUBJECT TO THIS LAW OR A CERTAIN KIND OF CLINIC SUBJECT TO THIS LAW AND ANOTHER ONE ISN'T?  AND THAT MAY

LEND CREDENCE TO THE IDEA THAT THERE'S A CONTENT BASED MOTIVATION UNDERLYING IT, BUT THAT'S THE REASON WHY THE COURT WOULD PAY ATTENTION TO A SPEAKER BASED DISTINCTION.

AND HERE, I THINK THE ONLY PURPORTED SPEAKER BASED DISTINCTION THAT PLAINTIFF POINTS TO IS ONE THAT I THINK IS EASILY EXPLAINED AS A CONDUCT RELATED DISTINCTION BECAUSE THOSE ARE NOT THE SITES THAT ARE AGAIN SENDING NOTIFICATIONS TO MINORS AND THAT IS -- YOU KNOW, THAT'S THE JUSTIFICATION RIGHT THERE.

THE COURT WAS ASKING ABOUT THE CITY OF AUSTIN CASE.  THE CITY OF AUSTIN IS A VERY IMPORTANT CASE FOR ALL KINDS OF CONSIDERATIONS HERE BECAUSE WHAT THE COURT REALLY CLARIFIED THERE WAS THAT UNLESS A STATUTE IS SAYING, UNLESS A STATUTE IS GOING AFTER A MESSAGE OR AN IDEA OR IS TAKING SOMETHING OUT OR PUTTING SOMETHING INTO THE MARKETPLACE OF IDEAS, THEN IT'S NOT SUBJECT TO STRICT SCRUTINY.  IT'S NOT A CONTENT BASED RESTRICTION.

SO HERE -- I MEAN, AGAIN, TO THE EXTENT THAT SOME PARTIES ARE REGULATED AND SOME AREN'T, AND WHAT IS THE EXPRESSIVE MESSAGE THAT SEPARATES REGULATED PARTIES FROM NON-REGULATED PARTIES?  THERE ISN'T ONE.  IT'S THE FACT THAT DOES ANY WEBSITE, SOCIAL MEDIA WEBSITE, WHATEVER A WEBSITE DOES OR WANTS TO CALL ITSELF, DOES IT HAVE ONE OF THESE FEEDS THAT USES USER DATA TO SERVE CONTENT BECAUSE IF IT DOES, IT'S SUBJECT TO THE ACT AND IF IT DOESN'T, THEN IT'S NOT.

I THINK THAT DISTINGUISHES THE CASE, FOR EXAMPLE, FROM REYES, WHICH IS THE NEW MEXICO -- I'M SORRY, IT'S THE UTAH CASE, DISTRICT COURT CASE WITH THIS PLAINTIFF WHERE THE COURT SAYS YOU'RE TARGETING ALL SOCIAL MEDIA SITES, BUT YOU SAY THE HARM IS THIS HARM.

AGAIN, IT RAISES THAT SORT OF PRETEXTUAL RED FLAG.  WHY TARGET THESE SPEAKERS AND FAVOR THESE SPEAKERS AND NOT THESE OTHERS?

HERE, THE STATUTE COMPLETELY AVOIDS THAT PROBLEM BECAUSE IT'S JUST LOOKING AT THE SPECIFIC DESIGN FEATURES AND THE SPECIFIC HARM TO MINORS, AND I THINK THAT'S A VERY IMPORTANT DISTINCTION WITH THOSE CASES.

I HATE TO SOUND LIKE A BROKEN RECORD WITH THIS OTHER POINT THAT I'M GOING TO MAKE, BUT ANY TIME THE PLAINTIFF SAYS, WELL, WE OFFERED DECLARATIONS FROM TWO OF OUR MEMBERS THAT EXPLAIN THAT THIS IS HOW PEOPLE CAN TURN NOTIFICATIONS ON OR OFF OR THIS IS THE KIND OF SAFETY FEATURES THAT SITES ALREADY HAVE.

WELL, THAT'S ONLY TWO -- EVEN ASSUMING THOSE FACTORS ARE TRUE, IT'S ONLY TWO WEBSITES.  FIRST OF ALL, IT'S ONLY TWO OF NETCHOICE'S MEMBERS BUT OUT IN THE WORLD OF POTENTIALLY REGULATED ENTITIES, IT DOESN'T SAY ANYTHING ABOUT THE SCOPE OF THE LAW.

THE COURT:  SO WHAT SHOULD WE DO WITH THAT?  WHAT SHOULD I DO WITH THOSE DECLARATIONS?  WHAT WEIGHT SHOULD I GIVE THEM AND HOW SHOULD I APPLY THAT TO A DECISION HERE?

MR. KISSEL:  I DON'T KNOW THAT IT REALLY HAS ANY RELEVANCE TO A FACIAL CHALLENGE.  I THINK IT WOULD HAVE RELEVANCE TO AN AS-APPLIED CHALLENGE BECAUSE THEN YOU'RE SAYING THIS IS HOW THE LAW AFFECTS US.

BUT JUST BECAUSE THE LAW AFFECTS META IN THE CERTAIN WAY DOESN'T MEAN IT AFFECTS X IN THE SAME WAY, DOESN'T MEAN IT AFFECTS DREAMWIDTH IN THE SAME WAY.  REALLY, I THINK THAT MAKES THE DETERMINATION IMPOSSIBLE.

AND MOODY WAS VERY CLEAR.  THAT'S WHY JUSTICE KAGAN SAID THEY'RE VERY HARD TO WIN.  THE COURT IS ACKNOWLEDGING, LIKE, IF YOU'RE GOING TO SAY THAT A STATUTE IS UNCONSTITUTIONAL AND LACKS A PLAINLY LEGITIMATE SWEEP ACROSS THE ENTIRE UNIVERSE OF APPLICATIONS, THAT'S A HUGE BURDEN TO CARRY, AND I THINK IT'S BEYOND WHAT YOU COULD CARRY WITH TWO DECLARATIONS FROM TWO POTENTIALLY REGULATED PARTIES.

THE COURT:  WELL, THAT'S WHY IT WAS SENT BACK, THAT'S WHY.

MR. KISSEL:  RIGHT.

THE COURT:  IN ESSENCE THE JUSTICES SAID THAT THERE'S MORE WORK TO BE DONE.

MR. KISSEL:  THAT'S RIGHT, YOUR HONOR.

THE COURT:  OKAY.

MR. KISSEL:  I THINK THAT'S IT.  I'M TRYING TO READ MY OWN NOTES.

UNLESS YOUR HONOR HAS ANY QUESTIONS?

THE COURT:  NO.  THANK YOU.

MR. LEHOTSKY, YOU HAVE TWO MINUTES, AND THEN WE'LL MOVE TO GOVERNMENTAL INTEREST, AND WE'VE TALKED A LITTLE BIT ABOUT IT, BUT TAILORING AND A LITTLE MORE FOCUSSED.

MR. LEHOTSKY:  YES, YOUR HONOR.  I THINK WE'VE SORT OF STARTED TALKING ABOUT CONTENT NEUTRALITY AND CONTENT BASED AND THEN ALSO TAILORING A LITTLE BIT.

THE COURT:  RIGHT.

MR. LEHOTSKY:  LET ME START FIRST WITH THE SORT OF ONLY TWO DECLARATIONS POINT.  I THINK THAT IGNORES OUR CLELAND DECLARATION, WHICH IS ABOUT ALL MEMBERS.  THERE'S ALSO THE PAOLUCCI DECLARATION ABOUT OUR MEMBER DREAMWIDTH BUT ESPECIALLY THE CLELAND DECLARATION.

BUT I ALSO TAKE MR. KISSEL'S CONCESSION THAT IT'S NOT REALLY RELEVANT FOR OUR FACIAL CHALLENGE, WHICH, AGAIN, WE THINK WE WIN UNDER -- HOWEVER YOU WOULD THINK ABOUT IT AS FACIAL OR AS APPLIED, OUR REASONING, OUR LEGAL REASONING IS CATEGORICAL.  IT DOESN'T MATTER WHETHER THERE WERE DIFFERENCES BETWEEN PINTEREST AND ITS MAIN PAGE AND YOUTUBE AND ITS MAIN PAGE.  THE THINGS -- THE SORT OF COMMON ELEMENT THAT UNITES THEM IS THAT THEY OFFER A PERSONALIZED FEED.  THAT'S WHAT THE STATE SEEKS TO TARGET.

TURNING TO MOODY AND SPENDING A LITTLE BIT OF TIME THERE, YOU KNOW, I THINK I VERY STRONGLY DISAGREE WITH THE STATE'S CHARACTERIZATION OF MOODY.  I THINK, YOU KNOW, MOODY DOESN'T

SUGGEST THAT THE INTERNET IS DIFFERENT OR WEIRD OR SCARY FOR FIRST AMENDMENT PURPOSES.

IT SAYS VERY CLEARLY, THE FIRST AMENDMENT, QUOTE, "DOES NOT GO ON LEAVE WHEN SOCIAL MEDIA ARE INVOLVED," END QUOTE. THAT'S VERY CONSISTENT WITH WHAT THE SUPREME COURT SAID IN BROWN, QUOTE, "THE BASIC PRINCIPLES OF FREEDOM OF SPEECH AND THE PRESS DO NOT VARY WHEN A NEW AND DIFFERENT MEDIAN FOR COMMUNICATION APPEARS," END QUOTE.

AND THAT'S CONSISTENT WITH ASHCROFT, RENO, AND PACKINGHAM AND ALL OF THE OTHER SUPREME COURT CASES THAT WE CITE.  THERE IS A WALL OF FIRST AMENDMENT PRECEDENT FROM THE SUPREME COURT SAYING THAT THESE TECHNOLOGICAL DIFFERENCES DO NOT MATTER. THEY DO NOT HAVE A DIFFERENCE FOR THE OUTCOME OF OUR FIRST AMENDMENT CHALLENGE.

I THINK MR. KISSEL SAID IT'S HARD TO WIN THESE CHALLENGES, AND IT'S TRUE THAT JUSTICE KAGAN SAID THAT AND YET WE WON.  ALL OF THESE LAWS ARE PRELIMINARILY ENJOINED.

IN PAXTON, THE CASE THAT WAS COMPANION TO MOODY, THE SUPREME COURT REBUKED THE FIFTH CIRCUIT AND SAID YOU'RE CLEARLY WRONG IN YOUR FIRST AMENDMENT ANALYSIS ABOUT WHY THESE WEBSITES' EDITORIAL DISCRETION CURATION ARE NOT PROTECTED, GO BACK AND TRY AGAIN.

THE COURT:  RIGHT.  SHE WAS CRITICAL BECAUSE THEY DIDN'T DO THE FULL ANALYSIS, THAT IS, TO ANALYZE ALL OF THOSE FEATURES.

MR. LEHOTSKY:  WELL, I THINK THAT'S BECAUSE OF THE SORT OF NATURE OF THE FLORIDA LAW, WHICH IS DIFFERENT FROM THE ONE HERE, BECAUSE HERE, AGAIN, THERE'S NO MYSTERY ABOUT WHICH WEBSITES THEY ARE TARGETING.

THEY ARE TARGETING SOCIAL MEDIA PLATFORMS THAT PROVIDE SOCIAL INTERACTION, THAT PROVIDE CONTENT THAT IS GENERATED BY OTHER USERS, AND NOT BY THEIR WEBSITE, WHICH IS WHY ESPN IS NOT COVERED BY THIS LAW.

THERE'S NOT AN EXPRESS CARVE-OUT SAYING THAT ESPN, YOU'RE ALL RIGHT WITH THE STATE OF CALIFORNIA, BUT THE LAW APPLIES ONLY TO WEBSITES THAT PROVIDE ONLY SOCIAL INTERACTION WITH THIRD PARTY CONTENT.  AGAIN, THE FUNDAMENTAL WAY THAT OUR MEMBER'S WEBSITES WORK HERE IS THAT THEY PROVIDE CONTENT FROM OTHER PEOPLE THAT A USER MIGHT BE INTERESTED IN.  AGAIN, YOU MIGHT BE INTERESTED IN THIS NIAGARA FALLS POST.

SO THAT'S WHY ESPN IS NOT COVERED HERE.  IT'S VERY CLEAR EXACTLY THE WEBSITES, THE SORT OF FIVE WEBSITES THAT WE CITE IN OUR DECLARATIONS THAT ARE CLEARLY COVERED, THAT'S WHO THEY ARE TARGETING, AND THAT'S WHO THEY ARE AFTER.

THE COURT:  SURE.

MR. LEHOTSKY:  IN FLORIDA, THE LAW WAS DRAFTED SO THAT, YOU KNOW, IT COULD APPLY TO UBER OR TO EMAIL.

NOW, THE THING IS, WHAT FLORIDA IS TRYING TO REGULATE HAS NOTHING TO DO WITH UBER, IT HAS NOTHING TO DO WITH EMAIL.  BUT THE WAY THAT FLORIDA DRAFTED THE LAW WAS NOT VERY PRECISE.

AND I THINK EVERYTHING THAT THE COURT SAID ABOUT HOW TO DO, YOU KNOW, FACIAL CHALLENGES AND WHAT TYPE OF FACTORS TO BE CONSIDERED NEEDS TO BE VIEWED THROUGH THE LENS OF THAT VERY POORLY DRAFTED FLORIDA LAW.

LIKE, FLORIDA IS TRYING TO REGULATE SOCIAL MEDIA COMPANY'S CONTENT MODERATION IN THE SAME WAY THAT TEXAS IS.  THEY JUST DRAFTED IT IN A VERY PECULIAR MANNER THAT RAISES QUESTIONS ABOUT WHETHER EMAIL OR UBER RIDE SHARE ARE RELEVANT.  AND THEY'RE NOT.  THEY'RE CLEARLY NOT RELEVANT TO THE OPERATIVE PROVISIONS OF THAT FLORIDA LAW.

BUT HERE THERE'S JUST NO MYSTERY.

AGAIN, I DON'T THINK THAT THE STATE IS MAKING ANY ARGUMENTS ABOUT, YOU KNOW, WHAT APPLICATIONS THERE MIGHT BE TO OTHER WEBSITES, OTHER SERVICES, ANY QUESTION ABOUT HOW IT WOULD APPLY TO OUR PERSONALIZED FEEDS.

AGAIN, WHAT THEY'RE TRYING TO DO IS REQUIRE PARENTAL CONSENT AND AGE ASSURANCE AS A PRECONDITION TO HAVING A PERSONALIZED FEED.  IF YOU DON'T GET PARENTAL CONSENT, THEN THE MINOR CAN'T GET IT.

THE SAME THING IS TRUE WITH RESPECT TO NOTIFICATIONS.

SO I THINK WHEN WE'RE TALKING ABOUT WHETHER ANY OF THESE FACTUAL QUESTIONS, THESE HYPOTHETICALS, THE SORT OF WHAT ABOUT, WHAT ABOUT THE CODE, WHAT ABOUT THE WAY THAT PINTEREST OPERATES AS COMPARED TO YOUTUBE, AGAIN, NONE OF THESE DIFFERENCES HAVE A FIRST AMENDMENT OUTCOME DETERMINATIVE EFFECT ON THE

FIRST AMENDMENT QUESTION.

I THINK MR. KISSEL ALSO REFERS A LOT TO THE CONCURRING OPINIONS, YOU KNOW, FROM JUSTICE BARRETT AND JUSTICE ALITO. AGAIN, THOSE ARE JUST THE CONCURRING OPINIONS.

