Steven P. Lehotsky*
Jeremy Evan Maltz*
Serena M. Orloff (SBN 260888)
**LEHOTSKY COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com
jeremy@lehotskycohn.com
serena@lehotskycohn.com

Joshua P. Morrow*
**LEHOTSKY COHN LLP**
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735 (512) 693-8350
josh@lehotskycohn.com

Jared B. Magnuson*
**LEHOTSKY COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lehotskycohn.com

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Attorneys for Plaintiff NetChoice*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

NETCHOICE,

Plaintiff,

v.

ROB BONTA, in his official capacity as Attorney General of California,

Defendant.

Case No. 5:24-cv-07885-EJD

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. California is again attempting to unconstitutionally regulate minors' access to protected online speech—impairing adults' access along the way. The restrictions imposed by California Senate Bill 976 ("Act" or "SB976") violate bedrock principles of constitutional law and established precedent under 47 U.S.C. § 230 ("Section 230").

2. As the United States Supreme Court has repeatedly held, "minors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). The Court has likewise recognized that "submitting to age verification" to access speech is a burden on First Amendment rights, even for speech that is *unprotected* as to minors, such as obscenity. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 483 (2025). These principles apply with even more force when fully protected online speech is at issue, as it is here: Governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Moody v. NetChoice, LLC*, 603 U.S. 707, 726-27 (2024).

3. Federal statute further protects online speech. In Section 230, Congress made it "the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet[,] . . . *unfettered* by Federal or State regulation." 47 U.S.C. § 230(b)(2) (emphasis added). Congress enacted this provision in recognition of the "staggering" amount of information communicated by online services, the "obvious chilling effect" of even the "specter of tort liability in an area of such prolific speech," and the infeasibility of screening "millions of postings for possible problems." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

4. "For statutory claims, the test [for Section 230 preemption] is simple. Statutes treat defendants as publishers whenever they prohibit . . . [or] 'touch[]' on quintessential publishing conduct." *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 806 F. Supp. 3d 1015, 1030 (N.D. Cal. 2025) (quoting *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024)), *appeal docketed*, No. 25-7917 (9th Cir. Dec. 17, 2025). Section 230 "bar[s] claims that 'attack the manner in which [a social media company's] algorithm sorts, arranges, and distributes third-party content.'" *Doe 1 v. Twitter*, 148 F.4th 635, 646 (9th Cir. 2025) (quoting *M.P. ex rel. Pinckney v.*

*Meta Platforms Inc.*, 127 F.4th 516, 521, 523-27 (4th Cir. 2025), *cert. denied sub nom. M. P. By & Through Pin v. Meta Platforms Inc.*, 146 S. Ct. 287 (2025)).

5. These robust legal protections under both the First Amendment and Section 230 are why courts across the country have enjoined or held invalid state laws that restrict access to online speech.

6. Courts have done so under the First Amendment. *E.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017); *NetChoice, LLC v. Bonta,* 113 F.4th 1101, 1122 (9th Cir. 2024) (*Bonta-AADC*); *NetChoice v. Hilgers*, 2026 WL 1850018, at *1 (D. Neb. June 27, 2026); *NetChoice v. Griffin*, 831 F. Supp. 3d 816, 831 (W.D. Ark. 2026); *NetChoice v. Jones*, 822 F. Supp. 3d 656, 664 (E.D. Va. 2026); *NetChoice v. Murrill*, 812 F. Supp. 3d 594, 608-09 (M.D. La. 2025); *NetChoice v. Griffin*, 812 F. Supp. 3d 905, 913, 926-27 (W.D. Ark. 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1223-24 (N.D. Ga. 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *9-11 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1131 (D. Utah 2024).

7. Courts have also enjoined or rejected similar attempts to hold services liable based on their publishing activity, including use of personalized algorithms, under Section 230. *See CCIA and NetChoice v. Paxton*, 184 F.4th 420, 442 (5th Cir. 2026) (Section 230 preempted State law that held websites "liable for their failure to adhere to state-set publication standards"); *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1167-70 (9th Cir. 2026) (the "promotion of engagement-driven content through" a "personalized algorithm" is "publishing conduct" protected by Section 230); *Pinckney*, 127 F.4th at 526 ("acts of arranging and sorting content are integral to the function of publishing" and "the fact that Facebook uses an algorithm to achieve the same result . . . does not change the underlying nature of the act that it is performing"); *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) ("[A]rranging and distributing third-party information . . . is an essential result of publishing" that Section 230 protects); *NetChoice v. Bonta*, 790 F. Supp. 3d 798, 809-10 (N.D. Cal. 2025) (finding that Section 230 likely preempted California statutory requirements, rendering them "invalid in all their applications"); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 831 (N.D. Cal. 2023).

8. This Court should similarly enjoin Defendant's enforcement of SB976 against NetChoice members.

9. The websites regulated by the Act allow both minors and adults to "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (citation omitted).[2] The "key" to making this speech meaningful to users "is prioritization of content, achieved through the use of algorithms" that "select[]" and "rank[]" content "based on a user's expressed interests and past activities," *Moody*, 603 U.S. at 734–35, and publish that content in the form of "feeds" that are "personalized" to each user. *Id.* at 718, 734. "Like . . . editors, cable operators, and parade organizers[,] . . . social-media platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." *Id.* at 738 (citation omitted). The use of algorithms to select, rank, and personalize feeds of user-generated content is publishing conduct that is fully protected by Section 230.

10. The Act violates Section 230 by fundamentally limiting and forcing changes to the publishing activity of NetChoice members and other covered services. Section 230 preempts state laws that "attack the manner in which [platforms]' algorithm[s] sort[], arrange[], and distribute[] third-party content." *Doe 1 v. Twitter, Inc.*, 148 F.4th at 646. The Act here does just that by restricting how and when covered services can disseminate personalized compilations of speech and requiring them to create, implement, and display an alternative "default feed" for minors "in which pieces of media are not recommended, selected, or prioritized for display based on" user information. §§ 27001(a), 27002(b)(4). The Act also requires covered websites to restrict publication of certain notifications about speech and access to third-party content in the form of "likes" and feedback. § 27002(a), (b)(1), (3). All of this is publishing activity that Section 230 protects. *See Doe 1 v. Meta Platforms, Inc.*, 174 F.4th at 1167 ("Under [Ninth Circuit] case law, matching users

---

[2] This Complaint refers to "internet website[s], online service[s], online application[s], [and] mobile application[s]," § 27000.5(b)(1), as "websites" or online "services." It refers to websites or services regulated by challenged provisions of the Act as "covered" websites or services. Unless otherwise noted, statutory citations in this Complaint refer to the California Health & Safety Code. When discussing the Act's requirements, this Complaint uses "minor," "adult," and "user" to refer only to California minors, adults, account holders, and users covered by the Act.

with content is publishing conduct" that Section 230 protects "even when the user has not requested the content.").