THE COURT: RIGHT.

MR. LEHOTSKY: IT'S THE MAJORITY OPINION FROM JUSTICE KAGAN THAT I THINK WE REALLY NEED TO FOCUS ON.

THE COURT: I'M CURIOUS ABOUT DO WE -- AND I THINK THIS IS WHAT JUSTICE KAGAN SAID. SHE SENT IT BACK TO THE CIRCUITS BECAUSE IT NEEDED MORE WORK, AND THAT MORE WORK SEEMED TO BE A DEEPER DIVE INTO THE APPLICATIONS OF THE PLATFORMS AND THAT ANALYSIS.

AND IS THAT SOMETHING THAT THIS COURT NEEDS TO DO OR YOU NEED TO SHOW? WE'RE GOING TO MOVE INTO THAT DISCUSSION AND THEN TALK ABOUT BURDENS, THE SCRUTINY AND THE BURDENS.

BUT IS THAT ANALYSIS -- JUSTICE KAGAN SAID WE'RE A COURT REVIEW, NOT FIRST REVIEW. AND SHE SEEMED TO SAY THAT THAT'S WHAT THE LOWER COURT SHOULD HAVE DONE.

IS THAT SOMETHING THAT THIS COURT SHOULD ENGAGE IN?

MR. LEHOTSKY: WELL, YES. I THINK THERE'S A QUESTION OF STATUTORY INTERPRETATION, WHAT DOES THIS LAW DO?

THE COURT: RIGHT.

MR. LEHOTSKY: JUST LIKE THE COURT IN FLORIDA WILL SAY THIS IS WHAT THE LAW DOES AND THEN WILL MAKE A RULING FROM THERE.

HERE, THIS COURT CAN SAY THIS IS WHAT THIS LAW DOES.  THIS IS HOW THIS LAW OPERATES AND WHAT ITS EFFECT AND SCOPE ARE.

AGAIN, LIKE, SETTING ASIDE SORT OF THE VAGUENESS ARGUMENT WHICH YOUR HONOR WANTED TO SAVE UNTIL THE END WITH RESPECT TO DREAMWIDTH, BUT, AGAIN, THERE'S NO MYSTERY ABOUT HOW THIS LAW APPLIES, HOW THE STATE OF CALIFORNIA EXPECTS IT TO APPLY, BECAUSE, AGAIN, THEY'RE TRYING TO DIMINISH THE AMOUNT OF TIME THAT MINORS SPEND ON OUR WEBSITES.

LIKE, THAT IS EXACTLY WHAT THEY'RE TRYING TO DO.  AND I -- YOU KNOW, SOMETIMES THEY'RE TRYING TO RUN AWAY FROM THAT A LITTLE BIT AND SAY, NO, NO, NO, WE'RE NOT TRYING TO IMPOSE ANY SORT OF RESTRAINT ON SPEECH OR ANYTHING LIKE THAT.

I'M NOT SURE HOW ELSE I'M SUPPOSED TO READ A ONE-HOUR TIME LIMIT ON OUR WEBSITE WITH A PERSONALIZED FEED UNLESS YOU HAVE GOT PARENTAL CONSENT.  I MEAN, VERY CLEARLY THESE ARE -- THESE PROVISIONS ARE AIMED AT REDUCING SPEECH, REDUCING THE SPEECH THAT WE ENGAGE IN AND THAT ADULT AND MINORS ALIKE RECEIVE.

SO I THINK THE MOODY ANALYSIS KIND OF HERE IS VERY CLEAR AND VERY STRAIGHTFORWARD.  I DO THINK YOUR HONOR HAS TO ENGAGE IN THAT AND SAY THIS IS HOW THE LAW APPLIES, THIS IS, YOU KNOW, WHERE IT DOES AND DOESN'T APPLY.

NOW, AGAIN, I DON'T THINK ANY OF THE DIFFERENCES AROUND THE EDGES ABOUT, YOU KNOW, THE DIFFERENT INTERNET WEBSITES WOULD MATTER, AND I DON'T THINK THE STATE HAS IDENTIFIED ANY REASON, LIKE ANY BASIS FOR YOU TO THINK THAT THERE IS SOMETHING

ABOUT PINTEREST OR THAT THERE IS SOMETHING ABOUT X THAT WOULD BE CONSTITUTIONALLY RELEVANT FOR THE PURPOSE OF OUR FIRST AMENDMENT ARGUMENTS, WHICH AGAIN, ARE THAT PARENTAL CONSENT, AGE ASSURANCE, CATEGORICALLY UNCONSTITUTIONAL.

THE COURT:  OKAY.  THANK YOU.

MR. LEHOTSKY:  MAY I TURN TO THE CONTENT NEUTRALITY AND THE TAILORING?

THE COURT:  YES, LET'S DO THAT NOW.

WE'VE GOT -- WELL, I HAVE COURT I THINK AT 1:00 O'CLOCK, I THINK.  IT'S NOW QUARTER PAST.  WE HAVE SOME WORK STILL TO DO, AND I DON'T WANT TO LIMIT YOUR PRESENTATIONS BECAUSE YOU'RE HELPING ME WITH YOUR COMMENTS, BUT I JUST POINT OUT THE TIME.

SO LET'S MOVE TO THESE NOW.

MR. LEHOTSKY:  THANK YOU, YOUR HONOR.

AND WE'VE ALREADY TALKED A LOT ABOUT, YOU KNOW, THE CONTENT BASED AND SPEAKER BASED REASONS AND SORT OF THE TWO ARGUMENTS THAT WE HAVE FOR WHY IT IS A CONTENT BASED LAW.

YOU KNOW, MAYBE I WOULD ADDRESS BRIEFLY THE CITY OF AUSTIN VERSUS REAGAN NATIONAL ADVERTISING.  AGAIN, I DO THINK THAT THAT CASE IS SORT OF PERFECTLY IN LINE WITH OUR ARGUMENT ABOUT SOCIAL INTERACTION.  YOU KNOW, AGAIN, I'M QUOTING FROM REAGAN, QUOTE, "A REGULATION OF SPEECH CANNOT ESCAPE CLASSIFICATION AS A FACIALLY CONTENT BASED DISTINCTION SIMPLY BY SWAPPING AN OBVIOUS SUBJECT MATTER DISTINCTION FOR A FUNCTION OR PURPOSE PROXY.  IT ACHIEVES THE SAME RESULT."

AGAIN, THAT'S EXACTLY WHAT WE'RE TALKING ABOUT WITH THE DEFINITION OF SOCIAL MEDIA PLATFORM AND THE DEFINITION OF, QUOTE, YOU KNOW, "AN ADDICTIVE FEED" IN SECTION 22675 OF THE BUSINESS AND PROFESSIONS CODE AND THEN SECTION 20000.5.

WITH RESPECT TO THE SPEAKER BASED DISTINCTIONS, AGAIN, YOU KNOW, WE THINK THERE IS AT LEAST HEIGHTENED SCRUTINY IF NOT STRICT SCRUTINY.  WE THINK WE WIN EITHER WAY, AND I THINK THIS ALSO KIND OF SORT OF GETS INTO THE TAILORING ASPECTS BECAUSE FOR ALL OF THE REASONS THAT THIS IS A SPEAKER BASED DISTINCTION ALSO GO TO WHY IT IS A TAILORING PROBLEM, AGAIN, UNDER EITHER FORM OF SCRUTINY.

MR. KISSEL HAD NOTED THAT, YOU KNOW, THEY'RE TRYING TO REALLY GET TO THE PROBLEM, THE PROBLEM THAT THEY SAY IS UNIQUELY POSED BY SOCIAL MEDIA.

BUT, AGAIN, MINORS CAN FREELY ACCESS THE ALGORITHMICALLY CREATED FEEDS OF SHOWS, OF STREAMING SERVICES LIKE NEXFLIX OR HULU, BUT THEY CAN'T GET THAT SAME PERSONALIZED FEED OF CLIPS FROM, YOU KNOW, INSTAGRAM'S REELS OR YOUTUBE WITHOUT FACING AGE ASSURANCE AND PARENTAL CONSENT RESTRICTIONS.

SO CLEARLY OUR MEMBER WEBSITES ARE BEING SINGLED OUT FOR BURDENS THAT OTHER, YOU KNOW, SPEAKERS DON'T HAVE TO FACE.

YOU KNOW, ANOTHER EXAMPLE.  LIKE, AGAIN, THE ACT RESTRICTS MINOR USERS FROM ACCESSING PERSONALIZED FEEDS OF MUSIC ON YOUTUBE BUT NOT ON SPOTIFY.

THE SAME CAN BE SAID WITH RESPECT TO NOTIFICATIONS, AS I

DETAILED EARLIER.  YOU CAN GET NOTIFICATIONS FROM SOME WEBSITES IN THE MIDDLE OF THE NIGHT BUT NOT FROM OTHERS.

AGAIN, IF THE HARM THAT THEY ARE PURPORTEDLY ADDRESSING IS THAT, YOU KNOW, THERE IS ALL OF THIS REALLY GREAT CONTENT THAT EVERYBODY WANTS TO WATCH AND, YOU KNOW, IT INTERRUPTS SLEEP BECAUSE KIDS ARE ONLINE ALL OF THE TIME AND, YOU KNOW, NOT SLEEPING OR DOING THEIR HOMEWORK OR GOING OUTSIDE AND PLAYING. AGAIN, YOU KNOW, KIDS CAN JUST SWITCH, RIGHT?  THEY'LL GO TO ESPN, THEY'LL GO TO HULU, THEY'LL GO TO NEXFLIX.

AND THE SECOND POINT IS, AS I'VE SAID MANY TIMES WITH BROWN, THESE ARE THE EXACT SAME ARGUMENTS THAT WERE APPLIED WITH RESPECT TO THE VIOLENT VIDEO GAMES CASE SPECIFICALLY AND VIDEO GAMES AND TELEVISION MORE GENERALLY.

THE KIDS AREN'T GOING OUTSIDE.  INSTEAD, THEY'RE SITTING INSIDE AND WATCHING T.V. AND PLAYING VIDEO GAMES.  IT'S BAD FOR THEIR MENTAL HEALTH.

ALL OF THESE ARGUMENTS HAVE BEEN REJECTED BY THE SUPREME COURT AS INSUFFICIENT FOR A GOVERNMENTAL INTEREST.

SO WITH RESPECT TO BOTH STRICT SCRUTINY AND HEIGHTENED SCRUTINY, INTERMEDIATE SCRUTINY, WE'VE LAID OUT IN OUR PAPERS WHY WE THINK THAT THE GOVERNMENT DOESN'T HAVE A PROPER INTEREST FOR FIRST AMENDMENT REGULATION.  AND AGAIN, NOT SAYING THE STATE DOESN'T HAVE GOOD MOTIVES AND THEY'RE NOT ACTING OUT OF THE BEST INTEREST OF THE CHILDREN OF THE STATE OF CALIFORNIA, BUT THEY HAVE NOT IDENTIFIED A PROBLEM THAT NEEDS A

GOVERNMENTAL SOLUTION.  THAT'S WHAT BROWN SAYS.  AND I THINK BROWN AND ASHCROFT ARE PRETTY CLEAR THAT THERE'S NOT A SUFFICIENT REASON FOR GOVERNMENT INTERVENTION HERE WHEN YOU CAN HAVE ALL MANNER OF OTHER PARENTAL THINGS THAT COULD BE DONE.

AND THE STATE OF CALIFORNIA CAN DO ALL SORTS OF OTHER THINGS, RIGHT?  THEY COULD PROVIDE PUBLIC EDUCATION ABOUT THE IMPORTANCE OF MAKING SURE NOTIFICATIONS WERE TURNED OFF ON YOUR TEENAGER'S PHONE, OF TURNING THE WIFI OFF, OF DOING OTHER THINGS TO SORT OF KEEP AN EYE ON YOUR TEENAGER'S SOCIAL MEDIA USE.

THERE ARE ALL SORTS OF THINGS THAT THE STATE OF CALIFORNIA COULD DO TO MAKE ACCESS TO PARENTAL CONTROLS EASIER.

THERE ARE ALL SORTS OF THINGS THAT THE STATE OF CALIFORNIA COULD DO WITH SUBSIDIES, OTHER INCENTIVES TO TRY TO ENCOURAGE PARENTS TO USE MORE PARENTAL CONTROLS.

SO THE STATE DOESN'T HAVE ANY ANSWER FOR WHY THOSE ARE NOT SUFFICIENT AND DON'T UNDERMINE THEIR TAILORING WHEN IT COMES TO STRICT SCRUTINY.

AND THOSE SAME THINGS APPLY WITH RESPECT TO INTERMEDIATE SCRUTINY AND NARROW TAILORING AS WELL.

THE COURT:  ONE QUESTION.  I BELIEVE YOU WERE CRITICAL OF THE GOVERNMENT BECAUSE THEY, IN YOUR OPINION, SHOWED CORRELATION AND NOT CAUSATION.  AND I WOULD LIKE TO HEAR YOUR THOUGHTS ON IT.

I DO THINK THEY DO TALK A LITTLE BIT.  THEY PROVIDE SOME

EVIDENCE ABOUT EXPERIMENTS THAT REFLECT CAUSATION.  AND ISN'T THAT SUFFICIENT FOR THAT PART OF THE ANALYSIS?

MR. LEHOTSKY:  I DON'T THINK SO.

YOU KNOW, I THINK ACTUALLY WE NOTE THAT SOME OF THE CAUSATION IN THOSE STUDIES IS PRETTY WEAK, AND THERE ARE OTHER FACTORS, SORT OF FAMILIAL OR PERSONAL, YOU KNOW, DYNAMICS OR PREEXISTING MENTAL HEALTH ISSUES THAT MIGHT DRIVE ONLINE AND SOCIAL MEDIA USAGE RATHER THAN THE OTHER WAY AROUND AND THAT SORT OF THE CAUSATION STORY IS NOT AT ALL CLEAR.  THE SURGEON GENERAL SAYS THAT.

I ALSO DON'T THINK WE NEED TO WIN THAT ARGUMENT IN ORDER TO WIN OUR FIRST AMENDMENT PRELIMINARY INJUNCTION UNDER THE NINTH CIRCUIT STANDARD, BUT I DO THINK THAT THE EVIDENCE IS NOT THERE, THAT IT IS CORRELATION, IT IS NOT CAUSATION.

AND AGAIN, TWO OTHER POINTS.  ONE IS BROWN SORT OF REJECTS THE SAME KIND OF ARGUMENTS ABOUT MENTAL HEALTH AND EFFECT ON TEENAGERS FROM, YOU KNOW, VIDEO GAME PLAYING.  SO IT'S THE EXACT SAME, YOU KNOW, REPEAT OF THE SUPREME COURT SAYING THAT THIS EVIDENCE IS NOT NEARLY SUFFICIENT TO ESTABLISH THE HEALTH HARMS.  SO I THINK THAT'S POINT ONE.

POINT TWO IS, AGAIN, SPEECH IS DIFFERENT.  THE ATTORNEY GENERAL IS, YOU KNOW, AGAIN REFERENCING TOBACCO AND GAMBLING, AND THIS IS JUST VERY DIFFERENT WHEN YOU'RE TALKING ABOUT PROTECTED FIRST AMENDMENT SPEECH.