11. The Act also violates the First Amendment. It requires covered websites to determine whether users are minors and secure parental consent for access to protected speech. *See* §§ 27001(a)(1)(B), 27002(a), (b)(1), (3). The Supreme Court has held that governments may not require minors to secure parental consent before accessing or engaging in protected speech. *Brown*, 564 U.S. at 803. The Act also compels speech. § 27005. As this Court and the Ninth Circuit have already recognized in part, these provisions restrict speech and do not satisfy the applicable level of scrutiny. *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1016-17 (9th Cir. 2025) (*Bonta II*) ("like-count" restrictions); *NetChoice v. Bonta,* 761 F. Supp. 3d 1202, 1227, 1230 (N.D. Cal. 2024) (*Bonta I*) (notifications and compelled disclosures).

12. Moreover, the Act's coverage definition imposes unconstitutional content-based and speaker-based regulations of speech. *See* § 27000.5(b). Websites that display self-generated content or "consumer reviews" are excluded, while websites that foster social interaction and publish user-generated content are included. § 27000.5(b)(2)(A). Supreme Court precedent is "deeply skeptical" of laws "that distinguish among different speakers." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) ("*NIFLA*") (cleaned up).

13. For these reasons and more, this Court should enjoin Defendant from enforcing the Act against Plaintiff's members and declare the Act unlawful.

**PARTIES & STANDING**

14. Plaintiff NetChoice is a District of Columbia nonprofit trade association for Internet companies. NetChoice members are listed at NetChoice, About Us, https://perma.cc/9LBX-W9AN. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while minimizing burdens that could prevent businesses from making the Internet more accessible and useful.

15. NetChoice has standing to bring its challenges on at least two grounds.[3]

[3] This Court and the Ninth Circuit previously addressed certain standing issues in their decisions addressing NetChoice's motion for a preliminary injunction, but "a preliminary injunction decision is just that: preliminary" and does "not constitute law of the case." *Ctr. for Biological Diversity v.*

16. *First*, NetChoice has associational standing to challenge the Act, because: (1) some NetChoice members would have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

17. Based on the Act's definitions, § 27000.5(b), the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Meta, which owns and operates Facebook and Instagram; (2) Nextdoor; (3) Pinterest; (4) TikTok Inc. and TikTok USDS Joint Venture LLC; (5) X; and (6) Google, which owns and operates YouTube. Although the Act does not regulate all of Plaintiff's members, this Complaint refers to members with services that the Act regulates as "members." And although each member exercises unique judgments about how to organize and present third-party content (and, in some cases, to execute those judgments through algorithms), these judgments all incorporate "independent content standards" that "show up" through their feeds. *Moody*, 603 U.S. at 736 n.5. Moreover, these covered members all disseminate through their personalized feeds vast amounts of protected speech to which the Act directly restricts access. Accordingly, any variation among NetChoice's covered members does not affect the legal analysis, and individual participation of each NetChoice member is not necessary to resolve the legal issues presented.

18. *Second*, NetChoice has standing to assert the First Amendment rights of members' current and prospective users. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).

19. Defendant Rob Bonta is the California Attorney General. Defendant is a California resident and is sued in his official capacity. The Act gives the California Attorney General authority to enforce it. § 27006(a).

---

*Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013) (explaining "decisions on preliminary injunctions . . . must often be made hastily and on less than a full record" (quoting *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't. of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007))). Accordingly, NetChoice retains and elaborates upon its standing allegations in this Amended Complaint. NetChoice expects record development to substantiate the fact that member-specific variations in algorithms are not constitutionally relevant and that, accordingly, individualized member participation is not needed at a level that would affect associational standing.

## JURISDICTION & VENUE

20. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) & (2) because Defendant performs his duties and thus resides in this District, and because the injuries giving rise to this action have been and will continue to be suffered by NetChoice and its members in Santa Clara County, California.

22. Assignment to the San Jose Division is proper under Local Civil Rule 3-2(c) & (e) because the injuries giving rise to this action have been and will continue to be suffered by NetChoice and its members in Santa Clara County, California.

23. Defendant has not challenged venue or personal jurisdiction.

## BACKGROUND

24. **NetChoice members' covered websites disseminate and facilitate speech protected by the First Amendment.** "Social media" websites—such as Plaintiff's members' covered services—"engage[] in expression" through their "display" and "compiling and curating" of protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 603 U.S. at 728, 731, 740. They do so by providing "feeds" that are often "personalized" to each user. *Id.* at 734. "The key to the scheme is prioritization of content, achieved through the use of algorithms." *Id.* These websites "allow[] users"—both minors and adults—"to gain access to information[,] communicate with one another," and "engage in a wide array of protected First Amendment activity." *Packingham*, 582 U.S. at 105, 107.

25. Minors and adults use NetChoice members' websites to engage in speech that is entitled to First Amendment protection from governmental interference. Such covered websites allow users to read, watch, listen, and exchange ideas on subjects "as diverse as human thought," including politics, religion, art, science, and the ordinary interactions of daily life. *Reno v. ACLU*, 521 U.S. 844, 852 (1997) (citation omitted). "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104.

Instagram allows people to establish mutual connections with family and friends, post and view photos and videos (among other types of content), comment on them, make social connections, showcase creative talents, gather information about the world around them, learn and receive education, and participate in the democratic process. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows users to explore recipes, home decor, and more. On X "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. On TikTok, people can discover things they love, build communities, and express themselves, consistent with the platform's mission to "inspire creativity and bring joy." And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

26. **Display of user-generated content on covered websites.** Although each NetChoice member is unique, they all aim to facilitate social interaction among users through the dissemination of protected speech on their services.

27. *Personalized feeds.* In general, covered websites organize combinations of both user-generated (third-party) content and speech they author. Each website makes unique decisions about how to organize, display, moderate, and disseminate user-generated content. These include "a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint." *Moody*, 603 U.S. at 738. The resulting "feeds" combine "'multifarious voices' to create a distinctive expressive offering" in which the "individual messages may originate with third parties, but the larger offering is the platform's." *Id.*

28. Many member websites "personalize" these compilations, such as through a user-tailored "feed," "for you," "following," or "landing" page. This is a central hub that is "personalized" and allows a user to see the content, activity, and other expression created and shared by family, friends, selected contributors, connections, and other third-party content creators. *Moody*, 603 U.S. at 734; *see id.* ("Facebook delivers a personalized collection of [users'] stories" and "YouTube" provides "an individualized list of video recommendations"). The "present[ation]" of these feeds constitutes "expressive activity." *Id.* at 731.