THE COURT:  I WAS JUST CURIOUS ALSO, JUST BECAUSE OF

THE TIMING OF THIS LITIGATION KEYED OFF OF WHEN THE STATUTE WAS ENACTED IN SEPTEMBER AS WE DISCUSSED.  YOU FILED YOUR MOTION IN EARLY NOVEMBER, I BELIEVE.  THIS IS ALL TO SAY THAT PERHAPS THE GOVERNMENT WILL ARGUE AND SUGGEST THAT, WELL, WE HAVEN'T HAD TIME TO DEVELOP ALL OF THAT GIVEN THE LIMITED WINDOW, AND WE CERTAINLY WOULD BE ABLE TO PROVIDE MORE.

THEY SUGGEST THAT IN THEIR PLEADINGS AT LEAST.

MR. LEHOTSKY:  I'M NOT SURE.

THE COURT:  WHAT ELSE IS OUT THERE?

MR. LEHOTSKY:  I'M NOT SURE WHEN THEY WILL BE ABLE TO COME UP WITH A RANDOMIZED CONTROLLED STUDY THAT WOULD BE ABLE TO ADDRESS ANYTHING ALONG THESE LINES.  THERE ARE A LOT OF BOOKS, SCHOLARLY ARTICLES THAT HAVE BEEN WRITTEN.  I MEAN, SOCIAL MEDIA HAS BEEN AROUND FOR A WHILE.  THIS IS A MUCH DISCUSSED, YOU KNOW, PHENOMENON.  IT'S BEEN A DECADE-PLUS, AND I DON'T THINK THERE'S ANY EVIDENCE THERE.  I HAVE NO REASON TO THINK THAT ANOTHER THREE MONTHS OR SIX MONTHS OR A YEAR IS GOING TO PRODUCE THAT EVIDENCE WHEN NOTHING HAS COME UP IN THE PAST DECADE.

THE COURT:  OKAY.  THANK YOU.

MR. KISSEL.

MR. KISSEL:  THANK YOU, YOUR HONOR.  I MIGHT GO A LITTLE BACKWARDS BECAUSE THE POINT THE COURT WAS DISCUSSING IS SORT OF FRESH IN MY MIND.

THE EVIDENCE -- FIRST OF ALL, I CERTAINLY WOULD

REEMPHASIZE FROM OUR PAPERS THAT THIS IS A VERY TIGHT TIMELINE TO PUT TOGETHER EXPERTS AND TO FIND THE KIND OF EVIDENCE THAT I THINK THIS CASE REALLY REQUIRES BECAUSE IT IS A FACTUALLY IMPORTANT INQUIRY, BUT WE DO HAVE SOME VERY GOOD DECLARATIONS LAYING OUT THE HARM.

AND I WOULD POINT TO THIS MAY BE THE PART OF THE DECLARATION THAT YOUR HONOR WAS REFERRING TO AND DR. FEDER'S DECLARATION WHERE HE TALKS ABOUT A RANDOMIZED TRIAL.  HE EXPLAINS THAT CORRELATION IS CAUSATION WHEN YOU'RE TALKING ABOUT A RANDOMIZED TRIAL, AND THAT IN THE PARTICULAR RANDOMIZED TRIAL HE WAS DISCUSSING, IT WAS A STUDY THAT SHOWED THAT EXCESSIVE INTERNET USE IS ESSENTIALLY COMPULSIVE AT A CERTAIN POINT; THAT IT IS EASIER TO AVOID THAT KIND OF EXCESSIVE USE IF THERE IS SORT OF AN EXTERNAL CONTROL ON THE USER'S ABILITY TO CONTINUE TO BE ONLINE I GUESS GENERICALLY; AND THAT THAT IS REALLY, IF NOTHING ELSE, IT'S JUST A REFLECTION FOR PEOPLE IN GENERAL THAT THIS SORT OF HABIT FORMING NATURE OF INTERNET USE IN OUR AGE IS DIFFICULT TO COUNTER.

BUT THEN I WOULD IN TANDEM WITH THAT REFER THE COURT TO DR. RADESKY'S DECLARATION WHERE IT TALKS ABOUT THE DEVELOPMENTAL DIFFERENCES BETWEEN CHILDREN AND ADULTS AND CHILDREN JUST BEING PARTICULARLY SUSCEPTIBLE TO THOSE KIND OF HABIT FORMING FEATURES.

SO I DO THINK THAT WE HAVE AT LEAST SOME OF THAT EVIDENCE THERE.

TO SORT OF THEN GO BACK TO THE BEGINNING, THIS MAY HAVE BEEN THE QUESTION THAT THE COURT ASKED OR JUST WHERE THE CONVERSATION WENT, BUT THE NETCHOICE CASES IN THE DISTRICT COURT FROM THE PAST 16 MONTHS OR SO, 2 OF THEM WERE DECIDED BEFORE MOODY.  MOODY DIDN'T CHANGE THE STANDARD OF FACIAL CHALLENGES, BUT IT CERTAINLY CLARIFIED THE STANDARD FOR FACIAL CHALLENGES, AND I THINK IT'S A CRUCIAL CASE FOR A DISTRICT COURT TO USE IN ASSESSING A CHALLENGE LIKE THIS ONE.

THE THIRD CASE, FITCH, I THINK IT CAME OUT THE SAME DAY AS MOODY.  SO THERE'S A MOODY CITATION IN THERE.  I DON'T KNOW. THE DECISION DOESN'T ENGAGE TOO DEEPLY WITH THE DISCUSSION IN MOODY.

AND THEN THERE ARE TWO CASES, PAXTON AND REYES, THAT WERE DECIDED AFTER MOODY, AND THERE ARE APPEALS PENDING IN BOTH OF THOSE CASES.

SO ALL OF THAT IS JUST TO SAY THAT I THINK MOODY IS AN IMPORTANT CLARIFYING CASE AND THAT THE DECISIONS IN THOSE DISTRICT COURTS ARE SUBJECT TO CHANGE, IF NOTHING ELSE.

I THINK IT'S IMPORTANT TO SAY THAT NOT ONLY DOES THE STATUTE NOT TARGET SOCIAL MEDIA, BUT IT DOESN'T TARGET SOCIAL MEDIA BECAUSE, AS THE SURGEON GENERAL'S REPORT SAYS, THERE ARE VERY IMPORTANT USES OF SOCIAL MEDIA.

THE STATE, YOU KNOW, IN THIS ACT AT LEAST ISN'T ATTEMPTING TO KEEP CHILDREN OFF OF SOCIAL MEDIA AND, IF ANYTHING, IT EXPRESSLY PRESERVES, FOR EXAMPLE, THE ABILITY OF MINORS TO SEND

EACH OTHER MESSAGES.

I DON'T THINK MESSAGES COULD BE INTERPRETED AS BEING ADDICTIVE FEEDS, BUT THE STATUTE GOES OUT OF ITS WAY TO SAY MINORS CAN STILL ENGAGE IN THIS SORT OF SPEECH ACTIVITY THAT GOES ON ON SOCIAL MEDIA WEBSITES BECAUSE THE POINT IS NOT TO POINT A FINGER AT SPECIFIC WEBSITES OR SPECIFIC KINDS OF WEBSITES, IT'S REALLY TO ZERO IN ON A PARTICULAR FEATURE RELATED HARM AS I'VE, YOU KNOW, SAID PROBABLY AD NAUSEAM AT THIS POINT.

BUT I THINK THAT'S AN IMPORTANT DISTINCTION TO MAKE BECAUSE I DON'T THINK ANYBODY WHO WAS INVOLVED IN THIS LAW AND I DON'T THINK THAT THE STATE WOULD WANT TO BE CONSTRUED AS DEMONIZING ANY PARTICULAR SPEAKER OR ANY PARTICULAR KIND OF WEBSITE.  IT'S JUST NOT THE CASE.

IF THERE'S A REASON THAT SOME WEBSITES ARE SUBJECT TO STATUTE AND SOME AREN'T, IT'S NOT BECAUSE THOSE LINES ARE DRAWN IN THE STATUTE BETWEEN, FOR EXAMPLE, IN ESPN, A WEBSITE THAT MAY OR MAY NOT HAVE AN ADDICTIVE FEED AND A WEBSITE THAT -- A NETCHOICE MEMBER THAT SAYS WE THINK WE HAVE AN ADDICTIVE FEED, IT'S NOT BECAUSE THE STATUTE DOES OR HAS ANY INTEREST IN MAKING THAT DISTINCTION.  THAT WOULD BE A CONTENT BASED DISTINCTION IF THAT WERE THE CASE, IF IT WERE BASED ON THE CONTENT THAT THOSE SITES PUBLISH.

I THINK IN TERMS OF MOODY AND WHAT THE COURT IS SUPPOSED TO GET FROM MOODY, CERTAINLY IT IS A COMPLICATED DECISION TO

RING SOME RULES OUT OF.

BUT I WOULD DIRECT THE COURT TO THE NETCHOICE VERSUS BONTA CASE THAT HAS ALREADY BEEN THROUGH THE NINTH CIRCUIT WHERE THE NINTH CIRCUIT PANEL TALKS ABOUT DARK PATTERNS, DARK PATTERNS BASICALLY BEING THIS SORT OF BLANKET TERM FOR FEATURES ON WEBSITES THAT I THINK MAKE IT, YOU KNOW, SORT OF CONFUSING OR DIFFICULT FOR USERS TO USE.  IT'S NOT MY AREA OF EXPERTISE AGAIN, BUT I THINK THE POINT THAT IS IMPORTANT TO TAKE FROM THAT CASE WAS THAT THE COURT SAID THE DISTRICT COURT DID NOT LOOK AT HOW THESE DARK PATTERNS ARE USED OR HOW THEY BEHAVE ON CERTAIN WEBSITES.

I MEAN, IF YOU'RE GOING TO MAKE A FACIAL CHALLENGE TO A WEBSITE THAT REGULATES THESE DARK PATTERNS, THEN THE COURT ACTUALLY NEEDS TO LOOK AT WHAT THE STATUTE IS DOING WITH RESPECT TO THE REGULATED PARTIES.

THE COURT:  THAT WAS MY QUESTION TO MR. LEHOTSKY. DOES THIS COURT THEN, DO I NEED TO DO THAT LARGE ANALYSIS THAT JUSTICE KAGAN SUGGESTED THESE OTHER COURTS DID NOT DO, AS TO APPLICATIONS, PLATFORMS, AND ALL OF THOSE THINGS?

MR. KISSEL:  YES, IN THIS CASE I THINK SO.

THE COURT:  AND IS IT POSSIBLE TO DO SO ON THIS RECORD?

MR. KISSEL:  NOT ON THIS RECORD, NO, YOUR HONOR. AND THAT'S THE POINT OF US SAYING TWO DECLARATIONS.  I MEAN, IF I WAS IMPRECISE, THOSE ARE THE TWO DECLARATIONS THAT PERTAIN TO

TWO OF THE NETCHOICE MEMBERS THAT PLAINTIFF SAID IT IS BRINGING AN AS-APPLIED CHALLENGE ON BEHALF OF -- I'M SURE I SAID IT WORSE THE SECOND TIME, BUT THAT'S HOW IT GOES.

I THINK NETCHOICE VERSUS BONTA SORT OF DISPELS THE NOTION THAT THE ONLY PROBLEM WITH THE FLORIDA LAW IN PARTICULAR WAS THAT IT MAY HAVE SWEPT IN UBER AND GMAIL.  THERE WAS CERTAINLY AN ISSUE WITH THAT STATUTE.

BUT IT SORT OF MADE IT EASIER, I THINK, PROBABLY FOR THE COURT TO SAY YOU DIDN'T LOOK AT ANY OF THESE OTHER APPLICATIONS, BUT IT DOESN'T MEAN THAT THOSE ARE THE ONLY KINDS OF APPLICATIONS THAT NECESSARILY ARE IMPLIED BY THE MOODY DECISION.

WHEN WE TALK ABOUT THE POINT OF THE LAW TO DIMINISH THE TIME SPENT ON CERTAIN WEBSITES, I THINK THAT JUST GOES BACK TO THE ARGUMENT OR THE POINT I WAS MAKING EARLIER IN TERMS OF, FIRST OF ALL, WHETHER THIS ON ITS FACE EVEN MAKES SPEAKER BASED DISTINCTIONS THAT ARE CONTENT BASED BUT JUST ALSO THE BROADER POINT ABOUT SPEAKER BASED DISTINCTIONS IN TERMS OF WHETHER THOSE DECISIONS INDICATE A PRETEXTUAL REASON FOR THE STATUTE.

AND SO I WOULD -- BECAUSE THERE'S REALLY NO DISTINCTION BETWEEN DIFFERENT WEBSITES, I DON'T THINK YOU COULD FAIRLY SAY THAT THE APPARENT PURPOSE OF THE WEBSITE IS TO LIMIT THE TIMELINE SPENT ON CERTAIN WEBSITES, ONLY THAT THE POINT IS TO LIMIT THEIR EXPOSURE TO CERTAIN MECHANISMS THAT CREATE THE SORT OF HARMS THAT ARE IDENTIFIED IN THE LEGISLATIVE FINDINGS THAT

ARE IDENTIFIED IN THE DECLARATIONS. FOR EXAMPLE, I THINK IT'S ONE-THIRD OF ADOLESCENT GIRLS DESCRIBE THEIR OWN USE OF SOCIAL MEDIA AS ADDICTION, MEANING PRESUMABLY THAT THEY WOULD LIKE TO USE IT LESS BUT FEEL POWERLESS TO DO SO; THAT TEENS DESCRIBE FEELING MANIPULATED BY THOSE MECHANISMS, YOU KNOW, JUST TO SORT OF ILLUSTRATE THAT NON-CONTENT RELATED HARM THAT WE'RE TALKING ABOUT.

IT'S ALSO IMPORTANT TO EMPHASIZE, I THINK, THIS IDEA THAT IT'S NOT A RELEVANT -- IT MAY NOT BE A RELEVANT DETERMINATION HOW THE DIFFERENT CONTENT FEEDS WORK, THAT THE STATE HASN'T OFFERED ANY EVIDENCE TO SAY THAT THE WAY THAT PINTEREST WORKS IS RELEVANT, THE DIFFERENCE BETWEEN THE WAY THAT PINTEREST AND FACEBOOK WORKS IS RELEVANT TO THE CASE.

IT'S NOT THE STATE'S BURDEN TO COME INTO COURT AND SHOW HOW PINTEREST WORKS. THE DIFFERENCE IS DO THOSE -- THE DIFFERENCE IS ESSENTIAL TO THE COURT'S ABILITY TO RESOLVE THE FACIAL CLAIM. IT'S NOT THAT -- I MEAN, WE DON'T KNOW OR PRESUME TO KNOW THAT THEY'RE NECESSARILY DIFFERENT, BUT IF THE QUESTION IS AS FIVE JUSTICES SAID IT IN MOODY, WHICH I THINK IS RELEVANT EVEN THOUGH A LOT OF THAT ANALYSIS WAS CONTAINED IN CONCURRING OPINIONS, THAT JUST BECAUSE, FOR EXAMPLE, IN A FEED THERE'S CONTENT FLOWING THROUGH IT, THERE ARE MANY RELEVANT DETERMINATIONS THAT ARE REQUIRED BEFORE A COURT COULD SAY THAT IS SPEECH OR THAT IS EXPRESSIVE CONDUCT. AND WHO KNOWS HOW CERTAIN FEEDS WORK ON CERTAIN WEBSITES. A LOT OF IT IS JUST --

IT'S OPAQUE, AND IT'S NOT IN THE RECORD.