29. Because it is impossible to display every piece of content to each user, and because it is therefore impossible to foster online communities without prioritizing the people and ideas a user is interested in, covered websites display speech through "stream[s] of other users' posts." *Id.* at 734. These unique curated offerings are, to a greater or lesser extent, personalized as defined by the Act, § 27000.5(b). Moreover, personalization is how many covered websites provide minors with age-*appropriate* experiences (*e.g.*, by filtering out inappropriate or potentially harmful content).

30. Many online services, including NetChoice members, use algorithms to automate the personalized sortation and presentation of content for users. These algorithms reflect a multitude of ongoing human expressive judgments. These include judgments about what classifiers to use to increase or decrease the prominence of content; how to identify content that might not be appropriate to recommend widely; how much new versus familiar content to present; how to implement community guidelines and content policies; and how to moderate content that might be more problematic with repeated exposure. Websites also decide on what type of feedback and signals from users to integrate into their algorithms to make assessments about content quality and presentation and organization of content. These judgments are unique, dynamic, and iterative, reflecting affirmative and ongoing efforts to present a distinctive expressive offering.

31. *Notifications.* Many covered websites also provide users the option to receive notifications.

32. Notifications allow covered websites to facilitate communication and interaction among users by informing users about new messages, comments, content from connections, and recommendations, among other things. They also enable covered websites to communicate with users about other issues like problems with their accounts, fraud or spam alerts, and emergencies.

33. Apple News, Disney+, ESPN, Libby, The New York Times, and The Wall Street Journal, in addition to many other applications, send users notifications. *See* Apple, Get News Notifications and Newsletters on iPhone, Turn on Notifications, https://perma.cc/JW7X-7MWD; Disney+, Push Notifications on Disney+, https://perma.cc/CSP7-CZU8; ESPN, How Do I Sign Up for Alerts?, https://perma.cc/6A7L-2GXY; Libby Help, Managing Notifications,

https://perma.cc/TW79-3QXN; The New York Times Help Center, iOS News App, https://perma.cc/VT5B-43QM; The Wall Street Journal Help Center, Newsletters & Alerts, https://perma.cc/GKW4-LXVG. But those websites and applications are not covered by the Act.

34. Member websites that use notifications allow users to control those notifications. *See, e.g.*, Facebook, Choose What You Get Notifications for on Facebook, https://perma.cc/Z3WJ-VBQJ; Instagram, Notification Settings, https://perma.cc/A2WU-DECL; Nextdoor, How to Change Your Mobile Notifications, https://perma.cc/WN6X-S387; Pinterest, Edit Notification Settings, https://perma.cc/W2MX-PP2U; TikTok, Notification, https://perma.cc/R35U-MKWV; X, About Notifications on Mobile Devices, https://perma.cc/2PYD-W949; YouTube Help, Manage YouTube Notifications, https://perma.cc/L4C6-UVZ4.

35. In addition to customizing notifications on the websites themselves, users can adjust notification settings for each application on their devices, including permitting them only during certain times of day or turning them off entirely. *See, e.g.*, Apple, Use Notifications on Your iPhone or iPad, https://perma.cc/N5FV-MZEL; Samsung, Control App Notifications on Your Galaxy Phone or Tablet, https://perma.cc/Y3Q8-NKGK; Google, Control Notifications on Your Pixel Phone, https://perma.cc/G8TP-9YEF.

36. **Existing options for parental control and oversight.** Parents, guardians, and other caregivers (collectively, "parents") have many existing choices to control their children's online experiences. *See Bonta-AADC*, 113 F.4th at 1121.

37. Parents have many existing and diverse choices to regulate and oversee whether and how their minor children use the internet.

38. There are resources that collect all these parental tools in one place. *E.g.*, Internet Matters, Parental Control Guides, https://perma.cc/VJU3-KYHH.

39. These existing market solutions allow parents to tailor their approaches to the needs of their families.

40. Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the internet.

41. Cellular and broadband internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/Q428-F9EZ; AT&T, AT&T Secure Family, https://perma.cc/KU4X-WTR6; T-Mobile, Family Controls and Privacy, https://perma.cc/3KNQ-MT7F.

42. Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and unblock websites with parental controls on Firefox (Aug. 11, 2022), https://perma.cc/S2KE-APLX (click "view live page"). Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, Choose parental controls that are right for your family, https://perma.cc/79RQ-NJRQ. Parents can also use widely available browser extensions to reinforce these tools.

43. Wireless routers often have settings allowing parents to block particular websites, filter content, monitor internet usage, and control time spent on the internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/QB2G-A277; tp-link, How to configure Parental Controls on the TP-Link Wi-Fi Router (Oct. 21, 2025), https://perma.cc/8KLF-TWA8.

44. Devices allow parents to limit the time their children spend on the device, block specific applications, filter content, and control privacy settings. *See* Apple, Set up parental controls to manage your child's iPhone or iPad (Sept. 14, 2026), https://perma.cc/L4NC-7AG9; Google Family Link, Help keep your family safer online, https://perma.cc/UL6W-2QSG; Microsoft, Set up Microsoft Family Safety (2026), https://perma.cc/VA5D-4Z65; Samsung, Manage Family groups and parental controls with your Samsung Account, https://perma.cc/324J-SKJE; Samsung, Use Digital Wellbeing features on your Galaxy phone or tablet, https://perma.cc/M2U7-76F2; Android Help, Manage how you spend time on your Android phone with Digital Wellbeing (2026), https://perma.cc/4BUL-CRRS.

45. Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, James Capell, *Best Parental Control App of 2026: Our security experts and parents give their verdict*, TechRadar (July 7, 2026), https://www.techradar.com/best/best-parental-control-app-of-year#, archived at https://perma.cc/P42Q-S355.

46. In addition, NetChoice members provide parents with tools and options to help monitor their minor children's activities.

47. Parents and guardians can use supervision tools on Facebook, Instagram, and Threads to set daily time limits for their teens or block use during select days and hours; set reminders to close the apps; change their teen's default settings to require non-personalized feed and stop video and animation content from automatically playing without a deliberate user action; see the average amount of time their teen has spent on Facebook and Instagram over the last week (and the total time spent on Facebook and Instagram for each specific day over the last week); and more. *See, e.g.*, Meta, Support Your Teen with Supervision (2026), https://perma.cc/A7MP-EPKU.

48. Additionally, Meta places teens on Facebook, Instagram, and Threads into Teen Accounts. Teen Accounts have built-in protections that limit who can contact teens, the content they see, and the time they spend. For example, with Teen Accounts, teens are, by default, placed into: daily time limit notifications after they've spent 60 minutes on Instagram; Sleep Mode, which mutes notifications overnight and sends auto-replies if someone tries to DM them; private accounts, so people who do not follow a teen cannot see their content or tag, mention, or interact with them; blocks on search terms related to certain sensitive topics like suicide, self-harm, and eating disorders; and more. Teens under 16 cannot change any of these default settings without a parent's permission. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/JK8T-T5HC; Meta, We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger (Apr. 8, 2025), https://perma.cc/29TF-MLH6; Instagram, About Teen Accounts on Threads, https://perma.cc/UST3-JXND.