THE COURT:  YOU MENTIONED THE GOVERNMENT BURDEN IN THIS FACIAL ANALYSIS.  AND WHAT IS THAT BURDEN?

MR. KISSEL:  WELL, I MEAN, ITS ESSENTIALLY THE CORE BURDENS ARE -- ARISE FROM THE POSTURE OF THE CASE.  SO ON A MOTION FOR PRELIMINARY INJUNCTION, IT'S THE PLAINTIFF'S BURDEN TO DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

SO THAT'S NOT ANY DIFFERENT JUST BECAUSE THIS IS A FACIAL CHALLENGE.

IF THIS COURT WERE -- IF THIS CASE WERE SUBJECT TO STRICT SCRUTINY, WHICH IT ISN'T, THERE IS A LITTLE BIT MORE FUZZINESS IN TERMS OF THE STATE HAS A BURDEN TO SHOW IT HAS A COMPELLING INTEREST, WHICH WE OF COURSE BELIEVE THAT WE DO AND WE HAVE DONE, BUT THAT DOESN'T TAKE AWAY THE SORT OF CORE BURDEN ON THE MOTION FOR THE PLAINTIFF TO AGAIN COME INTO COURT AND SHOW HOW --

THE COURT:  AND WHAT ABOUT AN INTERMEDIATE ANALYSIS, WHAT IS THE GOVERNMENT'S BURDEN THERE?

MR. KISSEL:  SO ON THE INTERMEDIATE ANALYSIS, MY UNDERSTANDING IS THAT THE COURT JUST -- OR THAT THE STATE -- AND FORGIVE ME IF I MISSTATE IT -- THAT THE STATE JUST NEEDS TO SHOW THAT IT HAS AN IMPORTANT INTEREST AND THAT THOSE -- THAT THE LAW IS TAILORED TO THAT INTEREST, SUFFICIENTLY TAILORED TO THAT AND IT LEAVES OPEN SUFFICIENT AVENUES OF SPEECH.

I'M A LITTLE BIT FUZZY ON EXACTLY THE BURDEN ON THAT SO --

THE COURT:  SO I WAS CURIOUS ABOUT IS THAT PREPONDERANCE?  IS IT CLEAR AND CONVINCING?

I DON'T THINK THERE ARE CASES THAT SPEAK TO THAT.

MR. KISSEL:  I DON'T THINK THERE ARE.  IF THERE ARE, I DON'T KNOW WHAT THEY ARE.  AND I ALSO DON'T WANT TO MISSTATE WHETHER IT'S THE GOVERNMENT'S BURDEN OR NOT.

THE COURT:  RIGHT.

MR. KISSEL:  BUT THAT IS AN ANALYSIS, OF COURSE.

THE COURT:  RIGHT.  THE COURT SHOULD LOOK AND SEE WHAT THE PURPOSE OF THE STATUTE IS AND WHETHER OR NOT IT -- AND I THINK THE LANGUAGE IS THE LARGE SWEEP OF THAT PURPOSE, HOW THAT AFFECTS AND INTERVENES WITH FIRST AMENDMENT.

MR. KISSEL:  DIFFERENT COURTS HAVE PUT IT IN DIFFERENT WAYS, AND I THINK THE WORDING HAS CHANGED A BIT.

BUT THE POINT IS FOR AN INTERMEDIATE SCRUTINY ANALYSIS, THAT THE INTEREST -- I MEAN, BECAUSE IT DOESN'T HAVE TO BE COMPELLING, THEN IT IS A LESSER BURDEN TO SOME DEGREE, AND THAT IT DOESN'T HAVE TO BE THE LEAST RESTRICTIVE MEANS TO SATISFY INTERMEDIATE SCRUTINY.  IN SHORT, IT'S AN EASIER STANDARD TO SATISFY.

AND I THINK ONE OF THE KEY PARTS OF THE INTERMEDIATE SCRUTINY ANALYSIS THAT IS RELEVANT IS THAT A LAW WILL PASS INTERMEDIATE SCRUTINY IF IT SATISFIES THOSE OTHER REQUIREMENTS AND IF THERE ARE AMPLE AVENUES FOR EXPRESSION AND FOR SPEECH TO

BE PROMULGATED OR ACCESSED.

AGAIN, BECAUSE AT MOST THIS LAW IS SUBJECT TO INTERMEDIATE SCRUTINY, THAT PRONG IS PARTICULARLY RELEVANT BECAUSE, FOR EXAMPLE, WITH THE ADDICTIVE FEEDS RESTRICTIONS, THE WAY THE CONTENT IS PRIORITIZED FOR DISPLAY MAY BE DIFFERENT, THE WAY -- THE ABILITY OF A USER TO ACCESS THE CONTENT IS NOT CHANGED. AND THAT IS REALLY ABOUT THE ACCESSIBILITY OF THE CONTENT AND THE AMPLE AVENUES FOR ALTERNATIVE COMMUNICATION.

THE COURT:  SO DO YOU HAVE -- AS THE GOVERNMENT, DO YOU HAVE TO THEN SHOW THAT THE LEGISLATION FURTHERS AN IMPORTANT OR SUBSTANTIAL GOVERNMENTAL INTEREST, THAT THAT INTEREST IS UNRELATED TO THE SUPPRESSION OF FREE EXPRESSION, AND THAT THE INCIDENTAL RESTRICTION ON THE FIRST AMENDMENT FREEDOMS IS NO GREATER THAN IS ESSENTIAL TO THE FURTHERANCE OF THAT INFERENCE, IS THAT THE STANDARD THAT I SHOULD BE LOOKING AT?

MR. KISSEL:  THAT SOUNDS LIKE AN INTERMEDIATE, YOUR HONOR.

THE COURT:  OKAY.  THANK YOU.

MR. KISSEL:  THE OTHER COUPLE OF POINTS THAT I'LL JUST ACKNOWLEDGE BEFORE I SIT DOWN IS THAT, YOU KNOW, AGAIN, BROWN IS DISTINGUISHABLE FOR MANY REASONS, ONE OF WHICH IS IT WAS A DIFFERENT --

THE COURT:  THAT WAS MY QUESTION IS -- YOU KNOW, YOUR COLLEAGUE HAS RECITED BROWN AND WE KNOW ABOUT BROWN NOW.

AND MY QUESTION IS HOW DO YOU SQUARE THIS LEGISLATION WITH THE BAN ON VIOLENT VIDEO GAMES THAT WERE INVALIDATED IN BROWN?

AND MR. LEHOTSKY SAYS, THIS IS EXACTLY THE SAME AS BROWN, AND JUST GO THERE AND YOU DON'T HAVE TO GO ANY FURTHER, JUDGE.

HOW DO YOU SQUARE THAT?

MR. KISSEL:  THERE WAS NEVER EVEN ANY DISPUTE IN BROWN REALLY AS TO WHETHER THERE WAS A CONTENT -- THE CONTENT WAS TARGETED IN THAT LAW, BECAUSE THE LAW WAS -- MY UNDERSTANDING FROM READING THE CASE IS THAT IT WAS ESSENTIALLY AN ATTEMPT BY THE STATE TO SAY, WELL, BECAUSE OBSCENE MATERIAL IS NOT PROTECTED UNDER THE FIRST AMENDMENT, VIOLENT VIDEO GAMES ARE OBSCENE, AND, THEREFORE, THIS CONTENT IS NOT PROTECTED UNDER THE FIRST AMENDMENT.  THAT WAS SORT OF THE THRUST OF THE STATUTE.

AND SO I THINK THERE'S A CERTAIN ELEMENT OF BROWN THAT ALMOST SEEMS OBVIOUS.  I MEAN, IT'S CLEARLY A VIOLENT VIDEO GAME.  IT'S A PARTICULAR KIND OF CONTENT.  IT HAS A PARTICULAR KIND OF MESSAGE THAT IF IT IS TARGETED, YOU HAVE A CONTENT BASED DISTINCTION.

HERE, AT THE VERY LEAST, IT'S A VERY COMPLICATED OPEN QUESTION AS TO WHETHER A SPECIFIC CONTENT FEED, A SPECIFIC ADDICTIVE FEED AS DESCRIBED IN THE STATUTE IS EVEN EXPRESSIVE IN THE SAME WAY.

I MEAN, I WOULD ARGUE THAT IT'S NOT ESPECIALLY TO THE EXTENT THAT THERE'S NO HUMAN INTERACTION INVOLVED.  ARTIFICIAL

INTELLIGENCE DOESN'T HAVE FIRST AMENDMENT RIGHTS, SO IF IT'S ARTIFICIAL INTELLIGENCE MAKING THOSE DECISIONS, THAT'S A HUGE DISTINGUISHING FACTOR.

BUT THAT'S JUST -- THAT EVEN ASSUMES WE'VE GONE BEYOND THE THRESHOLD THAT WE EVEN HAVE SPECIFIC FEEDS THAT WE CAN LOOK AT TO MAKE THAT DETERMINATION.

ANOTHER DIFFERENCE WITH BROWN IS THAT IT WAS JUST A DIFFERENT CASE WITH A DIFFERENT RECORD.  SO THE FACT THAT THE COURT SAID, WELL, YOU KNOW, THE STATE HASN'T COME INTO THE COURT WITH A RECORD THAT SUBSTANTIATES THE HARM, IT DOESN'T SAY ANYTHING ABOUT WHAT RECORD WE'VE GOT IN THIS CASE.

WE'VE GOT, AMONG OTHER THINGS, A CLEAR -- WE'VE GOT CLEAR LEGISLATIVE FINDINGS AND A CLEAR STATEMENT AND THE PURPOSE OF THE LAW WHICH AT LEAST ON THAT SORT OF BASIC LEVEL WOULD DISTINGUISH THIS CASE.  AND THOSE KINDS OF THINGS WEREN'T DISCERNIBLE AND DIFFERENT KINDS OF PRETEXTS, POTENTIAL PRETEXTS WERE POPPING UP TO ADD QUESTIONS THAT THE COURT HAD ABOUT THAT LAW.

THE ONLY OTHER THING, AND MAYBE WE'RE ABOUT TO GET TO THIS SO YOUR HONOR TELL ME IF YOU WOULD RATHER HAVE ME SAVE IT, BUT I KNOW WE'RE GOING TO TALK ABOUT DEFAULTS.

THE COURT:  THAT'S NEXT, RIGHT.

MR. KISSEL:  OKAY.  WELL, THERE WAS A POINT MADE ABOUT MAYBE TURNING OFF THE WIFI AT HOME IS THE SAME -- YOU KNOW, IT'S THE KIND OF INTERVENTION THAT THE FAMILY COULD TAKE

WITHOUT HAVING THE GOVERNMENT GET INVOLVED.

WITHOUT BELABORING THE POINT, I THINK THAT ALSO SPEAKS TO THE DIFFICULTY OF THE FACTUAL CHALLENGE BECAUSE WE DON'T KNOW WHAT KIND OF INTERNAL MECHANISMS THAT THESE COMPANIES MIGHT HAVE.

BUT THE OTHERS, I DON'T THINK ANY OF THE EXAMPLES THAT THE PLAINTIFF HAS POINTED TO IN TERMS OF WHAT KIND OF CONTROLS ARE AVAILABLE TO PARENTS DO WHAT THIS LAW DOES.  YOU KNOW, TO THE EXTENT THAT ANY OF THEM, YOU KNOW, EXISTS -- I MEAN, I ASSUME THEY DO -- THAT, YOU KNOW, A PARENT TURNING OFF THE WIFI AT HOME WOULD, I MEAN, WOULD EXILE THE ENTIRE FAMILY FROM THE INTERNET.  IT'S CLEARLY A DIFFERENT KIND OF MEASURE FROM SOMETHING THAT PRECISELY TARGETS A SPECIFIC MECHANISM ON THESE WEBSITES.

I DON'T KNOW THAT THERE'S ANYTHING LIKE THAT, THAT THESE COMPANIES DO INTERNALLY, BUT EVEN ASSUMING THAT THERE WERE, WE STILL HAVE A RECORD DOCUMENTING THAT THESE MECHANISMS ARE CAUSING HARM AND THAT SOME KIND OF -- THERE IS A JUSTIFICATION FOR THE GOVERNMENT'S INVOLVEMENT THAT WAS APPARENTLY NOT PRESENT IN BROWN.

THE COURT:  OKAY.

MR. KISSEL:  THANK YOU, YOUR HONOR.

THE COURT:  GREAT.  THANK YOU.

MR. LEHOTSKY.

MR. LEHOTSKY:  THANK YOU, YOUR HONOR.

SO I'LL START WITH SOME POINTS KIND OF WRAPPING UP ON MOODY AND THE QUESTION ABOUT WHO BEARS THE BURDEN BEFORE THEN TURNING TO THE DEFAULT PROVISIONS.

SO, YOU KNOW, I THINK WE'RE IN AGREEMENT THAT YOUR HONOR SHOULD CONDUCT THE MOODY ANALYSIS, WHICH AS I SAID REQUIRES INTERPRETING THE STATUTE.  WHAT DOES THE STATUTE DO?  AND THEN WHO DOES IT APPLY TO?

AS I SAID, I THINK IN THIS INSTANCE, THIS IS A VERY STRAIGHTFORWARD CASE.  YOU KNOW, WE HAVE DECLARATIONS IN THE RECORD FROM THREE OF OUR MEMBERS AND FROM THE GENERAL COUNSEL OF OUR CLIENT WHO KNOWS THE MEMBERSHIP, KNOWS ALL OF THE MEMBERS THAT ARE COVERED SAYING WE OFFER PERSONALIZED FEEDS, WE PROVIDE NOTIFICATIONS, WE DO ALL OF THE THINGS THAT CALIFORNIA SEEKS TO REGULATE.

THEY HAVE NOT IDENTIFIED ANY APPLICATIONS OR ANY SERVICES THAT WOULD BE WITHIN THE SCOPE OF THIS LAW THAT YOU NEED TO ASSESS.  YOU KNOW, THE APPLICATION OF THIS LAW IS TO OUR MEMBERS AND TO OUR MEMBER SERVICES THAT WE IDENTIFY.  THERE IS NOTHING ELSE THAT NEEDS TO BE DONE, NO FACTUAL INVESTIGATION, NO INQUIRY FOR THAT ANALYSIS TO BE UNDERTAKEN AT THE PRELIMINARY INJUNCTION STAGE.

AGAIN, THE INJUNCTIONS AGAINST THE LAW IN TEXAS AND THE LAW IN FLORIDA ARE STILL FULLY IN PLACE ON REMAND FROM THE SUPREME COURT.

THE SUPREME COURT MIGHT HAVE SAID THERE NEEDS TO BE SOME

INTERPRETATION ABOUT WHAT THIS STATUTE MEANS THAT HAPPENS ON THE FRONT END, BUT THAT DOESN'T MEAN THERE'S ANY KIND OF FACTUAL EVIDENCE OR ANY GAP IN THE RECORD.