49. Pinterest allows parents to create a "parental passcode," which permits them to manage their teen's accounts and provide guidance by managing social permissions. Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/G632-3UQZ.

50. TikTok offers Family Pairing, which allows parents to set a screen time limit, schedule time away, and customize or completely turn off comments. Parents can also decide who can send messages or message requests to their teen, and view who their teen is following and who

follows them. Additionally, parents can see which accounts their teens have blocked and view all of their privacy settings, including account visibility and comment control settings. Parents can also enable Restricted Mode to limit their teens' exposure to certain content. TikTok, Youth Safety and Well-being, https://perma.cc/4QL9-3WPK. TikTok also provides safeguards for all teen accounts, including extra safeguards for younger teens. For example, all teen accounts have a default daily screen time limit of 60 minutes and cannot receive push notifications at night. Additionally, TikTok does not ever allow users under 16 to direct message others. TikTok also offers a Teen Safety Center that is accessible both through the app and via browser, which helps users with managing interactions (including setting an account to private, blocking/muting other users, and reporting accounts or content that violates TikTok's Community Guidelines), and provides support resources for suicide and self-harm, substance abuse, sexual abuse, and bullying prevention. TikTok, Teen Safety Center, https://tinyurl.com/mth2h5fd.

51. YouTube offers a "supervised experience" for teens (separate from the supervised experience for minors younger than 13), allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teens' channel activity (such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen. YouTube, Choices for Every Family, https://perma.cc/5XSA-7BWG. YouTube has also developed features and policies directed at promoting digital wellbeing among teens and children, such as turning auto-play off by default, refining its recommendation systems so teens are not repeatedly exposed to potentially harmful content, and reminding teens to take a break or go to bed. *Id.*

52. **Covered websites' dedication to positive user experiences and user security.** NetChoice's members expend vast resources to improve their services and curate the third-party speech disseminated on their websites to best ensure that it is appropriate for the community of users they seek to foster. *See* Malena Dailey, *By The Numbers: What Content Social Media Removes And Why* 13 (2021), https://perma.cc/ML9R-PUFP. Covered services like "Facebook and YouTube" "cull and organize uploaded posts" to conform with those platforms' "content-modera-

tion policies," which "lead [them] to remove, disfavor, or label various posts based on their content." *Moody*, 603 U.S. at 719-20. Other NetChoice member websites enforce similar policies. They restrict the publication of harmful speech, such as violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. *See, e.g.*, *id.* at 735 (discussing policies about "hate speech, violent or graphic content, child safety"). In addition, many covered websites promote positive and age-appropriate speech, such as content that encourages a healthy self-image.

## CALIFORNIA SENATE BILL 976

53. In 2024, the California Legislature enacted Senate Bill 976, which places multiple content-based and speaker-based speech restrictions—including parental-consent and age-assurance requirements—on certain websites and their users. The Act took effect January 1, 2025, except for its age-assurance requirements, which take effect January 1, 2027.

54. **Content-based and speaker-based central coverage definition of "[a]ddictive internet-based service or application" (§ 27000.5(b)).** The Act's speech regulations apply to only a subset of Internet websites. The Act's coverage depends on a content-based and speaker-based set of definitions and exclusions. The Act regulates only so-called "[a]ddictive internet-based service[s] or application[s]." § 27000.5(b)(1). In so doing, the Act selects websites for regulation by discriminating based on content and speaker. Specifically, it targets websites based on their constitutionally protected "feeds" that are "personalized" for each user. *Moody*, 603 U.S. at 718. These covered "actors" and "activities," *id.* at 724, include the members and services identified above in ¶ 17.

55. The Act defines an "[a]ddictive internet-based service or application" as "an internet website . . . including, but not limited to, a 'social media platform' as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website." § 27000.5(b)(1).

56. The Business and Professions Code defines "social media platform" as "a public or semipublic internet-based service or application that has users in California and that meets both of the following criteria":

> (1)(A) A substantial function of the service or application is to connect users in order to allow users to interact socially with each other within the service or application. (B) A service or application that provides email or direct messaging services shall not be considered to meet this criterion on the basis of that function alone.
>
> (2) The service or application allows users to do all of the following: (A) Construct a public or semipublic profile for purposes of signing into and using the service or application. (B) Populate a list of other users with whom an individual shares a social connection within the system. (C) Create or post content viewable by other users, including, but not limited to, on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users.

Cal. Bus. & Prof. Code § 22675(f).

57. The Act defines "[a]ddictive feed" as "an internet website . . . or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device," unless seven specific "conditions are met, alone or in combination with one another":

> (1) The information is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others.
>
> (2) The information consists of search terms that are not persistently associated with the user or user's device.
>
> (3) The information consists of user-selected privacy or accessibility settings, technical information concerning the user's device, or device communications or signals concerning whether the user is a minor.
>
> (4) The user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media, or the blocking, prioritization, or deprioritization of such media, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device, except as otherwise permitted by this chapter and, in the case of audio or video content, is not automatically played.
>
> (5) The media consists of direct, private communications between users.
>
> (6) The media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played.

> (7) The recommendation, selection, or prioritization of the media is necessary to comply with this chapter or any regulations promulgated pursuant to this chapter.

§ 27000.5(a)(1)-(7).

58. *Moody* recognized that full First Amendment protection applies to websites, including NetChoice member services, that work in exactly this way. *E.g.*, 603 U.S. at 740 ("Facebook's News Feed and YouTube's homepage"). These services provide "curated compilation[s]" of personalized feeds of user-created speech, allowing "users to upload content . . . to share with others," and allowing those "viewing the content . . . [to] react to it, comment on it, or share it themselves." *Id.* at 717, 719.

59. The Act also contains content-based and speaker-based exceptions from its coverage definition. The Act provides that "'[a]ddictive internet-based service or application' does not apply to either of the following":

> (A) An internet website . . . for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof.
>
> (B) An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.

§ 27000.5(b)(2).

60. Accordingly, the Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply when assessing the First Amendment implications of distinct laws that may also regulate non-social media services. The Act's exclusion of services where interactions between users are limited to "commercial transactions or to consumer reviews," § 27000.5(b)(2)(A), excludes "ride-sharing service[s] like Uber," "payment service[s] like Venmo," and "online marketplace[s] like Etsy," *Moody*, 603 U.S. at 725. And the Act's exclusion for "direct, private communications between users," § 27000.5(a)(5), excludes "direct messaging" and "email" services, *Moody*, 603 U.S. at 725.

61. Nothing in the Act defines key coverage terms, such as "significant part of the service," "primary purpose," "multiple pieces," "information," or "persistently associated." § 27000.5(a)(1)-(2), (b)(1)-(2).