I THINK ALL THAT THE STATE IS OFFERING IS JUST SPECULATION. IT MIGHT BE AI, IT MIGHT BE THAT THERE ARE SOMETHING THAT COMPANIES CAN DO. NONE OF THAT IS IN THE RECORD. NONE OF THAT NEEDS TO DETAIN YOUR HONOR IN RULING ON THE PRELIMINARY INJUNCTION REQUEST THAT IS BEFORE YOU.

AND I THINK, YOU KNOW, THIS KIND OF CIRCLES NOW TO THE QUESTION ABOUT WHO BEARS THE BURDEN. YOU KNOW, IT IS CERTAINLY OUR BURDEN AS THE PLAINTIFF TO IDENTIFY A COLORABLE FIRST AMENDMENT CLAIM, WHICH I THINK WE HAVE DONE.

AND THEN IT IS THE GOVERNMENT'S BURDEN TO ESTABLISH THAT THEY SATISFY WHATEVER LEVEL OF SCRUTINY, WHETHER THAT'S STRICT SCRUTINY OR INTERMEDIATE SCRUTINY, WE THINK WHICHEVER YOUR HONOR CHOOSES TO APPLY, THIS LAW FAILS, BUT IT'S THEIR BURDEN.

I AGREE WITH YOUR HONOR. I'M NOT AWARE OF A CASE THAT SAYS WHETHER THAT'S THE PREPONDERANCE OF THE EVIDENCE OR ANYTHING LIKE THAT, BUT AGAIN, I THINK EVEN IF YOUR HONOR WERE TO CHOOSE TO PROVIDE THE LOWEST POSSIBLE BURDEN FOR THE GOVERNMENT, THEY DON'T SATISFY THAT FOR THE PURPOSES OF WHETHER WE ARE LIKELY TO SUCCEED ON THE MERITS OF OUR FIRST AMENDMENT CLAIMS.

MAYBE TURNING NOW TO THE DEFAULT PROVISIONS.

THE COURT:  RIGHT.  LET'S DO THAT.

MR. LEHOTSKY:  SO TURNING TO THE DEFAULT PROVISIONS.

AGAIN, I WANT TO GO BACK TO BROWN.  BROWN SAYS CLEARLY THAT MINORS HAVE, QUOTE, "THE CONSTITUTIONAL RIGHT," END QUOTE, UNDER THE FIRST AMENDMENT TO SPEAK OR TO BE SPOKEN TO WITHOUT THEIR PARENT'S CONSENT.

THESE PROVISIONS, AND THERE ARE FOUR OF THEM IN SECTION 27002(B), REQUIRE COVERED WEBSITES, OUR MEMBERS, TO PROVIDE MECHANISMS FOR PARENTS TO, ONE, PREVENT THEIR CHILD FROM RECEIVING NOTIFICATIONS DURING CERTAIN HOURS UNLESS THE PARENT SAYS OKAY, BUT IT'S BASICALLY DICTATED BY THE PARENTS.  SO IT'S THE STATE OF CALIFORNIA DOING EXACTLY WHAT BROWN SAID IS PROHIBITED.

TWO, LIMIT THEIR CHILD'S ABILITY TO VIEW THE NUMBER OF LIKES OR FEEDBACK ON A PERSONALIZED FEED.  THAT IS NOT A TIME, PLACE, AND MANNER RESTRICTION.  THAT IS YOU CAN'T SEE HOW MANY PEOPLE LIKE YOUR POST OR COMMENT ON YOUR POST OR YOUR VIDEO OR WHATEVER IT IS.

AGAIN, CLEARLY AN INFRINGEMENT ON MINOR'S SPEECH RIGHTS UNDER BROWN AND OTHER SUPREME COURT CASES.

THREE, REQUIRE THE DEFAULT FEED PROVIDED TO THE CHILD ON THE WEBSITE NOT RECOMMEND, SELECT, OR PRIORITIZE MEDIA BASED ON INFORMATION PROVIDED BY THE USER OR OTHERWISE ASSOCIATED WITH THE USER OR USER'S DEVICE.

AGAIN, NOT TIME, PLACE AND MANNER.  CLEARLY A RESTRICTION

ON OUR ABILITY TO PROVIDE A PERSONALIZED FEED.

FOUR, SET THEIR CHILD'S ACCOUNT TO PRIVATE MODE WHERE ONLY THE USERS CONNECTED TO THE CHILD MAY VIEW OR RESPOND TO CONTENT POSTED BY THE CHILD.

SO ALL OF THESE ARE DEFAULT LIMITS WHICH CALIFORNIA SETS AS NO SPEAKING.  I GUESS THAT LAST ONE IS SORT OF NO TALKING WITH STRANGERS UNLESS MOM AND DAD SAY IT'S OKAY.

THESE ARE, AGAIN, CLEARLY VIOLATIONS OF THE FIRST AMENDMENT, RUN FULL UP AGAINST BROWN, AND FOR ALL OF THE REASONS THAT WE HAVE NOTED PREVIOUSLY WITH RESPECT TO NARROWED TAILORING, FAIL ALL OF THOSE NARROWED TAILING REQUIREMENTS.

THE COURT:  ARE THESE CONTENT NEUTRAL?  CAN WE LOOK AT THEM THAT WAY?  WHAT ARE YOUR THOUGHTS ON THAT?  OR DO WE HAVE TO LOOK AT THEM THAT WAY?

MR. LEHOTSKY:  SO I THINK THEY ARE ALL CONTENT BASED BECAUSE OF THE CENTRAL COVERAGE DEFINITION, SO THAT SORT OF INFECTS EVERYTHING ELSE.

THE COURT:  EVEN IN THE PRIVATE MODE?  EVEN IN PRIVATE MODE?

MR. LEHOTSKY:  YES, I THINK SO.  YES.  LIKE, BECAUSE OF THAT CENTRAL COVERAGE DEFINITION, WHICH DIVVIES UP WEBSITES BASED ON WHETHER THERE IS ONE SOCIAL INTERACTION OR TWO, SUBJECT TO A PREFERRED EXCEPTION BASED ON THE TYPE OF CONTENT THAT THEY HAVE.  IF YOU'RE A WEBSITE THAT HAS CONSUMER PRODUCT REVIEWS, YOU'RE OKAY.  IF YOU'RE NOT, YOU KNOW, YOU'RE SUBJECT

TO CALIFORNIA'S REGULATION.  SO THAT AFFECTS EVERYTHING, INCLUDING THESE PROVISIONS.

BUT THEN WITH RESPECT TO THESE FOUR PROVISIONS SPECIFICALLY, YOU KNOW, SOME OF THEM ARE CONTENT BASED.  YOU KNOW, THE NOTIFICATION IS ONE, I WOULD AGREE.  LIKE, THAT'S JUST NOTIFICATIONS.  IT DOESN'T MATTER WHAT THE NOTIFICATION IS.

BUT THE SECOND CATEGORY, LIKES OR OTHER FORMS OF FEEDBACK, CLEARLY CONTENT BASED.

SAME, I THINK, WITH, YOU KNOW, RECOMMENDING, SELECTING, PRIORITIZING MEDIA BASED ON INFORMATION PROVIDED BY THE USER.  SO THAT IS SORT OF DIRECTED AT US.  IF WE SEE THAT A USER LIKES A JOSH ALLEN VIDEO, HE MIGHT THINK, WELL, THIS USER MIGHT BE INTERESTED IN THE NFL, MIGHT BE INTERESTED IN THE BUFFALO BILLS.  YOU KNOW, WHO KNOWS WHY, BUT THERE'S SORT OF THAT CONTENT, AND THIS IS A RESTRICTION ON WHAT WE'RE ABLE TO DO IN EXERCISING OUR EDITORIAL DISCRETION UNLESS THERE IS PARENTAL CONSENT.

THE COURT:  DO WE LOOK AT THE BURDENSOMENESS?  IS THAT A WORD?  HOW BURDENSOME THE DEFAULTS ARE?  IS THAT AN ANALYSIS THAT WE SHOULD ENGAGE?

IS IT JUST THEY CAN TURN THE DEFAULT OFF I SUPPOSE.  BUT IS THAT SOMETHING THAT WE NEED TO LOOK AT?

MR. LEHOTSKY:  WELL, I THINK THERE ARE MAYBE TWO TYPES OF BURDENSOMENESS.  ONE IS, YOU KNOW, FINANCIAL

ENGINEERING AND HOW DIFFICULT IS IT TO SORT OF RESTRUCTURE? AND AGAIN, LIKE, IT'S KIND OF HARD TO RESTRUCTURE A WEBSITE FOR SOME AND NOT OTHERS, BUT THAT IS A COMPLEXITY IN ITS OWN.  SO THERE'S THAT.

BUT THEN THERE IS ALSO, IS THIS A BURDEN ON SPEECH?  AND AS I SAID, YOU KNOW, EVEN IF IT IS EASY, EVEN IF IT'S FLIPPING A SWITCH, IT STILL VIOLATES OUR FIRST AMENDMENT RIGHTS, EVEN IF IT'S REALLY EASY TO DO SO.

UNLESS YOUR HONOR HAS ANY FURTHER QUESTIONS?

THE COURT:  NO.  THANK YOU.

OKAY.  MR. KISSEL.

MR. KISSEL:  THANK YOU, YOUR HONOR.

SO WE'VE DISCUSSED BROWN A LOT IN THE COURSE OF THE MORNING.  I WOULD JUST REEMPHASIZE WITH REGARD TO PLAINTIFF'S USE OF THAT CASE TO SAY THAT THERE REALLY CAN NEVER BE ANY PARENTAL VERIFICATION WALL OR REQUIREMENT BETWEEN A PERSON AND EVEN ASSUMING THAT THERE'S SPEECH ON THE OTHER SIDE OF THAT WALL.

BROWN DIDN'T, AS FAR AS I KNOW, DIDN'T PURPORT TO CREATE THAT RULE.  IT WAS A DISCUSSION THAT MADE SENSE VERY MUCH IN THE CONTEXT OF THAT CASE, WHICH WAS, AGAIN, LARGELY ABOUT THE QUESTION OF IF A PARENT HAS A VETO OVER ACCESS TO PARTICULAR CONTENT, THEN DOES THAT MEAN THAT THERE REALLY WAS SORT OF A COMPELLING INTEREST OR EVEN A LEGITIMATE INTEREST BEHIND THIS LAW THAT WASN'T JUST SORT OF OUTRAGE AT SPECIFIC CONTENT?

I DON'T -- IT VERY MUCH -- THE QUESTION OF PARENTAL VERIFICATION AND THE REQUIREMENT OF IT IN THE STATUTE VERY MUCH SPEAKS TO THE QUESTION OF TAILORING BECAUSE ANY LAW THAT HAS TO DO WITH MINORS, THAT RESTRICTS MINOR'S ACTIVITY OR ANYTHING, TO THE EXTENT THAT IT'S EFFECTIVE, THERE HAVE TO BE SOME MEANS OF VERIFYING, YOU KNOW, ON THE ONE HAND THE MINOR'S AGE.  AND THEN TO THE EXTENT THAT THE LAW ALLOWS FOR EXCEPTIONS TO THE RESTRICTIONS THAT A MINOR IS SUBJECT TO, THERE HAS TO BE SOME KIND OF PARENTAL VERIFICATION REQUIREMENT.

SO I DON'T KNOW THAT THERE'S ANOTHER WAY TO DRAW THE LINES AS NARROWLY AS THIS LAW DOES BY CREATING AS MANY ALTERNATIVE AVENUES FOR SPEECH AS POSSIBLE WITHOUT PROVIDING SOME WAY FOR PARENTS WHO ARE ENGAGED AND INVOLVED, AND GUARDIANS, WHICH IS INCLUDED IN THE DEFINITION, WHO ARE INVOLVED AND CAN CONSENT ON BEHALF OF THEIR CHILDREN AS A MATTER OF BASICALLY CONTRACT LAW, TO GO AND GET AROUND THOSE RESTRICTIONS.

SO IN TERMS OF THE QUESTION OF TAILORING, IT ONLY SHOWS THAT THE LAW IS NARROWLY TAILORED, THAT IT ALLOWS AND CONTINUES TO ALLOW ACCESS IF A PERSON WHO IS CAPABLE OF PROVIDING CONSENT IN THAT CONTRACTUAL RELATIONSHIP PROVIDES THAT CONSENT.

AT WORST, IF A CHILD DOESN'T HAVE SOMEBODY IN THEIR LIFE WHO FITS THAT DESCRIPTION, THEN THE CHILD, AGAIN, THEY STILL HAVE ACCESS TO ALL OF THE CONTENT ON THE SITE, THEY STILL HAVE THE POWER OVER THE CONTENT THAT THEY SEE.  AND THAT'S IMPORTANT JUST IN TERMS OF, AGAIN, ACCESSING THE SCOPE OF THE

RESTRICTION.

AND TO YOUR HONOR'S POINT, IT'S VERY RELEVANT TO THE QUESTION OF TAILORING, BECAUSE TAILORING INVOLVES, ESPECIALLY ON THE INTERMEDIATE SCRUTINY, HOW HIGH IS THE BURDEN?  YOU KNOW, HOW HIGH IS THAT WALL?

AND SO IF THE WALL IS BASICALLY NO HIGHER THAN IT NEEDS TO BE TO ENSURE THAT THE PURPOSE OF THE STATUTE, WHICH HERE IS TO PROTECT MINORS, IS ACCOMPLISHED, THEN THERE HAS TO BE SOME KIND OF PARENTAL VERIFICATION.

BUT THE FACT THAT THERE IS A CONSENT REQUIREMENT THAT GOES AROUND IT SHOWS THAT IT'S AS RESTRAINED AS IT COULD BE AND STILL ACCOMPLISH THAT PURPOSE.

THE COURT:  WELL, LET ME ASK YOU, WHY IS THERE A NEED FOR DEFAULTS AT ALL?  CAN'T WE RELY ON THE COMPANIES TO CREATE TOOLS, CREATE THOSE DEFAULT, I'LL CALL IT THAT, AND THEN ALLOW THE PARENTS PRIVATELY, INDIVIDUALLY TO MAKE THAT DECISION AS TO THEIR CHILD, CHILDREN, AS TO WHEN THEY EXERCISE IT?

MR. KISSEL:  WELL, YOUR HONOR, THIS IS ONE PART OF THE INQUIRY WHERE I DO THINK BROWN IS RELEVANT BECAUSE BROWN IS SAYING THAT IF YOU THOUGHT THIS CONTENT WAS SUCH A BIG DEAL, THEN YOU WOULD HAVE RESTRICTED ACCESS TO IT IN SOME OTHER WAYS, IN SOME MORE RESTRICTIVE WAYS.

IF THE HARMS THAT ARE CAUSED BY THESE DESIGN FEATURES ARE AS SERIOUS AS THEY CLEARLY ARE, THEN CREATING ALL OF THESE REQUIREMENTS BUT NOT HAVING THEM TURNED ON WOULD UNDERMINE THE,

I THINK IT WOULD UNDERMINE THE LEGITIMACY OF THE POINT OF THE LAW BECAUSE IT WOULD SAY WE THINK THAT IT'S VERY IMPORTANT THAT WE PROTECT CHILDREN AND TEENS FROM THE HARMS CREATED BY THESE MECHANISMS, BUT WE'LL LET THEM HAVE ACCESS.  AND IF THEY CAN FIND THE TOGGLE OR THE PARENTS CAN FIND THE TOGGLE AND PRESUMABLY YOU KNOW ARE ENGAGED OR INVOLVED ENOUGH TO MAKE THAT HAPPEN, THEN WE'LL PROTECT THEM FROM THE HARMS.  TO ME, THEN YOU MAY HAVE AN UNDERINCLUSIVE PROBLEM OF THE KIND THAT BROWN IS TALKING ABOUT BECAUSE YOU WOULD BE SAYING DO WE REALLY ACTUALLY CARE ABOUT THIS HARM?