62. **Parental consent (§§ 27001(a), 27002(a), 27002(b)(2)).** The Act contains multiple provisions requiring covered websites to restrict minor users' access to those websites—or particular functions—unless the websites obtain "verifiable parental consent" to allow such access. §§ 27001(a), 27002(a), 27002(b)(2) ("verified parent"). How covered websites determine whether a user is a minor will change before and after January 1, 2027, as explained below. § 27002(a)(2).

63. *Parental consent to view personalized feeds (§ 27001(a)).* The Act provides that "[i]t shall be unlawful for the operator of" a covered website "to provide an addictive feed"—that is, a personalized feed—to a minor "user unless . . . [t]he operator has obtained verifiable parental consent." § 27001(a)(2).[4] This provision requires covered websites to secure parental consent to provide minor users with a personalized feed.

64. *Parental consent to view personalized feeds for more than one hour per day (§ 27002(b)(2)).* The Act requires covered websites to implement a "default" setting limiting minor users' access to "one hour per day *unless modified by the verified parent*." § 27002(b)(2) (emphasis added); *id.* ("The operator of" a covered website "shall provide a mechanism through which the verified parent of a user who is a minor may . . . [l]imit their child's access to any addictive feed from the addictive internet-based service or application to a length of time per day specified by the verified parent"). Although the Act's other default requirements on minors' accounts (discussed below) may potentially be overridden by minors or their parents, this provision can only be overridden by parents. Thus, this provision requires parental consent before minor users can access personalized feeds for more than one hour per day.

65. *Parental consent to receive notifications at particular times (§ 27002(a)).* The Act makes it "unlawful for the operator of" a covered website, "between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user . . . unless the operator has obtained verifiable parental consent to send those notifications."

[4] The Act defines "Operator" as "a person who operates or provides an internet website, an online service, an online application, or a mobile application." § 27000.5(e). The Act defines "Minor" as "an individual under 18 years of age who is located in the State of California." § 27000.5(d). And the Act defines "Parent" as "a parent or guardian." § 27000.5(f).

§ 27002(a). This provision requires parental consent before minors can receive notifications at particular times of day.

66. Despite offering "verifiable parental consent" as a means of avoiding these prohibitions, the Act never defines or explains how such consent must be "verified" or "verifiable" to qualify.

67. The Act provides that "[i]nformation collected for the purpose of determining a user's age or verifying parental consent pursuant to this chapter shall not be used for any purpose other than compliance with" the Act or another law and that the "information collected shall be deleted immediately after it is used to determine a user's age or to verify parental consent, except as necessary to comply with state or federal law." § 27001(b). Although this provision contemplates that "information" is required to verify parental consent, it does not define that term nor state the extent to which a covered website may use such information to verify parental consent.

68. The Act does not account for the difficulty in verifying a parent-child relationship. These difficulties are compounded when, for example, families are nontraditional, families have differences in surname or address, parents disagree about consent, minors are unsafe at home, parents do not have or are unwilling to electronically submit documentation, or parental rights have been terminated.

69. **Age assurance (§§ 27001(a)(1)(B), 27002(a)(2), 27006).** The Act requires covered websites to perform "age assurance," beginning January 1, 2027. § 27006(b).

70. From January 1, 2025, to December 31, 2026, covered websites must secure parental consent from users that covered websites have "actual knowledge" are minors. §§ 27001(a)(1)(A), 27002(a)(1). In other words, the Act seems to allow covered websites to rely on users' self-reported ages until the end of 2026.

71. Beginning January 1, 2027, however, covered websites must affirmatively engage in age assurance to determine which users are minors—that is, they will need to treat as minors those users that their age-assurance processes "reasonably determine" are minors. §§ 27001(a)(1)(B), 27002(a)(2). Engaging in age assurance will require covered websites to evaluate the ages of *all* users—not just minors.

72. The Act requires the Attorney General to promulgate regulations regarding permissible age assurance methods by January 1, 2027. § 27006(b). As of October 13, 2026, the Attorney General has not finalized these regulations.[5]

73. Age assurance will deter people—both minors and adults—from accessing protected speech on covered websites. Such websites must place all content on personalized feeds behind an age-assurance system, § 27001(a)(1)(B), and must restrict sending notifications on any number of subjects based on the results of age assurance, § 27002(a)(2).

74. **Default limitations on minors' accounts (§ 27002(b)(1), (3)-(4)).** The Act requires covered websites to establish certain default settings for minor users' accounts and provide parents with the ability to implement or change those settings. The Act provides that "[t]he operator of an addictive internet-based service or application shall provide a mechanism through which the verified parent of a user who is a minor may do any of the following":

> (1) Prevent their child from accessing or receiving notifications from the addictive internet-based service or application between specific hours chosen by the parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited between the hours of 12 a.m. and 6 a.m., in the user's local time zone.
>
> . . .
>
> (3) Limit their child's ability to view the number of likes or other forms of feedback to pieces of media within an addictive feed. This setting shall be set by the operator as on by default.
>
> (4) Require that the default feed provided to the child when entering the internet-based service or application be one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor.

§ 27002(b)(1), (3)-(4) ("default" provisions).

---

[5] On December 31, 2024, the Court held that NetChoice's challenge to the age assurance requirements would not be prudentially fit for review "until Defendant issues regulations on age assurance." *Bonta I*, 761 F. Supp. 3d at 1216. The Ninth Circuit affirmed that decision. *Bonta II*, 152 F.4th at 1018-19 ("the state attorney general has not yet issued regulations defining what NetChoice members must do to verify users' age"). On September 29, 2026, the Court denied NetChoice's motion to extend the deadline to file an amended complaint until after the age assurance regulations are published, but held that NetChoice "is free to seek leave to file a further amended complaint after the age-assurance regulations are finalized." ECF 101 at 3. Accordingly, NetChoice has removed many of its age assurance allegations in this Amended Complaint but reserves its rights to amend those allegations after the final regulations are issued.

75. The Act's default limitations on minors' accounts burden covered websites' protected speech and minors' access to protected speech. They do so by requiring covered websites to implement specific "default[s]" on speech available to users, which are regulations of speech. *Id.* The fact that parents and users can override those defaults does not alter that the State has imposed limitations on speech.

76. **Disclosures (§ 27005).** The Act requires covered websites to "publicly disclose, on an annual basis, the number of minor users of its addictive internet-based service or application." § 27005. Covered websites must also disclose "the number [of minor users] for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the [above parental tools] are or are not enabled." *Id.* These disclosure requirements are speech regulations, compelling covered websites to speak and burdening covered websites' protected speech. Moreover, the disclosure provision requires covered websites to report statistics to the government under the rubric of a pejorative "addictive" label that they disagree with.