I MEAN, TO ME, IT SHOWS THE TAILORING IS ADEQUATE BECAUSE IF WE ALLOWED ACCESS TO THOSE DESIGN FEATURES, THEN THAT WOULD MAKE IT A LOT MORE DIFFICULT FOR THE STATUTE TO ACCOMPLISH THE GOALS.

THE COURT:  I'M JUST CURIOUS YOUR THOUGHTS, IF AFTER THIS HEARING WE READ ON NEXT MONDAY THAT ALL OF THESE MEMBERS HAVE INSTITUTED A DEFAULT THAT PARENTS CAN ACT ON ON BEHALF OF THEIR CHILDREN, DOES THAT CHANGE THINGS?  OR WHAT WOULD THAT CHANGE, IF ANYTHING?

MR. KISSEL:  IF THE COMPANIES IMPLEMENTED FEATURES LIKE THIS?

THE COURT:  ON THEIR OWN, A DEFAULT.  IF THEY SAID, YOU KNOW, LET'S DO A DEFAULT.  WE UNDERSTAND THAT THERE IS AN INHERENT GOVERNMENTAL INTEREST IN PROTECTING CHILDREN, AT LEAST AS TO STRANGERS.  WE KNOW THAT'S DANGEROUS, THAT CHILDREN

SHOULD BE PROTECTED FROM STRANGERS AND UNINVITED CONTENT, THOSE TYPES OF THINGS, LET'S PUT A DEFAULT ON IT.

DOES THAT CHANGE THINGS?

MR. KISSEL:  TWO POINTS, YOUR HONOR.

FIRST, I WOULD HESITATE TO DESCRIBE ANY OF THE PURPOSES BEHIND ANYTHING IN THE STATUTE TO LIMIT ANY USER'S ABILITY TO ENGAGE WITH OTHER PEOPLE OR TO ACCESS CERTAIN KINDS OF CONTENT, EVEN WHEN WE ARE TALKING ABOUT PRIVACY MODE, EVEN WHEN WE ARE TALKING ABOUT NOT BEING ABLE TO MONITOR THE LIKES ON A POST. THOSE RESTRICTIONS ARE OF A PIECE WITH THE OTHER RESTRICTIONS BECAUSE LIKE THOSE OTHER DESIGN FEATURES, THEY'RE AMONG THE CAUSES OF THE SORT OF COMPULSIVE EXCESSIVE USE.  SO THAT'S ONE BASIS FOR DISTINGUISHING THEM.

AND THEN I WAS TALKING ABOUT THAT AND I SORT OF FORGOT WHAT THE QUESTION WAS.

THE COURT:  WELL, I WAS CURIOUS IF NEXT WEEK THE PLAINTIFFS DECIDE TO IMPLEMENT ON THEIR OWN A DEFAULT WITH INSTRUCTIONS TO PARENTS, YOU KNOW, GOOD IDEA HERE, YOU CAN PROTECT YOUR CHILDREN WITH THIS, WE HAVE PUT THIS IN PLACE.

MR. KISSEL:  I MEAN, IF COMPANIES IMPLEMENTED WHAT IS REQUIRED BY THE STATUTE, THEN THAT WOULD BE AMAZING AND THEY WOULD BE IN COMPLIANCE WITH THE STATUTE.  I THINK WE WOULD BE VERY HAPPY.

I MEAN, I THINK ANYTHING THAT APPROACHES THE REQUIREMENT OF THE STATUTE IS AT LEAST OF MARGINAL BENEFIT, BUT I THINK

WHEN WE'RE TALKING ABOUT WHAT IS CONSTITUTIONALLY REQUIRED OF THE STATUTE, IT'S IMPORTANT TO LOOK AT -- TO THE EXTENT THAT PLAINTIFF HAS GOTTEN PAST THAT THRESHOLD BURDEN ON THE FACIAL CHALLENGE AND THERE IS A SPEECH INTEREST THAT IS INVOLVED, THIS LAW HAS TO BE TAILORED TO RESPECT THE FIRST AMENDMENT INTEREST, AND THAT'S WHY THIS LAW IS THE WAY IT IS.  THAT'S WHY IT'S SO PRECISELY TARGETED.  IT'S BECAUSE OF SENSITIVITY TO THOSE, TO THE NEED NOT TO INTERFERE WITH FIRST AMENDMENT INTERESTS.

THE COURT:  OKAY.  THANK YOU.

MR. KISSEL:  OKAY.  THANK YOU.

THE COURT:  MR. LEHOTSKY, RESPOND IN TWO MINUTES.

I THINK I MISSPOKE THOUGH.  IN OUR LAST COLLOQUY, I BELIEVE I INDICATED THAT THE CASE WAS FILED IN NOVEMBER.  I BELIEVE YOU FILED IN JULY.  I THINK I'M RIGHT ON THAT.  BUT THIS PI, I THINK, WAS FILED IN NOVEMBER.  THE REQUEST FOR PI WAS IN NOVEMBER.  I MAY HAVE THOSE DATES IN NOVEMBER.

MR. LEHOTSKY:  I DON'T THINK WE FILED THE COMPLAINT THAT LONG AGO.

THE COURT:  MY POINT WAS TO SUGGEST THAT THERE'S A COMPRESSED TIME.  YOUR PARTICULAR REQUEST IS THAT THIS COURT ISSUE AN ORDER BEFORE THE STATUTE GOES INTO PLACE.

MR. LEHOTSKY:  WELL, YES.  THE LAW WAS JUST ENACTED.

THE COURT:  YES.

MR. LEHOTSKY:  IT WAS JUST ENACTED.

THE COURT:  YES, IN SEPTEMBER.

MR. LEHOTSKY:  SIGNED INTO LAW BY THE GOVERNOR, AND WE FILED SHORTLY THEREAFTER, AS QUICKLY AS WE COULD.

THE COURT:  I'M NOT MEANING TO SUGGEST THAT YOU WERE DILATORY OR ANYTHING.

MR. LEHOTSKY:  THANK YOU, YOUR HONOR.  I TAKE THE POINT THAT THERE IS NOT A LOT OF TIME BEFORE JANUARY 1ST, YOU KNOW, ROLLS AROUND.

BUT IF THE QUESTION IS SHOULD THE ATTORNEY GENERAL OF CALIFORNIA BE ABLE TO ENFORCE THIS LAW AGAINST OUR MEMBERS ON JANUARY 1ST SO THAT, YOU KNOW, WE HAVE TO IMPLEMENT PARENTAL CONSENT, YOU KNOW, WE HAVE TO HAVE THESE DEFAULTS, WE HAVE TO START WORKING ON THE PROBLEM OF AGE ASSURANCE WITHOUT ANY GUIDANCE, BUT, YOU KNOW, AN OBLIGATION IS OUT THERE THAT WE WILL HAVE TO COMPLY WITH, AND IF WE MESS UP, IT'S $2500 PER VIOLATION, AND THE ATTORNEY GENERAL OF CALIFORNIA COMING AFTER OUR MEMBERS.  I THINK, YOU KNOW, THE ANSWER IS CLEARLY, NO, THIS LAW SHOULD BE ENJOINED.  WE FACE IRREPARABLE HARM.  OUR FIRST AMENDMENT FREEDOMS ARE LOST BY THIS CONTENT AND SPEAKER BASED STATUTE, IT CLEARLY CAUSES IRREPARABLE HARM TO THE FIRST AMENDMENT RIGHTS OF MINORS AS I'VE DISCUSSED MULTIPLE TIMES, AND THEN OUR FIRST AMENDMENT RIGHTS IN BEING ABLE TO PROVIDE A PERSONALIZED FEED.

MR. KISSEL SAYS THAT THE STATE OF CALIFORNIA ISN'T BANNING EVERYTHING, AND I GUESS THAT'S A GOOD START, BUT IT'S NOT MUCH COMFORT WHEN THEY ARE, YOU KNOW, PROHIBITING THE PERSONALIZED

FEED, THE THINGS THAT MAKE THESE WEBSITES, OUR MEMBER'S WEBSITES DESIRABLE.  THAT MAKES PEOPLE THINK I GET THE KIND OF CONTENT AND INFORMATION THAT I'M LOOKING FOR.  YOU KNOW, IT DELIVERS ME VIDEOS THAT I LIKE TO WATCH, INFORMATION ABOUT MY FRIENDS, NEWS ABOUT THE WORLD.

IF INSTEAD WHAT MINORS AND ADULTS IN CALIFORNIA GET IS SORT OF AN UNDIFFERENTIATED, YOU KNOW, MASS OF INFORMATION SORT OF NOT PERSONALIZED, NOT TAILORED, UNLESS THERE'S PARENTAL CONSENT OR EVENTUALLY AGE ASSURANCE, YOU KNOW, THAT'S A SIGNIFICANT BURDEN ON FIRST AMENDMENT FREEDOMS.

THE COURT:  DO YOU FEEL THAT THERE'S NO SUBSTANTIAL GOVERNMENT INTEREST IN HAVING THE COVERED ENTITIES CREATE THESE PRIVACY MODE FOR MINORS?

MR. LEHOTSKY:  WELL, SO LET ME ACTUALLY ADDRESS THAT BECAUSE WE HAVE EVIDENCE IN THE RECORD THAT THE CLELAND DECLARATION IN PARTICULAR, BUT THESE TOOLS, THESE SETTINGS, THEY'RE THERE.  THEY ARE ALREADY IN THESE DIFFERENT WEBSITES AND APPS.  PARENTS CAN GO IN AND USE THEM.  I USE THEM FOR MY KIDS.  I SET TIME LIMITS ON HOW MUCH MY KIDS CAN BE ON THESE CERTAIN SITES, WHETHER THEY GET NOTIFICATIONS, WHETHER THEY CAN INTERACT WITH STRANGERS.

THE COURT:  SO ARE YOU IN COMPLIANCE WITH THIS LEGISLATION?  HE SAID THAT WOULD MAKE HIM VERY HAPPY.

MR. LEHOTSKY:  WELL, NO, NO.  IT'S A SETTING THAT YOU CAN GO IN AND YOU CAN ADJUST AS A PARENT OR I CAN GO AND DO

IT FOR MY OWN FACEBOOK ACCOUNT AND SAY I DON'T WANT NOTIFICATIONS, I DON'T WANT TO SEE THIS.  I CAN CONTROL THE SETTINGS FOR MYSELF.  I CAN ALSO CONTROL THEM FOR THE KIDS.

WHAT IS DIFFERENT HERE, AND, AGAIN, THIS IS PRECISELY WHAT BROWN SAYS, IS THAT THE STATE CAN'T MANDATE THAT.  THE STATE CAN'T SAY THERE IS A GOVERNMENT REQUIRED PARENTAL VETO BEFORE MINORS CAN GET ACCESS TO PROTECTED SPEECH.  AND AGAIN, WE'RE TALKING ABOUT 100 PERCENT PROTECTED SPEECH HERE.

SO IT IS PERFECTLY FINE FOR PARENTS TO BE ABLE TO DO THIS, AND OUR MEMBERS INVEST A LOT OF RESOURCES IN TRYING TO PROVIDE THESE OPTIONS FOR THEIR USERS.  THEY INVEST A LOT OF RESOURCES IN CONTENT MODERATION, AS WAS DISCUSSED IN THE MOODY OPINION, IN TRYING TO MAKE THESE WEBSITES SAFE AND TRUSTWORTHY FOR ALL USERS INCLUDING AND ESPECIALLY MINOR USERS THAT ARE OUT ON THE PLATFORM.

SO THERE IS ALREADY A LOT THAT IS HAPPENING THERE, BUT THE DIFFERENCE IS THE FIRST AMENDMENT.

THE COURT:  IT SOUNDS LIKE YOU AGREE THAT THERE IS A SUBSTANTIAL GOVERNMENTAL INTEREST IN PROTECTING MINORS ON THESE PRIVACY SETTINGS?

MR. LEHOTSKY:  SO, YES, AS WE SAID IN OUR BRIEFING, WE AGREE THAT THERE IS A GOVERNMENTAL INTEREST IN THE HEALTH AND SAFETY OF MINORS.  THEIR MENTAL HEALTH, THEIR PHYSICAL HEALTH, ABSOLUTELY.  AND WE'RE NOT CONTESTING THAT THIS IS A LEGITIMATE GOVERNMENTAL INTEREST.

WHAT WE DO CONTEST IS WHETHER BANNING SPEECH, EVEN IF IT IS ONLY NOT BANNING THE ENTIRE FACEBOOK ACCOUNT BUT INSTEAD BANNING THE PERSONALIZED FEED ASPECT OF IT.  WE DO SAY THAT THAT IS NOT A CONSTITUTIONAL AND LEGITIMATE WAY FOR THE GOVERNMENT TO ADDRESS THAT INTEREST, AND THAT I THINK ALSO FOLLOWS FROM BROWN.  SO THAT'S KIND OF THE CLARIFICATION THAT I WOULD HAVE ON THAT POINT ABOUT GOVERNMENTAL INTEREST.

THE COURT:  SURE.  AND YOUR POINT AGAIN IS THAT THIS LEGISLATION INFRINGES THAT SPEECH AND IMPACTS IT NEGATIVELY.

OKAY.  LET'S SEE.  WE ARE ON COMPEL DISCLOSURES.  I DON'T KNOW HOW MUCH WE NEED TO DISCUSS ON THAT.

MR. LEHOTSKY:  I DON'T HAVE VERY MANY POINTS TO MAKE OTHER THAN WHAT'S IN OUR BRIEF, AND I THINK IT'S VERY STRAIGHTFORWARD.

THE COURT:  I THINK SO, TOO.  I DON'T NEED A LOT OF HELP.

ANYTHING, MR. KISSEL?

MR. KISSEL:  WE WOULD SUBMIT ON THE BRIEFS IF THAT'S WHAT THEY WOULD LIKE TO DO.

THE COURT:  OKAY.  THANK YOU.

LET'S TALK ABOUT VOIDNESS FOR A MOMENT.  I'LL GIVE YOU AN OPPORTUNITY TO SPEAK ABOUT THAT IF YOU WOULD LIKE.

MR. LEHOTSKY:  I'M SORRY?

THE COURT:  THE VOID FOR VAGUENESS.  I'M SORRY.  I BEG YOUR PARDON.

MR. LEHOTSKY:  I'M SORRY.  I THOUGHT MR. KISSEL WAS SAYING THAT WE WOULD SUBMIT BOTH OF THESE ISSUES ON THE BRIEFS.

THE COURT:  OH, DID YOU SAY BOTH?  I AM SORRY.

MR. KISSEL:  IS THAT WHAT EVERYONE WOULD LIKE TO DO?

MR. LEHOTSKY:  I'M HAPPY TO ADDRESS THE VAGUENESS ARGUMENT BRIEFLY.