77. **Enforcement (§ 27006(a)).** The Act "may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General." § 27006(a).

## CLAIMS

Other than as specified below, for each challenged provision, Plaintiff raises both (1) a facial challenge; and (2) a challenge as applied to the members and services identified in ¶ 17.

78. For all First Amendment claims, the facial challenge standard asks whether "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). At a minimum, the Act is invalid to the extent it regulates "social media" websites, including as applied to Plaintiff's members' regulated services identified in ¶ 17. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

79. The First Amendment facial challenge here is straightforward "from the face of the law" because all aspects of the Act's speech-restricting provisions, "in every application to a cov-

ered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).

80. Each challenge raises the rights of both NetChoice members and those who use or could prospectively use NetChoice members' websites.

**Count I**
**42 U.S.C. § 1983; 47 U.S.C. § 230**
**Supremacy Clause of the U.S. Constitution**
**(Publishing restrictions – Cal. Health & Safety Code §§ 27001-02)**

81. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

82. Section 230 preempts the Act's restrictions on personalized feeds, notifications, like-counts, feedback, and who a covered service can permit to "view or respond" to content posted by a minor user. §§ 27001, 27002.

83. Section 230(c)(1) provides: "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." That includes penalizing actions to "(A) filter, screen, allow, or disallow . . . ; (B) pick, choose, analyze, or digest . . . ; or (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content" created by third parties. 47 U.S.C. § 230(f)(4).

84. Congress expressly preempted "inconsistent" state law, providing that no "cause of action may be brought and no liability may be imposed." *Id.* § 230(e)(3). *E.g.*, *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1435 (2025); *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019).

85. Reviewing "courts have treated § 230(c) immunity as quite robust[.]" *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). "For statutory claims, the test is simple. Statutes treat defendants as publishers whenever they prohibit . . . [or] 'touch[]' on quintessential publishing conduct." *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 806 F. Supp. 3d at 1030-31 (citation omitted). If "a claim turns on a defendant's status as a publisher or conduct of publishing—including 'reviewing, editing, and deciding whether to publish or to

withdraw from publication third-party content'—it is barred under Section 230." *Doe 1*, 174 F.4th at 1167.

86. The Act's restrictions target precisely such publishing conduct. The Act applies to interactive service providers that publish content "generated or shared *by users*," § 27000.5(a), (c) (emphasis added), that is "information provided by another information content provider," 47 U.S.C. § 230(c)(1).

87. In violation of Section 230, the Act's personalized feeds provisions threaten liability based on how covered services "recommend," "select," and "prioritize" third-party content "for display to a user." § 27000.5(a). The Act provides that covered websites generally *cannot* recommend, select, or prioritize content for publication "based, in whole or in part, on information provided by the user" unless the website has "reasonably determined" that the user is not a minor, has obtained parental consent, or the user "expressly and unambiguously requests the specific media." §§ 27000.5(a)(4), (6), 27001(a). The Act also requires covered services to publish a "feed . . . in which pieces of media are *not* recommended, selected, or prioritized for display based on information provided by the user," § 27002(b)(4), and to impose default time restrictions on personalized feeds for minors, § 27002(b)(2), again dictating how websites must organize and present third-party speech.

88. Section 230 preempts these attempts to impose liability based on how covered services "match[] users with content." *Doe 1*, 174 F.4th at 1167; *see, e.g.*, *In re Soc. Media*, 702 F. Supp. 3d at 830-34 (Section 230 preempted liability based on a website's "[f]eed" or "algorithm to connect a user with certain third-party content"); *see also Doe 1 v. Twitter*, 148 F.4th at 646 (Section 230 preempts imposition of liability based upon how a service "sorts, arranges, and distributes third-party content"); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

89. Section 230 also preempts the Act's restrictions on notifications, § 27002(a), (b)(1); on "likes or other forms of feedback" published alongside "pieces of media," § 27002(b)(3); and on who may "view or respond to content posted by" a minor, § 27002(b)(5). These regulations likewise reach "quintessential publishing conduct." *In re Apple Inc. App Store Simulated Casino-*

*Style Games Litig.*, 806 F. Supp. 3d at 1030-31; *see In re Soc. Media*, 702 F. Supp. 3d at 830-34 (Section 230 preempted claims based on "notifications of third-party content" and failure to "institute blocks to use during certain times of day"); *Dyroff*, 934 F.3d at 1098 (Section 230 protects websites' decisions to provide "tools" that "facilitate the communication and content of others," including "notifications").

90. Unless declared invalid and enjoined, Cal. Health & Safety Code §§ 27001-02 will unlawfully deprive Plaintiff's members of their rights under Section 230, impermissibly impose liability based on Plaintiff's members' publishing functions, and irreparably harm Plaintiff, its members, and Internet users.

**Count II**
**42 U.S.C. § 1983**
**First Amendment, as Incorporated by the Fourteenth Amendment**
**(Publishing restrictions and mandates - Cal. Health & Safety Code §§ 27001-02, 27005)**

91. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

92. The Act's restrictions on personalized feeds, notifications, "likes or other forms of feedback," and its compelled disclosures and mandates about the "default" method of organizing and presenting speech to minors, §§ 27001, 27002, 27005, violate the First Amendment. [6]

93. **The First Amendment applies.** The "first step of First Amendment analysis is to determine whether" the Act's restrictions "implicate[] protected expression." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017). They overwhelmingly do.

94. As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I.

---

[6] Insofar as NetChoice challenges the Act's personalized feeds provisions, §§ 27001(a), 27002(b)(2), and 27002(b)(4), under this Count for violation of the First Amendment, NetChoice does not bring that challenge or seek relief on behalf of its members Google, Meta, TikTok Inc., TikTok USDS Joint Venture LLC, or YouTube. Those members have now brought their own challenges to the personalized feeds provisions. *See Meta Platforms, Inc. v. Bonta*, No. 5:25-cv-09792-EJD (N.D. Cal. filed Nov. 13, 2025); *TikTok, Inc. v. Bonta*, No. 5:25-cv-09789-EJD (N.D. Cal. filed Nov. 13, 2025); and *Google LLC v. Bonta*, No. 5:25-cv-09795-EJD (N.D. Cal. filed Nov. 13, 2025).

95. The First Amendment protects "publish[ing]" speech, *Reno*, 521 U.S. at 852-53; "disseminat[ing]" speech, *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023); "combining 'multifarious voices' " into "distinctive compilations of expression," *Moody*, 603 U.S. at 716, 738; and "creating, distributing, [and] consuming" protected speech, *Brown*, 564 U.S. at 792 n.1. These protections extend to the "source" of the speech "and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756-57 (1976). They also extend to those who "promote protected expression" and thereby vindicate the "free access of the public to the expression." *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 568 (9th Cir. 1984) (citing *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 77 (1976) (Powell, J., concurring)).