SO IN OUR BRIEFING WE IDENTIFY TWO VAGUENESS ISSUES, ONE AS SORT OF THE POTENTIALLY CONFLICTING TESTS IN 27000.5(A)(4), WHICH OUR DECLARATION FROM DREAMWIDTH ESTABLISHES, IT'S SORT OF UNCLEAR HOW AND WHETHER THEY WOULD BE ABLE TO COMPLY AND WHETHER THEY WOULD BE COVERED DEPENDING ON WHETHER THEY COULD OFFER A REVERSE CHRONOLOGICAL FEED OR WHETHER THAT WOULD BE BASED ON INFORMATION ASSOCIATED WITH THE USER DEVICE.  SO THERE'S AN UNCERTAINTY THERE.

AND THEN SECOND, AND I THINK THIS IS AN ARGUMENT THAT OTHER DISTRICT COURTS IN THE GRIFFIN CASE AND IN FITCH HAVE IDENTIFIED VAGUENESS PROBLEMS WITH, YOU KNOW, USE OF SIGNIFICANT PART, PRIMARY PURPOSE, PRIMARY FUNCTION ASPECTS OF THE DEFINITION OF WHAT COUNTS AS A REGULATED SOCIAL MEDIA PLATFORM.

AND AGAIN, BECAUSE THERE ARE SIGNIFICANT PENALTIES, SIGNIFICANT ENFORCEMENT RISKS, THE ATTORNEY GENERAL HAS BROUGHT ENFORCEMENT ACTIONS AGAINST A VARIETY OF OUR COVERED MEMBERS, AND SO THIS IS NOT A HYPOTHETICAL CONCERN THAT, YOU KNOW, THERE'S UNCERTAINTY ABOUT PRECISELY WHO WITH THE EDGES OF THIS

LAW MIGHT BE COVERED, AND FOR THAT REASON WE THINK THE ACT HAS SIGNIFICANT VAGUENESS PROBLEMS.

THE COURT:  OKAY.  THANK YOU.

MR. LEHOTSKY.

MR. KISSEL:  I WOULD ACTUALLY LIKE TO START, IF I MAY, YOUR HONOR, WITH A COUPLE OF CLARIFYING POINTS ON THE LAST TOPIC OF DISCUSSION, AND THEN I'LL MAKE A COUPLE OF BRIEF POINTS ON THE VAGUENESS ISSUE.

SO THE COMPLAINT AND THE PRELIMINARY INJUNCTION MOTION IN THIS CASE WERE BOTH FILED IN NOVEMBER, I BELIEVE NOVEMBER 12TH. SO THAT IS A BIT OF A TRUNCATED TIMELINE.

I MAY HAVE BEEN MISHEARING OR MISUNDERSTANDING THE POINT THAT PLAINTIFF WAS MAKING ABOUT THE $2500 FINE PER VIOLATION, AND MAYBE IT WOULD BE HELPFUL JUST TO CLARIFY WITH THE COURT THIS POINT IN TERMS OF HOW THIS STATUTE WORKS.

THERE ISN'T A PENALTY INCLUDED IN THE STATUTE ITSELF. THERE'S A LAW IN CALIFORNIA, AN UNFAIR COMPETITION LAW WHICH CREATES BASICALLY A CAUSE OF ACTION BASED ON ANY VIOLATION OF LAW AND ALLOWS THE PLAINTIFFS IN THOSE CASES TO SEEK EQUITABLE REMEDIES WHICH INCLUDE KIND OF THE FULL PANOPLY OF EQUITABLE REMEDIES.  IT WOULD BE WHATEVER WOULD BE APPROPRIATE IN A CERTAIN CASE, I'M SURE.  SO I JUST WANTED TO MAKE THAT POINT, TOO, ABOUT THE POTENTIAL LIABILITY IMPLICATIONS.

AND THEN I'LL JUST MOVE ON TO A COUPLE OF THE VAGUENESS POINTS.  ONE IS MY UNDERSTANDING OF THE CHALLENGE -- OF THE

SPECIFIC CHALLENGE RELATING TO THE TWO REQUIREMENTS IN I THINK IT MIGHT BE THE 27002(A)(4) AND (A)(1), ONE OF WHICH SAYS THAT AN ADDICTIVE FEED, IT TALKS ABOUT ADDICTIVE FEEDS THAT ARE CONSTRUCTED ON BASICALLY HELD USER INFORMATION, ANOTHER ONE TALKS ABOUT WHEN A FEED IS CONSTRUCTED BASED ON I THINK AUTHORS OR POSTERS THAT A USER HAS SPECIFICALLY SAID THAT THEY WANT TO SEE.

I THINK TO THE EXTENT THERE IS ANY CONFUSION THERE, IT'S RESOLVED BY THE FACT THAT THOSE REQUIREMENTS ARE DISJUNCTIVE. THE STATUTE SAYS, YOU KNOW, ONE OF THEM MAY EXEMPT THE FEED FROM THE REQUIREMENT WITHOUT HAVING TO WORRY ABOUT THE OPERATION OF ANOTHER ONE OF THOSE REQUIREMENTS.

I THINK IT'S JUST A MATTER OF READING THE STATUTE.  THERE IS A LOT GOING ON IN THE STATUTE.  I THINK THAT SPEAKS TO THE VERY PRECISE TAILORING OF THE STATUTE, BUT I THINK THAT THAT PARTICULAR ISSUE, AS I UNDERSTAND IT, IS RESOLVED BY JUST UNDERSTANDING THAT THOSE FIVE SUBSECTIONS ARE CREATED SPECIFICALLY TO BE EITHER EXCLUSIVE OF EACH OTHER OR THEY CAN OPERATE TOGETHER, BUT IF ANY ONE OF THEM APPLIES, THEN YOU FIND YOURSELF IN THAT LAND.

AND THEN IN TERMS OF THE QUESTION ABOUT THE PRIMARY PURPOSE OR THE SIGNIFICANT PART OF THE WEBSITE, I THINK IT'S PLAINTIFF'S BURDEN THERE TO DEMONSTRATE WHAT EXACTLY IS VAGUE ABOUT THOSE TERMS AND WHAT WOULD PRECLUDE A REGULATED PARTY FROM UNDERSTANDING WHAT THEY ARE AND THE STANDARD BEING A

REASONABLE PERSON FROM KNOWING WHETHER THEY'RE SUBJECT TO THE STATUTE OR NOT.

I JUST DON'T THINK THERE'S BEEN A SHOWING THERE THAT THOSE PARTICULAR TERMS WOULD PREVENT A REASONABLE PERSON FROM KNOWING THAT THEY WERE SUBJECT TO THE STATUTE, AND I -- THERE ISN'T CASE LAW ON THOSE PARTICULAR TERMS SAYING THAT THEY ARE PARTICULARLY CONFUSING TO A REASONABLE PERSON.  SO I WOULD JUST SUBMIT ON THOSE TWO POINTS.

THE COURT:  ALL RIGHT.  THANK YOU.

MR. KISSEL:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

MR. LEHOTSKY, IF YOU WANT TO RESPOND TO THE VAGUENESS QUESTION AND THEN I'LL GIVE YOU AN OPPORTUNITY TO WRAP UP IF YOU WISH.

MR. LEHOTSKY:  NOTHING ON THE VAGUENESS.

THE COURT:  OKAY.  SURE.

MR. LEHOTSKY:  IF YOU HAVE ANY FURTHER QUESTIONS?

THE COURT:  NO, NO, I DON'T.

SO DEEP BREATH, AND I'M HAPPY TO HEAR YOUR CLOSING SUMMATIONS, REMARKS IF YOU HAVE ANY.

MR. LEHOTSKY:  WELL, I'LL BE BRIEF.

SO AGAIN, I THINK I STARTED OUT BY SAYING THAT THERE ARE SORT OF THREE KEY ISSUES THAT I THINK WE HAVE TOUCHED ON ALL THREE SEVERAL TIMES THROUGHOUT THE COURSE OF THE MORNING.

THE FIRST BEING THAT THIS IS CLEARLY A CONTENT BASED AND

SPEAKER BASED RESTRICTION AND IT VIOLATES THE FIRST AMENDMENT, AND FOR THAT REASON ALONE IF YOU WOULD AGREE WITH US WITH RESPECT TO THAT, I DON'T REALLY EVEN THINK THAT YOU NEED TO GET INTO A LOT OF THE SPECIFIC QUESTIONS ABOUT THE PARTICULAR OPERATIVE PROVISIONS BECAUSE THAT, YOU KNOW, CONTENT BASED REGULATION OF SPEECH, YOU KNOW, CLEARLY WE ARE TALKING ABOUT SPEECH HERE, WE'RE NOT TALKING ABOUT CONDUCT, FIRST AMENDMENT PROTECTED ACTIVITY FOR BOTH MINORS AND FOR OUR WEBSITES, AND SO THAT IS I THINK THE EASIEST AND MOST STRAIGHTFORWARD WAY TO RESOLVE THE PRELIMINARY INJUNCTION AND SAY, YOU KNOW, THIS IS CONTENT BASED LAW, AND IT SHOULD BE ENJOINED FOR THAT REASON ALONE.

SECOND, THOUGH, IS OUR POINT ABOUT THE RIGHTS OF MINORS, YOU KNOW, OUR USERS.  OUR USERS, AS BROWN SAYS, ARE CLEARLY ENTITLED TO A SIGNIFICANT AMOUNT OF CONSTITUTIONAL PROTECTION, OF FIRST AMENDMENT FREEDOM.  THIS LAW IS DIRECTLY AIMED, ALL OF THE OPERATIVE PROVISIONS ARE AIMED AT REDUCING THE AMOUNT OF SPEECH THAT THEY RECEIVE AND THE AMOUNT OF SPEECH THAT THEY ENGAGE WITH ONLINE.  THAT IS THE STATED PURPOSE OF CALIFORNIA.

SO, AGAIN, A MOODY QUESTION LIKE THIS IS NOT HARD.  THAT IS EXACTLY WHAT THEY ARE TRYING TO DO WITH THIS LAW.  AND SO THAT'S ALSO A SECOND, I THINK, VERY STRAIGHTFORWARD WAY TO RESOLVE THIS CASE.

AND THEN THE THIRD WAY IS OUR OWN FIRST AMENDMENT RIGHTS, THAT BY PROHIBITING US FROM ENGAGING IN THOSE, YOU KNOW, TWO

ASPECTS OF SPEECH.  YOU KNOW, FIRST, THE CREATION OF PERSONALIZED FEEDS, THAT'S AN EDITORIAL DISCRETION, FIRST AMENDMENT, YOU KNOW, PROTECTED ACTIVITY UNDER MOODY, BUT THEN SECOND WITH RESPECT TO NOTIFICATIONS.  AGAIN, THAT IS JUST SPEAKING.  THAT'S JUST SENDING OUT EMAILS OR OTHER NOTIFICATIONS THAT GO THROUGH AN APP TO OUR USERS.  SO, AGAIN, IT IS SUBJECTING THAT SPEECH THAT WE ENGAGE IN TO A STATE MANDATED PARENTAL, VETO PARENTAL REQUIREMENT.

AND SO I THINK THAT'S SORT OF THE THIRD WAY TO RESOLVE THIS.

WE DIDN'T REALLY TALK ABOUT MANDATED DISCLOSURES, BUT I DO THINK THAT THE MANDATED DISCLOSURES OF REQUIRING US TO SAY THAT WE HAVE ADDICTIVE FEEDS AND HERE'S HOW MANY USERS ARE ENGAGED IN THESE ADDICTIVE FEEDS IS EXACTLY THE KIND OF COMPELLED SPEECH THAT THE SUPREME COURT, THE D.C. CIRCUIT, AND THE NINTH CIRCUIT MOST RECENTLY IN THE X CASE HAVE SAID IS INCONSISTENT WITH THE FIRST AMENDMENT.

THE COURT:  THANK YOU.  COULD YOU JUST REMIND ME AGAIN OR JUST GIVE ME YOUR PRIMER AGAIN OR WRAP-UP AGAIN ON EXPRESSIVE.  I KNOW I'VE ASKED SOME QUESTIONS AND WE'VE TALKED ABOUT THAT, BUT IT SOUNDS LIKE EVERYTHING THAT YOUR CLIENTS DO, ALL OF THIS THAT THEY DO YOU FIND TO BE EXPRESSIVE.

IS THAT FAIR?

MR. LEHOTSKY:  WELL, I GUESS I'LL RESIST THE EVERYTHING.  BUT CERTAINLY WHEN WE ARE TALKING ABOUT THE

CREATION OF THE INDIVIDUALIZED FEED, YOU KNOW, IF YOU HAVE A USER WHO SIGNS UP AND SAYS HERE ARE THE THINGS I'M INTERESTED IN AND THE PEOPLE I KNOW, AND THEY START TO CREATE THAT FEED, AND THEN THEY GET SOME INITIAL CONTENT, YOU MIGHT BE INTERESTED IN THIS POST, YOU KNOW, HERE'S THIS VIDEO FOR YOU, ALL OF THAT.

THE COURT:  AND IT SHOWS UP.  IT JUST SHOWS UP, AND THAT'S EXPRESSIVE?

MR. LEHOTSKY:  YES, IT IS.

THE COURT:  OKAY.

MR. LEHOTSKY:  AND IN THE SAME WAY THAT THE "NEW YORK TIMES" COMING UP WITH ITS NEWSPAPER, ALL OF THE NEWS THAT IS FIT TO PRINT.  HERE'S WHAT WE'RE GOING TO PUT ON PAGE 1, HERE'S WHAT YOU'RE GOING TO SEE FIRST, AND THEN AS YOU OPEN THE NEWSPAPERS, HERE'S WHAT YOU SEE SECOND.  IT'S THE EXACT SAME SECOND.

AND THE SAME FOR ANY OTHER WEBSITE, YOU KNOW, AGAIN, WE'VE TALKED ABOUT A LOT OF THE WEBSITES THAT DO SIMILAR THINGS. THEY AUTO PLAY VIDEOS.  THEY -- YOU KNOW, THEY HAVE CONTENT NOTIFICATIONS.  THEY DO ALL OF THESE THINGS THAT, YOU KNOW, THE STATE OF CALIFORNIA SAYS CREATES PROBLEMS FOR KIDS WHO, YOU KNOW, OVERCONSUME ONLINE, SPEND TOO MUCH TIME ONLINE.

THE SAME WEBSITES, THEY ALSO HAVE THE SAME THING.  THEY HAVE WHAT ARE WE GOING TO PUT FIRST WHEN SOMEONE GOES TO THE PAGE AND THEY'RE IN BOSTON, MASSACHUSETTS?  ARE THEY GOING TO GET A BOSTON CELTICS, YOU KNOW, SORT OF FRONT PAGE AND EMPHASIS

THERE?  ARE THEY GOING TO GET THE GOLDEN STATE WARRIORS?

SO EVERY WEBSITE, EVERY DISSEMINATOR OF SPEECH ENGAGES IN THAT EXPRESSIVE CURATION DEVELOPMENT OF THE INFORMATION THAT THEY'RE GOING TO PROVIDE TO THE USER IN THE CONTEXT OF THE INTERNET, YOU KNOW, WITH THE MIRACLES OF INTERNET TECHNOLOGY, THAT COULD BE CUSTOMIZED AND PERSONALIZED, AND THAT'S THE EXACT THING THAT MOODY SAID IS EXPRESSIVE AND IS PROTECTED BY THE FIRST AMENDMENT.