96. The First Amendment also prohibits the government from *compelling* persons "to speak its own preferred messages." *303 Creative*, 600 U.S. at 586 (discussing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 572-73 (1995)).

97. All of these rights apply to speech disseminated and facilitated by "social-media platforms," including NetChoice member services. *Moody*, 603 U.S. at 719 (discussing NetChoice member services like "Facebook" and "YouTube"). The Supreme Court has had no difficulty concluding—even on a "preliminary record"—that such services disseminate a "staggering amount" of protected speech, across "billions" of posts. *Id.* at 716-19, 725, 737, 744. Social media services allow people to "engage in a wide array of . . . activity on topics 'as diverse as human thought' "—all "protected [by the] First Amendment." *Packingham*, 582 U.S. at 105. Indeed, the Act itself states that "[s]ocial media provides an important tool for communication and information sharing," and is used for that purpose by a vast number of minor and adult users alike. SB976 § 1(a).

98. Social media services also independently "engage[] in expression" by "curating their feeds" to provide a "distinctive expressive offering" of "third party speech," in which the "key" is "prioritization of content, achieved through the use of algorithms . . . most often based on a user's expressed interests and past activities." *Moody*, 603 U.S. at 716-17, 734-38. Social media services have a First Amendment right to publish, organize, and disseminate protected speech absent governmental restraint and compulsion. *See Moody*, 603 U.S. at 738-43; *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("The right of freedom of speech and press . . . embraces the

right to distribute" information (citation omitted)). A social media service, "like a bookseller or theater owner, is a type of 'clearinghouse' for expression." *Cinevision Corp.*, 745 F.2d at 568.

99. Minors, like other users of social media services, likewise have a First Amendment "right to speak or be spoken to" on social media services, and "the state" lacks the "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3 (emphasis omitted). Although States have power to protect minors, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794.

100. The Act triggers First Amendment scrutiny for numerous reasons. It restricts how covered social media services may organize and present fully protected speech to minors, thereby controlling "whether and how third-party posts are presented to other users." *Moody*, 603 U.S. at 717; *see* §§ 27000.5(a), 27001(a) (governing how "pieces of media" are "recommended, selected, or prioritized for display to a user"), § 27002(b)(4) (mandating how covered services "recommend[,] select[,] [and] prioritize[,]" speech in their "default feed" for minors). The Act defines what *kinds* of speech may be prioritized, for example, permitting presentation of speech that is selected based on "the user's age" but not based on other "information provided by the user." *Id.* The Act thus "alters the content" presented by covered entities. *Moody*, 603 U.S. at 732. The Act also restricts both publishing and viewing "likes or other forms of feedback to pieces of media," § 27002(b)(3), and further limits when and to whom speech can be communicated, presumptively prohibiting notifications to minors at certain times of the day. § 27002(a), (b)(1). The Act also imposes default time limits for access to, and dissemination of, protected speech within certain types of speech compilations. § 27002(b)(2). The Act thereby burdens "publish[ing]," *Reno*, 521 U.S. at 852-53; "disseminat[ing]" speech, *303 Creative*, 600 U.S. at 594; "[c]urating a feed," *Moody*, 603 U.S. at 725; "creating, distributing, [and] consuming" protected speech, *Brown*, 564 U.S. at 792 n.1; and "promoting" the speech of third parties, *Cinevision Corp.*, 745 F.2d at 568—all "a matter of first amendment concern." *Id.* at 569.

101. The Act also requires that, as a condition of allowing users to access fully protected speech within personalized feeds, covered services must perform age assurance on *all* California

users (beginning in 2027) and bar access to personalized feeds and other expressive features by any user that the service has not "reasonably determined . . . is not a minor," absent parental consent. §§ 27001(a)(1)(B), 27002(a)(2), (b). The Supreme Court has held that laws requiring parental consent for minors to access and engage in protected speech of their choosing are unconstitutional. *Brown*, 564 U.S. at 795 & n.3, 804-05. The Court has likewise recognized that "submitting to age verification" to access speech is a burden on First Amendment rights, even for speech that is *unprotected* as to minors, such as obscenity. *FSC*, 606 U.S. at 483. The Act impermissibly requires parental consent for fully protected speech, including access to "like"-counts and other forms of "feedback," § 27002(b)(3), on NetChoice's members' covered websites.

102. The Act also compels content-based speech about the composition of audiences that access covered services and how they engage with such services. *See* § 27005; *Bonta I*, 761 F. Supp. 3d at 1229-30 ("The disclosure provision is content based because it requires covered entities to speak on specific topics but not others.").

103. All of these requirements, individually and collectively, are "directed at the communicative nature" of expressive activities and directly burden those activities; accordingly, they must "be justified by the substantial showing . . . that the First Amendment requires." *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 847 (9th Cir. 2026).

104. **Strict scrutiny applies.** "Consistent with the First Amendment's jealous protections for the individual's right to think and speak freely," the Supreme Court has "long held that laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional.'" *Chiles v. Salazar*, 607 U.S. 627, 640-41 (2026) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). As a general rule, such "content-based" restrictions trigger "strict scrutiny," a demanding standard that requires the government to prove its restriction on speech is "narrowly tailored to serve compelling state interests." *Id.* Under that test, it is "rare that a regulation . . . will ever be permissible." *Brown*, 564 U.S. at 799.

105. A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). Laws are also content-based if they "cannot be justified

without reference to the content of the regulated speech." *Reed*, 576 U.S. at 163 (cleaned up). Government cannot use "subtler forms of discrimination that achieve identical results based on function or purpose." *City of Austin*, 596 U.S. at 74. Accordingly, where the "overriding justification for the regulation is concern for the effect of the subject matter on young viewers," the regulation "is not 'justified without reference to the content of the regulated speech.'" *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811-12 (2000).

106. The Act's restrictions on speech and publication trigger strict scrutiny. As a threshold matter, the State's "overriding justification for the regulation is concern for the effect of the [speech] on young viewers," and therefore the Act is not "justified without reference to the content of the regulated speech." *Id.*; *see* SB976 § 1 (Act preamble characterizing speech disseminated by social media services as "harmful").

107. The Act's central coverage definition, § 27000.5(b)—which carries through to each of the Act's substantive provisions—also is content-based in at least three ways.

108. First, the central coverage definition discriminates based on the content of the information disseminated. The Act regulates expressive activity that involves users "interact[ing] socially with each other." Cal. Bus. & Prof. Code § 22675(f)(1)(A). But the Act *excludes* from regulation expressive activity that facilitates "commercial transactions" or constitutes "consumer reviews of products, sellers, services, events, or places." § 27000.5(b)(2)(A). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny).