THE COURT:  AND OUR CONVERSATIONS, PIECEMEAL AS THEY WERE, ABOUT THE GENESIS OF THAT, A HUMAN CREATES THE ALGORITHM, THE ALGORITHM CREATES OTHER ALGORITHMS, AND GOES ON AND ON AND ON, THERE'S NO DILUTION OF THE CONTENT, THERE'S NO DILUTION OF THE FEED, IT'S A HUMAN DID IT, AND, THEREFORE, IT'S PROTECTED SPEECH.

MR. LEHOTSKY:  AGAIN, I THINK THIS IS NOT DISSIMILAR FROM ANY OTHER WEBSITE.  THERE ARE ALGORITHMS IN ALL WEBSITES IN ALL MANNERS OF MOVIES, VIDEO GAMES, IN ALL SORTS OF OTHER SPEECH.  I MEAN, EVEN IN THE ANALOG SETTING, AN ALGORITHM IS KIND OF A RULE, A RULE OF DECISION, DO THIS, DO THIS, DO THIS, AND THEN THIS.

SO I DON'T THINK THERE'S ANYTHING MAGICAL ABOUT AN ALGORITHM.  I DON'T THINK THERE'S ANYTHING MAGICAL ABOUT A COMPUTER BEING INVOLVED.  THERE'S A COMPUTER INVOLVED IN CREATING A WEBSITE.  THERE'S A PRINTING PRESS INVOLVED IN CREATING THE "NEW YORK TIMES."

THE COURT:  SURE.

MR. LEHOTSKY:  THERE'S A TELEVISION CAMERA.  THERE ARE ALWAYS NON-HUMAN ELEMENTS THAT ARE PART OF THE CREATION.

THE COURT:  I GUESS WHAT I'M GETTING BACK TO IS WHAT SHOULD WE DIVINE FROM FOOTNOTE 5 AND JUSTICE KAGAN'S COMMENTS ABOUT THAT AND THEIR CONCURRENCES?

MR. LEHOTSKY:  YEAH.  AND AGAIN, YOU KNOW, MY VIEW IS THE CONCURRENCES ARE NOT BINDING ON THE COURT.

MOODY, IN THE MAJORITY OPINION, CLEARLY SAYS THAT THE FACEBOOK FEED, YOU KNOW, THE YOUTUBE MAIN PAGE, LIKE THESE ARE FIRST AMENDMENT PROTECTED, EXACTLY WHAT THEY DO IS FIRST AMENDMENT PROTECTED ACTIVITY.

AND AS WE SAY IN OUR DECLARATIONS, LIKE THAT IS THE SAME THING THAT OUR OTHER COVERED MEMBERS SUCH AS X, SUCH AS PINTEREST, SUCH AS NEXTDOOR, THEY ALL ENGAGE IN THAT EXACT SAME THING OF CREATING A PROCESS OF CREATING A PERSONALIZED FEED AND PROVIDING NOTIFICATIONS.

AS I'VE SAID, I THINK FOOTNOTE 5 CARVES OUT SOMETHING THAT IS NOT AT ISSUE HERE.  IT'S NOT TALKING ABOUT OUR MEMBERS.  OUR MEMBERS DON'T HAVE ALGORITHMS THAT ARE BASED SOLELY ON THE USER.

AS I SAID AND AS MOODY RECOGNIZES, OUR MEMBERS HAVE ALL MANNER OF TRUST AND SAFETY CONTENT, MODERATION POLICIES, OTHER POLICIES THAT ARE FROM OUR MEMBERS ABOUT WHAT TYPE OF CONTENT THEY WANT TO DELIVER TO THEIR USERS, WHAT TYPE OF COMMUNITY

THEY WANT TO CREATE.

SO IT'S ALL SORT OF OUTSIDE OF THE SCOPE OF THAT FOOTNOTE. THAT FOOTNOTE IS NOT TALKING ABOUT US, IT'S NOT TALKING ABOUT OUR MEMBERS.  IT'S TALKING ABOUT A HYPOTHETICAL THAT DOESN'T APPLY HERE AS WELL BECAUSE THIS IS NOT A LAW THAT REGULATES THAT TYPE OF ACTIVITY.

SO I DON'T THINK FOOTNOTE 5 HAS ANY REAL APPLICATION HERE.

I THINK MOODY HAS APPLICATION ON OUR FIRST AMENDMENT RIGHTS.

BUT I DON'T THINK FOOTNOTE 5 IS A REASON WHY THERE'S ANY REASON TO THINK THAT MOODY DIDN'T SETTLE THINGS FOR US.

THE COURT:  OKAY.  THANK YOU.

MR. LEHOTSKY:  THANK YOU, YOUR HONOR.

THE COURT:  I APPRECIATE IT.

MR. LEHOTSKY.

MR. KISSEL:  IF YOU DON'T MIND, YOUR HONOR, MAYBE I'LL START BY RESPONDING TO SOME OF THE SPECIFIC POINTS THAT WERE JUST MADE, AND THEN I'LL WRAP UP WITH A LITTLE BIT OF A SUMMATION.

THE COURT:  SURE.

MR. KISSEL:  THE DISCUSSION THAT THE COURT WAS JUST HAVING ABOUT THE NATURE OF ADDICTIVE FEEDS OR CONTENT FEEDS IN GENERAL OR ALGORITHMIC FEEDS, WHEN PLAINTIFF SAYS OUR ALGORITHMS ARE NOT LIKE THE ONES THAT JUSTICE KAGAN IS DISCUSSING IN FOOTNOTE 5.

WELL, THE COURT JUST HAS NO BASIS ON WHICH TO AGREE WITH THAT STATEMENT.  I MEAN, THERE MAY BE A BASIS, THERE MAY BE A BASIS, WITHOUT CONCEDING, TO AGREE WITH THAT FOR MAYBE ONE OR TWO PLATFORMS.  I DON'T THINK SO BECAUSE I DON'T THINK THAT INFORMATION IS IN THE DECLARATIONS, EITHER.  BUT AT LEAST THERE IS SOME INFORMATION BEFORE THE COURT ABOUT A COUPLE OF PLATFORMS, BUT I JUST DON'T THINK THE COURT CAN TAKE ON FAITH THAT THE MAJORITY OF FEEDS DON'T OPERATE THE WAY THAT FOOTNOTE 5 DESCRIBES.

I THINK FOOTNOTE 5 IS VERY RELEVANT TO THIS CASE BECAUSE I THINK -- FOR ESSENTIALLY THE REASON THAT I JUST SAID, IT SORT OF WALLS THIS CASE OFF FROM THE CONTENT MODERATION DISCUSSION THAT WAS HAPPENING IN THE MAJORITY OPINION IN MOODY BECAUSE THAT DISCUSSION ANALOGIZING CONTENT MODERATION POLICIES TO NEWSPAPER EDITORIAL PAGES TO THE COMPOSITION OF A PARADE, YOU KNOW, TO THE MAILERS THAT ARE SENT OUT OR THE NEWSLETTERS THAT ARE SENT OUT BY A PRIVATE COMPANY.

THOSE ANALOGS ARE RELEVANT WHEN YOU'RE TALKING ABOUT A POLICY THAT EXPLAINS WHAT KIND OF SPEECH A COMPANY IS GOING TO ALLOW ON ITS PLATFORM BECAUSE IT'S VERY MUCH OF A PIECE WITH THOSE KINDS OF SITUATIONS.  IT WAS THE SAME PHRASE THAT I SAID THE LAST TIME THAT WAS CONFUSING, I GUESS.  I'LL TRY TO SPEAK MORE SLOWLY.

THE DIFFERENCE HERE IS -- I MEAN, I THINK THE COURT ONLY NEEDS TO THINK ABOUT THAT PARTICULAR ANALYSIS IN MOODY, THE

COMPARISON TO THOSE CASES ABOUT THE EDITORIAL DISCRETION TO SEE HOW DIFFERENT A CASE WHERE WE'RE JUST TALKING ABOUT SORT OF OPAQUELY OPERATED CONTENT FEED OVERLAPS WITH THE KIND OF EXPRESSIVE ACTIVITY THAT WAS AT ISSUE IN THOSE CASES.

YOU KNOW, FOR EXAMPLE, IF WE'RE TALKING ABOUT THE FRONT PAGE OF THE "NEW YORK TIMES," WITH THE FRONT PAGE OF THE "NEW YORK TIMES," YOU KNOW WHO IS EXERCISING EDITORIAL DISCRETION.  YOU KNOW THEY'RE EDITORS.  YOU KNOW THAT THE PUBLICATION IS EXERCISING DISCRETION OVER WHAT APPEARS ON THE FRONT PAGE.  YOU KNOW THAT THAT CONTENT MIX IS THE PRODUCT OF HUMAN EDITORIAL DISCRETION.

WHEN YOU'RE LOOKING AT A CONTENT FEED, THERE'S NO WAY OF KNOWING AND IT MAY NOT HAVE ANY NEXUS WITH ANY KIND OF EDITORIAL DISCRETION.

IT'S ALSO LIKE SAYING, YOU KNOW, IF FACEBOOK HAS 1 BILLION USERS AND THERE ARE 1 BILLION CONTENT FEEDS OUT THERE, THEN THE COURT WOULD FIND ITSELF MAKING AN ANALOGY BETWEEN ONE "NEW YORK TIMES" PAGE AND ONE BILLION DIFFERENT CONTENT FEEDS.

IF YOU'RE TALKING ABOUT A "NEW YORK TIMES" FRONT PAGE, YOU'RE TALKING ABOUT, WELL, THERE ARE ONLY SO MANY ARTICLES THAT CAN FIT ON THE "NEW YORK TIMES" FRONT PAGE.  IT HAS A TOP AND A BOTTOM.  IT'S LIMITED.

THESE CONTENT FEEDS, YOU KNOW, MAY BE INFINITE.  THEY JUST MAY BE CONSTANTLY CONTINUALLY ABLE TO RESPOND TO WHAT A USER DOES FOREVER.

FOR THOSE REASONS, A FEED LIKE THIS -- THE FEEDS LIKE THIS THAT WE'RE DISCUSSING, I DON'T THINK THEY FIT INTO THE SAME ANALYSIS THAT THE CONTENT MODERATION POLICIES DID IN MOODY, AND THAT IS WHY FOOTNOTE 5 WAS SO IMPORTANT FOR THE COURT TO PUT IN THERE WAS SO THAT IT COULD DIFFERENTIATE THOSE TWO PROCESSES.

OF COURSE THE CONCURRENCES ARE NOT THE MAJORITY OPINION, BUT THERE ARE FIVE CONCURRENCES, AND WHAT THEY INDICATE IS THAT THERE ARE AT LEAST FIVE JUSTICES WHO WOULD GREET THAT KIND OF ANALYSIS WITH SKEPTICISM IF IT WERE APPLIED TO A FEED THAT WAS OPERATED BY AN ALGORITHM BECAUSE, FOR EXAMPLE, AS JUSTICE BARRETT SAYS, WHO KNOWS WHAT THE HUMAN INVOLVEMENT IN THAT ACTIVITY IS.  AND AS JUSTICE JACKSON SAYS, WHEN YOU START MAKING COMPARISONS TO OTHER KINDS OF MEDIA IN OTHER CONTEXTS, YOU JUST HAVE TO BE CAREFUL BECAUSE IN SOME WAYS THEY CAN BE SIMILAR AND IN SOME WAYS THEY CAN BE VERY DIFFERENT, AND IT'S NOT ENOUGH JUST TO SAY THAT A PARTICULAR COMPONENT OF A WEBSITE REMINDS US OF SOMETHING FROM A DIFFERENT CASE, FOR EXAMPLE.

SO ALL OF THOSE THINGS TOGETHER I THINK REALLY DEMONSTRATE WHY MOODY'S ANALYSIS OF CONTENT MODERATION DOES NOT CONTROL IN THIS CASE AND WHY, IF ANYTHING, MOODY STANDS FOR THE IDEA THAT ON A FACIAL CHALLENGE, A PLAINTIFF HAS TO COME INTO COURT EXPLAINING IN DETAIL HOW THESE, FOR EXAMPLE, FEEDS WORK, WHAT THE HUMAN INVOLVEMENT IS IN EACH, SO THE COURT COULD MAKE THE KIND OF DETERMINATION THAT IT WOULD NEED TO MAKE IN A CASE LIKE THAT.

I'LL JUST MAKE A COUPLE OF OTHER POINTS TO SUMMARIZE.

IN ADDITION TO THE FACIAL CHALLENGE, AND AS I SAID AT THE TOP, I THINK THE UNRESOLVED OR THE EXISTENCE EVEN OF FACTUAL QUESTIONS RELATING TO SPECIFIC PLATFORMS UNDERMINES THE IDEA THAT THERE COULD BE A FACIAL OR AS-APPLIED CHALLENGE THAT COULD SUCCEED HERE.

THE ACT IS NOT CONTENT BASED BECAUSE THE DISTINCTIONS THAT IT MAKES ARE CONTENT NEUTRAL, THEY'RE NOT BASED ON EXPRESSIVE ACTIVITY OR SPEECH, THEY'RE BASED ON A NON-CONTENT RELATED HARM THAT IS CREATED BY SPECIFIC FEATURES OF ANY WEBSITE, NOT OF SPECIFIC SITES.

I WOULD UNDERSCORE AGAIN, YOU KNOW, WHETHER WE'RE TALKING ABOUT THE RIGHTS OF LISTENERS/USERS OR WE'RE TALKING ABOUT THE RIGHTS OF OPERATORS/SPEAKERS, TO THE EXTENT THAT THE COURT GETS PAST THE SORT OF FACIAL THRESHOLD ISSUE, THIS LAW AT MOST REGULATES THE TIME OR MANNER THAT MATERIAL IS DELIVERED BECAUSE IT'S CONTENT NEUTRAL, THAT WOULD AT MOST SUBJECT THE LAW TO INTERMEDIATE SCRUTINY AND BECAUSE THE LAW LEAVES OPEN LOTS OF AVENUES FOR ALL USERS TO ACCESS CONTENT ON ANY WEBSITE, IT WOULD -- THIS LAW WOULD SATISFY INTERMEDIATE SCRUTINY.

THE COURT:  OKAY.  THANK YOU VERY MUCH.

MR. KISSEL:  THANK YOU.

THE COURT:  WELL, THANK YOU, COUNSEL.  THANK YOU.

MR. LEHOTSKY, ANYTHING YOU WOULD LIKE TO ADD, SIR?

MR. LEHOTSKY:  NO, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.  WELL, THANK YOU.  THE MATTER IS UNDER SUBMISSION.  THANK YOU FOR THE CONVERSATION THIS MORNING.

WE'VE SPENT -- WE'RE INTO THE NOON HOUR NOW, BUT IT WAS VERY FULSOME AND ROBUST, AND I APPRECIATE YOUR ATTENTION TO MY QUESTIONS AND TO YOUR PRESENTATION.  IT WAS VERY HELPFUL.

SO THE MATTER IS UNDER SUBMISSION.

AND SAFE TRAVELS.  AND THE BEST OF THE HOLIDAYS TO EVERYONE.  THANK YOU.

MR. LEHOTSKY:  THANK YOU, YOUR HONOR.

MR. KISSEL:  THANK YOU, YOUR HONOR.

(COURT CONCLUDED AT 12:32 P.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED:  JANUARY 12, 2025