109. Second, the central coverage definition imposes speaker-based distinctions that turn on *who* created the content displayed on the website or feed. The Act applies to services that display feeds of "media generated or shared *by users*." § 27000.5(a) (emphasis added). But it does not burden services that display content generated *by the website*. Furthermore, the Act exempts expressive feeds that are "a preexisting sequence from the *same author, creator, poster, or source*." § 27000.5(a)(6). But it regulates expressive feeds that sequence media from *different authors, creators, posters, or sources*.

110. Third, the central coverage definition burdens websites that choose personalized methods to combine "'multifarious voices' to create a distinctive expressive offering," *Moody*, 603 U.S. at 738; § 27000.5(a), while leaving non-personalized compilations unregulated, even if those compilations are organized using algorithms. "[L]aws that single out [a subset of speakers], or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (*Turner I*) (cleaned up).

111. Finally, individual provisions of the Act are themselves content-based. For example, the Act's restrictions on displaying "likes" and "feedback" to particular pieces of media facially discriminate based on the content of speech and therefore require strict scrutiny, as the Ninth Circuit has already recognized. *Bonta II*, 152 F.4th at 1016-17. So too do the Act's compelled speech and compelled publication requirements, which require covered services "to speak [California's] preferred messages" when publishing speech and information. *303 Creative*, 600 U.S. at 586; *see Bonta I*, 761 F. Supp. 3d at 1229 (preliminarily enjoining § 27005 "because it requires covered entities to speak on specific topics but not others"); *see also* § 27002(b)(4) (requiring covered services' "default" presentation of speech to be the State's preferred presentation, which may reflect age-based methods for how "pieces of media" are selected, but not other methods "associated with the user").

112. **Defendant cannot satisfy any form of First Amendment scrutiny.** Under strict scrutiny, the State must demonstrate that the Act is "the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799. Further, Defendant must "specifically identify" how the Act addresses an "actual problem in need of solving." *Id.* (citation omitted).

113. Under intermediate scrutiny, laws that restrict speech are unconstitutional unless they advance "important governmental interests *unrelated to the suppression of free speech* and [do] not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (*Turner II*) (emphasis added).

114. For both strict and intermediate scrutiny, the State "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022). And in both scenarios, the government's "burdens" on speech "must satisfy the same rigorous scrutiny" as the government's "bans." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (citation omitted).

115. The State cannot meet any level of First Amendment scrutiny.

116. Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (cleaned up).

117. Moreover, parents have a wealth of less restrictive means to oversee their minor children online, including voluntary tools and controls through which many NetChoice members already provide parents with the ability to supervise their minors' online activity, set reminders, and impose time limits, nighttime restrictions, and content controls, among other things. Those choices provide families more flexibility than the State's one-size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls as less restrictive means over governmental interventions that would impose state-created barriers to accessing lawful speech. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Playboy Ent. Grp.*, 529 U.S. at 826.

118. The State has not "specifically identif[ied]" how the Act's scope responds to "an actual problem in need of solving" by government mandate. *Brown*, 564 U.S. at 799 (cleaned up). Nor has it demonstrated why the Legislature ignored the viable alternatives available to parents, such as "incentivizing companies to offer voluntary content filters or applications blockers" (as are already available) or "educating children and parents" on the State's views about social media usage. *Bonta-AADC*, 113 F.4th at 1121.

119. The Act is also not properly or narrowly tailored to any sufficient interest.

120. The Act is overinclusive because its regulations touch all manner of protected speech, including political and religious speech that lies at the very heart of the First Amendment and personalized compilations designed to *protect* users from content that may be harmful or inappropriate for them specifically. Nor does the Act purport to limit itself to services or content that are particularly harmful to minors or particularly likely to be accessed by minors.

121. The Act's one-size-fits-all approach of treating all minors at every developmental stage alike—from websites' youngest users to seventeen-year-olds—is also vastly overbroad. *See Reno*, 521 U.S. at 866; *Am. Booksellers Ass'n*, 484 U.S. at 396. A teenager could not get, for example: (1) personalized content that is *more* safe or appropriate for that particular minor, or even potentially content tailored to that user's country of residence; (2) a "marked safe" Facebook notification from a family member after midnight during a wildfire or earthquake; (3) a notification *from a parent* during the prohibited hours; (4) feedback that might inform the user that a piece of media was inaccurate or that expressed a different viewpoint; or (5) notifications during vacations or time-off periods for schools on different tracks or homeschooling schedules.

122. The Act's restrictions are also *under*inclusive, including because they still allow minors to be exposed to the alleged risks or harms the State claims the Act was created to address so long as they have a single parent's consent. *Brown*, 564 U.S. at 802; *see Bonta I*, 761 F. Supp. 3d at 1227 (finding the notification provisions "extremely underinclusive" and thus not "properly tailored").

123. These provisions also fail any level of First Amendment scrutiny because they are not "unrelated to the suppression of free speech." *Turner II*, 520 U.S. at 189. At core, the Act seeks to prevent minors from accessing speech the State does not like, spending too much time, or engaging with speech that the State deems "addictive" on disfavored websites.

124. Unless declared invalid and enjoined, these restrictions will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**Count III**
**Equitable Relief**

125. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

126. The entire Act, §§ 27000-07, and individually challenged provisions of the Act violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

127. This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

**Count IV**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**
**Declaratory Relief**

128. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

129. The Act violates the First Amendment, as incorporated by the Fourteenth Amendment, and thereby deprives Plaintiff, its covered members, and Internet users of enforceable rights. The Act is unlawful and unenforceable because the entire Act relies on an unconstitutional central coverage definition of "[a]ddictive internet-based service[s] or application[s]." § 27000.5(b).

130. Sections 27000.5(b), 27001, 27002, and 27005 of the Act are unlawful and unenforceable, together and separately, because Section 230 preempts them and/or they violate the First Amendment of the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

131. The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

132. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

133. This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

134. This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

Plaintiff requests an order and judgment:

a. declaring that California Senate Bill 976 is unlawful;

b. declaring that California Senate Bill 976, and the specific provisions cited above, violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment;
c. declaring that California Senate Bill 976, and the specific provisions cited above, are preempted by Section 230;
d. enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiff or its members;
e. entering judgment in favor of Plaintiff;
f. awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and
g. awarding Plaintiff all other such relief as the Court deems proper and just.

DATED: October 13, 2026


<u>*Serena M. Orloff*</u>
Serena M. Orloff
Steven P. Lehotsky*
Jeremy Evan Maltz*
**LEHOTSKY COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
serena@lehotskycohn.com
steve@lehotskycohn.com
jeremy@lehotskycohn.com

Joshua P. Morrow*
**LEHOTSKY COHN LLP**
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
(512) 693-8350
josh@lehotskycohn.com

Jared B. Magnuson*
**LEHOTSKY COHN LLP**
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lehotskycohn.com

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com


* Admitted *pro hac vice*

*Attorneys for Plaintiff NetChoice*